No. 23-5067

# United States Court of Appeals
## for the District of Columbia Circuit

---

MEDICAL IMAGING & TECHNOLOGY ALLIANCE, ET AL.,
*Plaintiffs - Appellants*,

v.

LIBRARY OF CONGRESS, ET AL.,
*Defendants - Appellees.*

---

On appeal from a final judgment of the
United States District Court for the District of Columbia
Case No. 22-cv-499 (BAH)

---

**JOINT APPENDIX**

---

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MATTHEW M. GRAVES
  *United States Attorney*

DANIEL TENNY
LAURA E. MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave. NW*
  *Washington, DC 20530*
  *laura.e.myron@usdoj.gov*
  *(202) 514-4819*

*Counsel for appellees*

MICHAEL B. KIMBERLY
ALEX C. BOOTA
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Emery LLP*
  *500 N. Capitol Street NW*
  *Washington, DC 20001*
  *mkimberly@mwe.com*
  *(202) 756-8000*

*Counsel for appellants*

# TABLE OF CONTENTS

District Court Docket ............................................................................ JA1

Complaint ............................................................................................. JA6

District Court Order (Dkt. 26) ............................................................ JA33

District Court Memorandum Opinion (Dkt. 27) ................................ JA35

Notification of Inquiry and Request for Petitions (AR 45-49) .......... JA67

Notice of Proposed Rulemaking (AR 50-67) ..................................... JA72

Notice of Public Hearings (AR 68-69) .............................................. JA90

Final Rule (AR 70-84) ........................................................................ JA92

Excerpt of Register's 2015 Recommendation (AR 1043-1062) ...... JA107

Excerpt of Register's 2018 Recommendation (AR 1431-1438) ...... JA127

Excerpt of Register's 2021 Recommendation (AR 1763-1806) ...... JA135

Summit Imaging Petition (AR 2356-2358) ...................................... JA179

Transtate Equipment Petition (AR 2362-2365) ............................... JA182

Summit Imaging Comments (AR 2909-2916) .................................. JA186

Transtate Equipment Comments (AR 2917-2937) ........................... JA194

AdvaMed Comments (AR 4010-4024) .............................................. JA215

MITA Comments (AR 4095-4130) ................................................... JA230

Philips North America Comments (AR 4131-4156) ........................ JA266

Transtate Equipment Reply Comments (AR 4507-4523) ................. JA292

Letter from Dr. Suzanne B. Schwartz, FDA, to Kevin R. Amer,
    Copyright Office (Aug. 13, 2021) (AR 6160-6163) ................... JA309

Letter from Regan A. Smith, General Counsel and Associate Register of
    Copyrights, to Mark Raza, Acting Chief Counsel, FDA (May 4,
    2021) (AR 6168-6169) ............................................................... JA313

APPEAL,CLOSED,TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00499-BAH

| | |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE et al v. LIBRARY OF CONGRESS et al<br>Assigned to: Judge Beryl A. Howell<br>Case in other court: 23-05067<br>Cause: 05:702 Administrative Procedure Act | Date Filed: 02/25/2022<br>Date Terminated: 03/08/2023<br>Jury Demand: None<br>Nature of Suit: 890 Other Statutory Actions<br>Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**MEDICAL IMAGING & TECHNOLOGY ALLIANCE**

represented by **Alex Christopher Boota**
MCDERMOTT WILL & EMERY
500 North Capitol Street NW
Washington, DC 20001
202-756-8998
Email: aboota@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Branch Kimberly**
MCDERMOTT WILL & EMERY LLP
500 N. Capital Street, NW
The McDermott Building
Washington, DC 20001
202-756-8901
Email: mkimberly@mwe.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ADVANCED MEDICAL TECHNOLOGY ASSOCIATION**

represented by **Alex Christopher Boota**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Branch Kimberly**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**LIBRARY OF CONGRESS**

represented by **Rachael Lynn Westmoreland**
U.S. DEPARTMENT OF JUSTICE
1100 L St, NW
Washington, DC 20005
(202) 514-1280

JA001

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 4 of 317

Email: rachael.westmoreland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CARLA HAYDEN**
*in her official capacity as Librarian of Congress*

represented by **Rachael Lynn Westmoreland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/25/2022 | 1 | COMPLAINT against CARLA HAYDEN, LIBRARY OF CONGRESS ( Filing fee $ 402 receipt number ADCDC-9066179) filed by MEDICAL IMAGING & TECHNOLOGY ALLIANCE, ADVANCED MEDICAL TECHNOLOGY ASSOCIATION. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Summons, # 6 Summons, # 7 Civil Cover Sheet)(Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MEDICAL IMAGING & TECHNOLOGY ALLIANCE (Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION (Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Alex C. Boota, Filing fee $ 100, receipt number ADCDC-9066585. Fee Status: Fee Paid. by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Kimberly, Michael) (Entered: 02/25/2022) |
| 03/02/2022 | | Case Assigned to Chief Judge Beryl A. Howell. (zsb) (Entered: 03/02/2022) |
| 03/02/2022 | 5 | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on March 2, 2022. (lcbah4) (Entered: 03/02/2022) |
| 03/02/2022 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 4 Motion for Admission *Pro Hac Vice* of Alex C. Boota. Mr. Boota may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. Signed by Chief Judge Beryl A. Howell on March 2, 2022. (lcbah4) (Entered: 03/02/2022) |
| 03/04/2022 | 6 | NOTICE of Appearance by Alex Christopher Boota on behalf of All Plaintiffs (Boota, Alex) (Entered: 03/04/2022) |
| 03/04/2022 | 7 | SUMMONS (2) Issued Electronically as to CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 03/04/2022) |
| 03/07/2022 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/4/2022. Answer due for ALL FEDERAL DEFENDANTS by 5/3/2022. (Kimberly, Michael) (Entered: 03/07/2022) |
| 03/11/2022 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General March 9, 2022. (Kimberly, Michael) (Entered: 03/11/2022) |

JA002

USCA Case #23-5067     Document #2001858     Filed: 06/02/2023     Page 5 of 317

| 03/29/2022 | 10 | MOTION for Summary Judgment by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Kimberly, Michael) (Entered: 03/29/2022) |
|---|---|---|
| 03/29/2022 | 11 | MOTION for Briefing Schedule by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Text of Proposed Order)(Kimberly, Michael) (Entered: 03/29/2022) |
| 03/29/2022 | | MINUTE ORDER (paperless) DIRECTING the government to provide a response, by April 5, 2022, to plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross-Motions, stating its position regarding plaintiffs' proposed briefing schedule and explaining any opposition. Signed by Chief Judge Beryl A. Howell on March 29, 2022. (lcbah4) (Entered: 03/29/2022) |
| 03/29/2022 | | Set/Reset Deadlines: Government's response to plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross-Motions due by 4/5/2022. (ztg) (Entered: 03/29/2022) |
| 04/05/2022 | 12 | NOTICE of Appearance by Rachael Lynn Westmoreland on behalf of All Defendants (Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/05/2022 | 13 | Memorandum in opposition to re 11 MOTION for Briefing Schedule filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/05/2022 | 14 | MOTION to Stay re 10 MOTION for Summary Judgment by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Text of Proposed Order)(Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/07/2022 | | MINUTE ORDER (paperless) GRANTING IN PART and DENYING IN PART plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross-Motions; GRANTING IN PART and DENYING IN PART defendants' 14 Motion to Stay Plaintiffs' Motion for Summary Judgment; and ISSUING the following SCHEDULING ORDER: (1) by May 24, 2022, defendants shall file any motion to dismiss, consolidated with any opposition to plaintiffs' 10 Motion for Summary Judgment, and any cross-motion for summary judgment; (2) by June 15, 2022, plaintiffs shall file any reply in support of their 10 Motion for Summary Judgment, and any opposition to defendants' motion to dismiss and cross-motion for summary judgment; and (3) by June 30, 2022, defendants shall file any reply in support of their motion to dismiss and cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on April 7, 2022. (lcbah4) (Entered: 04/07/2022) |
| 04/08/2022 | | Set/Reset Deadlines: Defendants' motion to dismiss consolidated with any opposition to plaintiffs' 10 Motion for Summary Judgment, and any cross-motion due by 5/24/2022; plaintiffs' reply in support of their 10 Motion for Summary Judgment, and any opposition to defendants' motion to dismiss and cross-motion due by 6/15/2022; defendants' reply in support of their motion to dismiss and cross-motion due by 6/30/2022. (ztg) (Entered: 04/08/2022) |
| 05/24/2022 | 15 | ADMINISTRATIVE RECORD *Notice of Filing Certified List of Contents* by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Exhibit A)(Westmoreland, Rachael) (Entered: 05/24/2022) |
| 05/24/2022 | 16 | MOTION to Dismiss *or in the Alternative* MOTION for Summary Judgment by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Westmoreland, Rachael). Added MOTION for Summary Judgment on 5/25/2022 (zeg). (Entered: 05/24/2022) |

JA003

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 6 of 317

| 05/24/2022 | 17 | Memorandum in opposition to re 10 MOTION for Summary Judgment filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 05/24/2022) |
| 06/15/2022 | 18 | REPLY to opposition to motion re 10 MOTION to Dismiss filed by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Kimberly, Michael) Modified docket relationship on 6/16/2022 (zeg). (Entered: 06/15/2022) |
| 06/15/2022 | | NOTICE OF ERROR re 18 Reply to opposition to Motion; emailed to mkimberly@mwe.com, cc'd 4 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Two-part document; second docket entry is required, 3. FYI: Please also file using Memorandum in opposition to event. (zeg, ) (Entered: 06/15/2022) |
| 06/15/2022 | 19 | Memorandum in opposition to re 16 MOTION to Dismiss *or in the Alternative for Summary Judgment* MOTION for Summary Judgment filed by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Kimberly, Michael) (Entered: 06/15/2022) |
| 06/30/2022 | 20 | REPLY to opposition to motion re 16 MOTION to Dismiss *or in the Alternative for Summary Judgment* MOTION for Summary Judgment filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 06/30/2022) |
| 08/03/2022 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by CARLA HAYDEN, LIBRARY OF CONGRESS (Westmoreland, Rachael) (Entered: 08/03/2022) |
| 08/23/2022 | 22 | STRICKEN PURSUANT TO MINUTE ORDER ENTERED ON 8/24/2022.....NOTICE *regarding oral argument schedule* by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE (Kimberly, Michael) Modified on 8/25/2022 (hmc). (Entered: 08/23/2022) |
| 08/24/2022 | | MINUTE ORDER (paperless) STRIKING, without prejudice, plaintiffs' 22 Notice Regarding Oral Argument Schedule for failure to comply with this Court's Local Rules, which prohibit the directing of "correspondence...to a judge," D.D.C. LCvR 5.1(a), and require requests for oral hearings to be made in motion form, D.D.C. LCvR 7(f). *See also* 5 Standing Order paras. 6.a & c. Signed by Chief Judge Beryl A. Howell on August 24, 2022. (lcbah4) (Entered: 08/24/2022) |
| 08/25/2022 | 23 | Joint MOTION for Leave to File *granting leave to file appendix out of time* by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Appendix, # 2 Appendix, # 3 Appendix, # 4 Appendix, # 5 Appendix, # 6 Appendix, # 7 Text of Proposed Order)(Kimberly, Michael) Modified event on 8/29/2022 (znmw). (Entered: 08/25/2022) |
| 08/26/2022 | | MINUTE ORDER (paperless) GRANTING the parties' 23 Joint Motion for Leave to File Joint Appendix Out of Time and DIRECTING the parties to file on the docket the joint appendix, submitted as an exhibit to their 23 Joint Motion. Signed by Chief Judge Beryl A. Howell on August 26, 2022. (lcbah4) (Entered: 08/26/2022) |
| 08/29/2022 | 24 | JOINT APPENDIX by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Appendix Volume 1, # 2 Appendix Volume 2, # 3 Appendix Volume 3, # 4 Appendix Volume 4, # 5 Appendix Volume 5, # 6 Appendix Volume 6)(Kimberly, Michael) (Entered: 08/29/2022) |
| 09/06/2022 | 25 | MOTION for Hearing by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Text of Proposed Order)(Kimberly, Michael) (Entered: 09/06/2022) |

USCA Case #23-5067        Document #2001858        Filed: 06/02/2023        Page 7 of 317

| 03/07/2023 | [26](#) | ORDER GRANTING defendants' [16](#) Cross-Motion to Dismiss and DENYING plaintiffs' [10](#) Motion for Summary Judgment. See order for further details. Signed by Chief Judge Beryl A. Howell on March 7, 2023. (lcbah4) (Entered: 03/07/2023) |
| --- | --- | --- |
| 03/07/2023 | [27](#) | MEMORANDUM OPINION regarding plaintiffs' [10](#) Motion for Summary Judgment and defendants' [16](#) Cross-Motion to Dismiss. Signed by Chief Judge Beryl A. Howell on March 7, 2023. (lcbah4) (Entered: 03/07/2023) |
| 03/24/2023 | [28](#) | NOTICE OF APPEAL TO DC CIRCUIT COURT as to [26](#) Order on Motion for Summary Judgment by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. Filing fee $ 505, receipt number ADCDC-9952570. Fee Status: Fee Paid. Parties have been notified. (Kimberly, Michael) (Entered: 03/24/2023) |
| 03/27/2023 | [29](#) | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re [28](#) Notice of Appeal to DC Circuit Court. (ztnr) (Entered: 03/27/2023) |
| 03/31/2023 | | USCA Case Number 23-5067 for [28](#) Notice of Appeal to DC Circuit Court, filed by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (zed) (Entered: 04/05/2023) |

JA005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE 1300 North 17th Street, Suite 900 Arlington, VA 22209, *and* ADVANCED MEDICAL TECHNOLOGY ASSOCIATION 701 Pennsylvania Avenue NW, Suite 800 Washington, DC 20004-2654 *Plaintiffs*, *v.* THE LIBRARY OF CONGRESS, 101 Independence Avenue SE Washington, DC 20540, *and* CARLA HAYDEN, *in her official capacity as Librarian of Congress*, 101 Independence Avenue SE Washington, DC 20540 *Defendants*. | No. 1:22-cv-499 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the Medical Imaging & Technology Alliance (MITA) and the Advanced Medical Technology Association (AdvaMed)—for their complaint against defendants the Library of Congress and Carla Hayden, in her official capacity—allege on knowledge as to the plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This is a challenge pursuant to the Administrative Procedure Act and *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682 (1949), to a final rule of the Library of Congress adopted after notice-and-comment rulemaking under the Digital Millennium Copyright Act, or DMCA. The rule is codified at 37 C.F.R. § 201.40 and grants an exemption from DMCA liability for the circumvention of technological measures that control access to

copyrighted digital content when necessary to diagnose, service, and repair medical devices, including sophisticated devices like magnetic resonance imaging (MRI) machines, computerized tomography (CT) scanners, ultrasound systems, positron emission tomography (PET) scanners, X-ray machines, defibrillators, and surgery assisting robots.

2.     Creators of digital content—and the manufacturers of the machines and devices that depend on such content for operation, maintenance, and repair—rely on federal copyright laws to protect their creative works so they can control who uses the content and predictably recover the gains of their labors. As a reliable backstop against unfair exploitation by competitors (for whom the marginal cost to make perfect digital copies of most digital content is effectively zero), copyright law is vital to the way that modern markets function. Indeed, it drives the licensing negotiations that take place between creators and users.

3.     In the mid-1990s, amidst the growing role of the internet and digital content in the American economy, Congress came to understand the importance of a creator's ability to secure copyrighted digital content from unlawful duplication and tampering. Its answer was the DMCA. Among other things, the DMCA conforms U.S. copyright law to international treaty standards that "require [the United States] to provide effective legal remedies against the circumvention of protective technological measures used by copyright owners." *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010).

4.     In simple terms, the DMCA prohibits users of a copyrighted work from circumventing a "technological measure that effectively controls access to [the] work." 17 U.S.C. § 1201(a)(1)(A). As the House Judiciary Committee explained at the time of the DMCA's enactment, circumventing a technological protective measure (a TPM) "is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." H.R. Rep. No. 105-551, pt. 1, at 17 (1998) (*House Report*).

5.     At the same time, Congress understood that, with the growing importance of digital content to expression and learning, unchecked use of TPMs might threaten "a diminution of otherwise lawful access to works and information." *House Report* 36. After all, a copyright

is not an absolute bar to the copying of a work; Congress has long permitted certain non-infringing "fair uses" of copyrighted works to protect freedom of expression and promote further creation. *See* 17 U.S.C. § 107. Fair uses are generally non-commercial uses that promote the objective of copyright law, which is to stimulate creation, expression, and learning.

6.     In the DMCA, Congress therefore directed the Register of Copyrights—the head of the Copyright Office within the Library of Congress—to "monitor developments in the marketplace for copyrighted materials" and authorized the Librarian, upon the Register's recommendation, to grant selective exemptions to the DMCA's anti-circumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials." *House Report* 36.

7.     To that end, the DMCA calls for triennial rulemakings in which "the Librarian of Congress . . . shall make the determination . . . of whether persons who are users of a copyrighted work" qualify for a three-year "exemption" from the DMCA's prohibitions. 17 U.S.C. § 1201(a)(1)(C). Such exemptions are statutorily authorized only for noninfringing "fair" uses of the copyrighted works at issue. *Id.*

8.     The process by which the Librarian undertakes its triennial exemption review has all the trappings of a traditional agency rulemaking:

(a.)   The process commences with a Notice of Inquiry (or NOI) published in the Federal Register. In response to the NOI, proponents of new or renewed exemptions must file petitions and supporting evidence on the regulatory docket. These petitions are then subject to a traditional comment process.

(b.)   At the conclusion of the NOI comment process, the Copyright Office publishes a Notice of Proposed Rulemaking (NPRM) in the Federal Register identifying the exemptions that the Office proposes to adopt. The NPRM is followed by a similar comment process, as well as by a public hearing.

(c.)   At the conclusion of the NPRM comment process, the Register of Copyrights issues a formal recommendation to the Librarian of Congress, who in turn adopts the

recommendation in a final rule published in the Federal Register. The exemptions are thereafter codified in the Code of Federal Regulations, at 37 C.F.R. § 201.40.

9.   Independent service operators, or ISOs, are companies that provide unregulated third-party maintenance and repair services for medical devices (among other machines). ISOs do not create new content or expression as part of their service.

10.   In the most recent rulemaking, two ISOs petitioned for an exemption allowing circumvention of TPMs on software-enabled medical devices for purposes of diagnosis, maintenance, and repair of those devices. The ISOs sought access to device software and data files, asserting that the materials otherwise available were sometimes inadequate for them to execute certain repairs. The ISOs did not assert that access to the protected materials was necessary to stimulate creation, expression, and learning; rather, they asserted that it was necessary to stimulate their profits.

11.   Original equipment manufacturers, or OEMs, manufacture—and hold copyrights to the software useful to diagnose, maintain, and service—medical devices. OEMs use TPMs to safeguard their machines' software and to ensure the safety and privacy of patients that use their devices. TPMs are thus vital to the safety and functionality of medical devices. Although OEMs typically make some copyrighted materials useful to service their machines available either for free or for a licensing fee, in light of the technological complexity of some devices, OEM technicians (who are subject to extensive federal regulations that ISOs are not) can more safely use OEM proprietary software.

12.   As part of the rulemaking at issue here, plaintiffs submitted comments in opposition to the proposed exemption. They showed, in particular, that the proposed uses of the copyrighted material, when used by ISOs to make repairs, are not noninfringing within the meaning of the fair use doctrine. Rather, ISOs sought to circumvent TPMs to view and use copyrighted material purely for their own commercial benefit, instead of to serve any creative or transformative purpose.

13.    Despite this well-supported opposition, the Register of Copyrights recommended granting an exemption (the "Exemption"), which expressly covers "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files," shielding from DMCA liability circumvention of TPMs when it "is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." Register of Copyrights, *Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention*, Recommendation of the Register of Copyrights, 233 (Oct. 19, 2021) (*Register's Recommendation*) (attached as Exhibit A). In making that recommendation, the Register failed to engage with numerous significant comments provided by the Exemption's opponents, including plaintiffs. For her part, the Librarian adopted the recommendation without further changes.

14.    The Exemption is manifestly unlawful. By issuing a rule that enables unregulated, for-profit service providers to piggyback off the creative efforts and intellectual property of medical device manufacturers, it not only thwarts the purpose of the Copyright Act, but also puts patient safety, device integrity, and device cybersecurity at risk. What is more, the process by which the Exemption was adopted was infected with major procedural errors, including a failure to address many of the significant legal concerns raised by plaintiffs and other opponents.

15.    In the course of the rulemaking at issue here, moreover, the Library of Congress was acting as an executive agency and is therefore subject to the strictures of, and judicial review under, the Administrative Procedure Act (APA). Because the Exemption is not in accordance with law and was adopted without observance of required procedures, it should be set aside. Alternatively, if the Library of Congress did not assume the character of an executive agency within the meaning of the APA, the Exemption violates separation-of-power principles twice over. Either way, it should be vacated.

## PARTIES

16.   Plaintiff MITA is a non-profit, membership-based trade association. It is the leading voice of medical imaging equipment manufacturers, innovators, and product developers. Its member-companies' sales comprise more than ninety percent of the global market for advanced imaging technologies. MITA's mission is to establish standards and advocate for the medical imaging industry, with the vision that medical imaging drives effective patient care. MITA is a division of the National Electrical Manufacturers Association and is headquartered in Arlington, Virginia.

17.   Plaintiff AdvaMed is a non-profit, membership-based trade association that represents the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems. It leads the effort to advance medical technology to achieve healthier lives and healthier economies around the world. It is a world leader in advocating for health care policies that support diagnostic testing through robust innovation and the rapid adoption of new, safe, and effective diagnostic tests. It advocates for regulatory and payment policies tailored to the specific issues facing the device and diagnostics industry and that support patient access to innovation. AdvaMed members manufacture much of the life-enhancing and life-saving healthcare technology purchased annually in the United States and globally.

18.   AdvaMed is headquartered in Washington, D.C. Although it anticipates moving its offices in April 2022, it will remain located within Washington, D.C.

19.   Plaintiffs' members include companies that manufacture software-enabled medical devices. A complete list of MITA's membership is available at perma.cc/XVG8-2K9Q. A complete list of AdvaMed's membership is available at perma.cc/AR6V-MBWP.

20.   Both of plaintiffs' members rely on TPMs to protect their intellectual property from unlawful infringement. Consistent with both plaintiffs' missions, each participated in the triennial exemption rulemaking to try to ensure that exemptions are appropriately limited. *See* Exhibit B (*MITA Comments*); Exhibit C (*AdvaMed Comments*).

21.   MITA's and AdvaMed's members are harmed by the Exemption. The Exemption enables entities to circumvent the protective measures that their members rely on to safeguard their intellectual property. One of their joint members provided its own comments in the rulemaking, elaborating on this harm and urging the Register to recommend denying the proposed exemption for a variety of reasons. *See* Exhibit D (*Philips Comments*).

22.   Defendant the Library of Congress is the federal agency charged with overseeing and implementing the DMCA's triennial exemption rulemaking. The Copyright Office, headed by the Register of Copyrights, is located within the Library of Congress.

23.   Defendant Carla Hayden is the Librarian of Congress. She is the official charged with promulgating exemptions through the triennial exemption rulemaking pursuant to 17 U.S.C. § 1201(a)(1). She is sued in her official capacity.

## JURISDICTION AND VENUE

24.   Plaintiffs bring this suit pursuant to the APA, the Declaratory Judgment Act, and this Court's inherent equitable powers, including as recognized in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).

25.   This case arises under the Constitution and laws of the United States. The Court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

26.   Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because at least one plaintiff and one defendant resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this district.

27.   Sovereign immunity does not bar this suit. The APA's waiver of sovereign immunity extends to the Library, which acted here as an "agency" in all relevant respects. *See* 5 U.S.C. § 701(e). Alternatively, jurisdiction is provided under *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).

## LEGAL BACKGROUND

28.   Copyrights trace to the Founding. Their purpose, the Constitution says, is to "promote the Progress of Science and useful Arts." U.S. Const. Art. I, § 8, cl. 8. Copyrights

achieve this purpose "by securing for limited Times to Authors . . . the exclusive Right to their respective Writings." *Id.* This exclusive right is not a "special reward," but rather an incentive "to encourage the production of works that others might reproduce more cheaply." *Google LLC v. Oracle America*, 141 S. Ct. 1183, 1195 (2021).

29.   Congress implemented the Copyright Clause with the Copyright Act. *See* 17 U.S.C. §§ 101, *et seq.* It provides protection to "original works of authorship fixed in any tangible medium of expression." *Id.* § 102(a). Congress amended the Act in 1980 explicitly to include computer programs within the statute's ambit. *See* Computer Software Copyright Act of 1980, Pub. L. No. 96-517, § 10, 94 Stat. 3015, 3018 (1980). Software code is therefore treated the same as any other work of authorship—if it is original, it is protectable by copyright. *See* 17 U.S.C. § 101 (defining "computer program").

30.   In enacting the Copyright Act, Congress also recognized that granting exclusive rights could "sometimes stand in the way of others exercising their own creative powers." *Google*, 141 S. Ct. at 1195. Accordingly, it codified the longstanding framework for determining whether a particular use is a noninfringing "fair use." 17 U.S.C. § 107. Congress envisioned noninfringing uses "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." *Id.* It specified four factors for courts to evaluate in determining whether a particular use is a noninfringing fair use (*id.*): (a.) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (b.) the nature of the copyrighted work; (c.) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (d.) the effect of the use upon the potential market for or value of the copyrighted work.

31.   When it comes to digital versions of copyrighted material, a copyright owner may put in place a TPM, such as password protection or encryption, to control access to the work. In connection with enactment of the DMCA, the House Committee on the Judiciary observed that TPMs can "support new ways of disseminating copyrighted materials to users, and . . .

safeguard the availability of legitimate uses of those materials by individuals." Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 6 (Comm. Print 1998).

32.    The DMCA thus prohibits "circumvent[ing] a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(1)(A). The statute defines "circumvent a technological measure" to mean "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3).

33.    In parallel with the anti-circumvention rule, Congress directed the Copyright Office to "monitor developments in the marketplace for copyrighted materials" and authorized the Librarian, upon recommendation of the Register of Copyrights, to grant selective waivers of the anti-circumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials" for noninfringing uses. *House Report* 36.

34.    Congress called for a triennial rulemaking process for the promulgation of such exemptions. The DMCA specifies that "the Librarian of Congress, upon the recommendation of the Register of Copyrights . . . shall make the determination in a rulemaking proceeding . . . of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by" the anti-circumvention law "in their ability to make noninfringing uses." 17 U.S.C. § 1201(a)(1)(C). The Act further directs the Librarian to examine the following factors in making such a determination (*id.*): (i.) the availability for use of copyrighted works; (ii.) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii.) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv.) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v.) such other factors as the Librarian considers appropriate.

35.   The DMCA's anti-circumvention exemption process thus entails a two-part inquiry. *First*, the Librarian must determine whether there are noninfringing uses of a particular class of copyrightable works at stake. *Second*, if there are, she must apply the statutory factors to determine whether the DMCA's anti-circumvention bar would "adversely affect[]" users' ability to make those noninfringing uses. 17 U.S.C. § 1201(a)(1)(C).

## FACTUAL BACKGROUND

### A.   Medical devices and the repair industry

36.   Plaintiffs' members develop and manufacture all kinds of sophisticated medical devices, which have revolutionized healthcare. These technologies have transformed patient care by enabling healthcare providers to diagnose disease accurately and promptly. As a result, patients stay healthier longer and recover more quickly after treatment because clinicians can detect disease earlier.

37.   So these devices can deliver their advanced capabilities safely and effectively, OEMs design and write software embedded within the machines. To function properly, medical devices typically operate on a network (such as a hospital's internal internet) and store large amounts of data, including confidential patient health information. The computer code that drives the functioning of this software—and ultimately the operability of these complex devices—is original copyrighted work created by the OEM.

38.   Computer software and service materials used for the diagnosis, maintenance, and repair of medical devices are original works of authorship protected by the Copyright Act. *See Register's Recommendation* 199-200.

39.   As contemplated by the DMCA, OEMs use a range of TPMs to guard against unauthorized access and copying of copyrighted material. These include passwords, encryption, access codes, physical access keys with embedded authorization codes, and digital signatures.

40.   Unauthorized users employ a variety of methods to circumvent TPMs, such as copying physical access keys, "brute force" password cracking, passcode-generating algorithms, and sometimes simply obtaining access keys or passwords from authorized users.

41.   Medical device software is broadly licensed and available to healthcare providers. TPMs do not restrict healthcare providers from using licensed clinical software on medical devices; they limit only what aspects of the software may be viewed, used, copied, and modified. In this way, TPMs provide critical protection to ensure the privacy of patient data and that appropriate users operate the proprietary OEM software.

42.   The medical device servicing market is large and growing rapidly. Precedence Research, *Medical Equipment Maintenance Market to Hit USD 65 Bn by 2030* (Dec. 6, 2021), perma.cc/N5W2-RY32. The servicing of medical imaging equipment is the leading and fastest-growing segment of the market. Two groups of service providers are relevant here: (1) OEMs and their authorized agents, and (2) ISOs.

43.   OEMs use their own authorized repair technicians whom they train extensively to service and repair their devices consistent with federal regulations and patient safety demands. They are able to meet the repair demand for their own devices.

44.   Improper use of OEM software for servicing or repair of medical devices presents serious risks to patients and healthcare providers. The devices use advanced technologies that, if not employed according to well-researched and regulated safety standards, can introduce dangers to users. These risks include electrical shock, mechanical failure, improper dosing, infection, and burns. Some imaging devices, including X-Ray machines and CT scanners, emit ionizing radiation which, if not properly calibrated and maintained, could result in overexposure that severely harms or kills patients. Other devices, such as imaging contrast agent power injectors, could potentially cause a fatal air embolism if serviced improperly. In addition to these direct safety risks, failure to maintain or repair these devices properly could cause interference with other equipment, a delay in care, and misdiagnosis.

45.   The act of circumventing TPMs to access medical device operating systems and software applications creates cybersecurity vulnerabilities that risk the functionality of devices and the privacy of confidential patient health information stored on them. Whenever a software hack tool is used to access a device for diagnostic and maintenance purposes, the de-

vice is modified, potentially compromising the integrity of the software. This can produce unintended consequences. For example, it may introduce security vulnerabilities to the device and to any networks to which the device is connected. And it may interfere with the device's operability as intended. Thus, circumvention increases the cybersecurity risk of highly regulated and confidential patient data, and it puts the functionality of life-saving medical equipment in jeopardy, raising patient safety concerns. *See FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices* (May 2018), at 25, perma.cc/5QFU-72E4 (*FDA Report*) (explaining that device cybersecurity risks "in turn may have the potential to result in patient illness, injury, or death").

46.   Because of these risks to patients and providers, the Food and Drug Administration (FDA) strictly regulates the manufacturers of medical equipment. OEMs must register with the FDA (21 C.F.R. Part 807), list their devices with the FDA (*id.*), receive various FDA approvals before commercially distributing certain devices (21 C.F.R. Part 814), receive FDA label approval for devices (21 C.F.R. Part 801), and report serious malfunction incidents (21 C.F.R. Part 803). The FDA also regulates the quality control of medical devices, which includes requirements relating to the design, manufacture, installation, and servicing of medical devices. 21 C.F.R. Part 820. To comply with these important regulatory requirements, OEMs, among other things, periodically audit their quality control systems.

47.   Unlike OEMs, ISOs are unregulated service providers. They are not subject to the FDA regulations that apply to OEMs. Nor are they subject to the same training and quality control measures. As a result, they are not subject to the same regulatory oversight and do not have the same accountability as OEMs, increasing the potential that their circumvention of TPMs will result in faulty repairs that jeopardize patient care and safety. *See MITA Comments* 18-36. In addition, ISO repairs that circumvent TPMs "raise[] specific cybersecurity challenges related to" circumvention and frustrate FDA recommendations that OEMs "limit[] privileged access to operating systems and applications" and restrict "software or firmware updates to authenticated code only." *FDA Report* 25.

48.   It is more difficult to upgrade medical devices if the service history is unknown, improper parts have been used, or the device has been altered. The lack of regulatory reporting by ISOs can impair the tracking of significant device events and complicate root-cause investigations of device malfunctions.

49.   From the ISOs' perspective, the ability to circumvent TPMs in medical devices allows access to OEM software without internalizing any of the development or investment costs necessary to develop such software. The reason an ISO wants TPM circumvention is to benefit its commercial interests, resulting in greater market share and more profits, even at the expense of patient safety and device integrity.

50.   ISOs have previously used unauthorized access to copyrighted software and other content to sell advanced services for medical devices that they otherwise would be unable to sell.

51.   Many OEMs already provide service specifications to ISOs to enable them to perform maintenance and repair services. *Philips Comments*, Exs. A-B. ISOs are also typically able to access necessary documentation and software by contacting the OEM. *Id.*, Ex. B. The FDA has recognized that OEMs may reserve enhanced software programs for their own employees. *See, e.g.*, Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), perma.cc/BX3V-3U5B ("[T]he manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions.").

52.   The ISOs that petitioned for the Exemption have a track record of circumventing TPMs without authorization for commercial gain.

53.   OEMs must make enormous investments to develop and bring medical devices to market, including investments in creating the software that runs and maintains them. Be-

cause of extensive FDA regulation, there are massive costs to ensuring the devices are safe and to securing approval for distribution to the commercial market.

54.   OEMs rely on their ability to recoup these substantial costs by protecting their valuable intellectual property through copyrights and licensing agreements. Without assurance that their intellectual property is adequately protected, OEMs may be unable to cover the costs of developing and improving these life-saving devices. Indeed, this reliance is consistent with the purpose of the Copyright Act.

55.   It chills innovation when a creator cannot secure the benefit of meaningful copyright protection for its creations. Without that benefit here, OEMs may be unable to justify the costs of researching and developing improved products. Patents do not mitigate this problem because they provide a different scope of protection, and replication of uncovered intellectual property is extremely difficult to detect. Thus, the Exemption significantly reduces the incentives for continued innovation of life-saving medical devices and associated creative expressions.

**B.   The eighth triennial DMCA rulemaking**

56.   The Register of Copyrights commenced the eighth triennial Section 1201 rulemaking on June 22, 2020, with the publication of a Notice of Inquiry in the Federal Register. *See* U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 37,399 (June 22, 2020). The office took comments from proponents and opponents of various exemptions over the next three months.

57.   Two ISOs, Summit Imaging and Transtate Equipment, petitioned for the circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices. *See* U.S. Copyright Office, *Petitions for Newly Proposed Exemptions*, perma.cc/HDV5-XLWG. The ISOs sought access to device software and data files stored on medical devices and systems.

58.   ISOs do not create new content or expression when they service medical devices. Nor did they assert in their petitions for an exemption that plaintiffs' members' copyright protections are thwarting "the Progress of Science and useful Arts" (U.S. Const. Art. I, § 8, cl. 8)

that the copyright laws are meant to promote. Rather, the ISOs sought an exemption only so that they can freeride off the creative efforts and intellectual property of OEMs.

59.    The Register published an NPRM identifying the exemptions that she proposed to recommend to the Librarian. *See* U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 65,293 (Oct. 15, 2020). Without elaboration, the NPRM noted that the ISOs "petition for an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices." 85 Fed. Reg. at 65,307. Other than "invit[ing] comment on the extent to which its prior analysis of [third-party service providers] may be applicable here," the Register did not address the content of the proposed rule or request comments regarding the ISOs' petitions in the NPRM. *Id.*

60.    Plaintiffs submitted comments in opposition to the proposed exemption, making several significant arguments that an exemption was unwarranted. At a general level, they argued that the intended uses broadly infringed the copyrights of OEMs, thus foreclosing the possibility of an exemption. *AdvaMed Comments* 7-9; *MITA Comments* 7-11. Even if the intended uses were noninfringing, they asserted, the statutory factors weighed strongly in favor of rejecting an exemption due to the commercial nature of the ISOs' desire for an exemption, the consequential increased risk to patient safety and care, and an exemption's deleterious effects on the market for medical devices. *AdvaMed Comments* 10-15; *MITA Comments* 2-7.

61.    As to whether the intended uses were noninfringing, MITA argued that a categorical fair use determination here was inappropriate. *MITA Comments* 8. The Copyright Act demands a fact-specific inquiry to each "particular case," 17 U.S.C. § 107, and the Supreme Court has noted accordingly that "fair use analysis must always be tailored to the individual case." *Harper & Row v. Nation Enterprises, Inc.*, 471 U.S. 539, 552 (1985). Considering the complexity and varied applications of medical devices, and the range of services provided by ISOs, a categorical fair use determination based on the surface-level descriptions in the ISOs' petitions was inappropriate.

62.   Opponents of the exemption asserted further (*AdvaMed Comments* 7-9; *MITA Comments* 8-10; *Philips Comments* 7-10) that the purpose and character of the ISOs' proposed uses, and the effect of those uses upon the market, weigh strongly against a finding of fair use:

(a.)   Because the ISOs' proposed uses are not for "criticism, comment, news reporting, teaching . . . scholarship, or research" (17 U.S.C. § 107) but instead for promoting the financial interests of for-profit companies who are not engaged in the creation of new works, opponents explained that the fair use inquiry should end at the first step with a finding of no fair use. *AdvaMed Comments* 7-8; *MITA Comments* 8-9; *Philips Comments* 7-8.

(b.)   Opponents explained that, in addition to their commercial nature, there is nothing transformative about the ISOs' intended uses. Indeed, any alterations to the operability of devices would circumvent FDA regulatory oversight and put patients at risk. *MITA Comments* 9; *Philips Comments* 7-8 & n.24.

(c.)   They noted also that the creative nature of the copyrighted materials, which provide for the operation of complex machines and store and protect patient data, are essential to the safety, integrity, and security of medical devices, weighing against a fair use exception. *MITA Comments* 9; *Philips Comments* 8-9. Moreover, the unpublished nature of the work cuts against a finding of fair use. *AdvaMed Comments* 8.

(d.)   Commenters also explained that the broad scope of the proposed exemption meant that their copyrighted software and materials would be exposed in their entireties, again cutting against fair use. *AdvaMed Comments* 8; *MITA Comments* 10; *Philips Comments* 9-10.

(e.)   Opponents argued that the proposed exemption decreased the value of medical device software by increasing the share of the service-and-repair market held by unregulated ISOs. *AdvaMed Comments* 3; *MITA Comments* 10. At a general level, it harms OEMs by allowing competitors to view, replicate, and exploit their innovations without bearing the cost of their development. More specifically, because ISOs are not subjected to the same stringent

16

FDA requirements as manufacturers, they face less accountability concerning their servicing of medical devices. Further, the ISOs' circumvention of TPMs to use OEM proprietary software creates unnecessary cybersecurity vulnerabilities that put patient safety in jeopardy. An increase in ISO services would therefore decrease confidence in the functioning of serviced medical devices. *See AdvaMed Comments* 11-15; *MITA Comments* 18-36. This diminishes the market value of the devices and their software. *MITA Comments* 10-11.

(f.)   Finally, plaintiffs argued the copyrighted materials reflected "a substantial investment of time and labor made in anticipation of a financial return." *MITA Comments* 9 (quoting *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1154 (9th Cir. 1986)); *see also AdvaMed Comments* 8-9. They explained that ISOs' unchecked access to copyrighted material in its entirety would threaten the market for medical devices.

63.   Even assuming the intended uses were noninfringing, moreover, opponents argued that the Section 1201 factors also weigh against an exemption in this case:

(a.)   *First*, opponents explained (*AdvaMed Comments* 4-6, 10-11; *MITA Comments* 3; *Philips Comments* 5-6, 14-16) that TPMs do not prevent healthcare providers from using the device software, and OEMs already provide access to their code for most repairs. *MITA Comments* 3. As the FDA concluded, the repair market was already adequately served by authorized providers and ISOs prior to the Exemption. *Philips Comments* 3 (citing *FDA Report i* (declining to conclude there was a health or safety concern presented by the medical device servicing market)).

(b.)   *Second*, opponents explained (*MITA Comments* 3; *Philips Comments* 16) that the proposed exemption would not serve any "archival, preservation, [or] educational purposes." *See* 17 U.S.C. § 1201(a)(1)(C)(ii).

(c.)   *Third*, opponents noted (*MITA Comments* 3; *Philips Comments* 16-17) that an exemption would not impact "criticism, comment, news reporting, teaching, scholarship, or research." *See* 17 U.S.C. § 1201(a)(1)(C)(iii).

(d.)  *Fourth*, opponents demonstrated (*AdvaMed Comments* 11; *MITA Comments* 3; *Philips Comments* 17) that by unveiling valuable intellectual property, an exemption would diminish "the value of copyrighted works" and damage the market for medical device software and materials, thwarting future innovation. *See* 17 U.S.C. § 1201(a)(1)(C)(iv).

(e.)  *Finally*, opponents explained (*AdvaMed* 11-15; *MITA Comments* 4-5; *Philips Comments* 17-19) that an exemption would undermine comprehensive FDA regulations that ensure the devices are safe.

64.   The Register of Copyrights issued a formal recommendation to the Librarian of Congress to grant an exemption when circumvention is a necessary step for the diagnosis, maintenance, and repair of medical devices and systems. *See Register's Recommendation* 193, 208-212, 224-229, 233.

65.   The recommendation failed to respond, or to respond adequately, to many significant comments. These unaddressed comments related to matters of central relevance to the rule and genuinely cast doubt on the reasonableness of the Librarian's position:

(a.)   The recommendation did not address MITA's argument that as a threshold matter, a categorical fair use determination as the basis for reasoning the proposed uses are noninfringing is fundamentally incompatible with the fact-specific fair use inquiry demanded by the statute. *MITA Comments* 8; *see* 17 U.S.C. § 107 (requiring fair use analysis to each "particular case"). The Register's belief that she could categorically sanction the proposed uses as fair use was a key assumption that went unjustified despite this challenge.

(b.)   The recommendation did not address opponents' argument that the ISOs' proposed uses were generally barred from fair use consideration because they were not "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107; *see AdvaMed Comments* 7-8; *MITA Comments* 8-9; *Philips Comments* 7-8.

(c.)   The recommendation did not respond adequately to opponents' argument that the proposed uses were entirely commercial in nature, conveniently avoiding response to MITA's point that the Copyright Office itself has recognized that third-party software repairs

"would likely be considered a commercial use." *MITA Comments* 9; *see also AdvaMed Comments* 7-8; *Philips Comments* 7-8.

(d.)   The recommendation did not address opponents' argument that the copyrighted software "represented a substantial investment of time and labor made in anticipation of a financial return." *MITA Comments* 9 (quoting *Hustler*, 796 F.2d at 1154); *see also AdvaMed Comments* 8-9.

(e.)   The recommendation did not respond adequately to opponents' argument that once intellectual property is made public, any protection to its value is lost as a practical matter. *MITA Comments* 10; *see also AdvaMed Comments* 11; *Philips Comments* 17. The Register merely remarked that misuse of copyrighted material would not be permissible, but she did not address the simpler point that supposedly permissible uses will lead to impermissible ones, thus affecting the market for medical devices and their software. *Register's Recommendation* 212.

(f.)   The recommendation did not address opponents' numerous significant arguments concerning the statutory factors the Librarian "shall examine" when considering an exemption for a noninfringing use:

(g.)   The recommendation did not address MITA's argument that the "users" of copyrighted medical device software are "the patients themselves undergoing the medical imaging procedures." *MITA Comments* 2-3. By disregarding this argument and failing to consider patients as the ultimate users, the Register took an unduly narrow view of the scope of users as it pertains to the first statutory factor. *See* 17 U.S.C. § 1201(a)(1)(C)(i).

(h.)   The recommendation did not address MITA's argument that the copyrighted software at issue remains usable even though a physical component of a medical device needs maintenance or repair. *MITA Comments* 3. The Register instead focused on software being less *accessible* to ISOs. *Register's Recommendation* 224-226. But that interest is independent from the "availability for use of [the] copyrighted [software]." 17 U.S.C. § 1201-(a)(1)(C)(i). The copyrighted works remain available for use, a fact explained by MITA that

the Register failed to address.

(i.)   The recommendation did not respond adequately to opponents' arguments that an exemption did not serve any "nonprofit archival, preservation, and educational purposes," and that it would not "impact . . . criticism, comment, news reporting, teaching, scholarship, or research." 17 U.S.C. § 1201(a)(1)(C)(ii)-(iii); *see MITA Comments* 3; *Philips Comments* 16. The Register's only response was that these factors (which comprise nearly half of the statutorily mandated considerations) were "not especially relevant," *Register's Recommendation* 227, an impermissible (and flatly incorrect) non sequitur. *See City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

(j.)   The recommendation did not respond to opponents' argument that the challenged exemption would unduly chill innovation and weaken incentives for further innovation, contrary to the purpose of copyright laws, including the DMCA. *MITA Comments* 3; *Philips Comments* 17; *see* 17 U.S.C. § 1201(a)(1)(C)(iv).

(k.)   The recommendation did not respond to opponents' argument that an exemption would result in more ISO repairs consisting of risky TPM circumvention, which places patients at risk and ultimately undermines public confidence in medical devices, thus damaging the market for these devices. *AdvaMed Comments* 3; *MITA Comments* 3-4, 10-11; *see* 17 U.S.C. § 1201(a)(1)(C)(iv).

(l.)   The recommendation did not adequately respond to MITA's distinction between medical devices and other consumer electronics—while the software of both has no independent market—there are paramount differences in the botched repairs between the two groups. *MITA Comments* 4. Instead of addressing this concern, the Register simply lumped sophisticated medical devices with "other software-enabled devices" in its reasoning. *Register's Recommendation* 227.

66.   Without providing additional explanation or analysis, the Librarian adopted the Register's recommendation and issued a final rule published in the Federal Register and codified at 37 C.F.R. § 201.40, granting the Exemption. *See* 86 Fed. Reg. at 59,627. The Librari-

an's only explanation was to say that she had "duly considered and accepted the recommendation of the Register of Copyrights." *Id*. at 59,637.

### C.   Sovereign immunity does not bar this suit

67.   For purposes of this rulemaking, the Library of Congress was acting as an executive agency subject to the strictures of the APA and judicial review by this Court.

68.   The APA permits suit against "an agency or an officer or employee thereof." 5 U.S.C. § 702. The word "agency" includes "each authority of the Government of the United States . . . but does not include . . . the Congress." *Id.* § 701(b)(1).

69.   The Library of Congress is a hybrid agency—it is located within the legislative branch, but at times it exercises executive functions. *See Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1336 (D.C. Cir. 2012); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 43 (D.D.C. 2010). In particular, "[t]he powers in the Library . . . to promulgate copyright regulations [and] to apply the statute to affected parties . . . are ones generally associated in modern times with executive agencies rather than legislators." *Intercollegiate*, 684 F.3d at 1341-1342.

70.   The Library assumed the character of an executive "agency" within the meaning of the APA in undertaking the triennial DMCA rulemaking at issue here.

71.   The DMCA provides that the Library's exemptions are regulations with the force and effect of law, promulgated following traditional rulemaking procedures.

72.   The Library's use of the Federal Register and Code of Federal Regulations confirms its status as an "agency" for purposes of this suit. The Federal Register Act specifies that only a "document" may "be published in the Federal Register." 44 U.S.C. § 1505. It in turn defines "document" to be "an order, regulation, rule, . . . or similar instrument, issued, prescribed or promulgated by a Federal agency." *Id.* § 1501. The NOI, NPRM, and final rule all were published in the Federal Register.

73.   The Code of Federal Regulations is likewise reserved for the codification of "documents of each agency . . . promulgated by the agency by publication in the Federal Reg-

ister." *Id.* § 1510(a). All DMCA exemptions, including the challenged exemption here, are codified in the Code of Federal Regulations. *See* 37 C.F.R. § 201.40(b)(15).

74.   The term "agency" for purposes of the Federal Register Act covers agencies within "the administrative branch . . . but not the legislative" branch. 44 U.S.C. § 1501. The Library thus necessarily assumed the character of an administrative and not legislative "agency" under the Federal Register Act when it published the NOI, NPRM, and final rule in the Federal Register and codified the final rule in the Code of Federal Regulations.

75.   A governmental body that is an "agency" within the meaning of the Federal Register Act is also an "agency" within the meaning of the APA.

76.   The DMCA's legislative history further confirms that Congress intended the Library to act as an "agency" when exercising its exemption rulemaking duties. *See House Report* 37 (Congress intended the DMCA exemption rulemaking proceedings to be "consistent with the requirements of the Administrative Procedures Act.").

77.   If the Library was not acting as an "agency" within the meaning of the APA in the course of the rulemaking here, review is available instead under *Larson.* "[S]overeign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority." *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) (citing *Larson*).

**CLAIMS FOR RELIEF**

**Count I**
**Substantive Violations of the Administrative Procedure Act**

78.   Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

79.   Under the APA, courts must set aside agency action that is arbitrary and capricious, not in accordance with law, or in excess of statutory authority. 5 U.S.C. § 706.

80.   The DMCA permits the Librarian to issue exemptions to the anti-circumvention rule only when the evidence shows "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on cir-

cumvention in their ability to make noninfringing uses of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C). Accordingly, "proponents [of an exemption] must show" that the "uses affected by the prohibition on circumvention are or are likely to be noninfringing." 86 Fed. Reg. at 59,628.

81.    Because the ISOs' unauthorized uses of OEM software are infringing, the Librarian's grant of the Exemption exceeded her statutory authority and was not in accordance with law. Congress has specified that "the fair use of a copyrighted work" is not infringing only when the factors listed in 17 U.S.C. § 107 indicate a fair use consistent with the purposes of the Copyright Act. None of the Section 107 factors supports the Librarian's fair use determination in this case.

82.    The copyrighted work at issue here is unpublished computer software that reflects cutting-edge innovation and creativity, a product of a substantial investment of labor. It also contains valuable intellectual property.

83.    ISOs are for-profit companies that seek to use plaintiffs' members' copyrighted material for their own commercial interests only, not "for nonprofit educational purposes." 17 U.S.C. 107. The sole purpose of the ISOs' use of the copyrighted software is in connection with the provision of maintenance services, which is a commercial, non-transformative use. Like anyone else that merely views or copies copyrighted work for commercial benefit, the ISOs' use is presumptively an unfair exploitation of the copyright holder's privilege.

84.    The ISOs' use would diminish the value of the copyrights themselves by exposing valuable intellectual property, thus undermining the "value of the copyrighted work." 17 U.S.C. 107. The result is a diminished incentive to create and improve sophisticated, life-saving medical devices.

85.    The Library's grant of the Exemption was arbitrary and capricious in that it was not grounded in the evidence before the agency; and not in accordance with law and in excess of its statutory authority in that the Exemption is not authorized by copyright law or the DMCA. The Exemption must be set aside.

**Count II**
**Procedural Violation of the Administrative Procedure Act:**
**Failure To Respond To Critical Comments**

86.    Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

87.    The APA empowers courts to "hold unlawful and set aside agency action" that is undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2).

88.    Agencies are legally obligated to "consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S 402, 416 (1971)). In addition, agencies have "a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule." *Northeastern Maryland Waste Disposal Auth. (NMWDA) v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004).

89.    The Register of Copyrights failed to consider and respond adequately to several significant comments made during the public comment period. These unaddressed comments related to matters of central relevance to the rule and genuinely cast doubt on the reasonableness of the Library's position. The comments, if properly considered, likely would have changed the outcome of the Library's decisionmaking process.

90.    The Librarian of Congress adopted the Register's recommendation without further consideration of plaintiffs' and other commenters' arguments or evidence.

91.    The Exemption therefore was adopted without observance of procedure required by law and should be set aside.

**Count III**
**Official Federal Actions Beyond Statutory Authority**

92.    Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

93.    Plaintiffs are entitled to non-monetary judicial relief against federal officials who act in excess of authority conferred by Congress. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).

94.   The DMCA permits the Librarian to issue exemptions only when "noninfringing uses . . . of a particular class of copyrighted works" are at stake. 17 U.S.C. § 1201(a)(1)(C).

95.   The ISOs' uses of copyrighted medical device software and materials are demonstrably *not* noninfringing uses. They are purely commercial, non-transformative uses sought to boost ISOs' profits. By undermining the very purpose of copyright protection, the uses are infringing.

96.   The Librarian therefore acted in excess of the authority conferred by the DMCA in granting the Exemption. The Exemption accordingly must be vacated.

### Count IV
### Exercise Of Unconstitutional Power By A Federal Official

97.   Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

98.   If the Library did not assume the character of an executive agency in the course of the rulemaking at issue here, such that its actions are not subject to review under the APA, then the Exemption is unconstitutional and should be set aside under *Larson*.

99.   Agency rulemakings are "exercises of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. Art. II § 1, cl. 1). And legislative bodies are constitutionally prohibited from exercising executive power. *E.g.*, *MWAA v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991). If the Library's adoption of the Exemption was an exercise of executive power, and if the Library did not assume the character of an executive agency in the course of the rulemaking at issue here, the DMCA rulemaking was an unconstitutional arrogation of executive authority by a legislative body in violation of separate-of-powers principles, rendering the Exemption constitutionally void.

100.  Federal legislative bodies must exercise legislative powers in conformity with Article I, Section 7 of the Constitution, which requires bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 951 (1983). If the Library's adoption of the Exemption was an exercise of legislative power, and the Library acted in its capacity as a legislative agency in the course of the rulemaking at issue here, the DMCA rulemaking was an unconstitutionally

unilateral exercise of legislative authority in violation of the Constitution's bicameralism and presentment requirements, rendering the Exemption constitutionally void.

101.  In either event, if the Library did not assume the character of an executive agency in the course of the rulemaking at issue here, its adoption of the Exemption was constitutionally *ultra vires* and must be vacated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs the Medical Imaging & Technology Alliance and the Advanced Medical Technology Association request that the Court enter judgment in their favor and

(a.)    set aside the challenged exemption;

(b.)    declare the challenged exemption to be unlawful and void;

(c.)    enjoin defendants from enforcing, implementing, or otherwise carrying out the challenged exemption;

(d.)    award plaintiff its attorney's fees and costs; and

(e.)    award such other and further relief as the Court may deem just and proper.

February 25, 2022

Respectfully submitted,

/s/ Michael B. Kimberly

Peter J. Tolsdorf (Bar No. 503476)
   *National Electrical*
     *Manufacturers Association*
   *1300 17th Street North, No. 900*
   *Arlington, VA 22209*
   *(703) 841-3200*

*Counsel for Medical Imaging & Technology Association*

Terry Chang (Bar No. 503476)
   *Advanced Medical*
     *Technology Association*
   *701 Pennsylvania Ave. NW, Ste. 800*
   *Washington, DC 20004*
   *(202) 783-8700*

*Counsel for Advanced Medical Technology Association*

Michael B. Kimberly (Bar No. 991549)
Alex C. Boota*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*
   *mkimberly@mwe.com*

*Counsel for Plaintiffs*

*\* pro hac vice motion forthcoming*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEDICAL IMAGING & TECHNOLOGY
ALLIANCE, *et al.*,

          Plaintiffs,

          v.

LIBRARY OF CONGRESS, *et al.*

          Defendants.

Civil Action No. 22-499 (BAH)

Chief Judge Beryl A. Howell

## <u>ORDER</u>

Upon consideration of the plaintiffs' Motion for Summary Judgment, ECF No. 10, defendants' Cross-Motion to Dismiss, or, in the alternative, Cross-Motion for Summary Judgment, ECF No. 16, the legal memoranda in support and in opposition, and the exhibits attached thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that defendants' Cross-Motion to Dismiss, ECF No. 16, is **GRANTED**; it is further

**ORDERED** that plaintiffs' Motion for Summary Judgment, ECF No. 10, is **DENIED**; it is further

**ORDERED** that the plaintiffs' Complaint, ECF No. 1, is dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Date: March 7, 2023

*This is a final and appealable order*.

_____
BERYL A. HOWELL
CHIEF JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

MEDICAL IMAGING & TECHNOLOGY
ALLIANCE, *et al.*,

                Plaintiffs,

        v.

LIBRARY OF CONGRESS, *et al.*

                Defendants.

---

Civil Action No. 22-499 (BAH)

Chief Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

Nearly twenty-five years ago, Congress passed the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 1201 *et seq.*, to address the risks that the internet and new digital technology posed to copyrighted works. At the same time, Congress also recognized that changing marketplace realities and ever-evolving digital technologies might make some of the DMCA's tools to combat digital piracy harmful to innovation and non-infringing uses of copyrighted materials. To provide flexibility in accommodating those varied policy interests, Congress authorized the Librarian of Congress ("Librarian") to promulgate exceptions every three years to certain statutory proscriptions, including the DMCA's prohibition on circumvention of technological protection measures used by copyright owners to prevent access to their copyrighted works ("TPMs"). This authority is at issue in this case.

On October 28, 2021, pursuant to her triennial rulemaking authority under the DMCA, the Librarian adopted a final rule, effective the same date, that exempts parties accessing copyrighted software for the purpose of diagnosis, maintenance, and repair of medical devices from the statute's proscription barring the circumvention of TPMs. Final Rule, *Exemption to Prohibition*

1

*on Circumvention of Copyright Protection Systems for Access Control Technologies*, 86 Fed. Reg. 59,627, 59,628 (Oct. 28, 2021) ("Exemption"), codified at 37 C.F.R. § 201.40. Four months after the Final Rule went into effect, plaintiffs—the Medical Imaging & Technology Alliance and the Advanced Medical technology Association, which are membership-based trade associations for manufacturers of medical imaging equipment manufacturers, *see* Compl. ¶¶ 16-17, ECF No. 1— initiated this lawsuit against defendants, the Library of Congress ("Library") and the Librarian to challenge the Exemption. Specifically, plaintiffs seek to have the Exemption for repair of medical devices set aside and declared to be unlawful and void, and any enforcement by defendants enjoined, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, and this Court's inherent equitable powers. *Id.* ¶ 24, Prayer for Relief.[1]

Now pending are the parties cross-motions for summary judgment. *See* Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 10; Defs.' Cross-Mot. Dismiss, ECF No. 16; Defs.' Mem. Supp. Cross-Mot. Dismiss ("Defs.' Cross-Mem."), ECF No. 16-1. For the reasons explained below, defendants' motion to dismiss is granted, and plaintiffs' motion for summary judgment is denied.

## I.    BACKGROUND

The relevant statutory and regulatory scheme is described below, followed by a summary of the factual and procedural background to this case.

### A.  Statutory and Regulatory Scheme

---

[1]      The Administrative Record ("AR") in this case is voluminous and, in accordance with the local rules, the parties filed a Joint Appendix, containing portions of the AR cited or otherwise relied upon for the pending motions. *See* D.D.C. LCVR 7(n); Joint App'x at 1, ECF No. 24. The 9,410-page Joint Appendix is docketed in six separate attachments, *see* ECF Nos. 24-1–24-6. For clarity, "AR" citations herein are to those documents from the administrative record found in the Joint Appendix.

2

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, proscribes the unauthorized reproduction of "original works of authorship fixed in any tangible medium of expression." *Id.* § 102(a). "Works of authorship" covered by the Copyright Act include "literary work[s]," which themselves include "computer program[s]." *Id.* §§ 101, 102(a)(1), 109(b)(1)(A). While the purpose of the Copyright Act is "to encourage the production of works" that, without copyright protection, could be "reproduce[d] more cheaply" by others, this protection is intended to encourage the production of new creative works, not "stand in the way of others exercising their own creative powers." *Google LLC v. Oracle America*, 141 S. Ct. 1183, 1195 (2021). To this end, the Copyright Act codifies the fair use doctrine, which limits copyright protections as necessary to encourage "criticism, comment, news reporting, teaching . . . scholarship, [and] research." 17 U.S.C. § 107.

Anticipating the changing digital landscape, Congress passed the DMCA in 1998 to facilitate electronic commerce, communications, development, and education while simultaneously addressing the threats that the internet and new digital technology posed to copyrighted works. S. Rep. No. 105-190, at 1–2 (1998); *see also Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 112 (D.D.C. 2005) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)) ("Congress enacted the DMCA in 1998 'to strengthen copyright protection in the digital age.'"). Observing that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy[,]" S. Rep. No. 105-190, at 8, the Senate Committee Report on the DMCA explained that "the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials." *Id.* at 2. The DMCA accordingly "create[d] the legal platform for launching the global digital on-line marketplace for copyrighted works." *Id.* at 8.

3

To combat digital privacy, the DMCA prohibits, *inter alia*, "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act.  17 U.S.C. § 1201(a)(1)(A) ("the anti-circumvention provision").  As defined in the anti-circumvention provision, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  *Id.* § 1201(a)(3)(A).  Exceptions to the anti-circumvention provision are provided to allow circumvention of a TPM (or another form of access control to a copyrighted work) in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer, computer system, or computer network.  *See* 17 U.S.C. § 1201(d)–(j).

In addition to these statutory exceptions, the DMCA directs the Librarian to determine, through triennial rulemaking proceedings, any categories of copyrighted materials that should be exempted from the anti-circumvention provision for the next three-year period because the restriction adversely prevents users of copyrighted works from making noninfringing use of copyrighted material.  *See id.* § 1201(a)(1)(C).  As explained in the House Committee Report on the DMCA, Congress was concerned that evolving "marketplace realities" might make access to copyrighted materials unjustifiably difficult, so the triennial rulemaking requirement created a "'fail-safe' mechanism" that allowed the Library to "monitor developments in the marketplace for copyrighted materials," and "selectively waive[]" the anti-circumvention provision for a particular

4

category of materials for "limited time periods, [as] necessary to prevent a diminution in the availability to individual users of [that] particular category of copyrighted materials." H.R. Rep. No. 105-551(II), at 36 (1998).

When engaging in the statutorily authorized triennial rulemaking authority, the Librarian must comply with several requirements. First, the DMCA obligates the Librarian to make her rulemaking determinations "upon the recommendation of the Register of Copyrights," who in turn must "consult with the Assistant Secretary for Communications and Information of the Department of Commerce." 17 U.S.C. § 1201(a)(1)(C). Second, the DMCA provides that exemptions to the anticircumvention rule are authorized only if users are "adversely affected by" the rule "in their ability to make noninfringing uses." *Id.* In making this assessment during rulemaking, the Librarian must examine the following enumerated factors: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of [access controls] has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.* The Librarian must also "assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1)." Exemption, 86 Fed. Reg. 59,627, 59,628.

The Librarian is the final decisionmaker, but the Register is tasked with conducting the rulemaking process and making recommendations on exemptions to the Librarian. The House Committee Report explains that, "in recognition of the expertise of the Copyright Office, the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking,

seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate." H.R. Rep. No. 105-796, at 64. "To aid in this process, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record." 86 Fed. Reg. at 59,628. Proponents seeking an exception must demonstrate "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of [a TPM], the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses." *Id.* "The Register will recommend granting an exemption only 'when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met.'" *Id.* Upon receiving these recommendations from the Register, the Librarian then issues a Final Rule promulgating the temporary exemptions for the next three-year period. *See* Exemption, 86 Fed. Reg. 59,627.[2]

### B.  Exemption Adopted During Eighth Triennial Rulemaking Proceeding

The challenged exemption was adopted by the Librarian following a sixteen-month rulemaking process involving formal notices, submission and consideration of proposals, comments, a hearing, and a fulsome explanation by the Register regarding application of the requisite statutory factors, as summarized below.

### 1. Notice of Proposed Rulemaking, Petitions and Comments

---

[2]      During the three-year period beginning October 28, 2021, the Librarian adopted twenty-six exemptions for classes of copyrighted works. *See* 86 Fed. Reg 59,627. Examples of classes of copyrighted works for which the Librarian has granted an exemption include "computer programs that control motorized land vehicles" and "computer programs that control smartphones, home appliances, or home systems" for diagnosis, maintenance, or repair, *id.* at 59,631, excerpts of audiovisual works for criticism and comment, *id.* at 59,632, and literary works for use with assistive technologies for disabled individuals, *id.* at 59,633, 59,634.

6

The eighth triennial rulemaking proceeding began on June 22, 2020, when the U.S. Copyright Office ("the Office") submitted a Notice of Inquiry, published in the Federal Register, U.S. Copyright Office, seeking petitions for renewals of existing exemptions and proposals for new exemptions. Notice of Inquiry, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 37,399 (June 22, 2020) ("Notice"), AR at 45–49.  Upon receipt of twenty-seven petitions for new or expanded exemptions in response to the Notice, the Office organized the petitions into seventeen proposed classes for exceptions, and then requested comment.  Notice of Proposed Rulemaking, *Exceptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg., 65,293, 65,302 (Oct. 15, 2020) ("NPRM"), AR at 50–67.

Two of the petitions noticed for comment were submitted by two so-called independent service organizations ("ISOs"), which are non-manufacturer companies hired by hospitals and other medical professionals to repair and maintain complex, computer-controlled medical equipment.  These ISOs petitioned for an exemption to allow TPMs in computer-controlled medical equipment to be circumvented "for the purpose of diagnosis, maintenance, or repair of such a device."  Summit Imaging, Inc.'s Petition for New Exemption under 17 U.S.C. § 1201, AR at 2357 ("Summit Petition"); *accord* Transtate Equipment Company's Petition for New Exemption under 17 U.S.C. § 1201, AR at 2362 ("Transtate Petition").  The principal justification for the exemption sought by these two ISOs was the strong public health interest in "maintain[ing] and repair[ing] lifesaving equipment," a need that "has been magnified by the current COVID-19 pandemic."   Summit Petition at 2, AR at 2357; *see also* Transtate Petition at 4, AR at 2365 ("The ability to diagnose, maintain, and repair medical equipment is a public health priority, particularly in the midst of a global health crisis. . . .).

Plaintiffs' members are "original equipment manufacturers" ("OEMs"), which develop and manufacture medical devices, such as MRI machines, CT scanners, and defibrillators. Compl. ¶ 37. To allow the medical devices "to deliver their advanced capabilities safely and effectively," OEMs "design and write software embedded within the machines," which software is comprised of computer code that "is original copyrighted work created by the OEM" and protected by the Copyright Act. *Id.* ¶¶ 37-38; *see also* 17 U.S.C. §§ 101, 102(a). These devices also store and relay confidential patient data to providers connected to the network. Compl. ¶ 37. To safeguard their copyrighted material and patient data, OEMs use a wide variety of TPMs to guard against unauthorized access to their copyrighted material. *Id.* ¶¶ 37, 41, 45. According to plaintiffs, OEMs rely on copyright protections to recoup their substantial investments and facilitate further innovations to their medical devices, and absent such protections, they will not be able to continue developing more effective and efficient devices. *Id.* ¶¶ 53-55. Due to the potential risks to patients and providers posed by unauthorized access or release of sensitive patient information, the Food and Drug Administration ("FDA") strictly regulates OEMs and the medical devices they manufacture. *Id.* ¶ 46.

ISOs provide third-party maintenance and repair services for these medical devices, though these services are not necessarily authorized by OEMs. *Id.* ¶¶ 42-43, 47-50. To provide maintenance services for these medical devices, ISOs must circumvent TPMs to access OEM software. As Summit explained, "Unless hospitals or other owners of medical devices purchase expensive service contracts from the manufacturer, they may be unable to repair their own equipment (or have it repaired by an independent service provider) without risking a lawsuit against them or their service provider for allegedly violating the anti-circumvention provisions of the [DMCA]." Summit Petition at 2, AR at 2357; Transtate Petition, AR at 2363 ("This exemption

is sought to allow for timely critical servicing activities required for medical systems and devices
. . . used by hospitals and other medical service providers to care for individuals in need of medica
attention.").  Plaintiffs counter that the primary reason ISOs circumvent TPMs is to "benefit [their]
commercial interests, resulting in greater market share and more profits."  Compl. ¶ 49.[3]

In soliciting comments regarding the submitted petitions, the Office combined several
petitions relating to repair of software-enabled devices, including the Summit and Transtate
petitions, into a single proposed class, noting that current exemptions already include repair-related
exemptions to access computer programs in automobiles, smartphones, and home systems and
appliances for repair-related purposes.  85 Fed. Reg. at 65,306, 65,307, AR at 63–64.  The Office
scheduled three rounds of comments from: (1) proponents of petitions or neutral parties; (2)
opponents of petitions; and (3) proponents or neutral parties replying to arguments or facts raised
in other comments.  *Id.* at 65,302, AR at 59.  Transtate and Summit both submitted comments in
support of their petitions, AR at 2909–16; AR at 2917–53, while plaintiffs filed opposing
comments, AR at 4010–24; AR at 4095–30; AR at 4131–56.  Transtate also submitted reply
comments.  AR at 4507–12.

Plaintiffs criticized the Transtate and Summit exemption petitions as violating the basic
purposes of copyright law and damaging the market while providing only commercial gain to the
ISOs.  As support, plaintiffs explained, first, that the proposed exemptions would only facilitate
competing maintenance and repair services, with nothing transformative about the ISOs' intended
uses.  *See* Compl., Ex. B, Medical Imaging & Technology Alliance Comments ("MITA
Comments") at 8–9, ECF No. 1-2; Compl., Ex. C, Advanced Medical Technology Association
Comments ("AdvaMed Comments") at 7–8, ECF No. 1-3; *see also* Compl., Ex. D, Philips North

---

[3]      Many OEMs, nonetheless, "provide service specifications to ISOs to enable them to perform maintenance
and repair services."  *Id.* ¶ 51.

America, LLC Comments ("Phillips Comments") at 7–8 & n.24, ECF No. 1-4.  Second, plaintiffs

complained that, because the software at issue is innovative and required substantial investment of

time and labor made in anticipation of financial return, the proposed exemption would allow ISOs

to free-ride off the work of OEMs and discourage the production of further similar work.  MITA

Comments 9; AdvaMed Comments 8–9.  Third, plaintiffs asserted that the proposed exemption

would decrease the value of the copyrighted software and the medical devices that require the

software to function by making circumvention of TPMs protecting these devices more likely,

exacerbating cybersecurity risks and putting patient data and OEMs intellectual property at risk of

exposure.  MITA Comments 9-10; AdvaMed Comments 8–11; *see also* Phillips Comments 9–10.

Finally, according to plaintiffs, by increasing TPM circumvention, the requested exemption could

damage the devices themselves and introduce dangers such as electrical shock, mechanical failure,

improper dosing, and burns.  AdvaMed Comments 3, 11-15; MITA Comments 3-5; *see also*

Philips Comments 17-19.

### 2. Hearing

Following the close of the comment period, the Office held a hearing, after notice, on April

20, 2021, regarding the proposed exemption for repairing computer software.  *See* Notice of Public

Hearings, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 86

Fed. Reg. 8560, 8561 (Feb. 8, 2021), AR at 68–69.  A representative from Transtate and a

representative from the International Association of Medical Equipment Remarketers and

Servicers testified.  AR at 5627–5763.  Plaintiffs did not participate.  *See id.*

### 3. Register's Recommendation

Based upon the evidence gathered and submitted during the rulemaking process, the

Register submitted her recommendation to the Librarian in October 2021. *See Section 1201*

*Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights* (Oct. 2021), AR at 1571–1926. The Recommendation concluded that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." AR at 1802.

In explaining this recommendation, the Register considered four statutory factors guiding the analysis of whether diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software under the fair use doctrine. AR at 1781–85.[4] As to the first factor—"the purpose and character of the use"— the Register concluded that, although device repair can be commercialized, ISOs' repair activities were intended to "restore" a device's "functionality, not to commercialize the embedded copyrighted software." AR at 1782. Referencing her prior conclusions that diagnosis, maintenance, and repair of other software-enabled devices "are likely to be transformative uses," the Register determined that the first factor weighed in favor of fair use. *Id.*

The Register also found that the second factor—the nature of the copyrighted work— favored a finding of fair use because ISOs and hospitals did not seek to use the copyrighted software for its "expressive qualities," but rather for the "functional and informational" purposes of allowing them to operate the medical equipment. AR at 1783. As to the third factor—the amount and substantiality of the copyrighted work used—the Register determined that it also weighed in favor of finding fair use because the ISOs' desired use is "necessary to accomplish the

---

[4]     The Copyright Act provides that "fair use of a copyrighted work" is "not an infringement of copyright," 17 U.S.C. § 107, and outlines four factors "to be considered" in making a fair use determination: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

transformative purpose[] of diagnosis, maintenance, and repair," which the Register believed was "reasonable" under the circumstances.  AR at 1784.

Finally, the Register evaluated the fourth factor—the effect of the use on the market value of the copyrighted work—and found that it also weighed in favor of finding fair use since diagnosis, repair, and maintenance of software-enabled medical devices and systems would minimally "effect [ ] the market for or value of the copyrighted works because medical device and system software and data files are sold with the equipment and have no independent value separate from the devices[.]"  *Id.*  The Register observed, however, that if an ISO or provider were to "reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption."  AR at 1785.

Upon finding that the proffered uses by ISOs of the OEMs' copyrighted software were likely noninfringing, the Register next found that the prohibition against circumvention here was "adversely affecting" the repair of the at-issue medical devices, pursuant to the statutory criteria for an exception outlined in 17 U.S.C. § 1201(a)(1)(C).  AR at 1802.  With respect to the first statutory factor—the availability for use of copyrighted works—the Register concluded that the prohibition on circumvention for these types of medical devices "makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair," rejecting the plaintiffs' comments that the medical device software is otherwise broadly licensed and available.  AR at 1799.  As to the second and third statutory factors—the availability for use of works for nonprofit purposes and the impact that anti-circumvention provision has on criticism, comment, news reporting, teaching, scholarship, or research—the Register did not find "these factors [ ] especially relevant to the determination."  AR at 1800–01.  The Register accordingly

sidestepped an OEM argument that the ISOs' interest here is purely commercial-oriented, observing instead that "repair of medical devices and systems that are no longer supported by OEMs arguably preserves the availability for use of the equipment's software and servicing materials."  *Id.*  As to the fourth statutory factor, the Register discounted plaintiffs' concerns of harms to the market, concluding that the narrow scope of the exemption and proposed ISO uses "limit[s] any potential market harm" because repair of medical equipment "support[s] rather than displace[s] the embedded computer programs," and the device software has "no independent value separate from the equipment [it] operate[s] or explain[s]."  AR at 1800.  Finally, as to the fifth statutory factor—granting the Librarian discretion to consider additional factors as she deems appropriate—the Register found relevant that the exemption could help address competitive concerns related to OEMs dominating the repair market and the FDA's determination that the exemption did not pose a substantial safety or security concern.  AR at 1801–02.  The Register accordingly recommended that the Librarian grant the requested exemption.  *Id.* at 1804–06.

### 4. Librarian's Final Rule Adopting Exemption

After considering the Register's recommendation, the Librarian adopted the Exemption in a final rule on October 28, 2021.  Exemption, 86 Fed. Reg. 59,627, AR at 70–84.  In relevant part, the final rule exempts "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system" from the anti-circumvention provision.  37 C.F.R. § 201.40(b)(15), AR at 83.  The Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system," *id.* at § 201.40(b)(15)(i), AR at 83, and defines "repair" as "the restoring of the device

or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(15)(ii), AR at 83. By its terms then, the Exemption is solely limited to repair, diagnosis, and maintenance, and does not exempt ISOs or other users from liability under other provisions of the DMCA. *See id.* § 201.40(b)(15), AR at 83.

### C.  Procedural History

On February 25, 2022, plaintiffs filed their Complaint for declaratory and injunctive relief, alleging that the Librarian's adoption in the Final Rule of the Exemption for repair of medical devices violates the APA, as arbitrary and capricious and not in accordance with the law, Compl. ¶¶ 78–85, and contrary to the APA's procedural requirements because the Librarian failed to respond to critical comments, *id.* ¶¶ 86–91. Alternatively, plaintiffs claim that, if the APA is inapplicable to the Library of Congress, the Librarian's action should be deemed *ultra vires* as outside the scope of her statutory authority and in violation of the constitutional separation of powers. *Id.* ¶¶ 92–101 (citing *Larson v. Domestic and Foreign Com. Corp.*, 337 U.S. 682 (1949)).

About one month after instituting this lawsuit, plaintiffs filed their motion for summary judgment, Pls.' Mot., to which defendants have responded by moving to dismiss, under Federal Rule of Civil Procedure 12(b)(6), plaintiffs' *ultra vires* and constitutional claims for failure to state plausible claims, or in the alternative, cross-motion for summary judgment, under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, because plaintiffs' APA claims are barred under the doctrine of sovereign immunity. *See generally*, Defs.' Cross-Mem.; Defs.' Opp'n Pls.' Mot. Summ. J., ECF No. 17. With the parties having filed their respective oppositions and replies, Pls.' Consolidated Reply Supp. Mot. Summ J. & Opp'n Govt's Mot. Dismiss, ECF No. 18; Defs.' Reply

Supp. Mot. Dismiss, ECF No. 20, and the joint appendix, Joint App'x, ECF No. 24, the parties'

cross-motions are ripe for resolution.

## II.    LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-

matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants

jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020)

(alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012));

*see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited

jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).  Absent subject-matter

jurisdiction over a case, the court must dismiss it.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500,

506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); Fed. R. Civ. P. 12(h)(3).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff

bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue.

*Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  When considering a motion to dismiss under

Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all

uncontroverted material factual allegations contained in the complaint and "'constru[ing] the

complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the

facts alleged.'"  *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration

in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)).  The court

need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by

facts alleged in the complaint or amount merely to legal conclusions.  *Id.* at 288 (alteration in

original) (quotation marks omitted) (making clear that liberally construing complaint in plaintiff's

favor "does not entail accept[ing] inferences unsupported by facts or legal conclusions cast in the form of factual allegations").

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *VoteVets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *accord Atchley, v. AstraZeneca UK Limited, et al*., 22 F.4th 204, 214 (D.C. Cir. 2022).  In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.  Courts do not, however, "assume the truth of legal conclusions . . . nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio*, 797 F.3d at 19 (internal citation omitted).

## III.   DISCUSSION

Defendants' motion to dismiss all four of plaintiffs' claims is predicated on a straightforward three-pronged argument.  First, they argue that Congress exempted itself and the Library of Congress from APA review and thus sovereign immunity bars plaintiffs' procedural and substantive APA claims, in Counts I and II, under Rule 12(b)(1).  Defs.' Cross-Mem. at 16–23.  Second, plaintiffs have failed to plead, in Count III, a plausible statutory *ultra vires* claim because they have not alleged the Librarian violated a specific prohibition in the DMCA that is clear and mandatory.  *Id.* at 37–40.  Finally, defendants contend that the DMCA rulemaking

16

scheme, challenged in Count IV, does not violate the constitutional separation of powers because the Librarian is appointed by the President in accord with the Appointments Clause, so the regulatory scheme does not place unconstitutional power in Congress to legislate without proper bicameralism and presentment. *Id.* at 41–44.

Defendants are right on all counts. First, plaintiffs' APA claims are barred by sovereign immunity because the Librarian's decisions are not subject to APA review. Second, plaintiffs' *ultra vires* claim fails because the Librarian's promulgation of the Exemption does not amount to the type of extreme statutory error required to state a plausible claim. Third, plaintiffs' constitutional challenge is meritless because members of Congress do not participate in the challenged rulemaking, and the Librarian of Congress and the Register of Copyrights are subject to the control of the Chief Executive in carrying out these responsibilities.

### A.    Plaintiffs' APA Claims Are Barred By Sovereign Immunity

The parties do not dispute that the United States is immune from suit absent express consent to be sued. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). As noted, defendants contend that the APA does not waive sovereign immunity for the Library, even when the Library is engaging in rulemaking proceedings, requiring dismissal of plaintiffs' APA challenges for lack of jurisdiction. Defs.' Cross-Mem. at 16–23.

This inquiry begins, as it must, with the statute's text. The APA contains an express waiver of sovereign immunity for "[a]n action . . . seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed . . . on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702. The APA defines "agency" as "each authority of the Government of the United States, whether or not it is

within or subject to review by another agency, but does not include—(A) the Congress . . . ."  5

U.S.C. §§ 701(b)(1), 551(1).  The Library of Congress is indisputably part of Congress, *see* Pls.'

Mot. at 28–29; Defs.' Cross-Mem. at 16–17, and, accordingly, pursuant to the plain text of Section

701(b)(1), the Library is excluded from the definition of an "agency."  *See Kissinger v Reps.*

*Comm'n for the Freedom of the Press*, 445 U.S. 136, 145 (1979) (holding that the Library "is not

an 'agency'" within the meaning of the term used in the Freedom of Information Act ("FOIA"),

which uses the same definition of "agency" as the APA); *see also Intel Corp. Inv. Pol'y Comm. v.*

*Sulyma*, 140 S. Ct 768, 776 (2020) ("We must enforce plain and unambiguous statutory language

. . . according to its terms.") (quotation marks omitted).  The result is that the Library does not

qualify as an "agency" subject to the APA.

       If the plain text were not enough, Congress's decision to make the Copyright Office, which

is a component of the Library, subject to the APA—but not the Library of Congress as a whole—

confirms that Congress intended to exclude the Library from the APA.  Specifically, after the APA

was passed, Congress amended U.S. copyright law to make the Copyright Office subject to the

APA.  *See* 17 U.S.C. § 701(e) ("Except as provided by section 706(b) and the regulations issued

thereunder, all actions taken by the Register of Copyrights under this title are subject to the

provisions of the [APA.]");  H.R. Rep. No. 94-1476 at 171 (1976), reprinted in 1976 U.S.C.C.A.N.

5659 ("Under an amendment to section 701 adopted by the Committee, the Copyright Office is

made fully subject to the [APA] . . . .").  If the APA already provided a statutory authorization for

review of the Librarian's rulemaking decisions under the Copyright Act or the DMCA, section

706(b)'s addition would have been superfluous.  *See Hohn v. United States*, 524 U.S. 236, 249

(1998) ("We are reluctant to adopt a construction making another statutory provision

superfluous.").  Instead, this precise congressional action making the Copyright Office subject to

the APA, but not the Library, reflects a specific choice to decline waiving sovereign immunity under the APA as to the latter.

To put matters to rest, binding D.C. Circuit precedent makes crystal clear that the Library is not an "agency," as that term is defined in the APA and therefore not subject to the APA.  *See Clark v. Libr. of Cong.*, 750 F.2d 89, 102-03 (D.C. Cir. 1984) (citing 5 U.S.C. § 701(b)(1)(A) ("[T]he Library of Congress is not an 'agency' as defined under the [APA]."); *Ethnic Employees of Libr. of Cong. v. Boorstin*, 751 F.2d 1405,1416 n.15 (D.C. Cir. 1985) (observing "that the Library is not an agency under the Administrative Procedure Act"); *Wash. Legal Found. v. U.S. Sent'g Comm.*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (noting that "the Library of Congress . . . is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch").

Notwithstanding this clear textual evidence and binding precedent, plaintiffs assert that the Library of Congress should only be exempt from the APA when acting in a "legislative" capacity, in contrast to its role in the triennial rulemaking process under the DMCA.  Pls.' Mot. at 28–34. Citing to *dicta* in several court decisions analyzing the Library of Congress' structure under the Appointments Clause, U.S. CONST., art. II, § 2, cl., 2, plaintiffs maintain that when exercising functions similar to those of Executive Branch agencies, the Library should be treated like an agency subject to the APA.  *Id.* (citing *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25 (D.D.C. 2010); *Eltra Corp. v. Ringer*, 579 F.2d 294 (4th Cir. 1978)).  Plaintiffs also attempt to distinguish *Clark v. Library of Congress* by describing the Library as acting in a *legislative* capacity in that case, whereas when engaging in triennial rulemaking under the DMCA, the Library should qualify as an "agency" for purposes of the APA.  Pls.' Reply at 10 (second and third

19

JA053

alterations in original) ("[T]o determine the capacity in which the Library is acting, courts 'consider each [of its] function[s] . . . separately and . . . determine the character of each, whether legislative or executive.' *Eltra*, 579 F.2d at 301.  That explains the outcome in *Clark*.").

Plaintiffs' wishful reading of these cases does not withstand scrutiny.  For starters, the issue addressed in the cases plaintiffs cite concerned the validity of the Library's structure under the Appointments Clause, without touching on whether the Library should be treated as an "agency" for the purposes of the APA when engaging in agency-like activities.  *See, e.g., Intercollegiate Broad. Sys.*, 684 F.3d at 1342 ("We too hold that the Librarian is a Head of Department. . . ."); *Live365*, 698 F. Supp. 2d at 43  ("[E]ven though the Library is codified under Title II and is a free standing entity that operates independently from the Executive Branch in conducting its daily operations, the Librarian appears to nonetheless qualify as a Head of Department. . . ."); *Eltra Corp.*, 579 F.2d at 301 (holding that Library "operat[es] in conformity with the Appointments Clause").  To be sure, the Library does perform both executive and legislative functions.  *Eltra Corp.*, 579 F.2d at 301 ("The Librarian performs certain functions which may be regarded as legislative (i.e., Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative.  Because of its hybrid character, it could have been grouped code-wise under either the legislative or executive department.").

Critically, however, none of these cases condition their holdings on whether the challenged activity in question was legislative or executive in nature.  Indeed, in *Clark*, the D.C. Circuit never held that the Library is exempt from the APA based on the specific facts of that case, as plaintiffs mistakenly argue.  *See* Pls.' Reply at 10 ("Thus, given the particular facts at issue in *Clark*, the court held that the Library of Congress [was] not an 'agency' as defined under the Administrative Procedure Act."  750 F.2d at 102.").  Instead, the Court held that Congress did not waive sovereign

immunity with respect to the Library because it is not an "agency" as defined under the APA. *Clark*, 750 F.2d at 102.[5]

In a last gasp effort, plaintiffs urge that the D.C. Circuit implicitly overturned or modified decades of precedent in *Clark*, *Boorstin*, and *Washington Legal Foundation* in *Intercollegiate Broadcasting Systems v. Copyright Royalty Board*, when the D.C. Circuit held that the appointment of Copyright Royalty Judges by the Librarian violated the Appointments Clause and severed "the restrictions on the Librarian['s] . . . ability to remove the" judges to remedy that violation. 684 F.3d at 1334. Yet, *Intercollegiate* never articulated this "hybrid" framework for evaluating APA challenges to the Librarian's actions as plaintiffs theorize. *See* Pls.' Mot. at 28. This is far too flimsy a basis to sustain the "substantial burden on a party advocating the abandonment of an established precedent," *Saad v. Sec. & Exch. Comm'n*, 980 F.3d 103, 107 (D.C. Cir. 2020) (quotation marks omitted), and, consequently, plaintiffs' invitation to recast decades of D.C. Circuit precedent exempting the Library from APA review is declined. *See Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 99 (D.D.C. 2019) (likewise rejecting argument that *Intercollegiate* changed whether the Library was subject to APA review because plaintiffs "pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions . . . [when Congress] exempted [itself] from the APA's definition of 'agency'").

For the foregoing reasons, the Library is not subject to the APA since Congress explicitly declined to waive sovereign immunity for APA challenges to the Library's actions.[6] Accordingly,

---

[5]     For the same reason, the fact that "the Library publishes all relevant documents in connection with its DMCA rulemakings in the Federal Register and promulgates its final exemptions in the Code of Federal Regulations," Pls.' Mot. at 38, is immaterial, since such activity alters neither the statutory definition of an "agency," under 5 U.S.C. § 701(b)(1), nor the scope of any APA waiver of sovereign immunity.

[6]     Plaintiffs make two additional textual arguments in support of their foreclosed reading of the definition of "agency," under 5 U.S.C. § 701(b)(1), but neither is persuasive and cannot override binding D.C. Circuit precedent to

21

the Court lacks jurisdiction to address the merits of plaintiffs' substantive and procedural APA

challenges in Count I and II, which must be dismissed.

### B.  Plaintiffs Fail to Plead Plausible *Ultra Vires* and Constitutional Claims

Aside from asserting APA challenges, plaintiffs raise an *ultra vires* statutory challenge to

the Exemption and a constitutional challenge to the Library's rulemaking authority under the

DMCA, in Counts III and IV, respectively.  Given that the Library of Congress is part of the federal

government, however, these claims "must satisfy all the requirements for actions commenced

against the United States." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign

immunity shields the Federal government and its agencies from suit.").  "'In any suit in which the

United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a

waiver of sovereign immunity.'"  *United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*, 400

F. Supp. 2d 59, 61 (D.D.C. 2005) (quoting *Presidential Gardens Assocs. v. United States*, 175 F.3d

132, 139 (2d Cir. 1999)); *see also First Vir. Bank v. Randolph*, 110 F.3d 75, 77–78 (D.C. Cir.

1997) (outlining these three requirements).  To be sure, plaintiffs have properly asserted that their

claims challenging the Librarian's actions raise issues under the DMCA and the U.S. Constitution,

and thus are brought pursuant to the court's federal question jurisdiction, 28 U.S.C. § 1331.  *See*

Compl. ¶ 25.  That begs the other critical questions, however, whether the United States has waived

---

the contrary.  First, plaintiffs point to the strong presumption of judicial review of administrative action as militating in favor of finding that the Library's DMCA rulemaking actions are subject to APA review.  Pls.' Mot. at 31–32 (citing *Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)). This argument fails to grapple with the overwhelming weight of textual evidence favoring reading "the Congress" to include the Library.  *See Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (cleaned up) (explaining that the presumption for judicial review of agency action, "like all presumptions used in interpreting statutes, may be overcome by specific language that is a reliable indicator of congressional intent").  Moreover, judicial review of the Librarian's actions remains available under the *Larson-Dugan* doctrine, *Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority."), which plaintiffs concede, Pls.' Mot. at 36.  Second, plaintiffs argue that the canon of constitutional avoidance requires reading "agency" to include the Library because otherwise "tremendous separation of powers problems" are raised, *id.* at 32–35, but this variation on their constitutional attack on the Librarian's DMCA rulemaking authority is meritless, as explained, *infra* in Part III.B.2.

sovereign immunity to permit the claims, and, if so, whether plaintiffs have adequately plead their separate causes of action.

Plaintiffs maintain that sovereign immunity does not bar suit here under the *Larson-Dugan* doctrine.  In *Larson v. Domestic & Foreign Commerce Corporation*, the plaintiff sued the head of the War Assets Administration, not for money damages, but for specific performance of the delivery of surplus coal in accordance with plaintiff's contract with the government.  337 U.S. at 684–85.  Finding that the Administrator's action in refusing the coal shipment to the plaintiff was not unconstitutional or *ultra vires* conduct outside the scope of the Administrator's authority, nor contrary to statute or order, *id.* at 703, the Supreme Court concluded that the Administrator's action "was, therefore, inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States," *id.*; *see also id.* at 688 (noting suit would be barred "not because it is a suit against an officer of the Government, but because it is, in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction").  The Court thus articulated, and made explicit in *Dugan v. Rank*, an exception to sovereign immunity in actions seeking specific relief for "(1) action by [government] officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void."  372 U.S. 609, 621–22 (1963).  "In either of such cases the officer's action 'can be made the basis of a suit for specific relief against the officer as an individual.'"  *Id.* at 622 (quoting *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962)); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson*, 337 U.S. at 691 n.11) (emphasis in original) (summarizing *Larson* as holding "that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers'"); *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting *Larson,* 337

U.S. at 689, 693) ("Under [the *Larson-Dugan*] exception, 'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity.").

Here, plaintiffs allege both types of *Larson-Dugan* violations.  First, they say that the Librarian acted beyond the express limits authorized by the DMCA by promulgating the Exemption.  Pls.' Mot. at 38–39.  Second, they argue that the Exemption's promulgation was unconstitutional because, in so doing, the Librarian either "unconstitutionally exercise[d] executive authority (running afoul of separation-of-powers principles) or [ ] unconstitutionally exercise[d] legislative authority (running afoul Article I's bicameralism and presentment requirements)."  Pls. Mot. at 39.  Resolving whether *Larson-Dugan* ultimately applies, however, requires an assessment of the merits of plaintiffs' underlying statutory and constitutional claims and thus "the question of jurisdiction merges with the question on the merits."  *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996); *see also Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (determining whether "the *Larson-Dugan* exception would be triggered and hence no waiver of sovereign immunity is required" rested on "discussion of the central merits question in the case, namely whether" challenged government action violated statute); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013) (quoting *Wash. Legal Found.,* 89 F.3d at 901) (alterations in original) (following D.C. Circuit's practice when finding that "the question of '[w]hether the *Larson-Dugan* exception' applied 'merge[d] with the question on the merits,'" and therefore turning "to address the substantive merits of the mandamus claim before it'").  Each claim is evaluated in turn.

### 1.    *The Librarian Did Not Exceed Her Statutory Authority Under the DMCA.*

Plaintiffs argue that the Librarian's enactment of the Exemption was "well in excess of her delegated authority and contrary to the specific requirements of the DMCA . . . for the same basic reasons that the Exemption is substantively unlawful under the APA."  Pls.' Mot. at 38.  In other words, plaintiffs' theory underlying this claim is that the DMCA authorizes the Librarian to promulgate exemptions only for "noninfringing uses . . . of a particular class of copyrighted works," 17 U.S.C. § 1201(a)(1)(C), but the Exemption authorizes uses purportedly failing to meet this requirement because the sole purpose of the Exemption is to allow ISOs to engage in commercial behavior.  Pls.' Mot. 16–20.  Plaintiffs' recycled APA argument falls well short of pleading a plausible *ultra vires* claim.

At the outset, "[j]udicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up); *see also Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (upon finding that the National Labor Relations Board directly contravened a provision in the National Labor Relations Act, thereby making its action unlawful "in excess of its delegated powers and contrary to a specific prohibition in the Act," holding that the district court had jurisdiction to set aside the unlawful agency action). Pleading a plausible *ultra vires* claim is no simple task and has been described as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *See Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009); *accord N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (quotation marks omitted) ("*Ultra vires* review is intended to be of extremely limited scope, and it represents a more difficult course than would

25

review under the [APA].").  With respect to claims, as here, that a government official's action was contrary or in excess of statutory authority, "such a '*Kyne* exception' applies only when three requirements are met: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'"  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Nyunt,* 589 F.3d at 449); *see also Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (same).  Here, given that, absent the availability of review under the APA, no federal statute specifically precludes judicial review, and there is no alternative procedure for review, the critical question—both to state a plausible claim and for the exercise of jurisdiction— is whether the Librarian "plainly act[ed]" outside the scope of her delegated powers in promulgating the Exemption.

Plaintiffs' claim fails to satisfy the third "*Kyne* exception" requirement.  "The third requirement covers only extreme agency error, not merely garden-variety errors of law or fact." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509 (cleaned up); *see also Doehla Greeting Cards v. Summerfield*, 227 F.2d 44, 47 (D.C. Cir. 1955) (quoting *Larson*, 337 U.S. at 703) ("Erroneous action taken in the exercise of an admittedly validly delegated power is 'inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States.'"). *Ultra vires* claims are accordingly "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court."  *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up).  "Only error that is patently a misconstruction of the [statute], that disregards a

26

JA060

specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (cleaned up).

Plaintiffs merely restate that the Librarian erred in her fair use analysis, which, even if true, would amount to nothing more than a textbook error in statutory interpretation. The D.C. Circuit has given clear instruction that an *ultra vires* claim "must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review." *Fed. Express Corp.*, 39 F.4th at 765 (quotation marks omitted). Moreover, plaintiffs' claim appears even weaker when considering that a fair-use analysis is a highly fact-specific determination involving consideration of four different factors. *See Am. Soc'y for Testing & Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018) (explaining that "each case raising the question" concerning "whether a particular use is fair . . . must be decided on its own facts") (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985)); *see also supra* n.4. The Librarian's determination that diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software could not have been "patent[] [ ] misconstruction of the" DMCA, *Fed. Express Corp.*, 39 F.4th at 764, for this exact reason: it was premised on a detailed balancing of the fair use factors to determine that the ISOs' proffered uses of the OEMs' copyrighted software were likely noninfringing, *see* AR at 1780–1785. Even if plaintiffs believe that the Librarian's reasoning was "terse and incomplete[,]" Pls.' Mot. at 25, they have not demonstrated how that the Librarian has patently "disregard[ed] a specific and unambiguous statutory directive" or "violate[d] some specific command of a statute." *Fed. Express Corp.*, 39 F.4th at 764. At most, the Librarian and plaintiffs just have differing views on the outcome of a fair use analysis here.

In short, plaintiffs have fallen well short of completing their "Hail Mary pass" of an *ultra vires* claim, *see Nyunt*, 589 F.3d at 449, because they have not come close to showing that the Librarian has plainly acted "in excess of [her] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp.*, 39 F.4th at 763 (quotation marks omitted).

### 2. *The Librarian's Rulemaking Authority Does Dot Violate the Separation of Powers.*

Finally, in Count IV, plaintiffs challenge the Librarian's DMCA rulemaking authority as an unconstitutional violation of the separation of powers. The doctrine of separation of powers emanates from the Framers' decision to separate "powers of the [ ] Federal Government into three defined categories, legislative, executive, and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see also* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"); U.S. CONST. art. II, § 1 ("The executive Power shall be vested in a President of the United States[.]"); U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish[.]"). As relevant here, when exercising legislative authority, Congress must follow the procedures outlined in Article I, section 7 of the Constitution: passage by both Houses of Congress and presentment to the President. *Chadha*, 462 U.S. at 951. Moreover, Congress cannot "reserve for itself the power of removal of an [executive branch] officer" because "[t]o permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). Such wielding of executive power is unconstitutional and, conversely, Congress also "may not transfer to another branch 'powers which are strictly and

exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)).

At the same time, "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  Thus, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws," *Gundy*, 139 S. Ct. at 2123, so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform," *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United State*s, 276 U.S. 394, 409 (1928)).  Accordingly, assuming Congress "has supplied an intelligible principle to guide the [agency's] use of discretion," *Gundy*, 139 S. Ct. at 2123, the agency's lawful exercise of that authority is an exercise of executive power.  *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) (cleaned up) (quoting *Bowsher*, 478 U.S. at 733) ("'[I]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law.'").

Plaintiffs' argument is not that Congress unconstitutionally delegated to the Librarian legislative power by giving her rulemaking authority under Section 1201 of the DMCA, but rather that the Library faces a different Catch-22: "[I]f the Library functions as a component of the legislative branch rather than the executive branch in the course of its DMCA rulemakings, either it is unconstitutionally exercising executive authority (running afoul of separation-of-powers principles) or it is unconstitutionally exercising legislative authority (running afoul [of] Article I's bicameralism and presentment requirements)."  Pls.' Mot. at 39.  "Either way," plaintiffs assert, "the rulemaking is constitutionally *ultra vires*."  *Id.*  Plaintiffs' "either-or" reasoning is flawed.

29

JA063

The Library serves both executive and legislative functions and does not run afoul of separation of powers principles so long as both executive *and* legislative power are not simultaneously wielded when conducting those functions. Considering that the Librarian is appointed and subject to removal by the President, and that plaintiffs do not challenge the Librarian's DMCA rulemaking authority as an unconstitutional delegation of legislative power, the Librarian accordingly lawfully engages in executive power under Article II when promulgating rules under the DMCA.

The Fourth Circuit's decision in *Eltra Corporation v. Ringer* is instructive on this issue. When faced with the argument that "the Office of the Register of Copyrights is . . . violative of the Appointments Clause[,]" the Fourth Circuit concluded that the Clause was not violated because "[t]he Register is appointed by the Librarian of Congress, who in turn is appointed by the President with the advice and consent of the Senate," and the "Librarian is an 'Officer of the United States'" within the meaning of the Clause, *Eltra*, 579 F.2d at 300; *see also Intercollegiate*, 684 F.3d at 1342 (holding that the "Librarian is a Head of Department" within the meaning of the Appointments Clause). The court deemed "irrelevant that the Office of the Librarian of Congress is codified under the legislative branch or that it receives its appropriation as a part of the legislative appropriation" because the "Librarian performs certain functions which may be regarded as legislative (i.e., Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative." 579 F.2d at 301; *accord Intercollegiate*, 684 F.3d at 416 (acknowledging that the Library of Congress "performs a range of different functions, including some, such as the Congressional Research Service, that are exercised primarily for legislative purposes"). "Because of its hybrid character," the court continued, "it could have been grouped code-wise under either the legislative or executive department." 579 F.2d at 301. The

court concluded, however, that "such code-grouping cannot determine whether a given function is executive or legislative." *Id.*[7]

Just as the *Eltra* plaintiff, plaintiffs have created a false dichotomy here because, even though the Library performs some legislative functions, it also performs executive functions for the purposes of the Constitution when promulgating regulations under the DMCA. *Eltra* correctly concluded that the Librarian can perform both executive and legislative functions while still not raising separation-of-powers problems because of its "hybrid" character. When promulgating regulations under the DMCA and exercising executive functions, the Library thus need not comply with Article I, section 7's bicameralism and presentment requirements.

As defendants aptly point out, Defs.' Cross-Mem at 43, the critical flaw in plaintiffs' argument is that Congress's decision to categorize the Library as part of "the Congress" rather than make this entity subject to APA review, either directly (as with the Copyright Office) or through the definition of "agency" in 5 U.S.C. § 701(b)(1), has no bearing on whether the exercise of authority in triennial rulemaking is either legislative or executive in function. Congress's decision simply reflects its choice to exempt the Librarian's administrative actions from APA review, a choice that Congress could revisit at any time by amending the APA's definition of "agency."

---

[7]     Defendants are correct, *see* Defs.' Cross-Mem. at 42–43, that administrative bodies invalidated on separation-of-powers grounds had direct participation by Congress or Members of Congress in the exercise of executive actions. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77 (1991) (invalidating a review board partly composed of members of Congress); *Bowsher*, 478 U.S. at 733–34 (invalidating investment of executive powers in an officer removable by Congress); *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam) (holding that Congress could not vest administrative powers in a commission for which members were not appointed pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2). No such constitutional infirmity is present for the Library of Congress.

31

**III.    CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted, and plaintiffs' motion

for summary judgment is denied.  An Order consistent with this Memorandum Opinion will be

entered contemporaneously.

Date: March 7, 2023

_____

BERYL A. HOWELL
Chief Judge

32

System of Records notice (85 FR 14226, March 11, 2020).

Documents mentioned in this NPRM as being available in the docket, and all public comments, will be in our online docket at *https://www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted or a final rule is published.

### List of Subjects in 33 CFR Part 165

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard is proposing to amend 33 CFR part 165 as follows:

### PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 46 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T13–0247 to read as follows:

**§ 165.T13–0247   Safety Zone[s]; Safety Zone; I–5 Bridge Construction Project, Columbia River, Vancouver, WA.**

(a) *Location.* The following area is a safety zone: All navigable waters of the Columbia River, surface to bottom, encompassed by a line connecting the following points beginning at the shoreline at 45°37′17.7″ N/122°40′31.4″ W, southwest to 45°37′12.1″ N/122°40′35.0″ W, southeast to 45°37′08.8″ N/122°40′22.1″ W, thence northeast to 45°37′15.0″ N/122°40′18.3″ W, and along the shoreline back to the beginning point.

(b) *Definitions.* As used in this section, *designated representative* means any Coast Guard commissioned, warrant, or petty officer who has been authorized by the Captain of the Port Columbia River (COTP) to act on his behalf, or a Federal, State, and local officer designated by or assisting the Captain of the Port Columbia River in the enforcement of the safety zone.

(c) *Regulations.* (1) Under the general safety zone regulations in subpart C of this part, you may not enter the safety zone described in paragraph (a) of this section unless authorized by the COTP or the COTP's designated representative.

(2) Vessel operators desiring to enter or operate with the safety zone may contact the COTP's on-scene designated representative by calling (503) 209–2468

or the Sector Columbia River Command Center on Channel 16 VHF–FM. Those in the safety zone must comply with all lawful orders or directions given to them by the COTP or the COTP's designated representative.

(d) *Enforcement period.* This safety zone is in effect from 12:01 on September 6, 2020 through 11:59 p.m. on September 26, 2020. It will be subject to enforcement this entire period unless the Captain of the Port, Columbia River determines it is no longer needed. The Coast Guard will inform mariners of any change to this period of enforcement via Broadcast Notice to Mariners.

Dated: May 12, 2020.

**J.C. Smith,**

*Captain, U.S. Coast Guard, Captain of the Port Columbia River.*

[FR Doc. 2020–13128 Filed 6–19–20; 8:45 am]

**BILLING CODE 9110–04–P**

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Part 201

**[Docket No. 2020–11]**

### Exemptions to Permit Circumvention of Access Controls on Copyrighted Works

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notification of inquiry and request for petitions.

**SUMMARY:** The United States Copyright Office is initiating the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act ("DMCA"), to consider possible temporary exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. In this proceeding, the Copyright Office is again providing a streamlined procedure for the renewal of exemptions that were granted during the seventh triennial rulemaking. If renewed, those current exemptions would remain in force for an additional three-year period (October 2021–October 2024). Members of the public seeking the renewal of current exemptions should submit petitions as described below; parties opposing such renewal will then have the opportunity to file comments in response. The Office is also accepting petitions for new exemptions to engage in activities not currently permitted by existing exemptions, which may include proposals that expand upon a current exemption. Those petitions, and any

renewal petitions that are meaningfully opposed, will be considered pursuant to a more comprehensive rulemaking process similar to that of the seventh rulemaking, including three rounds of written comment, followed by public hearings, which may be conducted virtually.

**DATES:** Written petitions for renewal of current exemptions must be received no later than 11:59 p.m. Eastern Time on July 22, 2020. Written comments in response to any petitions for renewal must be received no later than 11:59 p.m. Eastern Time on September 8, 2020. Written petitions for new exemptions must be received no later than 11:59 p.m. Eastern Time on September 8, 2020.

**ADDRESSES:** Written petitions for renewal of current exemptions must be completed using the form provided on the Office's website at *https://www.copyright.gov/1201/2021/renewal-petition.pdf*. Written petitions proposing new exemptions must be completed using the form provided on the Office's website at *https://www.copyright.gov/1201/2021/new-petition.pdf*. The Copyright Office is using the *regulations.gov* system for the submission and posting of public petitions and comments in this proceeding. All petitions and comments are therefore to be submitted electronically through *regulations.gov*. Specific instructions for submitting petitions and comments are available on the Copyright Office website at *https://www.copyright.gov/1201/2021*. If electronic submission is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, *regans@copyright.gov* or Kevin R. Amer, Deputy General Counsel, *kamer@copyright.gov*. They can be reached by telephone at (202) 707–3000.

**SUPPLEMENTARY INFORMATION:**

### I. The Digital Millennium Copyright Act and Section 1201

The Digital Millennium Copyright Act ("DMCA")[1] has played a pivotal role in the development of the modern digital economy. Enacted by Congress in 1998 to implement the United States' obligations under two international treaties,[2] the DMCA was intended to

---

[1] Public Law 105–304, 112 Stat. 2860 (1998).

[2] WIPO Copyright Treaty, Dec. 20, 1996, 36 I.L.M. 65 (1997); WIPO Performances and Phonograms Treaty, Dec. 20, 1996, 36 I.L.M. 76 (1997).

LOC_AR_00000045

foster the growth and development of a thriving, innovative, and flexible digital marketplace by making digital networks safe places to disseminate and use copyrighted materials.[3] It did this by, among other things, providing new legal protections for copyrighted content made available in digital formats.[4]

These protections, codified in section 1201 of title 17, United States Code, seek to balance the interests of copyright owners and users, including the personal interests of consumers, in the digital environment.[5] Section 1201 protects technological measures (also called technological protection measures or TPMs) used by copyright owners to prevent unauthorized access to or use of their works.[6] Section 1201 contains three separate protections for TPMs. First, it prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works (also known as access controls). Access controls include, for example, a password requirement limiting access to an online service to paying customers or an authentication code in a video game console to prevent the playing of pirated copies. Second, the statute prohibits trafficking in devices or services primarily designed to circumvent access controls. Finally, it prohibits trafficking in devices or services primarily designed to circumvent TPMs used to protect the exclusive rights of the copyright owner of a work (also known as copy controls). Copy controls protect against unauthorized uses of a copyrighted work once access has been lawfully obtained. They include, for example, technology preventing the copying of an e-book after it has been downloaded to a user's device. Because title 17 already provides remedies for copyright infringement, there is no corresponding ban on the act of circumventing a copy control.[7] All these prohibitions supplement the preexisting rights of copyright owners under the Copyright Act of 1976 by establishing separate and distinct causes of action

independent of any infringement of copyright.[8]

Section 1201 contains a number of specific exemptions to these prohibitions, to avoid curtailing legitimate activities such as security testing, law enforcement activities, or the protection of personally identifying information.[9] In addition, to accommodate changing marketplace conditions and ensure that access to copyrighted works for other lawful purposes is not unjustifiably diminished,[10] the statute provides for a rulemaking proceeding where temporary exemptions to the prohibition on circumventing access controls may be adopted by the Librarian of Congress, upon the recommendation of the Register of Copyrights in consultation with the Assistant Secretary for Communications and Information of the Department of Commerce.[11] In contrast to the permanent exemptions set out by statute, exemptions adopted pursuant to the rulemaking must be reconsidered every three years.[12] By statute, the triennial rulemaking process only addresses the prohibition on circumvention of access controls; the statute does not grant the authority to adopt exemptions to the anti-trafficking provisions.[13]

For an exemption to be granted through the triennial rulemaking, it must be established that "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works." [14] In evaluating the evidence, several statutory factors must be weighed: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate." [15]

## II. Overview of the Rulemaking Process

To assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works, the Copyright Office solicits exemption proposals from the public and develops a comprehensive administrative record using information submitted by interested parties.[16] Based on that record, the Register provides a written recommendation to the Librarian concerning which exemptions are warranted based on that record. The recommendation includes proposed regulatory text for adoption and publication in the **Federal Register.**

The rulemaking process for the eighth triennial proceeding will be generally the same as the process followed in the seventh proceeding. This includes the streamlined procedure introduced in the seventh proceeding through which members of the public may petition for current temporary exemptions that were granted during the previous rulemaking to remain in force for an additional three-year period (October 2021– October 2024).

With this notification of inquiry, the Copyright Office is initiating the petition phase of the rulemaking, calling for the public to submit petitions both to renew current exemptions, as well as any comments in support of or opposition to such petitions, and to propose new exemptions. This two-track petition process is described below. After the close of the petition phase, the Office will publish a notice of proposed rulemaking ("NPRM") to initiate the next phase of the rulemaking process, as described below.

Video tutorials explaining section 1201 in general and the rulemaking process can be found on the Office's 1201 rulemaking web page at *https://www.copyright.gov/1201.*

## III. Process for Seeking Renewal of Current Exemptions

In the prior rulemaking, the Copyright Office introduced a streamlined process

---

[3] *See* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 2, 6 (Comm. Print 1998) ("House Manager's Report"); H.R. Rep. No. 105–551, pt. 2, at 21, 23 (1998); H.R. Rep. No. 105–551, pt. 1, at 10 (1998); S. Rep. No. 105–190, at 1–2, 8–9 (1998).

[4] *See* House Manager's Report at 6 (noting Congress's intention to "support new ways of disseminating copyrighted materials to users, and to safeguard the availability of legitimate uses of those materials by individuals").

[5] *See* H.R. Rep. No. 105–551, pt. 2, at 26.

[6] 17 U.S.C. 1201(a)–(b).

[7] S. Rep. No. 105–190, at 12.

[8] *See* U.S. Copyright Office, Section 1201 of Title 17, at i, iii, 43–45 (June 2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Study").

[9] 17 U.S.C. 1201(d)–(j).

[10] H.R. Rep. No. 105–551, pt. 2, at 35–36.

[11] 17 U.S.C. 1201(a)(1)(C); *see also id.* 1201(a)(1)(B)–(D).

[12] *Id.* 1201(a)(1)(C).

[13] *Id.* 1201(a)(1)(C), (a)(1)(E).

[14] *Id.* 1201(a)(1)(C).

[15] *Id.*

[16] *See* H.R. Rep. No. 105–796, at 64 (1998) (Conf. Rep.) ("It is the intention of the conferees that . . . the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate, and recommending final regulations in the report to the Librarian."); *see also* H.R. Rep. No. 106–464, at 149 (1999) (Conf. Rep.) ("[T]he Copyright Office shall conduct the rulemaking under section 1201(a)(1)(C) . . . .").

LOC_AR_00000046

to facilitate the renewal of previously adopted exemptions for which there was no meaningful opposition.[17] This process was initiated shortly after the Office concluded a comprehensive public policy study of section 1201.[18] In that study, following careful analysis of relevant legal principles and noting a broad consensus of stakeholders supporting an expedited process to consider renewal of such exemptions, the Office concluded that "the statute itself requires that exemptions cannot be renewed automatically, presumptively, or otherwise, without a fresh determination concerning the next three-year period. . . . [A] determination must be made specifically for each triennial period."[19] The Office further determined, however, that "the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding."[20]

Those seeking readoption of a current exemption may petition for renewal by submitting the Copyright Office's required fillable form, available on the Office's website at *https:// www.copyright.gov/1201/2021/renewal- petition.pdf*. This form is for renewal petitions only. The Office has a separate form, discussed below, for petitions for new exemptions.

*Scope of Renewal.* Renewal may only be sought for current exemptions as they are currently formulated, without modification. This means that if a proponent seeks to engage in any activities not currently permitted by an existing exemption, a petition for a *new* exemption must be submitted. Where a petitioner seeks to engage in activities that expand upon a current exemption, the Office recommends that the petitioner submit both a petition to renew the current exemption, and, separately, a petition for a new exemption. In such cases, the petition for a new exemption need only discuss those issues relevant to the proposed expansion of the current exemption. If the Office recommends readoption of the current exemption, then only those discrete aspects relevant to the expansion will be subject to the more comprehensive rulemaking procedure described below.

*Automatic Reconsideration.* If the Office declines to recommend renewal

of a current exemption (as discussed below), the petition to renew will automatically be treated as a petition for a new exemption, and will be considered pursuant to the more comprehensive rulemaking proceeding. If a proponent has petitioned both for renewal and an expansion, and the Office declines to recommend renewal, the entire exemption (*i.e.*, the current exemption along with the proposed expansion) will automatically be considered under the more comprehensive proceeding.

*Petition Form and Contents.* The petition to renew is a short form designed to let proponents identify themselves and the relevant exemption, and to make certain sworn statements to the Copyright Office concerning the existence of a continuing need and justification for the exemption. Use of the Office's prepared form is mandatory, and petitioners must follow the instructions contained in this notice and on the petition form. A separate petition form must be submitted for each current exemption for which renewal is sought. This is required for reasons of administrability and so it is clear to which exemption the stated basis for renewal applies. While a single petition may not encompass more than one current exemption, the same party may submit multiple petitions.

The petition form has four components:

*1. Petitioner identity and contact information.* The form asks for each petitioner (*i.e.*, the individual or entity seeking renewal) to provide its name and the name of its representative, if any, along with contact information. Any member of the public capable of making the sworn declaration discussed below may submit a petition for renewal, regardless of prior involvement with past rulemakings. Petitioners and/ or their representatives should be reachable through the provided contact information for the duration of the rulemaking proceeding. Multiple petitioning parties may jointly file a single petition.

*2. Identification of the current exemption that is the subject of the petition.* The form lists all current exemptions granted during the last rulemaking (codified at 37 CFR 201.40), with a check box next to each. The exemption for which renewal is sought is to be identified by marking the appropriate checkbox.

*3. Explanation of need for renewal.* The petitioner must provide a brief explanation summarizing the basis for claiming a continuing need and justification for the exemption. The required showing is meant to be

minimal. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to the petition, it is not necessary. The Office's petition form includes an example of what it regards as a sufficient explanation.

*4. Declaration and signature.* One of the petitioners named in the petition must sign a declaration attesting to the continued need for the exemption and the truth of the explanation provided in support. Where the petitioner is an entity, the declaration must be signed by an individual at the organization having appropriate personal knowledge to make the declaration. The declaration may be signed electronically.

For the attestation to be trustworthy and reliable, it is important that the petitioner make it based on his or her own personal knowledge and experience. This requirement should not be burdensome, as a broad range of individuals have a sufficient level of knowledge and experience. For example, a blind individual having difficulty finding and purchasing e- books with appropriate assistive technologies would have such personal knowledge and experience to make the declaration with regard to the assistive technology exemption; so would a relevant employee or volunteer at an organization like the American Foundation for the Blind, which advocates for the blind, visually impaired, and print disabled, is familiar with the needs of the community, and is well-versed specifically in the e-book accessibility issue. It would be improper, however, for a general member of the public to petition for renewal if he or she knows nothing more about matters concerning e-book accessibility other than what he or she might have read in a brief newspaper article, or simply opposes the use of digital rights management tools as a matter of general principle.

The declaration also requires affirmation that, to the best of the petitioner's knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at *https://www.copyright.gov/1201/2018*) that originally demonstrated the need for the selected exemption, such that renewal of the exemption would not be justified. By "material change," the Office means a significant change in the underlying conditions that originally justified the exemption when it was first granted, such that the appropriateness of continuing the exemption for another three years based on that original

---

[17] 82 FR 29804 (June 30, 2017).
[18] *See generally* Section 1201 Study.
[19] *Id.* at 142.
[20] *Id.* at 143.

LOC_AR_00000047

justification is called into question. This attestation tells the Office that the prior rulemaking record from when the current exemption was originally granted is still ripe and applicable in considering whether or not the same exemption is appropriate for the subsequent triennial period. Only after finding the old record to still be germane can the Office rely upon it in deciding, pursuant to 17 U.S.C. 1201(a)(1)(C), whether to recommend renewal.

*C. Comments in Response to a Petition To Renew an Exemption*

Any interested party may respond to a petition to renew a current exemption by submitting comments. While the primary purpose of these comments is to allow for opposition to renewing the exemption, comments in support of renewal are also permitted. Although no form is being provided for such comments, the first page of any responsive comments must clearly identify which exemption's readoption is being supported or opposed. While participants may comment on more than one exemption, a single submission may not address more than one exemption. For example, a party that wishes to oppose the renewal of both the wireless device unlocking exemption and the jailbreaking exemption must file separate comments for each.[21] The Office acknowledges that this format may require some parties to repeat certain general information (*e.g.,* about their organization) across multiple submissions, but the Office believes that the administrative benefits of creating self-contained, separate records for each exemption will be worth the modest amount of added effort involved.

Opposition to a renewal petition must be meaningful, such that, from the evidence provided, it would be reasonable for the Office to conclude that the prior rulemaking record and any further information provided in the renewal petition are insufficient to support recommending renewal of an exemption. For example, a change in case law might affect whether a particular use is noninfringing, new technological developments might affect the availability for use of copyrighted works, or new business models might affect the market for or value of

copyrighted works. Such evidence could cause the Office to conclude that the prior evidentiary record is too stale to rely upon for an assessment affecting the subsequent three-year period. The Office may also consider whether opposition is meaningful only as to part of a current exemption.

Unsupported conclusory opinion and speculation will not be enough for the Office to refuse to recommend renewing an exemption it would have otherwise recommended in the absence of any opposition, or to subject consideration of this exemption to the more comprehensive rulemaking procedure.

## IV. Process for Seeking New Exemptions

Those seeking to engage in activities not currently permitted by an existing exemption, including activities that expand upon a current exemption, may propose a new exemption by filing a petition using the Copyright Office's required fillable form, available on the Office's website at *https://www.copyright.gov/1201/2021/new-petition.pdf.* Use of the Office's prepared form is mandatory, and petitioners must follow the instructions contained in this notice and on the petition form. As in the seventh rulemaking, a separate petition must be filed for *each* proposed exemption. The Office anticipates that it will, once again, receive a significant number of submissions, and requiring separate submissions for each proposed exemption will help both participants and the Office keep better track of the record for each proposed exemption. Although a single petition may not encompass more than one proposed exemption, the same party may submit multiple petitions.

The petition form has two components:

*1. Petitioner identity and contact information.* The form asks for each petitioner (*i.e.,* the individual or entity proposing the exemption) to provide its name and the name of its representative, if any, along with contact information. Petitioners and/or their representatives should be reachable through the provided contact information for the duration of the rulemaking proceeding. Multiple petitioning parties may jointly file a single petition.

*2. Description of the proposed exemption.* At this stage, the Office is only asking petitioners to briefly explain the nature of the proposed new or expanded exemption. The information that would be most helpful to the Office includes the following, to the extent relevant: (1) The types of copyrighted works that need to be accessed; (2) the

physical media or devices on which the works are stored or the services through which the works are accessed; (3) the purposes for which the works need to be accessed; (4) the types of users who want access; and (5) the barriers that currently exist or which are likely to exist in the near future preventing these users from obtaining access to the relevant copyrighted works.

To be clear, petitioners do not need to propose precise regulatory language or fully define the contours of an exemption class in the petition. A short, plain statement describing the nature of the activities the petitioners wish to engage in is sufficient. Although there is no page limit, the Office anticipates that petitioners will be able to adequately describe in plain terms the relevant information in a few sentences. The Office's petition form includes examples of what it regards as a sufficient description of a requested exemption.

Nor does the Office intend for petitioners to deliver the complete legal and evidentiary basis for their proposals in the petition, and specifically requests that petitioners not do so. Rather, the sole purpose of the petition is to provide the Office with basic information about the uses of copyrighted works that are adversely affected by the prohibition on circumvention. The Office will then use that information to itself formulate categories of potential exemptions, and group similar proposals into those categories, for purposes of the next, more substantive, phase of the rulemaking beginning with the publication of the NPRM.

Indeed, as during the previous two rulemakings, even the NPRM will not "put forward precise regulatory language for the proposed classes, because any specific language for exemptions that the Register ultimately recommends to the Librarian will necessarily depend on the full record developed during this rulemaking." [22] Rather, the proposed categories of exemptions described in the NPRM will "represent only a starting point for further consideration in the rulemaking proceeding, and will be subject to further refinement based on the record." [23] Thus, proponents will have the opportunity to further refine or expound upon their initial petitions during later phases of the rulemaking.

## V. Notice of Proposed Rulemaking

Following receipt of all petitions, as well as comments on petitions for

---

[21] Commenters may, however, respond to multiple *petitions* to renew the same exemption in a single submission. For instance, if the Office receives six petitions in favor of readopting the current wireless device unlocking exemption, a commenter can file a single comment that addresses points made in the six petitions. That comment, however, may not address petitions to readopt the jailbreaking exemption.

[22] 82 FR at 29807 (quoting 79 FR 73856, 73859 (Dec. 12, 2014)).

[23] *Id.* (internal quotation marks and citation omitted).

LOC_AR_00000048

renewal, the Office will evaluate the material received and will issue an NPRM addressing all of the potential exemptions to be considered in the rulemaking.

The NPRM will set forth which exemptions the Register will recommend for readoption, along with proposed regulatory language. The NPRM will also identify any exemptions the Register has declined to recommend for renewal under the streamlined process, after considering any opposition received. Those exemptions will instead be subject to the more comprehensive rulemaking procedure in order to build out the administrative record. The Register will not at the NPRM stage make a final determination to reject recommendation of any exemption that meets the threshold requirements of section 1201(a).[24]

For current exemptions for which renewal was sought but which were not recommended for readoption through the streamlined process and all new exemptions, including proposals to expand current exemptions, the NPRM will group them appropriately, describe them, and initiate at least three rounds of public comment. As with the seventh rulemaking, the Office plans to consolidate or group related and/or overlapping proposed exemptions where possible to simplify the rulemaking process and encourage joint participation among parties with common interests (though such collaboration is not required). As in previous rulemakings, the exemptions as described in the NPRM will represent only a starting point for further consideration in the rulemaking proceeding, and will be subject to further refinement based on the record. The NPRM will provide guidance regarding specific areas of legal and factual interest for the Office with respect to each proposed exemption, and suggest particular types of evidence that participants may wish to submit for the record. It will also contain additional instructions and requirements for submitting comments and will detail the later phases of the rulemaking proceeding—*i.e.*, public hearings, post-hearing questions, recommendation, and final rule—which will be similar to those of the seventh rulemaking.

The Office expects to follow a similar timeframe for issuance of the NPRM and submission of comments that applied during the seventh rulemaking. In addition, as it did in the previous rulemaking, the Office will look for opportunities to discuss discrete issues, including suggestions regarding regulatory language, through its *ex parte* meeting process, and to ask additional post-hearing questions, where necessary to ensure sufficient stakeholder participation.[25]

Dated: June 11, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–12911 Filed 6–19–20; 8:45 am]

**BILLING CODE 1410–30–P**

---

## POSTAL REGULATORY COMMISSION

### 39 CFR part 3050

**[Docket No. RM2020–10; Order No. 5548]**

### Periodic Reporting

**AGENCY:** Postal Regulatory Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Commission is acknowledging a recent filing requesting the Commission initiate a rulemaking proceeding to consider changes to analytical principles relating to periodic reports (Proposal Three). This document informs the public of the filing, invites public comment, and takes other administrative steps.

**DATES:** *Comments are due:* August 14, 2020.

**ADDRESSES:** Submit comments electronically via the Commission's Filing Online system at *http:// www.prc.gov*. Those who cannot submit comments electronically should contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section by telephone for advice on filing alternatives.

**FOR FURTHER INFORMATION CONTACT:** David A. Trissell, General Counsel, at 202–789–6820.

**SUPPLEMENTARY INFORMATION:**

#### Table of Contents

I. Introduction
II. Proposal Three
III. Notice and Comment
IV. Ordering Paragraphs

### I. Introduction

On June 11, 2020, the Postal Service filed a petition pursuant to 39 CFR 3050.11 requesting that the Commission initiate a rulemaking proceeding to consider changes to analytical principles relating to periodic reports.[1] The Petition identifies the proposed analytical changes filed in this docket as Proposal Three.

### II. Proposal Three

*Background.* The Postal Service's current In-Office Cost System (IOCS) design uses a multi-stage probability sample to randomly select craft employees, including city carriers, and then an interval of work time from the employee's tour for a "snapshot" of work activities in the work interval. Petition, Proposal Three at 1. The Postal Service states that moving data collectors to distant delivery units for carrier readings is costly so that in FY 2019, of over 250,000 individual readings scheduled on city carriers, over 85 percent were conducted by telephone. *Id.* The Postal Service asserts that the availability of detailed clock ring data from the Time and Attendance Collection System (TACS) allows reshaping of the sampling design to improve sampling efficiency and data quality. *Id.* The Postal Service explains that In Docket No. RM2019–6, the Commission approved the modelling of all Special Purpose Route (SPR) carrier costs using TACS data and econometric equations.[2]

*Proposal.* The Postal Service states that Proposal Three would change IOCS system design for city carriers to a cluster sampling utilizing census data from TACS to enable on-site data collection at locations and times where and when city carriers are working on the premises. Petition, Proposal Three at 3. Rather than sampling individual employees, the proposed design would sample blocks of time and then subsample clusters of carriers working during those blocks of time. *Id.* The Postal Service asserts that this new design improves data quality with more on-site data rather than telephone readings and, thereby, improves data collection efficiency. *Id.* at 1.

---

[24] *See* 79 FR 55687, 55692 (Sept. 17, 2014) (explaining that part of the purpose of providing the information in the petition phase is so the Office can "confirm that the threshold requirements of section 1201(a) can be met"); *see also* 79 FR at 73859 (noting that three petitions sought an exemption which could not be granted as a matter of law and declining to put them forward for comment).

[25] *See* 82 FR at 29808; U.S. Copyright Office, *Ex Parte* Communications, *https://www.copyright.gov/ 1201/2018/ex-parte-communications.html*; U.S. Copyright Office, Additional Correspondence from Participants in Proposed Class 10, *https:// www.copyright.gov/1201/2018/additional-correspondence/*; Section 1201 Study at 150–51.

[1] Petition of the United States Postal Service for the Initiation of a Proceeding to Consider Proposed Changes in Analytical Principles (Proposal Three), June 11, 2020 (Petition). The Postal Service also filed a notice of filing of public and non-public materials relating to Proposal Three. Notice of Filing of USPS–RM2020–10–1 and USPS–RM2020– 10–NP1 and Application for Nonpublic Treatment, June 11, 2020.

[2] *Id.* at 1–2; Docket No. RM2019–6, Order on Analytical Principles Used in Periodic Reporting (Proposal One), January 14, 2020 (Order No. 5405).

LOC_AR_00000049

the kind of public notice given, and other information the Lead Executive finds pertinent to the analysis of the referendum and its results.

### § 1500.107   Confidential information.

The ballots and other information or reports that reveal, or tend to reveal, the vote of any person covered under the order and the voter list shall be strictly confidential and shall not be disclosed.

### § 1500.108   OMB control number.

The control number assigned to the information collection requirement in this subpart by the Office of Management and Budget pursuant to the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.,* is OMB control number xxxx.

Dated: September 4, 2020.

**Kenneth White,**
*Senior Policy Analyst, Under Secretary for Economic Affairs.*

[FR Doc. 2020–20035 Filed 10–14–20; 8:45 am]

**BILLING CODE 3510–20–P**

---

## LIBRARY OF CONGRESS

### U.S. Copyright Office

### 37 CFR Part 201

**[Docket No. 2020–11]**

### Exemptions To Permit Circumvention of Access Controls on Copyrighted Works

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of proposed rulemaking.

---

**SUMMARY:** The United States Copyright Office is conducting the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act ("DMCA"), concerning possible temporary exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. In this proceeding, the Copyright Office is considering petitions for the renewal of exemptions that were granted during the seventh triennial rulemaking along with petitions for new exemptions to engage in activities not currently permitted by existing exemptions. On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew existing exemptions and comments in response to those petitions, as well as petitions for new exemptions. Having carefully considered the comments received in response to that notification, in this notice of proposed rulemaking ("NPRM"), the Office announces its intention to recommend each of the existing exemptions for readoption. This NPRM also initiates three rounds of public comment on the newly-proposed exemptions. Interested parties are invited to make full legal and evidentiary submissions in support of or in opposition to the proposed exemptions, in accordance with the requirements set forth below.

**DATES:** Initial written comments (including documentary evidence) and multimedia evidence from proponents and other members of the public who support the adoption of a proposed exemption, as well as parties that neither support nor oppose an exemption but seek to share pertinent information about a proposal, are due December 14, 2020. Written response comments (including documentary evidence) and multimedia evidence from those who oppose the adoption of a proposed exemption are due February 9, 2021. Written reply comments from supporters of particular proposals and parties that neither support nor oppose a proposal are due March 10, 2021. Commenting parties should be aware that rather than reserving time for potential extensions of time to file comments, the Office has already established what it believes to be the most generous possible deadlines consistent with the goal of concluding the triennial proceeding in a timely fashion.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov.* The Office is accepting two types of comments. First, commenters who wish briefly to express general support for or opposition to a proposed exemption may submit such comments electronically by typing into the comment field on regulations.gov. Second, commenters who wish to provide a fuller legal and evidentiary basis for their position may upload a Word or PDF document, but such longer submissions must be completed using the long-comment form provided on the Office's website at *https:// www.copyright.gov/1201/2021.* Specific instructions for submitting comments, including multimedia evidence that cannot be uploaded through regulations.gov, are also available on that web page. If a commenter cannot meet a particular submission requirement, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov,* Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov,* or Terry Hart, Assistant General Counsel, by email at *tehart@copyright.gov.* Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew current exemptions, oppositions to the renewal petitions, and petitions for newly proposed exemptions in connection with the eighth triennial section 1201 rulemaking.[1] In response, the Office received thirty-two renewal petitions, eight comments in opposition to renewal of a current exemption, and seven comments supporting renewal of a current exemption.[2] These comments are discussed further below. In addition, the Office received twenty-six petitions for new exemptions or expansion of previously granted exemptions.

With this NPRM, the Office sets forth the exemptions that it intends to recommend for readoption without the need for further development of the administrative record, and outlines the proposed classes for new exemptions for which the Office initiates three rounds of public comment.

### I. Standard for Evaluating Proposed Exemptions

As the notification of inquiry explained, for a temporary exemption from the prohibition on circumvention to be granted through the triennial rulemaking, it must be established that "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works."[3] To define an appropriate class of copyrighted works, the Office begins with the broad

---

[1] 85 FR 37399 (June 22, 2020).

[2] The comments received in response to the notification of inquiry are available at *https:// www.regulations.gov/docketBrowser?rpp=25&so= DESC&sb=comment DueDate&po=0&dct=PS&D=COLC-2020-0010* and on the Copyright Office website. Renewal petitions are available at *https://www.copyright.gov/1201/ 2021/petitions/renewal/,* and petitions for new exemptions are available at *https:// www.copyright.gov/1201/2021/petitions/proposed/.* References to renewal petitions and comments are by party name (abbreviated where appropriate) and a brief identification of the previously granted exemption, followed by either "Renewal Pet.," "Supp." (for comments supporting an exemption), or "Opp." (for comments opposing an exemption). References to petitions for new exemptions are by party name (abbreviated where appropriate), the Office's proposed class number, and "Pet."

[3] 17 U.S.C. 1201(a)(1)(C).

LOC_AR_00000050

categories of works identified in 17 U.S.C. 102 and then refines them by other criteria, such as the technological protection measures ("TPMs") used, distribution platforms, and/or types of uses or users.[4]

In evaluating the evidence, the statutory factors listed in section 1201(a)(1)(C) are weighed: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.[5] After developing a comprehensive administrative record, the Register makes a recommendation to the Librarian of Congress concerning whether exemptions are warranted based on that record.

The Office has previously articulated the substantive legal and evidentiary standard for the granting of an exemption under section 1201(a)(1) multiple times, including in video and PowerPoint tutorials, its 2017 policy study for Congress on section 1201, and in prior recommendations of the Register concerning proposed classes of exemptions, each of which is accessible from the Office's section 1201 rulemaking web page at *https:// www.copyright.gov/1201/*. In considering whether to recommend an exemption, the Office must inquire: "*Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?*"[6] This inquiry breaks down into the following elements:

• The proposed class includes at least some works protected by copyright.

• The uses at issue are noninfringing under title 17.

• Users are adversely affected in their ability to make such noninfringing uses or, alternatively, users are likely to be adversely affected in their ability to make such noninfringing uses during the next three years. This element is analyzed in reference to section 1201(a)(1)C's five statutory factors.

• The statutory prohibition on circumventing access controls is the cause of the adverse effects.[7]

The Register will consider the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing.[8] When considering whether such uses are being adversely impacted by the prohibition on circumvention, the rulemaking focuses on "distinct, verifiable, and measurable impacts" compared to "*de minimis* impacts."[9] Taking the administrative record as a whole, the Office will consider whether the preponderance of the evidence shows that the conditions for granting an exemption have been met.[10]

## II. Review of Petitions To Renew Existing Exemptions

As with the previous rulemaking proceeding, the Office is using a streamlined process for recommending readoption of previously-adopted exemptions to the Librarian. As the

Office explained in its 2017 policy study, the "Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests," and the statute requires that "a determination must be made specifically for each triennial period."[11] The Office further determined that "the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding."[12] The Office first instituted this streamlined renewal process in the seventh triennial rulemaking, which concluded in 2018.[13] The process elicited requests to renew each of the exemptions that had been previously exempted, none of which were meaningfully contested.[14] As a result, the Office was able to recommend renewal of all previously granted exemptions.[15] The streamlined renewal process was praised by participants during the ensuing rulemaking phases.[16]

Following the same procedure that was successfully implemented in the last cycle, for this rulemaking, the Office solicited petitions for the renewal of exemptions as they are currently formulated, without modification. As noted, streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Office to recommend adoption of the exemption in the prior rulemaking will continue into the forthcoming triennial period.[17] That is, the same facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption. Accordingly, to the extent that any renewal petition proposed uses beyond the current exemption, the Office disregarded those portions of the petition for purposes of considering the renewal of the exemption, and instead focused on whether it provided sufficient information to warrant readoption of the exemption in its current form.

The Office received thirty-two petitions to renew existing exemptions, including at least one petition to renew each currently-adopted exemption. Each

[4] *See* H.R. Rep. No. 105–551, pt. 2, at 38 (1998) ("Commerce Comm. Report"); U.S. Copyright Office, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights 13–14 (2018) ("2018 Recommendation"); U.S. Copyright Office, Section 1201 of Title 17, at 26, 108–10 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Study"); *see also* 82 FR 49550, 49551 (Oct. 26, 2017) (same).

[5] 17 U.S.C. 1201(a)(1)(C).

[6] Section 1201 Study at 114.

[7] *Id.* at 115; *see also id.* at 115–27.

[8] *Id.* at 115–17. While controlling precedent directly on point is not required to justify an exemption, there is no "rule of doubt" favoring an exemption when it is unclear that a particular use is fair or otherwise noninfringing. *See* U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 15 (2015) ("2015 Recommendation").

[9] Commerce Comm. Report at 37; *see also* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998) (using the equivalent phrase "substantial adverse impact") ("House Manager's Report"); *see also, e.g.,* Section 1201 Study at 119–21 (discussing same and citing application of this standard in five prior rulemakings).

[10] *See* 17 U.S.C. 1201(a)(1)(C) (asking whether users "*are, or are likely to be*" in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses") (emphasis added); Section 1201 Study at 111–12; *see also Sea Island Broad. Corp.* v. *FCC*, 627 F.2d 240, 243 (D.C. Cir. 1980) (noting that "[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings"); 70 FR 57526, 57528 (Oct. 3, 2005); 2018 Recommendation at 18; 2015 Recommendation at 13–14; U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 6 (2012) ("2012 Recommendation"); U.S. Copyright Office, Section 1201 Rulemaking: Second Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 19–20 (2003).

[11] Section 1201 Study at 142, 145.

[12] *Id.* at 143.

[13] 2018 Recommendation at 17.

[14] *Id.* at 22.

[15] *Id.* at 19.

[16] *See, e.g., id.* at 19 n.80 (collecting transcript testimony from 2018 rulemaking).

[17] Section 1201 Study at 143–44.

JA073

petition to renew an existing exemption included an explanation summarizing the basis for claiming a continuing need and justification for the exemption. In each case, petitioners also signed a declaration stating that, to the best of their personal knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified.

The Office received fifteen comments in response to the renewal petitions; seven of these supported renewal of a specific exemption. Eight raised discrete concerns with specific petitions, but none opposed the verbatim readoption of an existing regulatory exemption. Rather, many of these comments address whether the petitions received were sufficient for the Office to consider renewal of the full scope of an exemption, rather than themselves disputing the reliability of the previously-analyzed administrative record.[18] These comments are specifically addressed in the context of the relevant exemption below.

The Office has generally not required petitions to speak to each and every type of use, but rather generally aver that the overall conditions persist.[19] Requiring a fulsome showing would undermine the goal of the streamlined process. The impetus for instituting the streamlined process was to create a

more efficient process for unopposed exemptions, and the Office was mindful in shaping the streamlined renewal process to avoid recreating the requirements of the full rulemaking process.[20] In outlining potential mechanics in its Section 1201 Study, the Office envisioned brief filings,[21] with a "minimal" evidentiary showing required.[22] The Office has previously advised that it is sufficient for petitioners to declare that "there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified."[23] In the current proceeding, the Office explained that it expects petitioners would need only "a paragraph or two" to explain the need for renewal and that documentary evidence at this stage of the process is accepted but not necessary.[24] Petitioners must also "sign a declaration attesting to the continued need for the exemption and the truth of the explanation provided in support" and attest that "there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record . . . that originally demonstrated the need for the selected exemption, such that renewal of the exemption would not be justified."[25] That attestation also serves as a basis for the Office to evaluate whether the entirety of the prior administrative record supporting a given exemption continues to obtain. The Office thus concludes that the petitions received are formally and substantively sufficient for the Office to consider in evaluating whether renewal of the existing exemptions is appropriate.

To the extent a commenter questions whether there is a continued need for a specific exempted use or otherwise believes that the scope of an exemption should be narrowed, that commenter should come forward and oppose the exemption. As explained in the notification of inquiry, opposition to a renewal request asks opponents to provide evidence that would make it "reasonable for the Office to conclude that the prior rulemaking record and

any further information provided in the renewal petition are insufficient to support recommending renewal of an exemption."[26] The Office will then consider such statements and, as appropriate, will notice the issue for subsequent comment phases to ensure the administrative record remains reliable in light of current developments. But in this rulemaking, the Office has not received comments actually disputing whether there is a continued basis for any exemptions.

In the next rulemaking, the Office may consider whether to include a mechanism for petitioners to disclaim types of uses or other aspects of an exemption if they believe only partial renewal is appropriate. As detailed below, after reviewing the petitions for renewal and comments in response, the Office concludes that it has received a sufficient petition to renew each existing exemption, and it does not find any meaningful opposition to such renewal. Accordingly, the Office intends to recommend readoption of all existing exemptions in their current form.

### A. Audiovisual Works—Criticism and Comment—Universities and K–12 Educational Institutions

Multiple organizations petitioned to renew the exemption for motion pictures[27] for educational purposes by college and university or K–12 faculty and students (codified at 37 CFR 201.40(b)(1)(ii)(A)).[28] The petitions demonstrated the continuing need and justification for the exemption, stating that educators and students continue to rely on excerpts from digital media for class presentations and coursework. Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, the American Association of University Professors ("AAUP"), International Communication Association ("ICA"), Library Copyright Alliance ("LCA"), and Society for Cinema and Media Studies ("SCMS") (collectively "Joint Educators I") provide several examples of professors using DVD clips in the classroom; for example, "Cornell University Communication professor Lee Humphreys samples short segments of movies and television shows for her lectures in her 'Media Communication' class" and has "shifted from using clips from YouTube because she wants to show higher quality clips and to avoid

---

[18] See, e.g., DVD Copy Control Ass'n ("DVD CCA") & Advanced Access Content Sys. Licensing Adm'r ("AACS LA") AV Educ. Opp'n at 4 ("the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses"); DVD CCA & AACS LA Nonfiction Multimedia Ebooks Opp'n at 2 ("To the extent the proponents are requesting renewal of the full exemption, the failure to provide any example of use of this expansion to all nonfiction works beyond film analysis should render the exemption's expanded nonfiction uses ineligible for the streamlined renewal process"); ESA, MPA & RIAA Noncom. Video Opp'n at 1 ("the Register should . . . carefully scrutinize OTW's petition, and all of the streamlined renewal petitions, to consider whether the examples of alleged exemption use provided in the petitions fall within the parameters of the existing exemptions").

[19] See 85 FR at 37401 ("The petitioner must provide a brief explanation summarizing the basis for claiming a continuing need and justification for the exemption. The required showing is meant to be minimal."); Section 1201 Study at 144 ("The Office believes that the evidentiary showing required in a declaration can be minimal, as the aim is only to show that the harm that existed when the exemption was first granted continues to occur or would return but for the exemption, thus providing a sufficient justification for the Office to rely upon the prior rulemaking record in making a new recommendation supporting renewal of the exemption. Moreover, this approach appears consistent with relevant case law upholding determinations based upon a single sworn affidavit.").

[20] Section 1201 Study at 144 (also noting that "some stakeholders expressed wariness that, in practice, a short-form filing might recreate the requirements of the current rulemaking").

[21] See id. at 143 (Office will request "parties seeking renewal of an exemption to submit a short declaration outlining the continuing need for an exemption"); see also id. at 144 (referring to a "short-form filing").

[22] Id. at 144.

[23] 2018 Recommendation at 18.

[24] 85 FR at 37401.

[25] Id.

[26] Id. at 37402; see also 2018 Recommendation at 18.

[27] Unless otherwise noted, all references to motion pictures as a category include television programs and videos.

[28] Joint Educators I AV Educ. Renewal Pet.; Brigham Young Univ. & Brigham Young Univ.—Idaho (collectively, "BYU") AV Educ. Renewal Pet.

showing the attached advertisements to her students." [29] In addition, co-petitioner Peter Decherney declares that he "continues to teach a course on Multimedia Criticism" where his students "produce short videos analyzing media." [30] Indeed, Joint Educators I broadly suggest that the "entire field" of video essays or multimedia criticism "could not have existed in the United States without fair use and the 1201 educational exemption." [31] Through these submissions, petitioners demonstrated personal knowledge and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking.

DVD CCA and AACS LA filed comments that do not object to the renewal of this exemption but ask the Office to address several purported deficiencies in the renewal petitions. [32] Because DVD CCA and AACS LA expressly disclaim opposition to streamlined renewal of this exemption, the Office does not treat the concerns raised as meaningful opposition. It does, however, provide brief additional comment on the points raised by DVD CCA and AACS LA regarding the sufficiency of the petition. Regarding the lack of evidence of use of the exemption by K–12 educators or students, DVD CCA and AACS LA argue that "the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses." [33] As explained above, petitioners need not address every possible use covered by an exemption when seeking to renew an exemption, and the Office has concluded that the petition was submitted in a sufficient manner. [34]

A similar conclusion applies to DVD CCA and AACS LA's complaint that "the users ignore the threshold requirement to consider alternatives to

circumvention." [35] DVD CCA and AACS LA are correct in noting that, although the 2018 rulemaking eliminated prior language limiting the exemption to circumstances where "close analysis" of video is required, it retained the requirement that the user "reasonably believe[] that non-circumventing alternatives are unable to produce the required level of high-quality content." [36] From their comment, it appears that DVD CCA and AACS LA believe that the "close analysis" requirement should be reinstated, but wish to reiterate a "lack of opposition" to the exemption in light of recognition that schools are currently "wrestling with implementing distance learning." [37]

The Office has examined the record and finds the petitions sufficient. As explained above, it does not follow that petitioners seeking renewal must provide an "explanation why screen capture technology could not suffice to capture and show" for each and every one of the film clips they seek to use. [38] Petitioners made that showing in the prior rulemaking, and their renewal petition attests that there has been no material change in the facts. Indeed, Joint Educators I reference the need of a communication professor to embed clips in PowerPoint rather than played from YouTube "because she wants to show higher quality clips and to avoid showing the attached advertisements to her students." [39] The same petition also provides multiple examples asserting a continued need to make use of the exemption for purposes of engaging in film analysis, precisely the kind of pedagogy that has been discussed in connection with the prior "close analysis" limitation. [40] This is sufficient. It then becomes opponents' burden to establish a basis for concluding that the prior findings no longer obtain. DVD CCA and AACS LA AV have provided no such evidence here.

Based on the information provided in the renewal petitions and the lack of

meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*B. Audiovisual Works—Criticism and Comment—Massively Open Online Courses ("MOOCs")*

Brigham Young University and Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, ICA, LCA, and SCMS (collectively "Joint Educators II") petitioned to renew the exemption for educational uses in MOOCs (codified at 37 CFR 201.40(b)(1)(ii)(B)). [41] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as increase the number of (and therefore access to) MOOCs in the field of film and media studies—with Joint Educators II noting that the "exemption has never been so relevant as it is now during the COVID–19 pandemic and the universal shift of our education systems to online learning." [42]

In response to the renewal petition, DVD CCA and AACS LA filed a comment noting that they did not oppose renewal of the exemption but asking the Office to address what they described as the "apparent failure of the proponents" to employ technological measures preventing retention and redistribution of MOOC content. [43] The comment suggests that this does not reflect any changed circumstances, and notes that the Office suggested in the seventh rulemaking that the proper method to air DVD CCA and AACS LA's concerns would be to oppose the renewal. [44] Again, they have not done so. The Office declines to address whether any user's activities may or may not be consistent with the exemption. The relevant exemption language is not in dispute, and interpreting compliance with or eligibility for the exemption is outside the scope of this proceeding. If DVD CCA and AACS LA believe that the exemption should be adjusted or eliminated in light of abuse or difficulty in complying with the condition that

---

[29] Joint Educators I AV Educ. Renewal Pet. at 3.

[30] *Id.*

[31] *Id.*

[32] DVD CCA & AACS LA AV Educ. Opp'n.

[33] *Id.* at 4.

[34] To the extent the eighth rulemaking has received information relating to whether the exemption remains necessary for K–12 educational activities, Joint Educator's petition for expansion of this exemption also suggests it continues to be necessary, especially in light of the ongoing pandemic. *See* Decherney, Sender, Jackson, Stein, Gaglani, Wisbauer, Berg, Siddiqui, Robertson, Console-ing Passions, AAUP, ICA, LCA & SCMS (collectively "Joint Educators III) Class 1 Pet. at 2.

[35] DVD CCA & AACS LA AV Educ. Opp'n at 7.

[36] 37 CFR 201.40(b)(1).

[37] DVD CCA & AACS LA AV Educ. Opp'n at 6–7.

[38] *Id.* at 6.

[39] Joint Educators I AV Educ. Renewal Pet. at 3.

[40] *See also, e.g.,* 2015 Recommendation at 92 (citing examples where high-definition quality is necessary, including close analysis of "*The Wizard of Oz* (to highlight prop wires and other 'stage-like' elements), *Citizen Kane* (to appreciate depth of field, chiaroscuro effects, and subtle narrative elements), Jacques Tati's *Playtime* (to better approximate the intended 70mm viewing experience and appreciate the film's very detailed and complex composition), and *Saving Private Ryan* (to experience the enhanced color and contrast effect of bleach bypass film processing, hyper-realism, and complex soundscapes)").

[41] BYU AV Educ. MOOCS Renewal Pet.; Joint Educators AV Educ. MOOCs Renewal Pet.

[42] Joint Educators II AV Educ. MOOCs Renewal Pet. at 3.

[43] DVD CCA & AACS LA AV Educ. MOOCs Opp'n at 1.

[44] *Id.* at 2 n.3.

LOC_AR_00000053

exemption beneficiaries reasonable technological measures, the proper response would be to submit an opposition to this exemption so the Office can determine whether fuller airing through notice and comment to evaluate this issue is appropriate.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*C. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs*

LCA and Professor Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofits (codified at 37 CFR 201.40(b)(1)(ii)(C)).[45] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs.[46]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*D. Audiovisual Works—Criticism and Comment—Multimedia E-Books*

Multiple petitioners jointly sought to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books (codified at 37 CFR 201.40(b)(1)(i)(C)).[47] The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge through Professor Buster's continued work on an e-book series based on her lecture series, "Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment," which, they said, "relies on the availability of high-resolution video not

available without circumvention of technological protection measures."[48]

In response, DVD CCA and AACS LA filed a comment that did not object to renewal of an exemption limited to "e-books offering filming analysis," but did object to renewing the existing exemption as it is currently formulated.[49] DVD CCA and AACS LA asserted that the renewal petition failed to "provide any example of use of this expansion to all nonfiction works beyond film analysis."[50] As a result, they argue that the evidence is only sufficient to support an exemption for use in e-books offering film analysis.

As noted above, however, in making a petition to renew an exemption, it is sufficient for petitioners to declare that to their knowledge, "there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified."[51] Petitioners are not required to provide examples that pertain to every type of use covered by the exemption. To the extent an opponent of renewal seeks to narrow an exemption, it should "provide evidence that would allow the Acting Register to reasonably conclude that the prior rulemaking record and any further information provided in the petitions are insufficient for her to recommend renewal without the benefit of a further developed record."[52]

In this case, the Office determined in the 2018 proceeding that the record was sufficient to justify recommending an exemption that includes nonfiction uses beyond film analysis.[53] The Office concludes that the renewal petition, which seeks renewal of the exemption as previously adopted, is sufficient to support renewal. Although DVD CCA and AACS LA note that the statements in the renewal petition are limited to examples related to e-books offering film analysis, this opposition does not amount to evidence in the form of legal, marketplace, or technological changes that render the prior rulemaking record insufficient to support recommending renewal.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly,

the Office intends to recommend renewal of this exemption.

*E. Audiovisual Works—Criticism and Comment—Filmmaking*

Multiple organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where use is in parody or for a biographical or historically significant nature (codified at 37 CFR 201.40(b)(1)(i)(A)).[54] The petitions summarized the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the International Documentary Association, Film Independent, and Kartemquin Educational Films (collectively "Joint Filmmakers")—which represent thousands of independent filmmakers across the nation—stated that TPMs such as encryption continue to prevent filmmakers from accessing needed material, and that this is "especially true for the kind of high fidelity motion picture material filmmakers need to satisfy both distributors and viewers."[55] Petitioners state that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so.[56]

DVD CCA and AACS LA filed comments that did not oppose renewal of the exemption but did object to the characterization of the exemption filed by the filmmaking proponents.[57] Specifically, DVD CCA and AACS LA noted that the exemption is limited to criticism or comment, documentary filmmaking, or any filmmaking that would make use of a clip in a parody or for its biographical or historical nature; in their view, petitioners suggest the exemption covers all fair use or noninfringing uses.[58] The Office does not find it necessary to opine on the characterization of the petitions by DVD CCA and AACS LA and believes that petitioners' declarations have met the minimal showing sufficient to support renewal of the exemption without modification.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during

---

[45] LCA & Hobbs AV Educ. Nonprofits Renewal Pet.

[46] *Id.*

[47] Buster, Authors Alliance & AAUP Nonfiction Multimedia E-Books Renewal Pet.

[48] *Id.* at 3.

[49] DVD CCA & AACS LA Nonfiction Multimedia E-Books Opposition Pet.

[50] *Id.* at 2.

[51] 2018 Recommendation at 18.

[52] *Id.*

[53] *Id.* at 64.

[54] Joint Filmmakers Documentary Films Renewal Pet.; New Media Rights ("NMR") Documentary Films Renewal Pet.

[55] Joint Filmmakers Documentary Films Renewal Pet. at 3.

[56] *Id.*; NMR Documentary Films Renewal Pet. at 3.

[57] DVD CCA & AACS LA Documentary Filmmaking Opp'n.

[58] *Id.* at 2.

LOC_AR_00000054

the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### F. Audiovisual Works—Criticism and Comment—Noncommercial Videos

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos (codified at 37 CFR 201.40(b)(1)(i)(B)).[59] The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, one of the petitioners, the Organization for Transformative Works ("OTW"), has advocated for the noncommercial video exemption in past triennial rulemakings, and has heard from "a number of noncommercial remix artists" who have used the exemption and anticipate needing to use it in the future.[60] OTW included an account from an academic stating that footage ripped from DVDs and Blu-ray was preferred for "vidders" (noncommercial remix artists) because "it is high quality enough to bear up under the transformations that vidders make to it."[61] Similarly, NMR stated that its staff personally knows "many video creators that have found it necessary to rely on this exemption during the current triennial period" and who intend to make these types of uses in the next triennial period.[62]

OTW contends that "the exemption should be renewed using the relatively simple language defining the exempted class from the 2008 rulemaking, covering both DVDs and Blu-Ray (and streaming where necessary) 'when circumvention is accomplished solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use.'"[63] OTW asserts that this change would not constitute "an expansion of the existing exemption, but a more understandable restatement."[64] Two comments, one from DVD CCA and AACS LA and the other from the Entertainment Software Association ("ESA"), Motion Picture Association ("MPA"), and Recording Industry Association of America

("RIAA") did not object to the renewal of the exemption for noncommercial videos but did object to the proposed change in the language sought by OTW, arguing that it involves a modification of the current exemption.[65] The Office agrees that OTW's proposed modifications are appropriately addressed as part of the full rulemaking proceeding, and therefore the Office has included this request with the proposed classes discussed below.[66]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### G. Audiovisual Works—Accessibility

Multiple organizations petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities (codified at 37 CFR 201.40(b)(2)(i)(A)).[67] No oppositions were filed against readoption of this exemption.

The petition demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience. For example, Brigham Young University asserts that its disability services offices "sometimes need to create accessible versions of motion pictures" to accommodate its students with disabilities.[68] Both petitions stated that there is a need for the exemption going forward; indeed, one group of petitioners states that "the need is likely to increase significantly in light of the ongoing COVID–19 pandemic as many educational institutions shift to online learning and the use of digital multimedia by faculty increases."[69]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### H. Literary Works—Accessibility

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (i.e., e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities (codified at 37 CFR 201.40(b)(3)).[70] No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies.[71] Petitioners noted that the record underpinning this exemption "has stood and been re-established in the past six triennial reviews, dating back to 2003," and that the "accessibility of ebooks is frequently cited as a top priority" by its members.[72] In addition, petitioners noted the unique challenges COVID–19 poses to the blind, visually impaired, and print disabled due to limited physical access to libraries and the shift to virtual learning.[73] Finally, the petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption; they are all organizations that advocate for the blind, visually impaired, and print disabled.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### I. Literary Works—Medical Device Data

Hugo Campos petitioned to renew the exemption covering access to patient data on networked medical devices (codified at 37 CFR 201.40(b)(4)).[74] No oppositions were filed, and Consumer

---

[59] NMR Noncom. Videos Renewal Pet.; OTW Noncom. Videos Renewal Pet.

[60] OTW Noncom. Videos Renewal Pet. at 3.

[61] Id.

[62] NMR Noncom. Videos Renewal Pet. at 3.

[63] OTW Noncom. Videos Renewal Pet. at 4.

[64] Id.

[65] DVD CCA & AACS LA Noncom. Videos Opp'n; ESA, MPA & RIAA Noncom. Videos Opp'n.

[66] The Office notes that much of the language that has been added to the exemption since 2008 was sought by proponents of the exemption, e.g., the addition of a reference to the statutory definition of motion pictures was sought by EFF. See 2012 Recommendation at 105. In some cases, the addition of such language was supported by OTW itself. See, e.g., id. at 110 (adding clarification that commissioned videos are included within exemption if ultimate use is noncommercial, a proposal that was supported by OTW).

[67] Ass'n of Transcribers and Speech-to-Text Providers ("ATSP"), Ass'n on Higher Educ. and Disability ("AHEAD") & LCA Captioning Renewal Pet.; BYU Captioning Renewal Pet.

[68] BYU Captioning Renewal Pet. at 3.

[69] ATSP, AHEAD & LCA Captioning Renewal Pet. at 3.

[70] Am. Council for the Blind ("ACB"), Am. Fed'n for the Blind ("AFB"), Nat'l Fed'n of the Blind ("NFB"), LCA, American Association of Law Libraries ("AALL"), Benetech/Bookshare, and HathiTrust Assistive Technologies Renewal Pet.

[71] Id. at 3.

[72] Id. at 3–4.

[73] Id. at 4.

[74] Campos Medical Devices Renewal Pet.

LOC_AR_00000055

Reports submitted a comment in support.[75] Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical devices to manage their health.[76] Mr. Campos demonstrated personal knowledge and experience with regard to this exemption, as he is a patient needing access to the data output from his medical device and is a member of a coalition whose members research, comment on, and examine the effectiveness of networked medical devices.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*J. Computer Programs—Unlocking*

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (*e.g.*, smartwatches), to allow connection of a new or used device to an alternative wireless network ("unlocking") (codified at 37 CFR 201.40(b)(5)).[77] No oppositions were filed against the petitions seeking to renew this exemption; Consumer Reports filed in support of renewal.[78] The petitions demonstrate the continuing need and justification for the exemption, stating that consumers of the enumerated products continue to need to be able to unlock the devices so they can switch network providers. For example, ISRI stated that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers still lock devices to prevent them from being used on other carriers.[79] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption. CCA and ISRI represent companies that rely on the ability to unlock cellphones. Both petitioners also participated in past 1201 triennial rulemakings relating to unlocking lawfully-acquired wireless devices.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the

conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*K. Computer Programs—Jailbreaking*

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones, tablets and other portable all-purpose mobile computing devices, smart TVs, or voice assistant devices to allow the device to interoperate with or to remove software applications ("jailbreaking") (codified at 37 CFR 201.40(b)(6)–(8)).[80] The petitions demonstrate the continuing need and justification for the exemption, and that petitioners had personal knowledge and experience with regard to this exemption. For example, regarding smart TVs specifically, the Software Freedom Conservancy ("SFC") asserts that it has "reviewed the policies and product offerings of major Smart TV manufacturers (Sony, LG, Samsung, etc.) and they are substantially the same as those examined during the earlier rulemaking process."[81] The petitions state that, absent an exemption, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or download third-party software on a smart TV to enable interoperability.[82] For example, EFF's petition outlined its declarant's experience with instances where it was necessary to replace the software on a smartphone, smart TV, and tablet.[83] Consumer Reports filed a comment in support of the exemption,[84] and no one opposed renewal.

Based on the information provided in the renewal petitions and the lack of meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*L. Computer Programs—Repair of Motorized Land Vehicles*

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land

vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of a vehicle function (codified at 37 CFR 201.40(b)(9)).[85] The petitions demonstrated the continuing need and justification for the exemption. For example, the Motor & Equipment Manufacturers Association ("MEMA") stated that over the past three years, its membership "has seen firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety."[86] The Auto Care Association ("ACA") stated that "[u]nless this exemption is renewed, the software measures manufacturers deploy for the purpose of controlling access to vehicle software will prevent Auto Care members from lawfully assisting consumers in the maintenance, repair, and upgrade of their vehicles."[87] SEMA stated that it "is unaware of any factor, incident or reason to change the exemption and the need for the exemption remains valid and imperative."[88] The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals conducting repairs or businesses that manufacture, distribute, and sell motor vehicle parts, and perform vehicle service and repair. Consumer Reports filed in support of the petition.[89]

Although not opposing readoption of this exemption, the Alliance for Automotive Innovation ("AAI") submitted comments raising concerns with the ACA and MEMA petitions.[90] Specifically, the AAI argued that the two petitions "mischaracterize the scope of the existing exemption and appear to argue for an expanded exemption, rather than for renewal of the existing exemption as it is 'currently formulated, without modification.'"[91] It states that both ACA and MEMA suggest "that the existing exemption permits third party repair shops to circumvent access controls on vehicle software in order to provide commercial repair services."[92] AAI asserts that "[p]roviding a commercial service that

---

[75] Consumer Reports Medical Devices Supp.
[76] Campos Medical Devices Renewal Pet. at 3.
[77] Competitive Carriers Ass'n ("CCA") Unlocking Renewal Pet.; Inst. of Scrap Recycling Industries ("ISRI") Unlocking Renewal Pet.
[78] Consumer Reports Unlocking Supp.
[79] ISRI Unlocking Renewal Pet. at 3.

[80] EFF Jailbreaking Renewal Pet.; NMR Jailbreaking Renewal Pet.; SFC Jailbreaking Renewal Pet.
[81] SFC Jailbreaking Renewal Pet. at 3.
[82] EFF Jailbreaking Renewal Pet. at 3; NMR Jailbreaking Renewal Pet. at 3; SFC Jailbreaking Renewal Pet. at 3.
[83] EFF Jailbreaking Renewal Pet. at 3–4.
[84] Consumer Reports Jailbreaking Supp.

[85] ACA Vehicle Repair Renewal Pet.; Am. Farm Bureau Fed'n Vehicle Repair Renewal Pet.; Consumer Tech. Ass'n Vehicle Repair Renewal Pet.; MEMA Vehicle Repair Renewal Pet.; Specialty Equip. Mkt. Ass'n ("SEMA") Vehicle Repair Renewal Pet.
[86] MEMA Vehicle Repair Renewal Pet. at 3.
[87] ACA Vehicle Repair Renewal Pet. at 3.
[88] SEMA Vehicle Repair Renewal Pet. at 3.
[89] Consumer Reports Vehicle Repair Supp.
[90] AAI Vehicle Repair Opp'n.
[91] *Id.* at 1.
[92] *Id.* at 2.

LOC_AR_00000056

requires circumventing access controls or copy controls (*e.g.*, using or providing certain engine tuning software) is indisputably trafficking in an unlawful service under Sections 1201(a)(2) and (b) and, therefore, is clearly outside the scope of the existing exemption." [93]

The Office addressed the relationship of this exemption to the anti-trafficking provisions in some detail in the 2018 Recommendation. In response to petitioners' requests, the Office recommended removal of the language in the prior repair exemption requiring that circumvention be "undertaken by the authorized owner." [94] That change, the Office explained, was intended to "account[] for the possibility that certain third parties may qualify as 'user[s]' eligible for an exemption from liability under section 1201(a)(1)." [95] In making this recommendation, which the Librarian accepted, the Office declined to express any "view as to whether particular examples of assistance do or do not constitute unlawful circumvention services"—specifically, "whether vehicle or other repair services may run afoul of the anti-trafficking provisions when engaging in circumvention on behalf of customers." [96] The Office adheres to this position and accordingly expresses no view as to the activities described by ACA and MEMA.

Based on the information provided in the renewal petitions and the lack of opposition to the specific exemption, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*M. Computer Programs—Repair of Smartphones, Home Appliances, and Home Systems*

Multiple organizations petitioned to renew the exemption for computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system (codified at 37 CFR 201.40(b)(10)). [97] The petitions demonstrated the continuing need and justification for the exemption. For example, EFF, the Repair Association, and iFixit asserted that "[m]anufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and

diagnostics, and they show no sign of changing course. [98] Consumer Reports filed in support of the petition. [99]

In comments filed in response to the petitions, DVD CCA and AACS LA did not object to renewal of the exemption, but did request that the Office "expressly . . . reject the implied assertion that some of the activity used as examples in the renewal petition . . . is permitted under the current exemption." [100] Specifically, they pointed to an example in which petitioners stated a purported need to "repair any disrupted functionality" in Sonos smart speakers for which the manufacturer had ceased to provide software updates. [101] DVD CCA and AACS LA contend that such activity does not constitute "repair" under the exemption because, under relevant licensing schemes, a manufacturer "may outright deactivate one or more functions due to the product's TPM being compromised. These results are not the consequences of the product falling out of repair or breaking." [102]

DVD CCA and AACS LA do not appear to be arguing that the use of this example renders the renewal petitions insufficient with respect to home systems. The Office agrees that the sufficiency of the petitions do not depend on whether this specific example qualifies under the current exemption. Even if this example were excluded, the petitions attest to a continuing need for the exemption and the continued validity of the prior record. [103] To the extent DVD CCA and AACS LA are asking the Office to opine on examples of particular uses, such a request is beyond the scope of the renewal phase, though they are free to raise such concerns in the comment phase to the extent they relate to proposed expansions of the current rule.

Based on the information provided in the renewal petitions and the lack of opposition to renewal, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends

to recommend renewal of this exemption.

*N. Computer Programs—Security Research*

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research (codified at 37 CFR 201.40(b)(11)). [104] The petitioners demonstrated the continuing need and justification for the exemption, as well as personal knowledge and experience with regard to this exemption. For example, the petition from Professor J. Alex Halderman, the Center for Democracy and Technology ("CDT"), and the U.S. Technology Policy Committee of the Association for Computing Machinery ("ACM") highlighted a number of concerns justifying the continuing need for the exemption, including the need to find and detect vulnerabilities in voting machines and other election systems, the increased proliferation of consumer Internet of Things devices, and the increasing reliance on digital systems combined with greater aggressiveness on the part of threat actors, including other nation states. [105] The petition from Professors Matt Blaze and Steven Bellovin asserted that in the past three years "one of us has received threats of litigation from copyright holders in connection with his security research on software in voting systems." [106] Finally, MEMA stated that its membership "experienced firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety." [107]

No oppositions were filed against readoption of this exemption, while Consumer Reports filed in support of renewal. [108] A petition seeking renewal of a separate exemption submitted by Hugo Campos, a member of a coalition of medical device patients and researchers, also noted support for this exemption. [109]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly,

---

[93] *Id.*

[94] 2018 Recommendation at 223–25.

[95] *Id.* at 225.

[96] *Id.*

[97] EFF Device Repair Renewal Pet.; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet.

[98] EFF Device Repair Renewal Pet. at 3; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet. at 3.

[99] Consumer Reports Device Repair Supp.

[100] DVD CCA & AACS LA Device Repair Opp'n at 1.

[101] *Id.* at 3.

[102] DVD CCA & AACS LA Device Repair Opp'n at 4.

[103] *See, e.g.,* EFF Device Repair Renewal Pet. at 3 ("Manufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course.").

[104] Blaze & Bellovin Security Research Renewal Pet.; Halderman, CDT & ACM Security Research Renewal Pet.; MEMA Security Research Renewal Pet.

[105] Halderman, CDT & ACM Security Research Renewal Pet. at 4.

[106] Blaze & Bellovin Security Research Renewal Pet. at 3.

[107] MEMA Security Research Renewal Pet. at 3.

[108] Consumer Reports Security Research Supp.

[109] Campos Medical Device Renewal Pet. at 4.

LOC_AR_00000057

the Office intends to recommend renewal of this exemption.

*O. Computer Programs—Software Preservation*

The Software Preservation Network ("SPN") and LCA petitioned to renew the exemption for computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums (codified at 37 CFR 201.40(b)(13)).[110] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software. For example, the petition asserts that "researchers at UVA designed a project in order to access the 'Peter Sheeran papers'—a collection of drawings and plans from a local Charlottesville architecture firm," and that without the exemption, "the outdated Computer Aided Design ("CAD") software used to create many of the designs in the Sheeran papers may have remained inaccessible to researchers, rendering the designs themselves inaccessible, too."[111] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking relating to access controls on software, and/or representing major library associations with members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*P. Computer Programs—Video Game Preservation*

SPN and LCA petitioned to renew the exemption for preservation of video games for which outside server support has been discontinued (codified at 37 CFR 201.40(b)(12)).[112] Consumer Reports supported the petition.[113] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate video games in playable form. For example, the petition highlights the Georgia Tech

University Library's Computing Lab, retroTECH, which has a significant collection of recovered video game consoles, made accessible for research and teaching uses pursuant to the exemption.[114] In addition, the Museum of Digital Arts and Entertainment in Oakland, California, relied on the exemption to restore a recent PC game, in collaboration with Microsoft and the original developers, despite potential DRM issues.[115] The petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section1201 triennial rulemaking, and/or through their representation of members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*Q. Computer Programs—3D Printing*

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock (codified at 37 CFR 201.40(b)(14)).[116] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and the petitioner demonstrated personal knowledge and experience. Specifically, Mr. Weinberg declared he is a member of the 3D printing community and has been involved with this exemption request during each cycle it has been considered by the Office.[117] In addition, the petition states that 3D printers continue to limit the types of materials used, and new companies and printers may consider implementing similar restrictions in the future, thereby requiring renewal of the exemption.[118]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

**III. Analysis and Classification of Proposed New or Expanded Exemptions**

Having addressed the petitions to renew existing exemptions, the Office now turns to the petitions for new or expanded exemptions. The Office received twenty-six petitions,[119] which it has organized into seventeen proposed classes, as described below. Before discussing those classes, the Office first explains the process and standards for submission of written comments.

*A. Submission of Written Comments*

Persons wishing to address proposed exemptions in written comments should familiarize themselves with the substantive legal and evidentiary standards for the granting of an exemption under section 1201(a)(1), which are also described in more detail on the Office's form for submissions of longer comments, available on its website. In addressing factual matters, commenters should be aware that the Office favors specific, "real-world" examples supported by evidence over speculative, hypothetical observations. In cases where the technology at issue is not apparent from the requested exemption, it can be helpful for commenters to describe the TPM(s) that control access to the work and method of circumvention.

Commenters' legal analysis should explain why the proposal meets or fails to meet the criteria for an exemption under section 1201(a)(1), including, without limitation, why the uses sought are or are not noninfringing as a matter of law. The legal analysis should also discuss statutory or other legal provisions that could impact the necessity for or scope of the proposed exemption. Legal assertions should be supported by statutory citations, relevant case law, and other pertinent authority. In cases where a class proposes to expand an existing exemption, participants should focus their comments on the legal and evidentiary bases for modifying the exemption, rather than the underlying exemption; as discussed above, the Office intends to recommend each current temporary exemption for renewal.

To ensure a clear and definite record for each of the proposals, commenters are required to provide a separate submission for each proposed class during each stage of the public comment period. Although a single comment may

---

[110] SPN & LCA Software Preservation Renewal Pet.

[111] *Id.* at 3.

[112] SPN & LCA Abandoned Video Game Renewal Pet.

[113] Consumer Reports Abandoned Video Game Supp.

[114] SPN & LCA Abandoned Video Game Renewal Pet. at 3.

[115] *Id.*

[116] Weinberg 3D Printers Renewal Pet.

[117] *Id.* at 3.

[118] *Id.*

[119] In addition, as noted, OTW's renewal petition seeks to amend the current regulatory language. The Office is treating that request as a petition for expansion.

LOC_AR_00000058

not address more than one proposed class, the same party may submit multiple written comments on different proposals. The Office acknowledges that the requirement of separate submissions may require commenters to repeat certain information across multiple submissions, but the Office believes that the administrative benefits of creating a self-contained, separate record for each proposal will be worth the modest amount of added effort.

The first round of public comment is limited to submissions from proponents (*i.e.,* those parties who proposed new exemptions during the petition phase) and other members of the public who support the adoption of a proposed exemption, as well as any members of the public who neither support nor oppose an exemption but seek only to share pertinent information about a specific proposal.

Proponents of exemptions should present their complete affirmative case for an exemption during the initial round of public comment, including all legal and evidentiary support for the proposal. Members of the public who oppose an exemption should present the full legal and evidentiary basis for their opposition in the second round of public comment. The third round of public comment will be limited to supporters of particular proposals and those who neither support nor oppose a proposal, who, in either case, seek to reply to points made in the earlier rounds of comments. Reply comments should not raise new issues, but should instead be limited to addressing arguments and evidence presented by others.

### B. The Proposed Classes

As noted above, the Office has reviewed and classified the proposed exemptions set forth in the twenty-seven petitions received in response to its notification of inquiry. Any exemptions adopted must be based on "a particular class of works," [120] and each class is intended to "be a narrow and focused subset of the broad categories of works . . . identified in Section 102 of the Copyright Act." [121] As explained in the Notice of Inquiry, the Office consolidates or groups related and/or overlapping proposed exemptions where possible to simplify

the rulemaking process and encourage joint participation among parties with common interests (though collaboration is not required). Accordingly, the Office has categorized the petitions into seventeen proposed classes of works.

Each proposed class is briefly described below; additional information can be found in the underlying petitions posted on the Office website. As explained in the notification of inquiry, the proposed classes "represent only a starting point for further consideration in the rulemaking proceeding, and will be subject to further refinement based on the record." [122] The Office further notes that it has not put forward precise regulatory language for the proposed classes, because any specific language for exemptions that the Register ultimately recommends to the Librarian will depend on the full record developed during this rulemaking. Indeed, in the case of proposed modifications to existing exemptions, as stated above, the Register may propose altering current regulatory language to expand the scope of an exemption, where the record suggests such a change is appropriate.

After examining the petitions, the Office has preliminarily identified some initial legal and factual areas of interest with respect to certain proposed classes. The Office stresses, however, that these areas are not exhaustive, and commenters should consider and offer all legal argument and evidence they believe necessary to create a complete record. These early observations are offered without prejudice to the Office's ability to raise other questions or concerns at later stages of the proceeding. Finally, "where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information." [123]

### Proposed Class 1: Audiovisual Works—Criticism and Comment

Three petitions seek to expand the existing exemptions for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for purposes of criticism and comment, including for educational purposes by certain users. Because these petitions raise some shared concerns, the Office has grouped them into one class, as it did during the seventh triennial proceeding. This grouping is without prejudice to

possible further refinement of this class, including dividing it into subclasses based on specific uses.

First, as noted, OTW filed a renewal petition requesting that the exemption regarding the creation of noncommercial videos be amended to incorporate the language of the exemption for such uses adopted in the 2010 rulemaking. [124] That exemption permitted circumvention undertaken "solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use." [125] Noting that the current exemption is longer than this formulation, OTW contends that "the complexity of [the current] provisions substantially increases the difficulty of communicating and implementing the exemptions in practice." [126] In OTW's view, reverting to the 2010 language would not expand the scope of the existing rule but merely would help "clarify the exemption for ordinary users." [127] The exemption, however, has been expanded since 2010, including by encompassing works on a Blu-ray disc or received via a digital transmission, and by including language clarifying that the exemption includes "videos produced for a paid commission if the commissioning entity's use is noncommercial." [128] The Office seeks comment on whether, or to what extent, commenters believe the suggested language would alter the substance of the current provision. As part of that analysis, commenters should discuss the extent to which the evidence submitted in the prior rulemaking may be relied upon to support the proposed change.

Second, Joint Educators III seek to expand the current exemption for educational uses to allow a greater number of users to engage in "online instructional learning." [129] They acknowledge that the existing exemption already covers the use of short clips in distance learning by certain users—college and university faculty and students, K–12 educators

---

[120] 17 U.S.C. 1201(a)(1)(B).

[121] Commerce Comm. Report at 38; *see also* Section 1201 Study at 109–10 (noting that while "in some cases, [the Office] can make a greater effort to group similar classes together, and will do so going forward," "in other cases, the Office's ability to narrowly define the class is what enabled it to recommend the exemption at all, and so the Office will continue to refine classes when merited by the record").

[122] 85 FR at 37403.

[123] Section 1201 Study at 147; *see also* 79 FR 55687, 55690 (Sept. 17, 2014).

[124] OTW Noncomm. Videos Renewal Pet. at 3. OTW's petition refers to that proceeding as the "2008 rulemaking," but the Office generally identifies each proceeding by its year of completion.

[125] 75 FR 43825, 43827 (2010).

[126] OTW Noncomm. Videos Renewal Pet. at 3.

[127] *Id.*

[128] 37 CFR 201.40(b)(1). *See* 2015 Recommendation at 103–06 (expanding exemption to include Blu-ray and digital transmission).

[129] Joint Educators III Class 1 Pet. at 2.

LOC_AR_00000059

and students, and faculty of accredited massive open online courses (MOOCs).[130] Indeed, the 2018 Recommendation specifically described the exemption language pertaining to college and university and K–12 users as "broad enough to encompass exempted uses under sections 110(1) and 110(2) (*i.e.,* face-to-face and distance teaching)."[131] Joint Educators III, however, seek to expand the exemption to other online learning platforms that offer "supplemental education, upskilling, retraining, recharging, and lifelong learning," such as Khan Academy, LinkedIn Learning, Osmosis.org and Code.org.[132] To enable these providers to exercise the exemption, they propose an expansion allowing "educators and preparers of online learning materials to use short portions of motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, for the purpose of criticism, comment, illustration and explanation in offerings for registered learners on online learning platforms when use of the film and media excerpts will contribute significantly to learning."[133]

Third, BYU requests to expand the class of eligible users to include "college and university employees," instead of "college and university faculty."[134] In addition, it seeks to broaden the permitted uses from "criticism, comment, teaching, or scholarship" to "a noninfringing use under 17 U.S.C. 107, 110(1), 110(2), or 112(f)."[135] BYU's proposal also would remove the current reference to screen-capture technology and the requirement that the exempted use be limited to "short portions" of motion pictures.[136]

With respect to both BYU's and Joint Educators III's petitions, the Office notes that certain proposals to remove the limitations on eligible users of this exemption were considered during the 2015 and 2018 rulemakings, and invites comment on any changed legal or factual circumstances with respect to these provisions.[137] In particular, the Office seeks specific examples where the presence of TPMs is resulting in an adverse effect on users who are not already included in the existing regulatory language. Further, with respect to BYU's request to expand the types of permitted uses, the Office notes

that it has previously rejected similar proposed classes as overbroad.[138] And in the previous rulemaking, the Office declined a proposed exemption by BYU that would permit circumvention for nonprofit educational purposes in accordance with sections 110(1) and 110(2) and eliminate the "criticism and comment" limitation and references to screen-capture technology.[139] The Office invites comment on whether any changed circumstances warrant altering that determination.

## Proposed Class 2: Audiovisual Works—Texting

SolaByte Corp. petitions for a new exemption to access "licensed audio/video works stored on optical disc media for the purpose of creating short (10 seconds or less) A/V clips that enhance communication effectiveness and understanding when using TEXTing messages."[140] The proposed class "[i]ncludes movies, TV shows, music video, other copyrighted works" that are stored on "[p]ackaged and replicated DVD or Blu-ray discs playable on computer or CE player hardware."[141] Eligible users would include persons "who want to create expressive clips that convey their thoughts when texting."[142]

Because these proposed activities do not appear to be limited to criticism and comment or educational uses, the Office has classified this proposal as a separate proposed class. The Office seeks additional detail about the scope of the proposed exemption from SolaByte or others, such as whether the exemption would be available for commercial services. Commenters should discuss with specificity the relevant TPMs and whether their presence is adversely affecting noninfringing uses, including identifying whether eligible users may access expressive clips through alternate channels that do not require circumvention and the legal basis for concluding that the proposed uses are likely to be noninfringing. Similarly, commenters should address any anticipated effect that circumvention of TPMs would have on the market for or value of the relevant copyrighted works, which appears to extend to the same

broad swatch of motion pictures as Class 1.

## Proposed Class 3: Audiovisual Works— Accessibility

ATSP, AHEAD, and LCA petition to expand the existing exemption relating to the creation of accessible versions of motion pictures for students with disabilities. They propose several changes to the existing exemption language, which includes the following requirements:

• Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;

• The educational institution unit has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and

• The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.[143]

First, petitioners seek to expand the exemption "to allow for the remediation of video for faculty and staff, as well as students."[144] They recommend that the current language be revised to read: "to create an accessible version as a necessary accommodation for students, faculty, and staff with disabilities."[145] Second, to clarify that a covered educational institution unit ("EIU") may create accessible versions "proactively," petitioners suggest removing the phrase "as a necessary accommodation" and requiring only that the creation of an accessible version be "consistent with" an applicable disability law.[146] Third, petitioners ask the Office to clarify that the "reasonable effort" requirement applies "only where an 'accessible version' is available that contains captions and descriptions of sufficient quality to satisfy applicable disability

---

[130] *Id.* at 2–3.
[131] 2018 Recommendation at 86.
[132] Joint Educators III Class 1 Pet. at 2.
[133] *Id.*
[134] BYU Class 1 Pet. at 2.
[135] *Id.*
[136] *Id.*
[137] 2018 Recommendation at 53–55; 2015 Recommendation at 102.

[138] *See* 2015 Recommendation at 100 (citing Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies at 17–19 (Nov. 17, 2006) ("2006 Recommendation")).
[139] 2018 Recommendation at 32, 52–53.
[140] SolaByte Class 2 Pet. at 2.
[141] *Id.*
[142] *Id.*

[143] 37 CFR 201.40(b)(2)(i).
[144] ATSP, AHEAD & LCA Class 3 Pet. at 2.
[145] *Id.*
[146] *Id.* at 3.

LOC_AR_00000060

law." [147] The Office notes that in recommending the existing regulatory language, it stated that an EIU may proceed after reaching a conclusion "that it must create an accessible version as a necessary accommodation for a student with disabilities." [148] Fourth, petitioners recommend qualifying the "reasonable effort" requirement in circumstances where "no accessible version of a video included with a textbook exists, but a publisher might be willing to generate an accessible version of the video at extra cost," by eliminating this requirement when a publisher does not include an accessible version of materials with purchased materials. [149] The Office would welcome comment upon whether petitioners believe that the extra costs should be of an unreasonable amount, or whether they contend that every offer carrying additional cost should be dismissed, along with any thoughts from copyright owners or licensors on this issue. Finally, petitioners recommend "altering the current exemption language to make clear that an EIU can reuse stored accessible versions instead of re-circumventing and re-remediating inaccessible media when complying with an accommodation request." [150]

The Office seeks comment on whether this exemption, including petitioners' suggested regulatory language, should be adopted.

## Proposed Class 4: Audiovisual Works—Livestream Recording

FloSports, Inc. petitions for an exemption "for circumvention of technology used in the digital storage of audiovisual works originating as a livestream of sports and other competitive events." [151] The exemption "would enable a livestreaming service to provide individual viewers, via a virtual digital video recorder ('vDVR'), with access to a recording on a server for fair use purposes." [152]

The petition indicates that circumvention is necessary to alter the functioning of HTTP Live Streaming ("HLS"), "a live-video streaming technique that enables high quality streaming of media content over the internet from web servers." [153] According to FloSports, the use of HLS

to stream content "results in only an ephemeral copy in addition to the live broadcast." [154] FloSports seeks to enable "copies of the audio and video data files [to] be stored on a longer-term basis and synchronized for later replay by the viewer." [155] It states that "[t]he cost and practical difficulty of obtaining synchronization licenses, combined with the cost and technical challenges of creating individualized audio and visual stored files for each viewer seeking to access the stored files, effectively control viewers access to the material for fair use purposes." [156]

FloSports contends that the recording of such material constitutes fair use on the following basis:

> Individual recordings of audiovisual performances, historically, had been used by directors of the groups in such recordings to instruct, teach, and otherwise educated [sic] the participants in the recordings on what went right, what went wrong, and how each could improve. Generally, the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work (e.g., all individual performances combined for an entire copyrighted broadcast). Further, there is no current market for educational recordings at the moment. Granting this exemption, or the performance of such a recording, would not adversely affect the market for the copyrighted recordings. [157]

The Office invites comment on this proposal but notes at the outset that the description of the proposed class in the petition is insufficiently clear to meet the statutory requirement to identify "a *particular class* of copyrighted works." [158] While the petition generally describes the class as covering livestreams of "sports and other competitive events," elsewhere it states that the relevant works are "audiovisual recordings of musical performances as identified in 17 U.S.C. 102(a)(6) and 17 U.S.C. 106(a)(5)." [159] It then states that the proposed class "incorporates any and all works for which audiovisual recordings may be made and used as fair use. This includes individual school performances." [160] Given this inconsistent information, the Office is unable to determine whether, for example, the petition is intended to cover the use of copyrighted broadcasts owned by another party or simply musical or other works that may be captured in broadcasts owned by

FloSports. Without further clarification, the petition does not seem to relate to a particular class of works.

Nor is it apparent to what extent the asserted adverse effects are attributable to "[t]he cost and practical difficulty of obtaining synchronization licenses," [161] as opposed to TPMs. As noted, the Office will only recommend an exemption where causation has been established; that is, where the Office can conclude that the statutory prohibition on circumventing access controls is the cause of the adverse effects. [162]

Finally, the Office seeks additional information regarding the intended noninfringing uses, including whether it would be appropriate to clarify that the petition is directed at facilitating educational, noncommercial uses. Petitioner appears to operate a commercial livestreaming service, [163] and it is unclear whether this exemption is intended to facilitate growth in that market. In addition to factual development regarding the intended uses, the Office welcomes information on the legal basis for finding that such uses would be fair. For example, in connection with petitioner's statement that "the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work," [164] commenters should address the well-established principle that copying even a quantitatively "insubstantial portion" of a work may weigh against fair use where the material is qualitatively significant to that work. [165] These factual and legal issues should be described with sufficient particularity to enable the Office to determine whether the specific uses are likely to be fair. As it has done in the past, the Office is inclined to reject overbroad proposed classes such as "fair use works" or "educational fair use works." [166] Absent such clarification, the Office will decline further consideration of the petition. [167]

---

[147] *Id.*

[148] 2018 Recommendation at 109–10.

[149] *Id.* The petition refers to a purchased textbook, but the Office queries if that was petitioner's intent, since the exemption concerns access to audiovisual works.

[150] *Id.*

[151] FloSports Class 4 Pet. at 2.

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.* at 3.

[157] *Id.* at 3.

[158] 17 U.S.C. 1201(a)(1)(C) (emphasis added); *see supra* Section I.

[159] FloSports Class 4 Pet. at 2.

[160] *Id.*

[161] *Id.*

[162] *See* Section 1201 Study at 115 ("The statutory prohibition on circumventing access controls [must be] the cause of the adverse effects.").

[163] *See Flosports, https://www.flosports.tv/join-now/* (advertising "plans starting from $12.49/mo") (last visited Oct. 8, 2020).

[164] FloSports Class 4 Pet. at 3.

[165] *See Harper & Row Publrs., Inc.* v. *Nation Enters.,* 471 U.S. 539, 564–65 (1985).

[166] *See* 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19).

[167] *Cf.* 79 FR 73856, 73859 (Dec. 12, 2014) (declining to put forward exemption proposals that could not be granted as a matter of law).

LOC_AR_00000061

## Proposed Class 5: Audiovisual Works—Preservation

LCA proposes a new exemption to facilitate preservation of audiovisual works stored on DVDs or Blu-ray discs. a class that would include "[m]otion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, and is no longer reasonably available in the commercial marketplace, for the purpose of lawful preservation of the motion picture, by a library, archives, or museum."[168] The petition is quite terse, consisting of a single sentence, and so the Office encourages proponents to develop the legal and factual administrative record in their initial submissions.

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language.

## Proposed Class 6: Audiovisual Works—Space-Shifting

Somewhat related to LCA's petition, but not cabined to preservation activities conducted by libraries, archives, or museums, SolaByte proposes a broader exemption that would be available to "[t]he legitimate owner of the DVD or blu-ray disc and licensee of the content" for the purpose of "making a usable personal back up copy."[169] The exemption "would apply to any title of audio/visual works 5 years after its public release date."[170] SolaByte notes that "[i]ncomplete licensing of titles by internet media service providers requires the owner of the disc to subscribe to multiple service providers at high personal cost to cover a fraction of their library titles."[171]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the 2006, 2012, 2015, and 2018 rulemakings, the Librarian rejected proposed exemptions for space-shifting or format-shifting, finding that the proponents had failed to establish under applicable law that space-shifting is a noninfringing use.[172] The Office invites comment on whether, in the past three years, there has been any change in the

legal or factual circumstances bearing upon that issue.

## Proposed Classes 7(a): Motion Pictures and 7(b): Literary Works—Text and Data Mining

Authors Alliance, AAUP, and LCA petition for an exemption "for researchers to circumvent technological protection measures on lawfully accessed literary works distributed electronically as well as on lawfully accessed motion pictures, in order to deploy text and data mining techniques."[173] Petitioners believe that these two categories of works "should be grouped together in a single exemption because they involve the same petitioners, the same proposed use, and implicate the same arguments for an exemption."[174] The proposed class includes both works embodied in physical discs and those transmitted digitally.[175] The users seeking access include "researchers engaged in text and data mining in the humanities, social sciences, and sciences."[176]

For reasons of administrative efficiency, the Office has grouped these proposals into one category that encompasses two proposed classes pertaining to motion pictures and literary works, respectively (*i.e.,* Classes 7(a) and 7(b)). Commenters therefore may submit a single comment addressing one or both aspects of the petition. It is important to emphasize, however, that proponents are required to make the statutorily required showing with respect to each category of works. As discussed above, the statute requires that exemptions describe "a *particular class* of copyrighted works."[177] Congress made clear that such a class may not encompass more than one of the categories of works set out in section 102; to the contrary, the "particular class" language refers to "a *narrow and focused subset*" of the section 102 categories.[178] This means that for each type of work for which an exemption is sought, petitioners must demonstrate an actual or likely adverse impact on a noninfringing use as a result of the statutory prohibition on circumvention. In the case of this proposal, to the extent proponents believe the relevant factual and legal issues are similar as to the two classes of works, the supporting comments should describe those matters

in detail. For example, commenters may wish to address the extent to which there is overlap with respect to the types of TPMs applied to these works, the nature of the proposed research activities, the relevant markets for the works, and the availability of potential alternatives to circumvention.

## Proposed Class 8: Literary Works—Accessibility

ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare, and HathiTrust petition to expand the current exemption for the use of assistive technologies by visually impaired persons in connection with electronically distributed literary works. The current regulatory language applies to literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

• When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or

• When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[179]

The proposed exemption would amend this language to reflect recent changes to U.S. law to implement the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled ("Marrakesh Treaty").[180] These include updates to the Chaffee Amendment, codified at section 121 of title 17, and the newly adopted section 121A, which pertains to the import and export of works in accessible formats. Petitioners propose the following changes:

• Updating the description of eligible users from "blind or other person with a disability" to "eligible person, as such a person is defined in 17 U.S.C. 121";

• Updating the description of eligible works to "literary works and previously published musical works that have been fixed in the form of text or notation"; and

• Adding the phrase "or 121A" to the end of 37 CFR 201.40(b)(3)(ii). As an

---

[168] LCA Class 5 Pet. at 2.

[169] SolaByte Class 6 Pet. at 2.

[170] *Id.*

[171] *Id.*

[172] *See* 83 FR 54010, 54026–27 (Oct. 26, 2018); 80 FR 65944, 65960 (Oct. 28, 2015); 77 FR 65260, 65276–77 (Oct. 26, 2012); 71 FR 68472, 68478 (Nov. 27, 2006).

[173] Authors Alliance, AAUP & LCA Class 6 Pet. at 2.

[174] *Id.*

[175] *Id.* at 3.

[176] *Id.*

[177] 17 U.S.C. 1201(a)(1)(C) (emphasis added); *see supra* Section I.

[178] Commerce Comm. Report at 38 (emphasis added).

[179] 37 CFR 201.40(b)(3).

[180] Marrakesh Treaty, art. 7, June 27, 2013, 52 I.L.M. 1312.

LOC_AR_00000062

**65306**    **Federal Register** / Vol. 85, No. 200 / Thursday, October 15, 2020 / Proposed Rules

alternative, petitioners request clarification that exercising the rights described in section 121A does not implicate section 1201.[181]

In addition, petitioners request that the Office "eliminate the reference to the price of 'mainstream' copies of works . . . and replace this term with a more inclusive phrase such as 'market price of an inaccessible copy.'"[182]

The Office seeks comment on whether this proposed exemption, including petitioners' suggested regulatory language, should be adopted.

### Proposed Class 9: Literary Works—Medical Device Class

Hugo Campos, a member of a coalition of medical device patients and researchers, requests two modifications to the current exemption permitting circumvention to access compilations of data generated by medical devices or corresponding personal monitoring systems. First, he seeks removal of the language limiting the exemption to devices "that are wholly or partially implanted in the body."[183] He notes that "[m]any current and upcoming devices obtain medical data about a patient without the need to be fully or partially implanted in the body," including smart watches, personal EKG monitors, and non-implanted glucose meters.[184] And he argues that "there is no relevant difference between implanted and non-implanted devices with respect to copyright."[185]

Second, Mr. Campos requests that the exemption "permit third parties to perform the circumvention, with permission, on behalf of the patient."[186] He notes that the Office and the Library "have structured other exemptions so that the identity of the person doing the circumvention does not matter."[187]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. With respect to the request to permit third-party assistance, the Office notes that it has addressed this issue on several occasions, most recently in the 2018 Recommendation's discussion of the current exemptions for repair of software-enabled motor vehicles and devices. There, the Office recommended removal of the prior requirement that circumvention be "undertaken by the authorized owner"

of the vehicle or device, noting participants' concern that such language "improperly excludes other users with a legitimate interest in engaging in noninfringing diagnosis, repair, or modification activities."[188] But the Office emphasized the limited nature of the change:

> To be clear, removal of the "authorized owner" language should in no way be understood to suggest that the exemption extends to conduct prohibited by the anti-trafficking provisions; such an exemption is beyond the Librarian's authority to adopt. . . . The recommended revision simply accounts for the possibility that certain third parties may qualify as "user[s]" eligible for an exemption from liability under section 1201(a)(1). Such parties still will be required to consider whether their activities could separately give rise to liability under section 1201(a)(2) or (b). Given the legal uncertainty in this area, services electing to proceed with circumvention activity pursuant to the exemption do so at their peril.[189]

The Office invites comment on the extent to which this analysis may be relevant to the current proposal.

### Proposed Class 10: Computer Programs—Unlocking

ISRI submitted two separate petitions to expand the current exemption for "unlocking"—*i.e.,* connecting a wireless device to an alternative wireless network. The current exemption permits circumvention of the following lawfully acquired devices for unlocking purposes:

• Wireless telephone handsets (*i.e.,* cellphones);
• All-purpose tablet computers;
• Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and
• Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[190]

In its first petition, ISRI seeks to add "laptop computers (including chromebooks) with 4G LTE or 5G or other cellular connection capabilities" to the list of covered devices.[191] In its second petition, ISRI seeks to remove the enumeration of devices altogether and extend the exemption to "any other devices with 4G LTE or 5G or other cellular connection capabilities," including, but not limited to, "Smart TVs, Internet of Things (IoT) devices, immersive extended reality (XR) headsets, desktop computers, and drones."[192]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the seventh triennial rulemaking it considered a similar petition to remove the list of enumerated device categories, but concluded that the proponents had failed to carry their burden of demonstrating adverse effects on noninfringing uses with respect to all types of wireless devices with cellular connection capability.[193] Comments responding to this petition should address the extent to which factual and legal issues pertaining to certain categories of devices may be relevant to wireless devices more generally.

### Proposed Class 11: Computer Programs—Jailbreaking

Two petitions seek to expand or clarify the categories of devices covered by the exemptions for jailbreaking, which currently include smartphones and portable all-purpose mobile computing devices, smart televisions, and voice assistant devices.[194] SFC petitions for a new exemption to enable the installation of alternative firmware in "routers and other networking devices."[195] EFF proposes a clarification of the current exemption regarding smart televisions. In EFF's view, it is "unclear whether that exemption includes hardware devices that enable the viewing of video streams, along with other software applications, when such devices are not physically integrated into a television."[196] The petition refers to such hardware as "streaming devices" and cites "the Roku line of products, the Amazon Fire TV Stick, and the Apple TV" as examples.[197]

The Office seeks comment on whether these proposed exemptions should be adopted, including any proposed regulatory language to define the types of devices that would be covered.

### Proposed Class 12: Computer Programs—Repair

Multiple organizations petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices. As noted, the current regulations include two repair-related exemptions, covering (1) computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle, when circumvention is a

---

[181] ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare & HathiTrust Class 8 Pet. at 4.

[182] *Id.*

[183] Campos Class 9 Pet. at 2 (citing 37 CFR 201.40(b)(4)).

[184] *Id.* at 2.

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] 2018 Recommendation at 229.

[189] *Id.* at 225.

[190] 37 CFR 201.40(b)(5).

[191] ISRI Class 10 Pet. #1 at 2.

[192] ISRI Class 10 Pet. #2 at 2.

[193] 2018 Recommendation at 162.

[194] 37 CFR 201.40(b)(6)–(8).

[195] SFC Class 11 Pet. at 2.

[196] EFF Class 11 Pet. at 2.

[197] *Id.*

LOC_AR_00000063

*Federal Register* / Vol. 85, No. 200 / Thursday, October 15, 2020 / Proposed Rules      **65307**

necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function; and (2) computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system.[198]

Three petitions seek to expand the current exemptions to include additional types of devices. Summit Imaging, Inc. and Transtate Equipment Co., Inc. separately petition for an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices.[199] iFixit and Public Knowledge jointly petition for an exemption permitting circumvention "to repair video game consoles and replace damaged hardware."[200] With respect to the latter petition, the Office notes that in prior rulemakings it has declined to recommend exemptions for jailbreaking and repair of video game consoles in light of evidence that circumvention of TPMs in such devices may adversely affect the value of the affected software, as well as a lack of evidence of adverse effects on noninfringing uses.[201] The Office invites comment on whether, in the past three years, there has been any change in the legal or factual circumstances bearing upon these issues.

Two additional petitions request removal of the limitation to specific categories of devices, along with further changes to the current regulatory text.[202] EFF seeks to expand the exemption to permit circumvention for purposes of *modification* of a device, in addition to repair-related activities. iFixit and the Repair Association propose to remove the current requirement that circumvention of TPMs protecting software in motor vehicles not constitute a violation of applicable law.[203] The Office notes that it considered similar requests regarding these issues in the 2018 rulemaking.[204] Therefore, as with the above petitions, comments addressing these proposals

should include discussion of any relevant changed circumstances.

Finally, the Office notes that all of the petitions in this class appear to request that the users eligible to exercise these exemptions include third-party service providers.[205] As above, the Office invites comment on the extent to which its prior analysis of that issue may be applicable here.[206]

### Proposed Class 13: Computer Programs—Security Research

Two petitions seek to expand the current exemption permitting circumvention for purposes of good-faith security research. Professor J. Alex Halderman, CDT, and ACM propose removal of several limitations in the current regulation: (1) The requirement that circumvention be undertaken on a "lawfully acquired device or machine on which the computer program operates" and "not violate any applicable law"; (2) both instances of the term "solely" (*i.e.*, "solely for the purpose of good-faith security research" and "solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability"); and (3) the requirement that the information derived from the activity be used "primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement."[207] As petitioners note, the Office considered these proposed changes in the 2018 rulemaking and provided interpretive guidance as to the regulatory language's intended scope.[208] Petitioners state, however, that they "intend to further develop the record in favor of these changes in the current rulemaking period."[209]

SFC petitions for an expansion to "clarify that the definition of 'good faith security research' . . . includes good-faith testing, investigation, and/or correction of privacy issues (including flaws or functionality that may expose personal information) and permits the owner of the device to remove software or disable functionality that may expose personal information."[210] Eligible users under this proposal would include

"privacy and security researchers who investigate and publish information about privacy flaws in computing devices; and individual consumers and hobbyists who wish to prevent their private data from being disclosed by the devices they own."[211]

The Office seeks comment on whether these proposed changes should be adopted. With respect to SFC's petition, comments should include discussion of the extent to which the proposed activities may or may not be addressed by permanent statutory exemptions or current regulatory exemptions.

### Proposed Classes 14(a): Computer Programs and 14(b): Video Games—Preservation

SPN and LCA filed two petitions to expand the current exemptions for preservation of software and video games by eligible libraries, archives, and museums.[212] Both of these exemptions currently require that the covered works not be "distributed or made available outside of the physical premises of the eligible library, archives, or museum."[213] The proposed exemptions would remove those requirements.[214] The Office welcomes further elaboration on how proponents of the exemptions would envision these works to be distributed or made available in a manner likely to be noninfringing, respectively. For example, the current exemptions are focused on circumvention to enable preservation uses, in contrast to enabling provision of lending copies for users, a preliminary distinction that the Office has found critical in the past when analyzing potential legislative reforms to the section 108 exception for libraries and archives.[215] Would the proposed modification maintain this distinction, and if so, how? Would there be conditions on access restrictions to registered users of an eligible library, archives, or museum or would material be made available more generally to members of the public? The Office notes that in the 2018 rulemaking, it declined to recommend a proposal to expand the video game preservation exemption to allow circumvention by affiliate archivists outside the premises of a covered institution, concluding that the

---

[198] 37 CFR 201.40(b)(9)–(10).

[199] Summit Imaging, Inc. Class 12 Pet. at 2; Transtate Equip. Co. Class 12 Pet. at 2.

[200] iFixit & Public Knowledge Class 12 Pet. at 2.

[201] *See* 2018 Recommendation at 206, 219–20; 2015 Recommendation at 199–201; 2012 Recommendation at 44, 47.

[202] EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2–3.

[203] iFixit & Repair.org Class 12 Pet. at 3.

[204] *See* 2018 Recommendation at 189–94, 206–09, 310–11.

[205] Summit Imaging, Inc. Class 12 Pet. at 3; Transtate Equip. Co. Class 12 Pet. at 2; iFixit & Public Knowledge Class 12 Pet. at 2; EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2.

[206] *See* 2018 Recommendation at 225.

[207] Halderman, CDT & ACM Class 13 Pet. at 3.

[208] *See* 2018 Recommendation at 283–314.

[209] Halderman, CDT & ACM Class 13 Pet. at 3.

[210] SFC Class 13 Pet. at 2.

[211] *Id.*

[212] 37 CFR 201.40(b)(12), (13).

[213] *Id.* at § 201.40(b)(12)(ii), (b)(13)(i).

[214] SPN & LCA Class 14(a) Pet. at 2; SPN & LCA Class 14(b) Pet. at 2.

[215] U.S. Copyright Office, Revising Section 108: Copyright Exceptions for Libraries and Archives at 24–34 (addressing preservation uses), 35–41 (addressing user copies) (2017), *https://www.copyright.gov/policy/section108/discussion-document.pdf*.

LOC_AR_00000064

proponents had failed to establish that such activity was likely noninfringing.[216] Commenters responding to these petitions should address the extent to which the legal and factual issues relevant to this class may differ from those considered previously.

Although these proposed classes both involve computer programs (which constitute literary works under the Copyright Act), the petition regarding video games involves an additional category of works insofar as video games also constitute audiovisual works.[217] Therefore, the Office is following the same procedure discussed above in relation to the proposed TDM exemption: the Office has grouped these petitions into a single category encompassing two proposed classes. Commenters addressing these proposals may submit a single comment addressing both computer programs and video games, but the supporting evidence must be sufficient to establish an adverse effect on noninfringing uses with respect to each category of works. In particular, the Office is interested in the extent to which licensing markets for video games may be similar or different from those for software more generally, and whether any such differences may be relevant under the fair use analysis or the expected effect of circumvention of technological measures on the market for or value of copyrighted works.[218] The Office seeks comment on these and other relevant issues, including any proposed regulatory language.

### Proposed Class 15: Computer Programs—3D Printing

Michael Weinberg petitions to amend the current exemption permitting circumvention to enable the use of alternative feedstock in 3D printers. The current exemption allows access to "[c]omputer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data." [219] Mr. Weinberg seeks two changes to this language. First, he proposes to "replace the term 'feedstock' . . . with the term

'material,' " stating that the latter "is more commonly used to describe the substances used by 3D printers within the 3D printing community and industry." [220] Second, he proposes to remove the term "microchip-reliant." In his view, there is no "justification to narrow the scope of the exemption to a specific subset of technological measures tied to microchip-based verifications," and "the inclusion of the limiting language creates unnecessary ambiguity." [221] As noted, to recommend an exemption, the Office requires a showing that the statutory prohibition on circumventing access controls is yielding adverse effects on non-infringing uses. The current reference to "microchip-reliant" was based on the record of relevant TPMs submitted in connection with the exemption request.[222] In particular, the Office now solicits descriptions and examples of the prevalence of TPMs that are not microchip-based verifications, and descriptions of adverse effects stemming from such TPMs.[223]

In general, the Office seeks comment on whether these proposed changes should be adopted.

### Proposed Class 16: Computer Programs—Copyright License Investigation

SFC petitions for a new exemption to permit circumvention of TPMs protecting computer programs for purposes of "(a) investigating potential copyright infringement of the computer programs; and (b) making lawful use of computer programs (e.g., copying, modifying, redistributing, and updating free and open source software (FOSS))." [224] The proposed exemption does not appear to be limited to particular users or types of devices. SFC states that the users seeking access include:

software authors and publishers, including the authors of FOSS computer programs (which are frequently incorporated in embedded computing devices in an infringing manner); and individual consumers who are lawful owners of embedded computing devices and licensees of the computer programs embedded therein, and who wish to make lawful use of computer programs protected by technological protection measures (e.g. the right granted by certain FOSS licenses to

install modified versions of the FOSS computer programs).[225]

It is somewhat unclear whether the requested exemption for "lawful use of computer programs" would apply to any lawful use or seeks merely to allow licensed uses of FOSS software. To the extent the former is intended, the proposed exemption appears beyond the Librarian's authority to grant. As the Office has consistently noted, the rulemaking requires a showing of "distinct, verifiable and measurable" adverse impacts on noninfringing uses.[226] Such evidence "cannot be hypothetical, theoretical, or speculative, but must be real, tangible, and concrete." [227] In light of that requirement, "the Register has previously rejected broad proposed categories such as 'fair use works' or 'educational fair use works' as inappropriate." [228] SFC and any other proponents of this request therefore must narrow or clarify the specific uses of computer programs that the proposed exemption seeks to permit, so that participants and the Office may fairly assess whether they are likely to be noninfringing and adversely affected by the prohibition on circumvention. The Office also welcomes additional detail regarding the first subpart of SFC's intended uses "investigating potential copyright infringement of the computer programs, including the statement 'FOSS computer programs ([] are frequently incorporated in embedded computing devices in an infringing manner)."

### Proposed Class 17: All Works—Accessibility Uses

Multiple organizations representing persons with disabilities ("Accessibility Petitioners") jointly filed a petition proposing "a more comprehensive exemption to resolve the shortcomings of the current, piecemeal approach to Section 1201 exemptions for accessibility." [229] The proposed exemption would permit circumvention to access "all cognizable classes of works under Section 102 (a) of the Copyright Act" to facilitate accessibility for persons with disabilities. Accessibility Petitioners state that this

---

[216] 2018 Recommendation at 271–75.

[217] U.S. Copyright Office, Compendium of U.S. Copyright Office Practices sec. 807.7(A)(1) (3d ed. 2017) ("Generally, a videogame contains two major components: the audiovisual material and the computer program that runs the game.").

[218] See 17 U.S.C. 107; 1201(a)(1)(C)(iv).

[219] 37 CFR 201.40(b)(14).

[220] Weinberg Class 15 Pet. at 2.

[221] Id.

[222] 2015 Recommendation at 376.

[223] See Lexmark Int'l Inc. v. Static Control Components, Inc., 387 F.3d 522, 547 (6th Cir. 2004) ("Because the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible.").

[224] SFC Class 16 Pet. at 2.

[225] Id.

[226] Commerce Committee Report at 37; see also Section 1201 Study at 119–21.

[227] Section 1201 Study at 120.

[228] 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19).

[229] ACB, AFB, Ass'n of Late-Deafened Adults, ATSP, AHEAD, Benetech/Bookshare, Gallaudet U., HathiTrust, Hearing Loss Ass'n of Am., LCA, Nat'l Ass'n of the Deaf, Nat'l Fed'n of the Blind, Telecomm. for the Deaf and Hard of Hearing, Inc. (collectively "Accessibility Petitioners") Class 17 Pet. at 4.

LOC_AR_00000065

exemption would allow such users, as well as "advocates[ ] and organizations that produce accessible versions of copyrighted works protected by technological protection measures[,] to press ahead on accessibility without the burden of engaging in a complex, situation-specific analysis."[230] They state that the relevant barriers to access include "(1) the access controls that inhibit accessibility and (2) failures of producers, publishers, and other rightsholders to authorize access for accessibility purposes or to produce accessible versions of their works."[231]

As presently suggested, this proposed exemption is beyond the Librarian's authority to adopt because it does not meet the statutory requirement to describe "a *particular class* of copyrighted works."[232] As discussed above, the legislative history confirms that this language is intended to refer to "a *narrow and focused subset* of the broad categories of works . . . identified in section 102 of the Copyright Act."[233] Therefore, the Office uses the section 102 categories as a starting point and refines the proposed classes by other criteria, such as the types of TPMs used or the types of uses.[234] For example, while the category of "literary works" under section 102(a)(1) "embraces both prose creations such as journals, periodicals or books, and computer programs of all kinds," Congress explained that "[i]t is exceedingly unlikely that the impact of the prohibition on circumvention of access control technologies will be the same for scientific journals as it is for computer operating systems."[235] Thus, "these two categories of works, while both 'literary works,' do not constitute a single 'particular class' for purposes of" section 1201(a)(1)."[236]

Further, petitioners are required to establish "distinct, verifiable and measurable impacts" on noninfringing uses,[237] and those impacts must be caused by the statutory prohibition on circumvention.[238] While TPMs undoubtedly have such impacts with respect to many accessibility uses (as

reflected by the exemptions adopted for such uses in prior rulemakings), it is not clear to what extent various TPMs are effectively applied to every category of work in section 102, some of which may not readily lend themselves to such measures (*e.g.*, sculptural works). In addition, the availability of accessible-format versions of works in the marketplace is a relevant consideration in determining adverse effects,[239] and it is not clear that that factor applies equally to all categories of works.

The Office notes its continuing discretion to decline to put forward proposals for public comment that are unlikely to yield consideration of exemptions consistent with the standards of section 1201(a)(1).[240] In light of the important public policy considerations raised by this request and past exemptions adopted with respect to facilitating accessibility uses, however, the Office is noticing this category for public comment while flagging the need to further develop and refine petitioners' request into separate proposed classes. Accordingly, Accessibility Petitioners and any other proponents in this category must provide evidence and legal analysis sufficient to enable the Office to make a particularized assessment as to each class of works for which an exemption is sought. Based on prior exemptions adopted, the Office anticipates Accessibility Petitioners to be seeking exemptions related to TPMs protecting literary works as well as motion pictures distributed electronically, and proponents should provide evidence and proposed regulatory language with respect to these and any other relevant classes, and clearly identify and propose contours for each such class. For example, the Office is not inclined to recommend an exemption for printed copies of literary works, for which no TPMs are employed. Nor is the Office empowered to recommend regulatory language that extends to sound recordings, musical works, architectural works, etc. without development of an adequate administrative record demonstrating that an exemption is appropriate for each of these classes.[241]

Accessibility Petitioners should also include, with respect to each class, evidence of an actual or likely adverse effect on accessibility uses resulting from TPMs applied to that type of work. While the Office recognizes the vital importance of ensuring accessibility for persons with disabilities, and indeed has recommended legislation to make permanent the current exemption regarding assistive technologies for electronically-distributed literary works,[242] its authority in this proceeding is bound by the provisions of the statute. Subject to these requirements, the Office invites comment on this proposed class(es).

## IV. Future Phases of the Eighth Triennial Rulemaking

As in prior rulemakings, after receipt of written comments, the Office will continue to solicit public engagement to create a comprehensive record. Described below are the future phases of the administrative process that will be employed for this rulemaking, so that parties may use this information in their planning.

### A. Public Hearings

The Copyright Office intends to hold public hearings in spring 2021 following the last round of written comments. The hearings will allow for participation by videoconference and will be streamed online. In addition, the Office will determine at a later date, based on applicable public health guidelines, whether in-person participation will be possible. A separate notice providing details about the hearings and how to participate will be published in the **Federal Register** at a later date. The Office will identify specific items of inquiry to be addressed during the hearings.

### B. Post-Hearing Questions

As with previous rulemakings, following the hearings, the Copyright Office may request additional information with respect to particular classes from rulemaking participants. The Office may rely on this process in cases where it would be useful for participants to supply missing information for the record or otherwise resolve issues that the Office believes are material to particular exemptions. Such requests for information will take the form of a letter from the Copyright Office and will be addressed to individual parties involved in the proposal as to which more information is sought. While responding to such a request will be voluntary, any response

---

[230] *Id.* at 5.

[231] *Id.*

[232] 17 U.S.C. 1201(a)(1)(C) (emphasis added).

[233] Commerce Committee Report at 38 (emphasis added).

[234] *See supra* Section I.

[235] House Manager's Report at 7.

[236] *Id.* As noted, the Office has repeatedly declined to recommend proposed exemptions that have failed to define the class of works to be covered with sufficient particularity. *See, e.g.*, 2018 Recommendation at 131–32; 79 FR at 73859; 2006 Recommendation at 17–19.

[237] Commerce Committee Report at 37.

[238] 17 U.S.C. 1201(a)(1)(C); *see also* Section 1201 Study at 115, 117.

[239] *See, e.g.*, 2018 Recommendation at 110 (including market check requirement in exemption for accessibility uses of audiovisual works "to prevent copies being made of works already available in accessible formats, while supporting the motion picture industry's effort to further expand the availability of accessible versions in the marketplace").

[240] 79 FR at 73859 (declining to notice three proposals for public comment).

[241] *See supra* Section I (outlining four elements to the evidentiary standard applied by the Office in evaluating requests).

[242] *See* Section 1201 Study at 84–88.

LOC_AR_00000066

will need to be supplied by a specified deadline. After the receipt of all responses, the Office will post the questions and responses on the Office's website as part of the public record.

*C. Ex Parte Communication*

In the seventh triennial rulemaking, in response to stakeholder requests, the Office issued written guidelines under which interested non-governmental participants could request informal communications with the Office during the post-hearing phase of the proceeding. The Office expects to follow substantially the same process in this proceeding. To ensure transparency, participating parties will be required to submit a list of attendees and a written summary of any oral communications, which will be posted on the Office's website. Specific guidelines for this proceeding will be made available following the public hearings. No *ex parte* communications with the Office regarding this proceeding will be permitted prior to the post-hearing phase.

Dated: October 9, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–22893 Filed 10–14–20; 8:45 am]

**BILLING CODE 1410–30–P**

## POSTAL SERVICE

### 39 CFR Part 20

### International Mailing Services: Proposed Product and Price Changes—CPI

**AGENCY:** Postal Service™.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** The Postal Service proposes to revise *Mailing Standards of the United States Postal Service, International Mail Manual (IMM ),* to reflect changes coincident with the recently announced mailing services price adjustments.

**DATES:** We must receive your comments on or before November 16, 2020.

**ADDRESSES:** Mail or deliver comments to the manager, Product Classification, U.S. Postal Service , 475 L'Enfant Plaza SW, RM 4446, Washington, DC 20260–5015. You may inspect and photocopy all written comments at USPS Headquarters Library, 475 L'Enfant Plaza SW, 11th Floor N, Washington DC by appointment only between the hours of 9 a.m. and 4 p.m., Monday through Friday by calling 1–202–268–2906 in advance. Email comments, containing the name and address of the commenter, to: *PCFederalRegister@usps.gov,* with a subject line of ''January 2021 International Mailing Services Price

Change—CPI.'' Faxed comments are not accepted.

**FOR FURTHER INFORMATION CONTACT:** Kathy Frigo at 202–268–4178.

**SUPPLEMENTARY INFORMATION:**

### International Price and Service Adjustments

On October 9, 2020, the Postal Service filed a notice of mailing services price adjustments with the Postal Regulatory Commission (PRC), effective on January 24, 2021. The Postal Service proposes to revise Notice 123, *Price List,* available on Postal Explorer  at *https://pe.usps.com,* to reflect these new price changes. The new prices are or will be available under Docket Number R2021–1 on the Postal Regulatory Commission's website at *www.prc.gov.*

This proposed rule describes the price changes for the following market dominant international services:

• International extra services and fees.

*International Extra Services and Fees*

The Postal Service plans to increase prices for certain market dominant international extra services including:

• Certificate of Mailing
• Registered Mail™
• Return Receipt
• Customs Clearance and Delivery Fee
• International Business Reply™ Mail Service

CERTIFICATE OF MAILING

|  | Fee |
|---|---|
| **Individual pieces** | |
| Individual article (PS Form 3817) ............................................................................................................................... | $1.55 |
| Duplicate copy of PS Form 3817 or PS Form 3665 (per page) ...................................................................................... | 1.55 |
| Firm mailing sheet (PS Form 3665), per piece (minimum 3), First-Class Mail International only ...................................... | 0.44 |
| **Bulk quantities** | |
| For first 1,000 pieces (or fraction thereof) ................................................................................................................... | $8.80 |
| Each additional 1,000 pieces (or fraction thereof) ........................................................................................................ | 1.10 |
| Duplicate copy of PS Form 3606 ................................................................................................................................. | 1.55 |

Registered Mail

*Fee:* $16.30.

Return Receipt

*Fee:* $4.25.

Customs Clearance and Delivery

*Fee:* per piece $6.65.

International Business Reply Service

*Fee:* Cards $1.55; Envelopes up to 2 ounces $2.05

Following the completion of Docket No. R2021–1, the Postal Service will adjust the prices for products and

services covered by the International Mail Manual. These prices will be on Postal Explorer at *pe.usps.com.*

Accordingly, although exempt from the notice and comment requirements of the Administrative Procedure Act (5 U.S.C. 553(b), (c)) regarding proposed rulemaking by 39 U.S.C. 410(a), the Postal Service invites public comment on the following proposed changes to *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM ), which is incorporated by reference in the *Code of Federal Regulations* in accordance with 39 CFR

20.1, and to associated changes to Notice 123, *Price List.*

### List of Subjects in 39 CFR Part 20

Foreign relations, International postal services.

Accordingly, 39 CFR part 20 is proposed to be amended as follows:

## PART 20—[AMENDED]

■ 1. The authority citation for 39 CFR part 20 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301–307; 18 U.S.C. 1692–1737; 39 U.S.C. 101,

**8560**

# Proposed Rules

**Federal Register**

Vol. 86, No. 24

Monday, February 8, 2021

---

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## LIBRARY OF CONGRESS

### U.S. Copyright Office

### 37 CFR Part 201

### [Docket No. 2020–11]

### Exemptions To Permit Circumvention of Access Controls on Copyrighted Works

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of public hearings.

**SUMMARY:** The United States Copyright Office will be holding public hearings as part of the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act ("DMCA") concerning possible exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. Parties interested in testifying at the hearings are invited to submit requests to testify pursuant to the instructions set forth below.

**DATES:** The public hearings are scheduled for April 5–8 and April 19–22, 2021. Requests to testify must be received no later than 11:59 p.m. Eastern time on February 24, 2021. Once the hearing agendas are finalized, the Office will notify all participants and post the times and dates of the hearings at *https://www.copyright.gov/1201/2021/*.

**ADDRESSES:** The Office will conduct the hearings remotely using the Zoom videoconferencing platform. Requests to testify should be submitted through the request form available at *https://www.copyright.gov/1201/2021/hearing-request.html*.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov*; Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov*; or Anna Chauvet, Associate General Counsel, by email at *achau@copyright.gov*. Each can

be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** On June 22, 2020, the Copyright Office ("Office") published a notice of inquiry in the **Federal Register** to initiate the eighth triennial rulemaking proceeding under 17 U.S.C. 1201(a)(1), which authorizes the Librarian of Congress, upon the recommendation of the Register of Copyrights, to exempt certain classes of copyrighted works from the prohibition against circumventing a technological measure that controls access to a copyrighted work.[1] On October 15, 2020, the Office published a notice of proposed rulemaking setting forth proposed exemptions for seventeen classes of works and requesting written comments.[2] The responsive comments received thus far have been posted on the Office's website at *https://www.copyright.gov/1201/2021/*.

At this time, the Office is announcing public hearings to be held via Zoom to further consider the proposed exemptions. The Office plans to convene panels of witnesses for the proposals to be considered, and may combine certain panels if the witnesses and/or key issues substantially overlap. All of the hearings will be live streamed online, and the video and transcript for each hearing will be posted on the Office's website. If no request to testify is received for a proposed exemption, the Office will consider the class based on the written submissions and any *ex parte* communications with interested parties (discussed below).

### A. Submitting Requests To Testify

A request to testify should be submitted to the Office using the form on the Office's website indicated in the **ADDRESSES** section above. Anyone wishing to testify with respect to more than one proposed class must submit a separate form for each request. To the extent feasible, the Office requests that organizations submit only one panelist request per proposed class, and generally encourages parties with similar interests to select a common representative to testify on their behalf. If multiple persons from the same organization wish to testify regarding *different* proposed exemptions, each should submit a separate request

outlining the subject matter area. If multiple persons from the same organization wish to testify regarding the *same* proposed exemption, each should again submit a separate request, and explain in their submissions the need for multiple witnesses. For parties represented by law school clinics, the Office will attempt to accommodate requests to allow students to participate under the supervision of a faculty member. The Office will contact requesters should it determine that a hearing for a particular class is unnecessary.

Depending upon the number and nature of the requests, and in light of the limited time available for the public hearings, the Office may not be able to accommodate all requests to testify. The Office will give preference to those who have provided substantive evidentiary submissions in support of or in opposition to a proposal.

All requests to testify must clearly identify:

• The name of the person desiring to serve as a witness;

• The organization or organizations represented, if any;

• Contact information;

• The proposed class about which the person wishes to testify;

• A two- to three-sentence summary of the testimony the witness expects to present; and

• If the party is requesting the ability to demonstrate a use or a technology during the hearing, a description of the demonstration, the approximate time required, and any functionality required to make the demonstration viewable via Zoom. In light of the transition to virtual hearings for this proceeding, the Office cannot guarantee that witnesses will have the ability to introduce demonstrative evidence into the record during the hearings. The Office will consider options to accommodate such requests, including potentially by holding one or more dedicated panel sessions for that purpose.

To facilitate the process of scheduling panels, it is essential that all of this information be included in a request to testify.

Following receipt of the requests to testify, the Office will prepare agendas listing the witnesses, dates, and times for each hearing. These will be circulated to witnesses and posted at *https://www.copyright.gov/1201/2021/* on or about March 8, 2021.

---

[1] 85 FR 37399 (June 22, 2020).
[2] 85 FR 65293 (Oct. 15, 2020).

LOC_AR_00000068

## B. Format of Public Hearings

The Office will establish time limits for each panel after receiving all requests to testify. Generally, the Office plans to allot approximately one to two hours for each proposed class, although it may adjust the timing depending upon the complexity of the class. In addition, members of the public will be provided a limited opportunity to offer additional comments for the record, but parties who wish to provide detailed information to the Office are encouraged to submit a request to testify.

Witnesses should expect the Office to have carefully studied all written comments, and the Office will expect witnesses to have done the same with respect to the classes for which they will be presenting. The hearings will focus on legal or factual issues that are unclear or underdeveloped in the written record, as identified by the Office, as well as demonstrative evidence.

The Office stresses that factual information is critical to the rulemaking process, and witnesses should be prepared to discuss, among other things, where the copies of the works sought to be accessed are stored, how the works would be accessed, and what would be done with the works after being accessed. The Office also encourages witnesses to provide real-world examples to support their arguments. In some cases, the best way to do this may be to provide a description or demonstration of a claimed noninfringing use or the technologies pertinent to a proposal. As noted above, a person wishing to provide a demonstration should include a request to do so with the request to testify, using the appropriate space on the form. Persons should consider whether a demonstration is able to be presented in a format that enables it to be viewed by participants and observers via Zoom. To ensure proper documentation of the hearings, the Office will require that a copy of any audio, visual, or audiovisual materials (*e.g.,* slideshows and videos) be provided to the Office following the hearing. The Office may contact witnesses individually ahead of time to ensure that demonstrations can be preserved for the record in an appropriate form.

## C. Ex Parte Communication

During the seventh triennial rulemaking, the Office issued guidelines according to which interested parties could request informal meetings with the Office. The Office intends to issue similar guidelines in this proceeding. Consistent with its prior practice, the Office will establish requirements to ensure transparency, including that participating parties submit a list of attendees and a written summary of any oral communications, which will be posted on the Office's website. The *ex parte* guidelines will be made available at *https://www.copyright.gov/1201/2021/* following the completion of the public hearings. No *ex parte* meetings in this proceeding will be scheduled before that time.

As in prior proceedings, such informal communications may supplement, but not substitute for, the written record and testimony at the public hearings. The primary means to communicate views in the course of the rulemaking will continue to be through the submission of written comments and testimony at the public hearings.

Dated: February 2, 2021.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2021–02464 Filed 2–5–21; 8:45 am]

**BILLING CODE 1410–30–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R03–OAR–2020–0522; FRL–10016–86–Region 3]**

### Approval and Promulgation of Air Quality Implementation Plans; Delaware; Amendments to Control of Volatile Organic Compounds Mobile Equipment Repair and Refinishing Rule Regulation

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve a state implementation plan (SIP) revision submitted by the Delaware Department of Natural Resources and Environmental Control (DNREC). This SIP revision consists of the 2010 amendments to the State of Delaware's Mobile Equipment Repair and Refinishing (MERR) regulations to incorporate the Ozone Transport Commission's (OTC) 2009 Motor Vehicle and Mobile Equipment Non-Assembly Line Coating Operations regulations (MVMERR) model rule. The MVMERR rule establishes updated volatile organic compounds (VOC) content limits for coating and cleaning solvents used in vehicle refinishing and standards for coating application, work practices, monitoring, and recordkeeping. This action is being taken under the Clean Air Act (CAA).

**DATES:** Written comments must be received on or before March 10, 2021.

**ADDRESSES:** Submit your comments, identified by Docket ID Number EPA–R03–OAR–2020–0522 at *https://www.regulations.gov,* or via email to *gordon.mike@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* For either manner of submission, EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Mike Gordon, Planning & Implementation Branch (3AD30) Air & Radiation Division, U.S. Environmental Protection Agency, Region III, 1650 Arch Street, Philadelphia, Pennsylvania 19103. The telephone number is (215) 814–2039. Mr. Gordon can also be reached via electronic mail at *gordon.mike@epa.gov.*

## I. Background

### A. General

Ozone is formed in the atmosphere by photochemical reactions between VOCs and nitrogen oxides ($NO_X$) in the presence of sunlight. In order to reduce these ozone concentrations, the CAA requires control of VOC and $NO_X$ emission sources to achieve emission reductions in moderate or more serious ozone nonattainment areas. Section 184(a) of the CAA established a single ozone transport region (OTR), comprising all or part of 12 eastern states, including all of the State of Delaware. Section 176a of the CAA requires that when a transport region is established, the Administrator must also establish a transport commission

LOC_AR_00000069

in its place the citation "34 CFR 668.23(b)".

■ b. In the parenthetical OMB control number at the end of the section, removing the words "control number 1840–0688" and adding in their place the words "control number 1845–0039".

■ c. Removing the parenthetical authority citation at the end of the section

## PART 691 [Removed and Reserved]

■ 18. Under the authority of 20 U.S.C. 1221e–3, part 691 is removed and reserved.

[FR Doc. 2021–23423 Filed 10–27–21; 8:45 am]

**BILLING CODE 4000–01–P**

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Part 201

**[Docket No. 2020–11]**

### Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Librarian of Congress adopts exemptions to the provision of the Digital Millennium Copyright Act ("DMCA") that prohibits circumvention of technological measures that control access to copyrighted works. As required under the statute, the Register of Copyrights, following a public proceeding, submitted a recommendation concerning proposed exemptions to the Librarian of Congress ("Register's Recommendation"). After careful consideration, the Librarian adopts final regulations based upon the Register's Recommendation.

**DATES:** Effective October 28, 2021.

**FOR FURTHER INFORMATION CONTACT:** Kevin R. Amer, Acting General Counsel and Associate Register of Copyrights, by email at *kamer@copyright.gov*, or Mark Gray, Attorney-Advisor, by email at *mgray@copyright.gov*. Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Librarian of Congress, pursuant to section 1201(a)(1) of title 17, United States Code, has determined in this eighth triennial rulemaking proceeding that the prohibition against circumvention of technological

measures that effectively control access to copyrighted works shall not apply for the next three years to persons who engage in certain noninfringing uses of certain classes of such works. This determination is based upon the Register's Recommendation.

The below discussion summarizes the rulemaking proceeding and the Register's recommendations, announces the Librarian's determination, and publishes the regulatory text specifying the exempted classes of works. A more complete discussion of the rulemaking process, the evidentiary record, and the Register's analysis with respect to each proposed exemption can be found in the Register's Recommendation, which is posted at *www.copyright.gov/1201/2021/*.

### I. Background

*A. Statutory Requirements*

Congress enacted the DMCA in 1998 to implement certain provisions of the WIPO Copyright and WIPO Performances and Phonograms Treaties. Among other things, title I of the DMCA, which added a new chapter 12 to title 17 of the U.S. Code, prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works. In enacting this aspect of the law, Congress observed that technological protection measures ("TPMs") can "support new ways of disseminating copyrighted materials to users, and . . . safeguard the availability of legitimate uses of those materials by individuals." [1]

Section 1201(a)(1) provides in pertinent part that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under [title 17]." Under the statute, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." [2] A technological measure that "effectively controls access to a work" is one that "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." [3]

Section 1201(a)(1) also includes what Congress characterized as a "fail-safe"

mechanism,[4] which requires the Librarian of Congress, following a rulemaking proceeding, to exempt any class from the prohibition for a three-year period if she has determined that noninfringing uses by persons who are users of copyrighted works in that class are, or are likely to be, adversely affected by the prohibition against circumvention during that period.[5] The Librarian's determination to grant an exemption is based upon the recommendation of the Register of Copyrights, who conducts the rulemaking proceeding.[6] The Register consults with the Assistant Secretary for Communications and Information of the Department of Commerce, who oversees the National Telecommunications and Information Administration ("NTIA"), in the course of formulating her recommendations.[7]

Exemptions adopted by rule under section 1201(a)(1) apply only to the conduct of circumventing a technological measure that controls access to a copyrighted work. Other parts of section 1201 address the manufacture and provision of—or "trafficking" in—products and services designed for purposes of circumvention. Section 1201(a)(2) bars trafficking in products and services that are used to circumvent technological measures that control access to copyrighted works (for example, a password needed to open a media file),[8] while section 1201(b) bars trafficking in products and services used to circumvent technological measures that protect the exclusive rights of the copyright owner (for example, technology that prevents the work from being reproduced).[9] The Librarian has no authority to adopt exemptions for the anti-trafficking prohibitions contained in section 1201(a)(2) or (b).[10]

The statute contains certain permanent exemptions to permit specified uses. These include section 1201(d), which exempts certain activities of nonprofit libraries, archives, and educational institutions; section 1201(e), which exempts "lawfully authorized investigative, protective, information security, or intelligence activity" of a state or the federal

---

[1] Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 6 (Comm. Print 1998).

[2] 17 U.S.C. 1201(a)(3)(A).

[3] 17 U.S.C. 1201(a)(3)(B).

[4] *See* H.R. Rep. No. 105–551, pt. 2, at 36 (1998).

[5] *See* 17 U.S.C. 1201(a)(1).

[6] 17 U.S.C. 1201(a)(1)(C).

[7] *Id.*

[8] 17 U.S.C. 1201(a)(2).

[9] 17 U.S.C. 1201(b).

[10] *See* 17 U.S.C. 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

LOC_AR_00000070

government; section 1201(f), which exempts certain "reverse engineering" activities to facilitate interoperability; section 1201(g), which exempts certain types of research into encryption technologies; section 1201(h), which exempts certain activities to prevent the "access of minors to material on the internet"; section 1201(i), which exempts certain activities "solely for the purpose of preventing the collection or dissemination of personally identifying information"; and section 1201(j), which exempts certain acts of "security testing" of computers and computer systems.

### B. Rulemaking Standards

In adopting the DMCA, Congress imposed legal and evidentiary requirements for the section 1201 rulemaking proceeding, as discussed in greater detail in the Register's Recommendation [11] and the Copyright Office's 2017 policy study on section 1201.[12] The Register will recommend granting an exemption only "when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met." [13] The evidence must show "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works." [14]

The Librarian must assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To aid in this process, the Register develops a comprehensive administrative record using information submitted by interested members of the

[11] Register of Copyrights, Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights (Oct. 2021), *https://cdn.loc.gov/copyright/1201/2021/2021_Section_1201_Registers_Recommendation.pdf* (Register's Recommendation").

[12] Register's Recommendation at section II.C; U.S. Copyright Office, Section 1201 of Title 17 111–12 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Report").

[13] Section 1201 Report at 111–12; *accord* Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 12–13 (Oct. 2018). References to the Register's recommendations in prior rulemakings are cited by the year of publication followed by "Recommendation" (*e.g.*, "2018 Recommendation"). Prior Recommendations are available on the Copyright Office website at *https://www.copyright.gov/1201/*.

[14] Section 1201 Report at 112.

public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record.

To establish the need for an exemption, proponents must show, at a minimum, (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses. In addition, the Librarian must examine the statutory factors listed in section 1201(a)(1): (1) The availability for use of copyrighted works; (2) the availability for use of works for nonprofit archival, preservation, and educational purposes; (3) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (4) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (5) such other factors as the Librarian considers appropriate.

Finally, section 1201(a)(1) specifies that any exemption adopted as part of this rulemaking must be defined based on "a particular class of works." [15] Among other things, the determination of the appropriate scope of a "class of works" recommended for exemption may take into account the adverse effects an exemption may have on the market for or value of copyrighted works. Accordingly, "it can be appropriate to refine a class by reference to the use or user in order to remedy the adverse effect of the prohibition and to limit the adverse consequences of an exemption." [16]

## II. History of the Eighth Triennial Proceeding

The Office initiated the eighth triennial rulemaking proceeding through a Notice of Inquiry ("NOI") on June 22, 2020.[17] The NOI requested petitions for renewal of exemptions adopted in the 2018 rulemaking, petitions in opposition to renewal, and any petitions for new exemptions, including proposals to expand a current exemption. The Office received twenty-six petitions for new exemptions, including thirteen comments seeking to expand certain current exemptions.

As in the prior rulemaking, the Office employed a streamlined process for

[15] 17 U.S.C. 1201(a)(1)(B).

[16] 2006 Recommendation at 19.

[17] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399 (June 22, 2020).

renewing existing exemptions in this proceeding, detailing the renewal process in its public notices.[18] Streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Register to recommend adoption of the exemption in the prior rulemaking are expected to continue into the forthcoming triennial period.[19] That is, the same material facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption. Because the statute requires that exemptions be adopted upon a new determination concerning the next three-year period, the fact that the Librarian previously adopted an exemption creates no presumption that readoption is appropriate.

The Register's Recommendation provides a detailed description of the process the Office used to create a record for each renewal petition.[20] In brief, the Office first solicited renewal petitions as well as comments from participants opposing the readoption of the exemption. The Office received thirty-two renewal petitions and fifteen comments in response to those petitions. Seven comments supported renewal of a current exemption, and eight comments raised discrete concerns with specific petitions, but did not oppose readoption of the relevant exemption.[21]

On October 15, 2020, the Office issued its notice of proposed rulemaking ("NPRM") identifying the existing exemptions for which the Register intended to recommend renewal, and outlined the proposed classes for new exemptions, for which three rounds of public comments were initiated.[22] Those proposals were organized into seventeen classes of works. Six of the seventeen proposed exemptions sought

[18] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37400–02 (June 22, 2020); Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65294–95 (Oct. 15, 2020).

[19] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37401–02 (June 22, 2020); Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65295 (Oct. 15, 2020).

[20] Register's Recommendation at III.D & IV.

[21] The submissions received in response to the NOI are available at *https://www.copyright.gov/1201/2021/*. References to these submissions are by party and class name (abbreviated where appropriate) followed by "Renewal Pet.," "Renewal Comment," or party name and class number followed by "Pet.," "Initial," "Opp'n," or "Reply" for comments submitted in the first, second, or third round, as applicable.

[22] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65293 (Oct. 15, 2020).

LOC_AR_00000071

expansions of existing exemptions, seven proposed entirely new exemptions, and four contained a combination of both expansions and new exemptions. The Office then held seven days of public hearings in which it heard testimony from numerous participants.[23] After the hearings, the Office issued written questions to hearing participants regarding certain proposed classes.[23] Finally, the Office held several *ex parte* meetings with participants concerning ten proposed classes.[24]

As required by section 1201(a)(1), the Register consulted with NTIA during this rulemaking. NTIA provided input at various stages and participated in the virtual public hearings. NTIA formally communicated its views on each of the proposed exemptions to the Register on October 1, 2021. The Office addresses NTIA's substantive views on the proposed classes below. NTIA's recommendations can be viewed at *https://cdn.loc.gov/copyright/1201/2021/2021_NTIA_DMCA_Letter.pdf.*

## III. Summary of Register's Recommendation

### A. Renewal Recommendations

As set forth in the NPRM, the Register received petitions to renew each of the exemptions adopted pursuant to the seventh triennial rulemaking. Eight comments in response to renewal petitions raised discrete concerns with specific petitions, but none opposed the verbatim readoption of an existing regulatory exemption or disputed the reliability of the previously analyzed administrative record.[25] The Register recommends renewal of these exemptions based on the information provided in the renewal petitions and the lack of meaningful opposition, finding that the conditions that led to adoption of the exemptions are likely to continue during the next triennial period. The existing exemptions, and the bases for the recommendation to readopt each exemption in accordance with the streamlined renewal process, are discussed in detail in the Recommendation and summarized briefly below. Where noted, these

exemptions serve as a baseline in considering requests for expansion.

### 1. Audiovisual Works—Educational and Derivative Uses

Multiple individuals and organizations petitioned to renew the exemption covering the use of short portions of motion pictures for various educational and derivative uses.[26] The Office did not receive meaningful opposition to readoption of these exemptions. Petitions to renew the various subparts of the exemption are discussed below. The existing exemption and its various subparts collectively serve as the baseline in assessing whether to recommend any expansions in Class 1.

*a. Audiovisual Works—Criticism and Comment, Teaching, or Scholarship— Universities and K–12 Educational Institutions.*[27]

Multiple individuals and organizations petitioned to renew the exemption for motion pictures for educational purposes by college and university or K–12 faculty and students. The Office did not receive substantive opposition to readoption of this exemption. The petitions demonstrated that educators and students continue to rely on excerpts from digital media for class presentations and coursework. For example, a collective of individuals and organizations provided several examples of professors using DVD clips in the classroom. A group of individual educators and educational organizations[28] broadly suggested that the ''entire field'' of video essays or multimedia criticism ''could not have existed in the United States without fair use and the 1201 educational exemption.''[29] Petitioners demonstrated personal knowledge and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking. The Register finds that petitioners demonstrated a

continuing need and justification for the exemption.

*b. Audiovisual Works—Criticism and Comment—Massive Open Online Courses (''MOOCs'').*[30]

A collective of individuals and organizations and Brigham Young University (''BYU'') petitioned to renew the exemption for educational uses of motion pictures in MOOCs. The Office did not receive meaningful opposition to readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as to increase the number of (and therefore access to) MOOCs in the field of film and media studies.

*c. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs*[31]

Library Copyright Alliance (''LCA'') and Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other organizations. No oppositions were filed against readoption of this exemption. The petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs, thereby demonstrating the continuing need and justification for the exemption.

*d. Audiovisual Works—Criticism and Comment—Multimedia E-books*[32]

Multiple petitioners jointly sought to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books. The Office did not receive meaningful opposition to readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge through Bobette Buster's continued work on an e-book series based on her lecture series, ''Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment,'' which ''relies on the

---

[23] Participants' post-hearing letter responses are available at *https://www.copyright.gov/1201/2021/post-hearing/.*

[24] All *ex parte* letters in the eighth triennial rulemaking can be found at *https://www.copyright.gov/1201/2021/ex-parte-communications.html.*

[25] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65295 (Oct. 15, 2020); *see also* Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37402 (June 22, 2020) (describing ''meaningful opposition'' standard).

[26] *See* 37 CFR 201.40(b)(1). In the 2018 rulemaking, this recommended regulatory language was the result of consideration of one proposed class of works that grouped together five petitions. *See* 2018 Recommendation at 31–34.

[27] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.1.

[28] The individuals and organizations include Peter Decherney, Katherine Sender, John L. Jackson, Int'l Commc'n Ass'n, Soc'y for Cinema and Media Studies, Console-ing Passions, Library Copyright All., and Am. Ass'n of Univ. Professors.

[29] Joint Educators AV Educ. Renewal Pet. at 3.

[30] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.2.

[31] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.3.

[32] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.4.

LOC_AR_00000072

availability of high-resolution video not available without circumvention of TPMs.''[33]

e. Audiovisual Works—Criticism and Comment—Filmmaking[34]

Multiple organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where the use is a parody or based on the work's biographical or historically significant nature. The Office did not receive meaningful opposition to readoption of this exemption. Petitioners stated that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so. The petitions summarized the continuing need and justification for the exemption.

f. Audiovisual Works—Criticism and Comment—Noncommercial Videos[35]

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos. The Office did not receive meaningful opposition to readoption of this exemption. Petitioners stated that they had personal knowledge that video creators have relied on this exemption and anticipate needing to continue to use the exemption in the future. The Organization for Transformative Works (''OTW'') included an account from an academic who stated that footage ripped from DVDs and Blu-ray is preferred for ''vidders'' (noncommercial remix artists) because ''it is high quality enough to bear up under the transformations that vidders make to it.''[36] The petitions therefore demonstrated the continuing need and justification for the exemption.

2. Audiovisual Works—Accessibility[37]

Multiple organizations petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities. No oppositions were filed in connection with readoption of

this exemption. The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience as to the exemption. For example, BYU asserted that its disability services offices ''sometimes need to create accessible versions of motion pictures'' to accommodate its students with disabilities.[38] The petitions stated that there is a need for the exemption going forward; indeed, one group of petitioners stated that ''the need is likely to increase significantly in light of the ongoing COVID–19 pandemic as many educational institutions shift to online learning and the use of digital multimedia by faculty increases.''[39] This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 3.

3. Literary Works Distributed Electronically—Accessibility[40]

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (i.e., e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities. No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled have difficulty obtaining accessible e-book content because TPMs interfere with the use of assistive technologies. Petitioners noted that their members frequently cite accessibility of e-books as a top priority. Finally, petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption because they are all organizations that advocate for the blind, visually impaired, and print disabled. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 8.

4. Literary Works—Medical Device Data[41]

Hugo Campos petitioned to renew the exemption covering access to patient data on networked medical devices. No oppositions were filed against

readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical devices to manage their health. Mr. Campos demonstrated personal knowledge and experience with regard to this exemption, as he is a patient needing access to the data output from his medical device and a member of a coalition whose members research the effectiveness of networked medical devices. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 9.

5. Computer Programs—Unlocking[42]

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (e.g., smartwatches) to allow connection of a new or used device to an alternative wireless network (''unlocking'').[43] No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption, stating that consumers continue to need to be able to unlock the devices so they can switch network providers. For example, the Institute of Scrap Recycling Industries, Inc. (''ISRI'') stated that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers lock devices to prevent them from being used on other carriers.[44] In addition, petitioners demonstrated personal knowledge and experience with regard to this exemption. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 10.

6. Computer Programs—Jailbreaking[45]

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones,

---

[33] Bobette Buster, Authors All. & Am. Ass'n of Univ. Professors Nonfiction Multimedia E-Books Renewal Pet. at 3.

[34] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.5.

[35] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.6.

[36] OTW Noncommercial Videos Renewal Pet. at 3.

[37] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.B.

[38] BYU Captioning Renewal Pet. at 3.

[39] Accessibility Petitioners Captioning Renewal Pet. at 3.

[40] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.C.

[41] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.D.

[42] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.E.

[43] Competitive Carriers Ass'n Unlocking Renewal Pet.; Inst. of Scrap Recycling Indus., Inc. Unlocking Renewal Pet.

[44] ISRI Unlocking Renewal Pet. at 3.

[45] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.F.

LOC_AR_00000073

tablets and other portable all-purpose mobile computing devices, smart TVs, or voice assistant devices to allow the device to interoperate with or to remove software applications ("jailbreaking"). No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption, and that petitioners have personal knowledge and experience with regard to this exemption. For example, regarding smart TVs specifically, the Software Freedom Conservancy ("SFC") asserted that it has "reviewed the policies and product offerings of major Smart TV manufacturers (Sony, LG, Samsung, etc.) and they are substantially the same as those examined during the earlier rulemaking process."[46] The petitions stated that, absent an exemption, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or download third-party software on a smart TV to enable interoperability. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 11.

7. Computer Programs—Repair of Motorized Land Vehicles[47]

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of a vehicle function. The Office did not receive meaningful opposition to readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption. For example, the Motor & Equipment Manufacturers Association ("MEMA") stated that over the past three years, its membership "has seen firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety."[48] Similarly, the Auto Care Association ("ACA") stated that "[u]nless this exemption is renewed, the software measures manufacturers deploy for the purpose of controlling access to vehicle software

will prevent Auto Care members from lawfully assisting consumers in the maintenance, repair, and upgrade of their vehicles."[49] The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals or businesses that perform vehicle service and repair. This existing exemption, as well as the existing exemption pertaining to repair of smartphones, home appliances, and home systems, serve as the baseline in assessing whether to recommend any expansions in Class 12.

8. Computer Programs—Repair of Smartphones, Home Appliances, and Home Systems[50]

Multiple organizations petitioned to renew the exemption for computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system. The Office did not receive meaningful opposition to readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption. For example, the Electronic Frontier Foundation ("EFF"), the Repair Association, and iFixit asserted that "[m]anufacturers of these devices continue to implement [TPMs] that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course."[51] This existing exemption, as well as the existing exemption pertaining to repair of motorized land vehicles, serve as the baseline in assessing whether to recommend any expansions in Class 12.

9. Computer Programs—Security Research[52]

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research. No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitioners demonstrated the continuing need and justification for the

exemption, as well as personal knowledge and experience with regard to this exemption. For example, J. Alex Halderman, the Center for Democracy and Technology ("CDT"), and the U.S. Technology Policy Committee of the Association for Computing Machinery ("ACM") highlighted the need to find and detect vulnerabilities in voting machines and other election systems in response to increasing aggressiveness on the part of threat actors, including other nation states.[53] MEMA stated that its membership "experienced firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety," and opined that the current exemption strikes an "appropriate balance."[54] This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 13.

10. Computer Programs—Software Preservation[55]

The Software Preservation Network ("SPN") and LCA petitioned to renew the exemption for computer programs, other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums. No oppositions were filed against readoption of this exemption. The petition stated that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software. For example, the petition explained that researchers at the University of Virginia designed a project in order to access a collection of drawings and plans from a local Charlottesville architecture firm, and that without the exemption, the outdated Computer Aided Design software used to create many of the designs "may have remained inaccessible to researchers, rendering the designs themselves inaccessible, too."[56] In addition, petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking relating to access controls on software, and/or representing major library associations with members who have relied on this exemption. This existing

---

[46] SFC Jailbreaking Renewal Pet. at 3.

[47] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the earlier Register's Recommendation at IV.G.

[48] MEMA Vehicle Repair Renewal Pet. at 3.

[49] ACA Vehicle Repair Renewal Pet. at 3.

[50] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.H.

[51] EFF Device Repair Renewal Pet. at 3; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet. at 3.

[52] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.I.

[53] J. Alex Halderman, CDT & ACM Security Research Renewal Pet. at 4.

[54] MEMA Security Research Renewal Pet. at 3.

[55] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.J.

[56] SPN & LCA Software Preservation Renewal Pet. at 3.

LOC_AR_00000074

exemption, as well as the exemption pertaining to video game preservation, serve as the baseline in assessing whether to recommend any expansions in Class 14.

### 11. Computer Programs—Video Game Preservation[57]

SPN and LCA petitioned to renew the exemption for preservation of video games for which outside server support has been discontinued. No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petition stated that libraries, archives, and museums continue to need the exemption to preserve and curate video games in playable form. For example, the petition highlighted Georgia Tech University Library's Computing Lab, retroTECH, which has made a significant collection of recovered video game consoles accessible for research and teaching uses pursuant to the exemption.[58] Petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking, and/or through their representation of members who have relied on this exemption. This existing exemption, as well as the above exemption pertaining to software preservation, serve as the baseline in assessing whether to recommend any expansions in Class 14.

### 12. Computer Programs—3D Printers[59]

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock. No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and petitioner demonstrated personal knowledge and experience regarding the exemption. Specifically, Mr. Weinberg declared that he is a member of the 3D printing community and previously participated in the section 1201 triennial rulemaking. In addition, the petition stated that manufacturers of 3D printers continue to limit the types of materials that may be used with the devices. This existing exemption serves as the

baseline in assessing whether to recommend any expansions in Class 15.

### B. New or Expanded Designations of Classes

Based upon the record in this proceeding regarding proposed expansions to existing exemptions or newly proposed exemptions, the Register recommends that the Librarian determine that the following classes of works be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

#### 1. Proposed Class 1: Audiovisual Works—Criticism and Comment[60]

Proposed Class 1 sought to expand the existing exemption that permits circumvention of access controls protecting excerpts of motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for the purposes of criticism and comment, including for educational purposes by certain users. Three different petitions were filed in this class. OTW's proposed exemption sought to eliminate multiple limitations, including the requirement that a user consider whether screen capture technology is a viable alternative before circumvention. BYU's proposed exemption would permit circumvention by college or university employees or students or by K–12 educators or students acting under the direct supervision of an educator, and would significantly alter the language of the current exemption regarding the purpose of the circumvention. A group of individual educators and educational organizations ("Joint Educators") proposed an exemption that would permit circumvention by "educators and preparers of online learning materials" to be used on online learning platforms. All three proposals sought to remove the reference to screen capture from the existing exemption. OTW and Joint Educators' proposals sought to use short portions of motion pictures; the BYU proposal sought use of full-length works. The proposals addressed several uses of motion pictures that proponents contended are noninfringing and that they argued are adversely affected by TPMs. NTIA supported the proposed exemption, but proposed some amendments to the text.

Opponents argued that the proposed changes were unwarranted or unnecessary. The Motion Picture Association, the Alliance for Recorded Music, and the Entertainment Software Association (collectively, "Joint

Creators") and the DVD Copy Control Association ("DVD CCA") and the Advanced Access Content System Licensing Administrator, LLC ("AACS LA") argued that screen capture technology has improved and remains an adequate alternative in some circumstances. Joint Creators also argued that the Joint Educators' proposal to expand the exemption to "educators and preparers of online learning materials" could permit circumvention by businesses and threaten the market for licensed clips. DVD CCA and AACS LA contended that expanding the exemption to cover employees of a qualifying MOOC was unnecessary for online educators to prepare materials.

For the reasons detailed in the Register's Recommendation, the Register recommended expanding the exemption to permit employees of colleges and universities to circumvent at the direction of a faculty member for the purpose of teaching a course, and also to cover similar uses by both faculty and employees acting at the direction of faculty members of accredited nonprofit educational institutions for the purposes of offering MOOCs. The Register further recommended retaining the screen capture provision in the exemption to anticipate the possibility that screen capture technology could be found to involve circumvention. The Register concluded that the exemption should not be expanded or amended to cover copying for the purpose of performing full-length motion pictures for educational purposes; to replace the phrase "short portions" with "reasonable and limited portions"; to enable circumvention by for-profit and/or unaccredited educational companies and organizations; or to cover the broadly defined "educators and preparers of online learning materials" of "online learning platforms."

#### 2. Proposed Class 3: Audiovisual Works—Accessibility[61]

Class 3 proponents sought to expand several provisions of the current exemption for adding captions or audio description to motion pictures for the benefit of students with disabilities. Proponents requested expanding the exemption to include faculty and staff with disabilities at educational institutions as beneficiaries, explicitly permitting reuse of previously remediated materials, allowing for proactive remediation in advance of a

---

[57] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.K.

[58] SPN & LCA Abandoned Video Game Renewal Pet. at 3.

[59] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.L.

[60] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.A.

[61] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.C.

LOC_AR_00000075

specific request for accessible material, and clarifying the market-check requirement to encompass only works on the market that are of "sufficient quality." Joint Creators and DVD CCA & AACS LA filed oppositions. NTIA supported the proposed exemption.

For the reasons discussed in the Register's Recommendation, the Register concluded that expanding the exemption to faculty and staff with disabilities, allowing reuse of previously remediated material, and permitting proactive proactive remediation are likely fair uses because they are directed towards adding captions or audio descriptions in compliance with disability law, the same purpose found fair in the Register's 2018 Recommendation. Additionally, the Register concluded that proponents had provided sufficient evidence that they would be adversely affected if the exemption were not expanded.

3. Proposed Class 5: Audiovisual Works—Preservation and Replacement [62]

Class 5 proponents sought to permit circumvention of TPMs on motion pictures (including television shows and videos) stored on DVDs or Blu-ray discs that are no longer reasonably available in the marketplace to enable libraries, archives, and museums to make preservation and replacement copies of those works. The proposed exemption would permit qualifying institutions to make copies of discs that are damaged or deteriorating, as well as discs that have not yet begun to deteriorate; to make physical or digital copies of the motion pictures; and to make any digital copies available outside the premises of the institution. NTIA supported the proposed exemption.

Joint Creators and DVD CCA and AACS LA opposed the exemption, arguing that it would enable institutions to space-shift [63] their film collections and launch online streaming services. Opponents contended that, should an exemption be granted, it should apply only to damaged or deteriorating discs; it should prohibit off-premises access to the copied works; and the market check should include a requirement that institutions determine if the motion

picture is available for streaming through a licensed source.

For the reasons detailed in the Register's Recommendation, the Register concluded that it was likely to be a fair use for qualifying institutions to copy motion pictures from discs that are damaged or deteriorating if the motion pictures on those discs are not reasonably available in the marketplace for purchase or streaming. The Register concluded that proponents had not demonstrated that providing off-premises access to the replacement copies of motion pictures is likely to be noninfringing. The Register concluded that proponents had provided substantial evidence that granting the exemption would benefit preservation, education, and scholarship by making available motion pictures that might otherwise be lost to history and that the exemption is unlikely to adversely affect the market for or value of the motion pictures.

4. Proposed Classes 7(a): Motion Pictures and 7(b): Literary Works—Text and Data Mining [64]

Authors Alliance, the American Association of University Professors, and LCA jointly filed a petition proposing Classes 7(a) and 7(b), seeking to permit circumvention of TPMs on motion pictures and literary works stored on DVDs or Blu-ray discs or made available for digital download to enable researchers to perform text and data mining ("TDM") techniques for the purpose of scholarly research and teaching. Proponents argued that copying literary works and motion pictures to create large collections on which to perform TDM research is a fair use, and that requirements to use security measures to protect the corpora from public access or further distribution should afford qualifying institutions flexibility to tailor the measures to the size and content of the corpus. NTIA supported the proposed exemptions.

Joint Creators and DVD CCA and AACS LA opposed the proposed exemption for class 7(a), and the American Association for Publishers ("AAP") and the Software and Information Industry Association opposed the proposed exemption for class 7(b). They argued that TDM research would interfere with the licensing market for collections of literary works and motion pictures and that researchers' ability to view the

entirety of the works in a corpus would create a risk of substitutional use. They also argued that any exemption must require specific, robust security measures.

As discussed in greater detail in the Register's Recommendation, the Register found that the prohibition on circumvention adversely affects researchers' ability to conduct TDM research projects, which are likely to be noninfringing with the addition of several limitations. Most importantly, the Register recommended requiring the institution of higher education storing or hosting a corpus of copyrighted works to implement either security measures that have been agreed upon by copyright owners and institutions of higher education, or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. The Register also recommended adding a limitation that the person undertaking the circumvention view or listen to the contents of the copyrighted works in the corpus solely for the purpose of verification of the research findings, not for the works' expressive purposes. The Register concluded that existing alternatives to circumvention do not meet researchers' needs.

5. Proposed Class 8: Literary Works—Accessibility [65]

Class 8 proponents sought to modify the current exemption for e-book accessibility to align with recent changes to the Copyright Act as a result of the Marrakesh Treaty Implementation Act. Proponents requested expanding the class of beneficiaries to "eligible persons" as defined in section 121 of the Copyright Act, expanding the exemption to cover previously published musical works, and replacing references to a "mainstream copy" in the remuneration requirement with the term "inaccessible copy." Proponents also sought guidance on whether import and export activity under section 121A was implicated by the prohibition on circumvention. Joint Creators stated that they did not oppose the exemption to the extent it is consistent with sections 121 and 121A. AAP filed a reply comment in support of this class, and NTIA supported the proposed exemption.

For the reasons discussed in the Register's Recommendation, the Register concluded that without the proposed modifications, print-disabled

---

[62] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.E.

[63] Space-shifting occurs when a work is transferred from one storage medium to another, such as from a DVD to a computer hard drive. *See* 2015 Recommendation at 107.

[64] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.G.

[65] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.H.

LOC_AR_00000076

individuals would be adversely affected in their ability to engage in the proposed noninfringing uses. The Register also determined that replacement of the reference to a "mainstream copy" with an "inaccessible copy" is a non-substantive change. Finally, the Register declined to recommend language regarding import and export of accessible works because the record did not indicate that such activity implicates the prohibition on circumvention. Proponents and Joint Creators filed a joint post-hearing submission proposing regulatory language that excludes sound recordings of performances of musical works from the exemption, which the Register recommended including.

## 6. Proposed Class 9: Literary Works— Medical Device Data [66]

Class 9 proponents sought to expand several provisions of the current exemption that permits the circumvention of TPMs on medical devices to access their data outputs. Proponents filed a petition seeking to eliminate the current limitation of the exemption to "wholly or partially implanted" devices; permit authorized third parties to perform the circumvention on behalf of a patient; extend the exemption to non-passive monitoring; and remove the condition that circumvention not violate other applicable laws. ACT|The App Association opposed the proposed exemption. NTIA supported adopting the proposed exemption, with some modification.

For the reasons detailed in the Register's Recommendation, the Register concluded that accessing medical data outputs likely qualifies as a fair use and that expanding the exemption to include non-implanted medical devices and non-passive monitoring would not alter the fair use analysis. Additionally, the Register concluded that proponents set forth sufficient evidence that the "wholly or partially implanted" language and the passive monitoring limitation are causing, or are likely to cause, adverse effects on these noninfringing uses. The Register also recommended expanding the exemption to permit circumvention "by or on behalf of a patient." After consultation with the U.S. Food and Drug Administration, the Register recommended removing the language requiring compliance with other laws, and replacing it with a statement that

eligibility for the exemption does not preclude liability from other applicable laws.

## 7. Proposed Class 10: Computer Programs—Unlocking [67]

ISRI petitioned to expand the existing exemption for unlocking to either (1) add a new device category for laptop computers or (2) remove enumerated device categories from the current exemption and permit unlocking of all wireless devices. It argued that the proposed uses are noninfringing based on the Register's previous findings that unlocking of certain types of devices is a fair use, contending that the legal analysis does not differ depending on the type of device that is unlocked. The only opposition comment was filed by MEMA, which opposed expanding the exemption to permit unlocking cellular-enabled vehicles. NTIA supported expanding the exemption to permit unlocking all lawfully-acquired devices.

For the reasons discussed in the Register's Recommendation, the Register concluded that unlocking is likely to be a fair use regardless of the type of device involved. Proponents offered unrebutted evidence that many different types of wireless devices share the same wireless modem. Because the Register concluded that unlocking those modems is likely a fair use, she determined that users of these devices experience the same adverse effects from the prohibition on circumvention.

## 8. Proposed Class 11: Computer Programs—Jailbreaking [68]

Two petitions were filed for new or expanded exemptions relating to the circumvention of computer programs for jailbreaking purposes. EFF filed a petition seeking to clarify and expand the current exemption pertaining to jailbreaking smart TVs to include video streaming devices. SFC filed a petition for a new exemption to allow jailbreaking of routers and other networking devices to enable the installation of alternative firmware. ACT|The App Association, DVD CCA and AACS LA, and Joint Creators opposed this proposed class. NTIA supported adopting both proposed exemptions.

In supporting comments, EFF clarified that its proposed exemption

would cover devices whose primary purpose is to run applications that stream video from the internet for display on a screen, and would not extend to DVD or Blu-ray players or video game consoles. The Register concluded that jailbreaking video streaming devices likely constitutes a fair use. Additionally, the Register concluded that the prohibition on circumvention is likely to adversely affect proponents' ability to engage in such activities. She recommended that the regulatory language contain certain limitations to address opponents' concerns over potential market harm.

With respect to SFC's petition, the Register concluded that jailbreaking routers and other networking devices is likely to qualify as a fair use. Additionally, the Register concluded that the prohibition on circumvention is likely to prevent users from installing free and open source software ("FOSS") on routers and other networking devices and that there are no viable alternatives to circumvention to accomplish that purpose.

## 9. Proposed Class 12: Computer Programs—Repair [69]

Several organizations submitted petitions for new or expanded exemptions relating to the diagnosis, maintenance, repair, and modification of software-enabled devices. EFF and, jointly, iFixit and the Repair Association filed petitions seeking to merge and expand the two existing exemptions to cover all devices and vehicles and permit "modification" of all devices. Opponents objected that the proposed expansion to cover all devices was overbroad and that proponents failed to develop a record demonstrating sufficient commonalities among the various types of software-enabled devices. In addition, they argued that specific types of devices for which circumvention of TPMs raises piracy and safety concerns should be excluded from the proposed class. Opponents also contended that the term "modification" is so broad that it could implicate infringing activities, including violating copyright owners' exclusive right to prepare derivative works.

Separately, Public Knowledge and iFixit jointly petitioned for an exemption to repair optical drives in video game consoles and to replace damaged hardware in such devices. They asserted that authorized repair services are inadequate, particularly for

---

[66] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.I.

[67] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.J.

[68] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.K.

[69] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.L.

certain legacy consoles that manufacturers no longer support. Opponents argued that the proposed exemption would create a risk of market harm for these devices and that adequate alternatives to circumvention exist.

NTIA recommended expanding the current exemptions by merging them into a single exemption that would permit circumvention for the diagnosis, maintenance, and repair of all software-enabled devices, machines, and systems. In addition, NTIA recommended allowing "lawful modification that is necessary for a repair or maintenance" and software modifications relating to device functionality.

For the reasons discussed in the Register's Recommendation, the Register recommended expanding the existing exemption for diagnosis, maintenance, and repair of certain categories of devices to cover any software-enabled device that is primarily designed for use by consumers. For video game consoles, the Register concluded that an exemption is warranted solely for the repair of optical drives.

The proposals to merge the two existing repair exemptions would also effectively broaden the existing vehicle exemption by: (1) No longer limiting the class to "motorized land vehicles"; and (2) removing other limitations in the exemption, including that users comply with other laws. Opponents did not object to including marine vessels in the vehicle exemption, but opposed removing language requiring compliance with other laws. For the reasons discussed in the Register's Recommendation, the Register recommended that the exemption for land vehicles be expanded to cover marine vessels and to remove the condition requiring compliance with other laws.

Finally, Summit Imaging, Inc. and Transtate Equipment Co., Inc. petitioned to exempt circumvention of TPMs on software-enabled medical devices and systems for purposes of diagnosis, maintenance, and repair. Petitioners also sought access to related data files stored on medical devices and systems, including manuals and servicing materials. Opponents argued that this exemption is unnecessary because adequate authorized repair services are available. They also contended that the proposed uses are commercial in nature, would harm the market for medical devices and systems, may undermine patient safety and create cybersecurity risks, and would interfere with manufacturers' regulatory compliance obligations. For the reasons discussed in

the Register's Recommendation, the Register recommended a new exemption allowing circumvention of TPMs restricting access to firmware and related data files on medical devices and systems for the purposes of diagnosis, maintenance, and repair.

### 10. Proposed Class 13: Computer Programs—Security Research [70]

Two petitions sought to expand the current exemption that permits circumvention of TPMs on computer programs for good-faith security research. Together, the petitions sought to eliminate several limitations within the exemption and to explicitly extend the exemption to privacy research. Proponents generally argued that the limitations have chilled valuable security research, primarily by creating uncertainty about whether conducting or reporting security research could result in liability under section 1201. Six parties opposed class 13 at least in part; they argued that the existing exemption has sufficiently enabled good-faith security research and that the record did not justify removing the limitations. NTIA supported the elimination of several limitations, but did not recommend modifying the existing exemption to address privacy-related research activities explicitly.

For the reasons discussed in the Register's Recommendation, the Register concluded that because the exemption is broadly defined and is not limited to specific issues or subjects relating to security flaws or vulnerabilities, expanding it to expressly cover privacy research is unnecessary. Regarding the specific limitations, the Register recommended removing the condition that circumvention not violate "other laws" and instead clarifying that the exemption does not provide a safe harbor from liability under other laws. The Department of Justice submitted comments supporting this change. The Register declined to recommend removal of limitations pertaining to access to and use of computer programs, finding a lack of specific evidence establishing adverse effects resulting from those provisions. The Register also did not recommend removal of the requirement that devices be lawfully acquired.

### 11. Proposed Class 14(a): Computer Programs and 14(b) Video Games—Preservation [71]

Proposed Classes 14(a) and 14(b) seek to amend the existing exemptions permitting libraries, archives, and museums to circumvent TPMs on computer programs and video games, respectively, for the purpose of preservation activities. Specifically, proponents seek to remove the requirement that the preserved computer program or video game must not be distributed or made available outside of the physical premises of the institution. Proposed Class 14(b) would also incorporate the current eligibility requirements for the software preservation exemption into the video game preservation exemption.

Proponents argued that enabling remote access to the works is likely to be a fair use, based in part on a general federal policy favoring remote access to preservation materials, as reflected in various provisions of the Copyright Act. They also argued that the proposed uses would not affect the potential market for or value of the copyrighted works because only works that are no longer reasonably available in the commercial marketplace would be subject to the exemption. NTIA supported the removal of the premises limitation in both exemptions.

Joint Creators and the Entertainment Software Association opposed removing the premises limitation, with most arguments directed to the video game class. They expressed concern that, because the proposed exemption did not limit beneficiaries of the exemption to authenticated educators or researchers, if preserved video games were made available outside the premises of an institution, they would become accessible to the general public, thereby adversely affecting the existing market for older video games.

For the reasons discussed in the Register's Recommendation, the Register concluded that off-premises access to software as described in the proposal is likely to be noninfringing, with the limitation that the work be accessible to only one user at a time and for a limited time. With respect to video games, the Register concluded that proponents failed to carry their burden to show that the uses are likely noninfringing, and noted the greater risk of market harm in this context given the market for legacy video games. The Register therefore recommends that the Librarian amend

---

[70] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.M.

[71] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.N.

LOC_AR_00000078

the exemption for Class 14(a) to address the eligibility requirements for libraries, archives, and museums, but not to remove the premises limitation. The Register recommends removing the premises limitation in the exemption for Class 14(a).

### 12. Proposed Class 15: Computer Programs—3D Printing [72]

Class 15 seeks to expand two provisions of the current exemption that permits the circumvention of access controls on computer programs in 3D printers to enable the use of non-manufacturer approved feedstock. Michael Weinberg filed a petition to replace the term "feedstock" with the term "material," stating that the latter is more commonly used within the industry and that the two terms are interchangeable. Additionally, Mr. Weinberg sought to eliminate the phrase "microchip-reliant" from the exemption, arguing that 3D printers may use technology other than microchips to verify 3D printing materials. Mr. Weinberg provided evidence that manufacturers are increasingly moving beyond microchip-based verification techniques, such as using optical scanners. No parties opposed proposed class 15. NTIA supported the proposed exemption.

For the reasons discussed in greater detail in the Register's Recommendation, the Register concluded that changing the word "feedstock" to "material" is not a substantive change, and found that the removal of the term "microchip-reliant" does not alter the fair use analysis because the expansion is directed at the same uses the Office previously concluded were fair.

### 13. Proposed Class 16: Computer Programs—Copyright License Investigation [73]

SFC petitioned for a new exemption that would permit investigating whether a particular computer program includes FOSS, and if so, whether the use of the program complies with applicable license terms. SFC, supported by the Free Software Foundation, subsequently agreed to add limitations to require that the circumvention be undertaken on a lawfully acquired device or machine; that it be solely for the purpose of investigating potential copyright

infringement; that it be performed by, or at the direction of, a party that has standing to bring a breach of license claim; and that it otherwise comply with applicable law. NTIA supported the proposed exemption as modified.

Opponents—DVD CCA and AACS LA; the Equipment Dealers Association, and its regional affiliates, and Associated Equipment Distributors; Joint Creators; and Marcia Wilbur—argued that FOSS licensors could obtain the information they seek by other means. They objected to application of the proposed exemption to a broad category of devices, and requested exclusion of DVD and Blu-ray players, video game consoles, set-top boxes, and vehicles. They argued that any exemption should be limited to investigating potential violations of FOSS licenses, rather than infringement of any proprietary software, and that the investigation must be based on a good-faith, reasonable belief that the device may violate FOSS license terms. Finally, opponents expressed concerns about devices being left exposed to piracy or unauthorized access after circumvention.

For the reasons discussed in the Register's Recommendation, the Register recommended adopting an exemption with several limitations. First, the purpose of the investigation must be limited to investigating whether a computer program potentially infringes FOSS, and the user must have a good-faith, reasonable belief in the need for the investigation. Second, circumvention must be undertaken by, or at the direction of, a party that would have standing to bring either a breach of license claim or a copyright infringement claim. Third, the copy of a computer program made pursuant to the exemption, or the device or machine on which it operates, cannot be used in a manner that facilitates copyright infringement. Finally, video game consoles should be excluded from the types of devices on which TPMs may be circumvented.

### 14. Proposed Class 17: All Works—Accessibility Uses [74]

Petitioners, a coalition of accessibility groups, requested a new exemption to create accessible versions of any copyrighted works that are inaccessible to individuals with disabilities. They argued that the Librarian has the authority to define a class of works that share the attribute of being inaccessible

to individuals with disabilities and that creating accessible versions of inaccessible works is unquestionably a fair use. Proponents argued that a broad exemption is warranted to prevent individuals with disabilities from being forced to make piecemeal requests every three years when new accessibility issues arise. NTIA supported the proposed exemption.

Joint Creators, DVD CCA and AACS LA, and AAP filed comments opposing the proposed exemption, focusing primarily on the ground that the statute does not give the Librarian the authority to adopt a class consisting of "all works" sharing a particular attribute. Joint Creators also raised concerns about the lack of limitations on the use of copies, such as prohibiting further distribution to individuals without disabilities.

As discussed in greater detail in the Register's Recommendation, although the Register supports the policy goals that underpin the proposed exemption, the statute requires proponents to provide evidence of actual or likely adverse effects resulting from the prohibition on circumvention with respect to "particular class[es]" of works. Here, the Register determined that proponents submitted insufficient evidence of such adverse effects as to most types of works. Proponents did, however, provide evidence to support an exemption to enable individuals with disabilities to use alternate input devices to play video games.

### C. Classes Considered but Not Recommended

Based upon the record in this proceeding, the Register recommended that the Librarian determine that the following classes of works shall not be exempt during the next three-year period from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

### 1. Proposed Class 2: Audiovisual Works—Texting [75]

Proposed Class 2 would allow circumvention of technological measures protecting motion pictures and other audiovisual works to create short audiovisual clips for expressive purposes in text messages. Petitioner did not provide legal arguments or evidence in support of its petition and did not participate in the public hearings. Petitioner failed to explain how the proposed uses were noninfringing and why an exemption is

---

[72] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.O.

[73] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.P.

[74] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.Q.

[75] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.B.

LOC_AR_00000079

necessary. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, due to the *de minimis* showing provided by proponents, the Register does not recommend the adoption of an exemption for proposed Class 2.

2. Proposed Class 4: Audiovisual Works—Livestream Recording [76]

Proposed Class 4 would allow circumvention of HTTP Live Streaming technology for the purpose of recording audiovisual works originating as livestreams. Petitioner did not provide legal arguments or evidence to support its petition and did not participate in the public hearings. Petitioner first described the exemption as encompassing sports and other competitive events, but elsewhere stated that the class includes "any and all works" where audiovisual recordings may be made, including individual school performances. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, the Register does not recommend the adoption of an exemption for proposed Class 4.

3. Proposed Class 6: Audiovisual Works—Space-Shifting [77]

Proposed Class 6 would allow circumvention of TPMs protecting motion pictures and other audiovisual works to engage in space-shifting. Petitioner failed to provide legal arguments or evidence to demonstrate that space-shifting is a noninfringing use. Additionally, petitioner did not participate in the public hearings to support its petition or clarify whether the proposed exemption would extend to commercial services. Opponents argued that petitioner did not provide the evidence necessary to support an exemption, citing several substantive and procedural deficiencies. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, the Register does not recommend the adoption of an exemption for proposed Class 6.

*D. Conclusion*

Having considered the evidence in the record, the contentions of the

commenting parties, and the statutory objectives, the Register of Copyrights has recommended that the Librarian of Congress publish certain classes of works, as designated above, so that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply for the next three years to persons who engage in noninfringing uses of these particular classes of works.

Dated: October 20, 2021.

**Shira Perlmutter,**

*Register of Copyrights and Director of the U.S. Copyright Office.*

**Determination of the Librarian of Congress**

Having duly considered and accepted the recommendation of the Register of Copyrights, the Librarian of Congress, pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), hereby publishes as a new rule the classes of copyrighted works that shall for a three-year period be subject to the exemption provided in 17 U.S.C. 1201(a)(1)(B) from the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A).

**List of Subjects in 37 CFR Part 201**

Copyright, Exemptions to prohibition against circumvention.

**Final Regulations**

For the reasons set forth in the preamble, 37 CFR part 201 is amended as follows:

**PART 201—GENERAL PROVISIONS**

■ 1. The authority citation for part 201 continues to read as follows:

**Authority:** 17 U.S.C. 702.

■ 2. Section 201.40 is amended by revising paragraph (b) to read as follows:

**§ 201.40  Exemption to prohibition against circumvention.**

\*      \*      \*      \*      \*

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

(1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired

on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraphs (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

(i) For the purpose of criticism or comment:

(A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

(B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

(C) For use in nonfiction multimedia e-books.

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K–12) educators and students (where the K–12 student is circumventing under the direct supervision of an educator), or employees acting at the direction of faculty of such educational institutions for the purpose of teaching a course, including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of accredited nonprofit educational institutions and employees acting at the direction of faculty members of those institutions, for purposes of offering massive open online courses (MOOCs) to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably

---

[76] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.D.

[77] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.F.

LOC_AR_00000080

prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services for the purpose of adding captions and/or audio description to a motion picture to create an accessible version for students, faculty, or staff with disabilities;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has a reasonable belief that the motion picture will be used for a specific future activity of the institution and, after a reasonable effort, has determined that an accessible version of sufficient quality cannot be obtained at a fair market price or in a timely manner, including where a copyright holder has not provided an accessible version of a motion picture that was included with a textbook; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of paragraph (b)(2) of this section,

(A) "Audio description" means an oral narration that provides an accurate rendering of the motion picture;

(B) "Accessible version of sufficient quality" means a version that in the reasonable judgment of the educational institution unit has captions and/or audio description that are sufficient to meet the accessibility needs of students, faculty, or staff with disabilities and are substantially free of errors that would materially interfere with those needs; and

(C) Accessible materials created pursuant to this exemption and stored pursuant to paragraph (b)(2)(i)(C) of this section may be reused by the educational institution unit to meet the accessibility needs of students, faculty, or staff with disabilities pursuant to paragraphs (b)(2)(i)(A) and (B) of this section.

(3)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, solely for the purpose of lawful preservation or the creation of a replacement copy of the motion picture, by an eligible library, archives, or museum, where:

(A) Such activity is carried out without any purpose of direct or indirect commercial advantage;

(B) The DVD or Blu-ray disc is damaged or deteriorating;

(C) The eligible institution, after a reasonable effort, has determined that an unused and undamaged replacement copy cannot be obtained at a fair price and that no streaming service, download service, or on-demand cable and satellite service makes the motion picture available to libraries, archives, and museums at a fair price; and

(D) The preservation or replacement copies are not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) For purposes of paragraph (b)(3)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by paragraph (b)(3)(i) of this section.

(4)(i) Motion pictures, as defined in 17 U.S.C. 101, where the motion picture is on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or made available for digital download where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of motion pictures for the purpose of scholarly research and teaching;

(B) The copy of each motion picture is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention views or listens to the contents of the motion pictures in the corpus solely for the purpose of verification of the research findings; and

(D) The institution uses effective security measures to prevent further dissemination or downloading of motion pictures in the corpus, and to limit access to only the persons identified in paragraph (b)(4)(i)(A) of this section or to researchers affiliated with other institutions of higher education solely for purposes of collaboration or replication of the research.

(ii) For purposes of paragraph (b)(4)(i) of this section:

(A) An institution of higher education is defined as one that:

(1) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(2) Is legally authorized to provide a postsecondary education program;

(3) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(4) Is a public or other nonprofit institution; and

(5) Is accredited by a nationally recognized accrediting agency or association.

(B) The term "effective security measures" means security measures that have been agreed to by interested copyright owners of motion pictures and institutions of higher education; or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. If the institution uses the security measures it uses to protect its own highly confidential

LOC_AR_00000081

information, it must, upon a reasonable request from a copyright owner whose work is contained in the corpus, provide information to that copyright owner regarding the nature of such measures.

(5)(i) Literary works, excluding computer programs and compilations that were compiled specifically for text and data mining purposes, distributed electronically where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of literary works for the purpose of scholarly research and teaching;

(B) The copy of each literary work is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention views the contents of the literary works in the corpus solely for the purpose of verification of the research findings; and

(D) The institution uses effective security measures to prevent further dissemination or downloading of literary works in the corpus, and to limit access to only the persons identified in paragraph (b)(5)(i)(A) of this section or to researchers or to researchers affiliated with other institutions of higher education solely for purposes of collaboration or replication of the research.

(ii) For purposes of paragraph (b)(5)(i) of this section:

(A) An institution of higher education is defined as one that:

(1) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(2) Is legally authorized to provide a postsecondary education program;

(3) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(4) Is a public or other nonprofit institution; and

(5) Is accredited by a nationally recognized accrediting agency or association.

(B) The term ''effective security measures'' means security measures that have been agreed to by interested copyright owners of literary works and institutions of higher education; or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. If the institution uses the security measures it uses to

protect its own highly confidential information, it must, upon a reasonable request from a copyright owner whose work is contained in the corpus, provide information to that copyright owner regarding the nature of such measures.

(6)(i) Literary works or previously published musical works that have been fixed in the form of text or notation, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(A) When a copy or phonorecord of such a work is lawfully obtained by an eligible person, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the market price of an inaccessible copy of the work as made available to the general public through customary channels; or

(B) When such a work is lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(ii) For the purposes of paragraph (b)(6)(i) of this section, a ''phonorecord of such a work'' does not include a sound recording of a performance of a musical work unless and only to the extent the recording is included as part of an audiobook or e-book.

(7) Literary works consisting of compilations of data generated by medical devices or by their personal corresponding monitoring systems, where such circumvention is undertaken by or on behalf of a patient for the sole purpose of lawfully accessing data generated by a patient's own medical device or monitoring system. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986, or regulations of the Food and Drug Administration.

(8) Computer programs that enable wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network.

(9) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the

smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this paragraph (b)(9), a ''portable all-purpose mobile computing device'' is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(10) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(10), ''smart televisions'' includes both internet-enabled televisions, as well as devices that are physically separate from a television and whose primary purpose is to run software applications that stream authorized video from the internet for display on a screen.

(11) Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(11), a ''voice assistant device'' is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

(12) Computer programs that enable routers and dedicated network devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the router or dedicated network device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(12), ''dedicated network device'' includes switches, hubs, bridges, gateways, modems, repeaters, and access points, and excludes devices that are not lawfully owned.

(13) Computer programs that are contained in and control the functioning

LOC_AR_00000082

of a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle or vessel function, where such circumvention is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency.

(14) Computer programs that are contained in and control the functioning of a lawfully acquired device that is primarily designed for use by consumers, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(14):

(i) The "maintenance" of a device is the servicing of the device in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device; and

(ii) The "repair" of a device is the restoring of the device to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device. For video game consoles, "repair" is limited to repair or replacement of a console's optical drive and requires restoring any technological protection measures that were circumvented or disabled.

(15) Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. For purposes of this paragraph (b)(15):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

(16)(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research.

(ii) For purposes of paragraph (b)(16)(i) of this section, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(iii) Good-faith security research that qualifies for the exemption under paragraph (b)(16)(i) of this section may nevertheless incur liability under other applicable laws, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code, and eligibility for that exemption is not a safe harbor from, or defense to, liability under other applicable laws.

(17)(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video

game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(17)(i)(B) or (b)(17)(ii) of this section.

(iv) For purposes of this paragraph (b)(17), the following definitions shall apply:

(A) For purposes of paragraphs (b)(17)(i)(A) and (b)(17)(ii) of this section, "complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(17)(i)(B) of this section, "complete games" means video games that meet the definition in paragraph (b)(17)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered "eligible" if—

LOC_AR_00000083

(*1*) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(*2*) The library, archives, or museum has a public service mission;

(*3*) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(*4*) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(*5*) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(17).

(18)(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage. Any electronic distribution, display, or performance made outside of the physical premises of an eligible library, archives, or museum of works preserved under this paragraph may be made to only one user at a time, for a limited time, and only where the library, archives, or museum has no notice that the copy would be used for any purpose other than private study, scholarship, or research.

(ii) For purposes of the exemption in paragraph (b)(18)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(18).

(19) Computer programs that operate 3D printers that employ technological measures to limit the use of material, when circumvention is accomplished solely for the purpose of using alternative material and not for the purpose of accessing design software, design files, or proprietary data.

(20) Computer programs, solely for the purpose of investigating a potential infringement of free and open source computer programs where:

(i) The circumvention is undertaken on a lawfully acquired device or machine other than a video game console, on which the computer program operates;

(ii) The circumvention is performed by, or at the direction of, a party that has a good-faith, reasonable belief in the need for the investigation and has standing to bring a breach of license or copyright infringement claim;

(iii) Such circumvention does not constitute a violation of applicable law; and

(iv) The copy of the computer program, or the device or machine on which it operates, is not used or maintained in a manner that facilitates copyright infringement.

(21) Video games in the form of computer programs, embodied in lawfully acquired physical or downloaded formats, and operated on a general-purpose computer, where circumvention is undertaken solely for the purpose of allowing an individual with a physical disability to use software or hardware input methods other than a standard keyboard or mouse.

\*        \*        \*        \*        \*

Dated: October 21, 2021.

**Carla D. Hayden,**

*Librarian of Congress.*

[FR Doc. 2021–23311 Filed 10–27–21; 8:45 am]

**BILLING CODE 1410–30–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

**[EPA–R04–OAR–2020–0445; FRL–8779–02–R4]**

## Air Plan Approval; SC; Revisions to Definitions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing approval of a State Implementation Plan (SIP) revision submitted by the State of South Carolina, through the South Carolina Department of Health and Environmental Control (SC DHEC or Department), on April 24, 2020. The SIP revision updates the definition of "Spec. Oil (Specification Oil)" and makes minor updates to formatting and numbering. EPA is finalizing approval of these changes pursuant to the Clean Air Act (CAA or Act) and implementing federal regulations.

**DATES:** This rule is effective November 29, 2021.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA–R04–OAR–2020–0445. All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information may not be publicly available, *i.e.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. EPA requests that if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Andres Febres, Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. The telephone number is (404) 562–8966. Mr. Febres can also be reached via electronic mail at *febres-martinez.andres@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

On April 24, 2020, SC DHEC submitted a SIP revision to EPA for approval that includes changes to South Carolina Regulation 61–62.1, Section I—*Definitions.*[1] First, SC DHEC's April 24,

---

[1] In the April 24, 2020, SIP revision SC DHEC also submitted to EPA changes to Regulations 61–62.1,

Continued

## I.  Proposed Class 21:  Vehicle Software – Diagnosis, Repair or Modification

### 1.  Proposals

Modern automobiles and agricultural vehicles and machinery are equipped with systems of interconnected computers that monitor and control a variety of vehicle functions.[1425]  As modern vehicles have become more reliant on software to operate, a wide variety of diagnostic, repair and modification activities now require access to and sometimes alteration of those computer programs, including identifying malfunctions, installing replacement parts, and customizing vehicles for specialized uses.[1426]  As is explained below, however, manufacturers restrict access to vehicle computer programs in a variety of ways.  Accordingly, proponents are requesting an exemption to permit circumvention of TPMs protecting computer programs[1427] that control the functioning of vehicles for the purposes of diagnosis, repair and modification of the vehicles.

EFF filed a petition seeking an exemption to allow the circumvention of TPMs on computer programs that are embedded in vehicles for purposes of personalization, modification, or other improvement of the vehicle.  The exemption would apply to all motorized land vehicles.[1428]

IPTC USC proposed two similar exemptions for agricultural machinery specifically.[1429]  The proposed exemptions would allow owners of agricultural vehicles to circumvent the TPMs on computer programs that are embedded in their vehicles for the purpose of modifying, and to diagnose and/or repair, those vehicles.

These proposals were consolidated by the Office into a single proposed class, described as follows in the NPRM:

---

[1425] The Electronic Frontier Foundation ("EFF") Vehicle Software Repair Pet. at 2.

[1426] *Id.* ; The Intellectual Property & Technology Law Clinic of the University of Southern California Gould School of Law ("IPTC USC") Vehicle Software Modification Pet. at 1, 4; IPTC USC Vehicle Software Repair Pet. at 1, 4.

[1427] The Register notes that throughout this Recommendation, the terms "firmware" and "software" are variously used, although both are "computer programs" within the meaning of the Copyright Act.  *See* 17 U.S.C. § 101 (definition of "computer program").

[1428] EFF's proposed regulatory language reads as follows:  "Lawfully-obtained computer programs that control or are intended to control the functioning of a motorized land vehicle, including firmware and firmware updates, where circumvention is undertaken by or on behalf of the lawful owner of such a vehicle for the purpose of lawful aftermarket personalization, improvement, or repair."  EFF Vehicle Software Repair Pet. at 1.

[1429] IPTC USC filed two petitions relating to agricultural machinery software.  The first seeks an exemption to "allow[] farmers to circumvent . . . TPMs for the purpose of modifying their own agricultural machinery to improve efficiency and/or functionality."  IPTC USC Vehicle Software Modification Pet. at 1.  The second seeks an exemption to "allow[] farmers to circumvent . . . TPMs for the purpose of diagnosing and/or repairing their own agricultural machinery."  IPTC USC Vehicle Software Repair Pet. at 1.

218

LOC_AR_00001043

Proposed Class 21: This proposed class would allow circumvention of TPMs protecting computer programs that control the functioning of a motorized land vehicle, including personal automobiles, commercial motor vehicles, and agricultural machinery, for purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement. Under the exemption as proposed, circumvention would be allowed when undertaken by or on behalf of the lawful owner of the vehicle.[1430]

In addition to EFF and IPTC USC, the Office received comments supporting the proposed exemption from AAA,[1431] Auto Care Association and Automotive Parts Remanufacturers Association ("Auto Care"),[1432] Catherine Gellis and the Digital Age Defense project ("Gellis/Digital Age Defense"),[1433] Consumer Electronics Association ("CEA"),[1434] Farm Hack,[1435] Free Software Foundation ("FSF"),[1436] iFixit,[1437] National Corn Growers Association,[1438] Randy's Repair, LLC.,[1439] Specialty Equipment Market Association ("SEMA"),[1440] and over 2500 individuals.[1441] Two parties, SAE International Dedicated Short Range Communication Standards Committee ("SAE DSRC") and SAE Vehicle Electrical System Security (VESS) Committee ("SAE VESS"), submitted neutral comments, along with offers to assist the Copyright Office by providing and sharing their technical expertise.[1442]

### a. Background

As noted above, modern vehicles are equipped with computers that monitor and control vehicle functions. These computers are referred to as electronic control units, or

---

[1430] NPRM, 79 Fed. Reg. at 73,869. In discussing this class, the Register uses the term "vehicle" to refer generally to all the types of motorized vehicles listed in the proposed exemption language, including agricultural machinery.

[1431] AAA Reply.

[1432] Auto Care Reply.

[1433] Gellis/Digital Age Defense Class 21 Supp.

[1434] CEA Reply.

[1435] Farm Hack Supp.

[1436] FSF Class 21 Supp.

[1437] iFixit & Kyle Wiens Supp.; iFixit Class 21 Supp.; iFixit Reply.

[1438] National Corn Growers Association Reply.

[1439] Randy's Repair, LLC. Reply.

[1440] SEMA Reply.

[1441] Digital Right to Repair Class 21 Supp. (2284 individuals); Jay Freeman Class 21 Supp.; Scott Rogers Supp.; Digital Right to Repair Class 21 Reply (298 individuals); DANNiE D Reply; David M. Lawrence Reply; David Ricotta Reply; Donna Eno Class 21 Reply; Drayton Green Reply; Edward Brown Reply; George Cothran Reply; George Sawyer Class 21 Reply; Louis Wesler Class 21 Reply; Perry Bruns Reply.

[1442] SAE DSRC Class 21 Supp.; SAE VESS Class 21 Reply.

219

LOC_AR_00001044

ECUs.[1443] A vehicle may have several ECUs that facilitate its operation. The individual ECUs are programmed to fulfill specific vehicular functions, such as engine control, fuel efficiency and braking.[1444] There are several types of TPMs that restrict access to the software programs contained in ECUs, including challenge-response mechanisms, encryption, and disabled access ports on the circuitry itself.[1445]

EFF explains that while vehicle owners expect to be able to engage in diagnosis, repair, and modification activities, TPMs on vehicle software "block such legitimate activities, forcing vehicle owners to choose between breaking the law or tinkering [with] and repairing their vehicles."[1446] IPTC USC similarly notes that farmers specifically require access to vehicle software "to make any significant modifications to the efficiency and/or functionality of . . . their increasingly sophisticated agricultural machinery"[1447] and to "obtain vital diagnostic information."[1448]

### b. Asserted Noninfringing Uses

Citing the four-factor fair use test set forth in section 107, Class 21 proponents assert that vehicle owners, independent mechanics, and third-party innovators are entitled to use the computer programs in ECUs to diagnose, repair, or modify vehicles as a matter of fair use. They further assert that these activities are noninfringing pursuant to the statutory exception for computer programs embodied in section 117, which exempts certain uses of computer programs from infringement liability. The Register reviews each theory of noninfringing use in turn.

### i. Fair Use

On the question of fair use, addressing the first statutory factor, proponents maintain that accessing and using copyright-protected ECU computer programs to diagnose, repair and modify vehicles serve transformative purposes.[1449] Proponents assert that if the exemption were to be granted, users would be empowered to dissect and understand the functional aspects of these programs in order to create tools and applications for use on or in coordination with ECUs.[1450] In the case of modification, proponents maintain that the exemption would allow the addition of new functions and enhancement of existing functions to suit users' particular needs, as well as necessary

---

[1443] EFF Vehicle Software Repair Pet. at 2; IPTC USC Vehicle Software Modification Pet. at 1; IPTC USC Vehicle Software Repair Pet. at 1.

[1444] EFF Vehicle Software Repair Pet. at 1; IPTC USC Vehicle Software Modification Pet. at 4.

[1445] *See, e.g.*, EFF Class 21 Supp. at 3-4; IPTC USC Class 21 Supp. at 5-6.

[1446] EFF Vehicle Software Repair Pet. at 5.

[1447] IPTC USC Vehicle Software Modification Pet. at 1.

[1448] IPTC USC Vehicle Software Repair Pet. at 1.

[1449] EFF Class 21 Supp. at 8-9 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

[1450] *Id.* at 8; *see also* EFF Class 21 Reply at 4-7; IPTC USC Class 21 Supp. at 11-12; IPTC USC Class 21 Reply at 8-9.

LOC_AR_00001045

modifications to ECUs to accommodate replacement parts. They urge that these uses are transformative, and that this conclusion alone requires a finding of fair use.[1451]

Turning to the second fair use factor, proponents state that the nature of the computer programs on ECUs weighs heavily in favor of fair use because the programs contain "unprotected aspects that cannot be examined without copying."[1452] They also note that the computer programs at issue act much like an internal operating system and thus lie "'at a distance from the core' of copyright protection."[1453] In particular, proponents observe that in prior 1201 rulemaking proceedings, the Register had concluded that computer programs comprising bootloaders and operating systems are essentially functional and that "[a]s functional works, certain features are dictated by function and in order to interoperate with [other] works certain functional elements of those programs, elements that in and of themselves may or may not be copyrightable, must be modified."[1454] Proponents thus urge that "where the nature of the work is such that purely functional elements exist in the work and it is necessary to copy the expressive elements in order to perform those functions, consideration of this second factor arguably supports a finding that the use is fair."[1455]

With regard to the third factor, the amount of the copyrighted work used, proponents recognize that the entire work may be used. However, they note that this does not preclude a finding of fair use. They observe that the relevant analysis includes a consideration of whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying.[1456] They reiterate that because it is necessary to copy the entire work in order to achieve a transformative purpose, consideration of this third factor arguably supports a finding that the use is fair.[1457] They assert that in the case of the diagnosis, repair, or modification of vehicle functions, any reproduction or alteration of computer programs on ECUs will only be that which is reasonable and for a legitimate purpose.[1458]

---

[1451] *See, e.g.*, EFF Class 21 Supp. at 7-11; EFF Class 21 Reply at 4-8; IPTC USC Class 21 Supp. at 11-12; IPTC USC Class 21 Reply at 8-10.

[1452] *See, e.g.*, IPTC USC Class 21 Supp. at 12 (quoting *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000)).

[1453] *See, e.g., id.*

[1454] EFF Class 21 Supp. at 9 (quoting 2010 Recommendation at 96); Auto Care Class 21 Reply at 8 (same).

[1455] EFF Class 21 Supp. at 9 (quoting *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1375 (Fed. Cir. 2014)).

[1456] *Id.* at 10 (citing *Campbell*, 510 U.S. at 586-87); IPTC USC Class 21 Supp. at 11 (citing *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007)).

[1457] IPTC USC Class 21 Reply at 9 (citing *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014)).

[1458] EFF Class 21 Supp. at 10; EFF Class 21 Reply at 7-8.

LOC_AR_00001046

Finally, proponents assert that the fourth factor, the effect on the market for or value of the copyrighted work, also favors fair use.[1459]  Proponents note that there is no market for computer programs on ECUs apart from the sale of vehicles themselves, and so the uses encompassed by the proposed exemption, by definition, cannot substitute for sales of the vehicle software.[1460]  Proponents also maintain that the relevant market for consideration is the market for the copyrighted works themselves and not the market for vehicles containing the ECUs.[1461]  Accordingly, proponents reject as inapposite opponents' claims regarding market effects such as vehicle values and brand equity.[1462]

### ii.    Section 117

Proponents also assert that vehicle owners' copying or alteration of computer programs for diagnosis, repair or modification purposes on ECUs is noninfringing under section 117.  That provision allows the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that program "as an essential step in the utilization of the computer program in conjunction with a machine and [if] it is used in no other manner."[1463]

A key consideration with respect to the application of section 117 is who owns the computer program in question.  Proponents argue that under either of the two leading tests for ownership under section 117—*Krause v. Titleserv, Inc.*[1464] and *Vernor v. Autodesk, Inc.*[1465]—it is the owners of the vehicles who own the copies of the programs on ECUs embedded within those vehicles.[1466]  Proponents state that most vehicle ECUs are transferred with the vehicle with no explicit agreements governing title to the copies of ECU computer programs.[1467]  Proponents explained during the initial round of comments that they were able to identify only a few license agreements pertaining to ECUs.  These agreements addressed only specific telematics[1468] or entertainment systems; proponents did not locate any licenses covering more general vehicle

---

[1459] *See, e.g.*, EFF Class 21 Supp. at 11; EFF Class 21 Reply at 8; IPTC USC Class 21 Supp. at 12; IPTC USC Class 21 Reply at 10.

[1460] EFF Class 21 Supp. at 11; IPTC USC Class 21 Supp. at 12.

[1461] IPTC USC Class 21 Reply at 10.

[1462] EFF Class 21 Reply at 8; IPTC USC Class 21 Reply at 10.

[1463] 17 U.S.C. § 117(a)(1).

[1464] 402 F.3d 119 (2d Cir. 2005).

[1465] 621 F.3d 1102 (9th Cir. 2010).

[1466] *See, e.g.*, EFF Class 21 Supp. at 11-15; EFF Class 21 Reply at 9-12; IPTC USC Class 21 Reply at 4-5.

[1467] EFF Class 21 Supp. at 13; *see also* Tr. at 183:02-12 (May 19, 2015) (Walsh, EFF).

[1468] EFF Class 21 Supp. at 14 (citing *Terms and Conditions of Your Safety Connect Telematics Service*, TOYOTA 4 (Oct. 20, 2010), http://www.toyota.com/safety-connect/img/safetyconnect-terms.pdf (establishing that telematics systems are vehicle systems that combine global positioning satellite tracking and other wireless communications to identify the location of vehicles for a variety of purposes such as automatic roadside assistance)).

LOC_AR_00001047

functions.[1469]  And, during the reply phase, proponents noted that opponents had failed to offer any further evidence that copies of computer programs on ECUs are licensed rather than sold to vehicle purchasers.[1470]

Proponents further maintain that even if written license terms exist, a vehicle owner can nonetheless be considered the owner of the ECU software copies.  They note that possessing actual title to a copy of a work is not an "absolute prerequisite" to section 117(a) protection.[1471]  Rather, a party who exercises sufficient incidents of ownership over a copy of the program can be considered the owner of it.[1472]  They assert that such incidents of ownership exist for vehicle purchasers, noting that vehicle owners are understood to have the right to indefinitely use, possess, resell, discard or destroy their vehicles, including the embedded ECUs, without any material restriction from the manufacturer, and that no opponent has introduced any contrary evidence.[1473]  Proponents rely as well on the Register's conclusion, in the context of granting an exemption for cellphone "unlocking," that under applicable precedent, at least some subset of cellphone owners may be considered to own the copy of the cellphone software on their devices.[1474]

Proponents additionally assert that making copies or adaptations of ECU computer programs for the desired uses is "an essential step in the utilization of the computer program in conjunction with a machine and that [the copy or adaptation] is used in no other manner," as required to invoke section 117.[1475]  Although proponents concede that making such copies and adaptations may not be essential to using the vehicle in the manner intended by the manufacturer, they stress that section 117 allows the making of such copies and adaptations for the purpose of adding new features and capabilities to that software, noting that *Krause* had "approved the modifications and deemed them essential not because they were necessary to make the software *work*, but because they were necessary to make the software *helpful* or worth using."[1476]  Additionally, proponents maintain that the creation of a backup copy to protect against destruction of or damage to the ECU software in the process of diagnosis, repair or

---

[1469] *Id.* at 13-14 (citing end-user license agreements for GM OnStar, Pioneer AppRadioLIVE, Ford Sync, Toyota Safety Connect, and Mercedes-Benz mbrace).

[1470] EFF Class 21 Reply at 9; IPTC USC Class 21 Reply at 4-5.

[1471] IPTC USC Class 21 Reply at 4 (citing *Krause*, 402 F.3d at 124).

[1472] *Id.*

[1473] *Id.* at 4-5; EFF Class 21 Reply at 9-10.

[1474] IPTC USC Class 21 Reply at 7 (citing 2012 Recommendation at 92-93).

[1475] *See, e.g.*, EFF Class 21 Supp. at 13 (quoting 17 U.S.C. § 117(a)(1)).

[1476] *Id.* at 15 (internal quotation marks omitted) (citing *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 373 & n.2 (E.D. Va. 2011) (describing *Krause*)); *see also Krause*, 402 F.3d at 126-27 (holding that section 117 encompassed "changes [that] were not strictly necessary to keep the programs functioning, but were designed to improve their functionality in serving the business for which they were created").

LOC_AR_00001048

modification is covered by the archival purposes exception set forth in section 117(a)(2).[1477]

### c.  Asserted Adverse Effects

Proponents maintain that vehicle owners expect to have the freedom to diagnose, repair, or modify their own vehicles, and that access to the computer programs in the ECUs is required for these purposes.[1478]  They cite numerous examples of diagnosis, repair and/or modification activities in which vehicle owners have traditionally engaged—such as performance of routine maintenance, including oil changes,[1479] resetting service warning lights,[1480] fixing safety items like seatbelts,[1481] and enhancing suspensions[1482]—that would, or would likely be, impeded by the prohibition on circumvention today.  Moreover, EFF explains that "it is common for repairs that replace hardware components to require modifications [of ECU programs] in order to calibrate the new part," explaining, for example, that "[i]f new gears have a different radius than old ones, the computer needs to know so that the speedometer will work correctly."[1483]

Proponents claim, however, that because of the existence of TPMs on vehicle software, vehicle owners must take their cars to authorized repair shops, or purchase expensive manufacturer-authorized tools, to diagnose and repair their vehicles.[1484]  They also suggest that in some instances, TPMs prevent vehicle owners from making lawful modifications to their vehicles, such as modifying the car "to cap the speed when they lend the car to their teenage children or to a valet."[1485]  Moreover, proponents allege that manufacturer-licensed tools may not always allow a user to diagnose and repair a problem.[1486]  For instance, Craig Smith of Open Garages gave the example of a colleague who attempted to diagnose an inoperable power window on a car, where the authorized diagnostic tool indicated the window was operational.  Smith explained that through

---

[1477] See, e.g., EFF Class 21 Reply at 11-12.

[1478] See, e.g., EFF Class 21 Supp. at 16-23; EFF Class 21 Reply at 12-20; IPTC USC Class 21 Supp. at 12-18; IPTC USC Class 21 Reply at 10-11.

[1479] EFF Class 21 Supp. at 18.

[1480] Id.

[1481] IPTC USC Class 21 Supp. at 14.

[1482] Id. at 10.

[1483] EFF Class 21 Supp. at 7; see also id. at App. A at 1-2 (Statement of David Blundell) (highlighting modifications that require reprogramming of ECUs, including installing "a different rear axle gear . . . to improve its ability to tow heavy loads" and to accommodate changes in tire size).

[1484] Id. at 17-19; IPTC USC Class 21 Supp. at 14-15.

[1485] EFF Class 21 Supp. at 20-21; see also IPTC USC Supp. at 16-17 (explaining that manufacturers of agricultural equipment "tend to program ECUs to completely shut the machine down if they detect aftermarket 'modules' which users can attach to modify performance characteristics").

[1486] Tr. at 223:22-224:10 (May 19, 2015) (Charlesworth, USCO; Smith, Open Garages).

LOC_AR_00001049

reverse engineering the vehicle software, he and his colleague were able to determine that the communications system for the power window unit was faulty.[1487]

IPTC USC maintains that TPMs restricting access to agricultural vehicles and machinery place the livelihoods of farmers and other business owners at risk, because vehicle owners must sometimes wait significant periods of time before their disabled vehicles can be repaired by an authorized technician.[1488] Proponents further assert that TPMs force vehicle owners to pay higher prices to authorized repair shops; prevent them from using their local, chosen and/or trusted service providers; reduce competition in the repair market by allowing manufacturers to monopolize diagnosis and repair of vehicles; cause vehicle owners to delay repairs, sometimes at a cost to user comfort, ease or safety; prevent vehicle owners from safely increasing engine power; prevent vehicle owners from increasing environmental efficiency; prevent vehicle owners with disabilities from enhancing accessibility; and distort secondary markets for vehicles.[1489] Proponents assert that as vehicles are embedded with greater capabilities, such as self-driving functions, that are controlled by TPM-protected ECUs, the negative effects will only increase.[1490]

Proponents also challenge opponents' claim that alternatives to circumvention mitigate the adverse impact of TPMs. As explained in greater detail below, opponents assert that a 2014 nationwide memorandum of understanding ("MOU"),[1491] entered into by auto manufacturers, aftermarket parts manufacturers, and independent repair shops, broadly authorizes diagnosis and repair activities without the need for circumvention.[1492] Proponents, however, argue that this industry arrangement is too narrow to mitigate the adverse impact of TPMs on vehicle owners.[1493] For instance, proponents note that the MOU regime leaves out many vehicles: the MOU encompasses only certain model years;[1494] not all manufacturers of automobiles are party to the MOU;[1495] and certain types of vehicles, such as mechanized agricultural vehicles, motorcycles and RVs, are not

---

[1487] *See id.* at 222:09-20 (Smith, Open Garages). Note that the transcript for the hearing refers to the window unit's "cannibus." This is a typo, and should instead read "CAN bus," which is the network by which vehicle ECUs communicate with each other. *See* John Deere Class 21 Opp'n at 23; Tr. at 15:12-21 (May 19, 2015) (Miller).

[1488] IPTC USC Class 21 Supp. at 12-13 ("Without an exemption, farmers must often send their machines to far-away dealerships, or wait for a technician to travel to their farm to perform diagnostics and repairs— even for minor problems such as a blown fuse.").

[1489] *See, e.g.*, EFF Class 21 Supp. at 16-23; EFF Class 21 Reply at 12-20; IPTC USC Class 21 Supp. at 12-18; IPTC USC Class 21 Reply at 10-11.

[1490] *See, e.g.*, EFF Class 21 Supp. at 16-17.

[1491] *See* Auto Alliance Class 21 Opp'n at Exhibit A.

[1492] *See id.* at 12-16.

[1493] *See, e.g.*, EFF Class 21 Reply at 17-18; IPTC USC Class 21 Reply at 11-12.

[1494] EFF Class 21 Reply at 17 ("The MoU excludes roughly half of motorized land vehicles now operating in the United States."); *see also id.* (noting that certain obligations of the MOU need not be implemented until January 2, 2019, "*after* the three-year period covered by this rulemaking").

[1495] IPTC USC Class 21 Reply at 12; EFF Class 21 Reply at 17.

LOC_AR_00001050

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 117 of 317

**Section 1201 Rulemaking: Sixth Triennial Proceeding**                    **October 2015**
**Recommendation of the Register of Copyrights**

covered by the MOU.[1496]  In addition, proponents observe that the MOU focuses on enabling diagnosis and repair, but does not generally enable vehicle owners to engage in vehicle modification.[1497]

### d.  Argument Under Statutory Factors

Proponents maintain that the statutory factors set forth in section 1201(a)(1) support their request.  Concerning the first statutory factor, Class 21 proponents argue that the availability of copyrighted works will not be harmed by granting the exemption.[1498]  They assert that the exemption will not "diminish the[] production of vehicle software."[1499]  Proponents also maintain that the proposed exemption will increase access to copyrighted works, because the computer programs on ECUs currently in the marketplace are not available for vehicle owners to "'use' in the copyright sense of conduct that implicates the rights enumerated in Section 106."[1500]  Proponents also believe that the information made accessible via the proposed exemption will lead to the creation of additional copyrighted works that explain the operation of car software, such as the *Car Hacker's Handbook*, an online manual that provides information about vehicle computer systems.[1501]

Regarding the second factor, the availability for use of works for nonprofit archival, preservation, and educational purposes, proponent IPTC USC concedes that it is unaware of "any potential uses that would fall under this factor."[1502]  EFF, however, maintains that the proposed exemption will increase public knowledge of the computer programs in ECUs by allowing vehicle owners to participate in educational activities, such as tinkering and exchanging information about those programs.[1503]  Additionally, EFF asserts that the exemption would facilitate archival use of computer programs on ECUs, in the form of software backups, which they describe as a routine and advisable step in the process of lawful diagnosis and repair, or modification.[1504]

---

[1496] *See, e.g.*, EFF Class 21 Reply at 17; IPTC USC Class 21 Reply at 12; *see also* Tr. at 228:25-229:01 (May 19, 2015) (Lightsey, GM).

[1497] *See, e.g.*, IPTC USC Class 21 Reply at 12.

[1498] EFF Class 21 Supp. at 23.

[1499] EFF Class 21 Reply at 20.

[1500] *Id.*

[1501] *See* EFF Class 21 Supp. at 23 ("Craig Smith, author of the *2014 Car Hacker's Handbook*, reported that the Handbook was downloaded 300,000 times in the first two weeks it was available.").  The *Car Hacker's Handbook* offers information about how to analyze the computer systems inside vehicles and determine whether there are security weaknesses.  Craig Smith, 2014 CAR HACKER'S HANDBOOK (2014), *available at* http://opengarages.org/handbook.

[1502] *See* IPTC USC Class 24 Supp. at 19-20 ("We have not investigated any potential uses that would fall under this factor.").

[1503] EFF Class 21 Supp. at 23-24.

[1504] *See, e.g.*, EFF Class 21 Reply at 11-12.

226

LOC_AR_00001051

With respect to the third factor, the impact that the prohibition on circumvention has on criticism, comment, news reporting, teaching, scholarship or research, while some proponents fail to offer any evidence on this point,[1505] EFF maintains that vehicle owners' fear of incurring liability under section 1201(a)(1)'s prohibition on circumvention negatively impacts speech in relation to each of the activities listed under this factor.[1506] It also argues that an exemption would enhance the ability to produce new copyrighted works, such as the *Car Hacker's Handbook*.[1507]

Regarding factor four, the effect of circumvention on the market for or value of copyrighted works, proponents argue that the market value of computer programs used in ECUs would not be harmed by the proposed exemption at all. Proponents urge that because "the copyrighted work is sold to end-users along with an entire vehicle," simply allowing users to access or modify the copy of the work in their own vehicle has no effect on the market for the software.[1508] Proponents further assert that the proposed exemption will not negatively impact the sales or production of computer programs used in ECUs, because auto manufacturers will still be able to sell vehicles at "substantially the same price," and the exemption will primarily drive the development of aftermarket software products.[1509]

Proponents offered little input on the fifth statutory factor, which concerns such other factors as the Librarian considers appropriate. As discussed below, however, opponents rely heavily on this provision to raise potential public safety, security, and environmental concerns with respect to the proposed exemption. Proponents respond by urging that such concerns are purely speculative and, in any event, unrelated to the copyright concerns that underlie section 1201.[1510] They maintain that these concerns are better addressed via laws designed specifically for those purposes, rather than being swept up in the blanket prohibition embodied in section 1201.[1511] Moreover, in response to the specific concern about whether purchasers of used vehicles would be able to detect whether a previous owner had made changes to the ECU, EFF argued that it would be possible to detect such changes.[1512]

---

[1505] *See, e.g.*, IPTC USC Class 21 Supp. at 20.

[1506] EFF Class 21 Supp. at 24 ("The legal cloud resulting from the prohibition on circumvention reduces participation in research, scholarship and teaching on vehicle functionality, repair, and modification, as well as critiquing, commenting, and reporting on the functionality of manufacturer software and potential alternatives.").

[1507] *Id.* at 23-24.

[1508] *Id.* at 11, 25.

[1509] IPTC USC Class 21 Supp. at 20.

[1510] IPTC USC Class 21 Reply at 14.

[1511] *See, e.g., id.* at 14-15; EFF Class 21 Reply at 18-21; Tr. at 189:24-190:14 (May 19, 2015) (Walsh, EFF).

[1512] EFF Class 21 Post-Hearing Resp. at 2-4.

227

LOC_AR_00001052

## 2. Opposition

The Office received comments in opposition to the proposed exemption from Association of Equipment Manufacturers ("AEM"), Association of Global Automakers ("Global Automakers"), Alliance of Automobile Manufacturers ("Auto Alliance"), Eaton Corporation, General Motors ("GM"), John Deere, and Motor & Equipment Manufacturers Association ("MEMA").[1513]

### a. Asserted Noninfringing Uses

Opponents challenge the view that the diagnosis, repair, or modification activities that would be covered by the Class 21 exemption qualify as noninfringing.[1514]

Opponents first dispute the claim that the proposed activities are fair uses under section 107.[1515] Under the first fair use factor, opponents argue that consideration of the purpose and character of the use weighs against a fair use finding.[1516] Several opponents contend that proponents' proposed uses would require accessing and altering computer programs on ECUs so that they perform the identical function as they previously did, albeit with different parameters or values, and that such uses are not transformative.[1517] GM also notes that the exemption is not limited to allowing the creation of interoperable tools.[1518] John Deere, meanwhile, contends that the exemption would allow proponents to modify ECUs to undermine or reverse the purposes for which the computer programs were intended by enabling and encouraging noncompliance with environmental regulations and that such a use is of a purpose and character that should be disfavored under section 107.[1519] And, while Global Automakers concedes that the exempted activity would involve altering automotive functions, it maintains that such use is not the sort of transformative use that is contemplated by the first fair use factor.[1520]

---

[1513] AEM Opp'n; Global Automakers Class 21 Opp'n; Auto Alliance Class 21 Opp'n; Eaton Corp. Opp'n; GM Class 21 Opp'n; John Deere Class 21 Opp'n; MEMA Class 21 Reply. The Register notes that MEMA filed its comments in the reply phase of the written comment period, which had been designated as allowing proponents and neutral commenters to respond to points made by the opposition. The Register will exercise her discretion to consider MEMA's comments in reply, while at the same time being mindful that proponents did not have an opportunity to file written comments in response to MEMA.

[1514] *See, e.g.*, Auto Alliance Class 21 Opp'n at 4-11; John Deere Class 21 Opp'n at 4-9.

[1515] *See, e.g.*, Global Automakers Class 21 Opp'n at 4-5; Auto Alliance Class 21 Opp'n at 8-11; GM Class 21 Opp'n at 14-18; John Deere Class 21 Opp'n at 6-9.

[1516] *See, e.g.*, Global Automakers Class 21 Opp'n at 4-5; Auto Alliance Class 21 Opp'n at 7-8; GM Class 21 Opp'n at 14-16; John Deere Class 21 Opp'n at 6-7.

[1517] GM Class 21 Opp'n at 14-16; Auto Alliance Class 21 Opp'n at 8.

[1518] GM Class 21 Opp'n at 14-15; Auto Alliance Class 21 Opp'n at 8.

[1519] John Deere Class 21 Opp'n at 6-7.

[1520] Global Automakers Class 21 Opp'n at 4.

228

LOC_AR_00001053

**Section 1201 Rulemaking: Sixth Triennial Proceeding**                                          October 2015
**Recommendation of the Register of Copyrights**

In opponents' view, the second fair use factor, the nature of the copyrighted work, also favors a finding that the proposed uses do not qualify as fair use.[1521]  John Deere and Auto Alliance recognize that ECU software is functional in nature.[1522]  Additionally, they note that the Register has previously concluded that computer programs used to operate devices like smartphones are functional works.[1523]  Nonetheless, John Deere and Auto Alliance urge that the Register should reconsider this position, or at least distinguish between the computer programs on ECUs and those on the smartphones in prior rulemakings.[1524]  For its part, GM asserts that the computer programs at issue are "highly creative" and "expressive," noting the time and resources devoted to their development.[1525]  It urges that while elements of such programs are functional, the works are nonetheless deserving of protection.[1526]

With respect to the third fair use factor, directed to the amount and substantiality of the portion used, opponents uniformly maintain that the proposed uses require copying the bulk, if not the entirety, of the copyrighted work.[1527]  Additionally, they observe that the essence or essential part of the work will remain in the modified copy.[1528]  Therefore, they urge that the third factor strongly indicates that the proposed uses are not fair.[1529]

Turning to the fourth factor, regarding the impact on the market for or value of the work, Auto Alliance admits that there is no separate market for the computer programs at issue aside from the market for the vehicle in which they are embedded.[1530]  Auto Alliance and other opponents nonetheless maintain that vehicle values may be adversely affected indirectly.[1531]  Opponents argue that if the exemption is granted, vehicles are likely to become out of compliance with regulatory standards in areas such as fuel economy, emissions control, and safety, which could negatively impact the ability to resell a car, or a subsequent purchaser's ability to meet state registration requirements.[1532]

---

[1521] *See, e.g.*, Auto Alliance Class 21 Opp'n at 8; John Deere Class 21 Opp'n at 7-8; GM Class 21 Opp'n at 16; Global Automakers Class 21 Opp'n at 5.

[1522] Auto Alliance Class 21 Opp'n at 8; John Deere Class 21 Opp'n at 7-8.

[1523] *Id.*

[1524] Auto Alliance Class 21 Opp'n at 8 (citing 2012 Recommendation at 73); John Deere Class 21 Opp'n at 7-8.

[1525] GM Class 21 Opp'n at 16.

[1526] *Id.*

[1527] *See, e.g.*, Auto Alliance Class 21 Opp'n at 9; John Deere Class 21 Opp'n at 8; GM Class 21 Opp'n at 17; Global Automakers Class 21 Opp'n at 5.

[1528] *See, e.g., id.*

[1529] *See, e.g.*, Auto Alliance Class 21 Opp'n at 9; John Deere Class 21 Opp'n at 9; GM Class 21 Opp'n at 17; Global Automakers Class 21 Opp'n at 5.

[1530] Auto Alliance Class 21 Opp'n at 9.

[1531] *See, e.g., id.* at 9-10; John Deere Class 21 Opp'n at 9; GM Class 21 Opp'n at 17-18; Global Automakers Class 21 Opp'n at 5.

LOC_AR_00001054

John Deere also asserts that the activity covered under the exemption could erode the public's trust in the safety and security of vehicles, thereby diminishing demand for new vehicles.[1533]

In addition, opponents assert that the proposed uses do not fall within section 117.[1534] Opponents suggest that proponents have failed to demonstrate that vehicle owners are the owners of the computer programs on ECUs or that the broad set of uses covered by the proposed exemption all fall within the narrow exceptions specified in section 117.[1535] They note that proponents cite the same two cases considered in the 2012 Recommendation, *Krause* and *Vernor*, in which the Register observed the uncertain state of the law regarding ownership of software.[1536] Relying chiefly on the license agreements for entertainment and telematics software identified by proponents in their opening comments, opponents assert that proponents have failed to demonstrate that vehicle owners own the software that controls the vehicle ECUs under the test set forth in either case.[1537] However, opponents conceded at the public hearing that there were no written license agreements covering other types of ECUs in automobiles.[1538] Neither opponents nor proponents offered any evidence of ECU license agreements for agricultural equipment.

Finally, opponents challenge proponents' proposition that making copies of computer programs on ECUs is an essential step in the utilization of the computer program in conjunction with a machine.[1539] In opponents' view, proponents cannot demonstrate that diagnosis, repair and modification activities will be limited merely to adding new features and capabilities to the software in the manner contemplated by *Krause*.[1540] Similarly, they challenge the notion that the proposed copying will fit within the archival purposes exception of section 117(a)(2).[1541]

---

[1532] *See, e.g.*, Auto Alliance Class 21 Opp'n at 9-10; John Deere Class 21 Opp'n at 9; GM Class 21 Opp'n at 17-18.

[1533] John Deere Class 21 Opp'n at 9.

[1534] *See, e.g.*, Auto Alliance Class 21 Opp'n at 6-7; GM Class 21 Opp'n at 9-14; Global Automakers Class 21 Opp'n at 5-6.

[1535] *See, e.g.*, Auto Alliance Class 21 Opp'n at 6-7; GM Class 21 Opp'n at 9-14; Global Automakers Class 21 Opp'n at 5-6; John Deere Class 21 Opp'n at 5-6.

[1536] GM Class 21 Opp'n at 11-12 (citing *Krause*, 402 F.3d at 124; *Vernor*, 621 F.3d at 1110-11; 2010 Recommendation at 126).

[1537] *Id.* (citing EFF Class 21 Supp. at 13-14).

[1538] Tr. at 276:18-24 (May 19, 2015) (Lightsey, GM) ("I think it would be very difficult, if not impossible, to have license agreements covering the myriad of ECU's that are contained in the vehicle.").

[1539] GM Class 21 Opp'n at 12-13 (citing 17 U.S.C. § 117(a)(1)).

[1540] *Id.* at 13.

[1541] *Id.* at 13-14 (citing 17 U.S.C. § 117(a)(2)).

230

LOC_AR_00001055

### b. Asserted Adverse Effects

Opponents dispute that TPMs have a substantial adverse impact on the ability of vehicle owners to engage in lawful diagnosis, repair or modification of their vehicles.[1542] They assert that there is no need to circumvent as vehicle owners have alternative options that permit diagnosis and repair of their vehicles.[1543] While opponents do not focus on the modification element of the exemption, GM maintains that proponents have not demonstrated that a significant number of individuals are interested in accessing the software controlling a vehicle's ECUs for the purposes of modification.[1544]

To support their position, opponents reference a nationwide MOU entered into in January 2014 by major organizations representing automobile manufacturers, after market providers and auto repair services, including opponents Auto Alliance and Global Automakers.[1545] Opponents note that the MOU includes a "Right to Repair" commitment requiring the signing manufacturers and aftermarket service providers to make all diagnostic repair tools available to vehicle owners and independent repair facilities for all vehicles for model years 2002 forward.[1546] The Right to Repair commitment also includes requirements relating to tool standardization for vehicles starting with 2018 model year vehicles.[1547] Opponents maintain that, with few exceptions,[1548] this commitment guarantees independent vehicle repair facilities, and

---

[1542] *See, e.g.*, Auto Alliance Class 21 Opp'n at 11-16; GM Class 21 Opp'n at 18-20; John Deere Class 21 Opp'n at 10-12.

[1543] *See, e.g., id.*

[1544] GM Class 21 Opp'n at 19.

[1545] Auto Alliance Class 21 Opp'n at 12-16, App. A (MOU).

[1546] *Id.* at 13, App. A (MOU & R2R Agreement) (Section 2(a) of the R2R Agreement states, "for Model Year 2002 motor vehicles and thereafter, a manufacturer of motor vehicles sold in United States shall make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities the same diagnostic and repair information, including repair technical updates, that such manufacturer makes available to its dealers through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be made available to owners and to independent repair facilities in the same form and manner and to the same extent as is made available to dealers utilizing such diagnostic and repair information system. Each manufacturer shall provide access to such manufacturer's diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly and yearly subscription basis and upon fair and reasonable terms.").

[1547] *Id.* at 13; *see id.* at App. A (R2R Agreement) (providing that "[c]ommencing in Model Year 2018, except as provided in subsection (2)(e), manufacturers of motor vehicles sold in the United States shall provide access to their onboard diagnostic and repair information system . . . using an off-the-shelf personal computer" and a non-proprietary vehicle interface).

[1548] *See, e.g., id.* at 14-16 (conceding instances in which owners of older vehicles, such as a 1987 Cadillac, would not be covered by the MOU, and an instance in which Subaru refused to provide an independent repair shop with the computer program for a low tire pressure sensor).

LOC_AR_00001056

individual vehicle owners who wish to patronize such facilities, access to the information necessary to engage in the desired diagnostic and repair activities.[1549]

### c. Argument Under Statutory Factors

With respect to section 1201(a)(1)'s statutory factors, opponents assert that the first factor, concerning the availability for use of copyrighted works, is not substantially impacted by the current prohibition on circumvention.[1550] They assert that granting the proposed exemption would not substantially advance the availability for use of the copyrighted works because numerous alternatives to circumvention exist for the proposed activities.[1551]

Opponents devote little time to the second factor, but generally maintain that the proposed exemption is wholly unrelated to the availability for use of works for nonprofit archival, preservation, and educational purposes.[1552] Similarly, with respect to the third factor, opponents assert that the proposed exemption would not impact criticism, comment, news reporting, teaching, scholarship or research.[1553]

Regarding the fourth statutory factor, opponents maintain that the effect of the exemption on the market for or value of copyrighted works would generally be negative,[1554] asserting that the exemption would erode public confidence in the safety and security of vehicles.[1555] GM in particular suggests that the exemption would create public concern about U.S. efficacy in regulating vehicles, and uncertainty as to whether a subsequent purchaser could trust a vehicle's ECU system since it may have been modified by a prior owner.[1556] As a result, according to opponents, granting the exemption could lead to a diminishment in the value of the vehicles and their associated software.

Opponents also raise specific concerns regarding entertainment and telematics system ECUs. GM notes that "[v]ehicle entertainment systems can include non-software copyrighted content, such as videogames, music and movies, as well as other digital content."[1557] In the case of telematics, opponents note that GM's OnStar and other telematics systems typically require an ongoing subscription.[1558] Auto Alliance explains

---

[1549] *See, e.g., id.* at 13-16; GM Class 21 Opp'n at 19-20.

[1550] GM Class 21 Opp'n at 21; John Deere Class 21 Opp'n at 11-12.

[1551] GM Class 21 Opp'n at 21; John Deere Class 21 Opp'n at 10-12.

[1552] GM Class 21 Opp'n at 13, 21-22; John Deere Class 21 Opp'n at 12-13.

[1553] GM Class 21 Opp'n at 22; John Deere Class 21 Opp'n at 13.

[1554] GM Class 21 Opp'n at 22-23; John Deere Class 21 Opp'n at 13.

[1555] GM Class 21 Opp'n at 23; John Deere Class 21 Opp'n at 13.

[1556] GM Class 21 Opp'n at 23.

[1557] GM Class 21 Post-Hearing Resp. at 1.

[1558] *See, e.g.,* Tr. at 279:06-17 (May 19, 2015) (Charlesworth, USCO; Lightsey, GM).

232

LOC_AR_00001057

that "removing the prohibition on circumvention of access controls on vehicle software could enable unauthorized access to [such] value added services without any payment, or could allow [unauthorized] access to premium content."[1559]

Opponents rest much of their argument against the exemption on the fifth statutory factor, which permits consideration of "such other factors as the Librarian considers appropriate."[1560] They assert that the proposed exemption would negatively impact vehicle safety, energy policy (including fuel efficiency), the environment (including air pollution and the emission of greenhouse gas pollutants), personal security (including cybersecurity), and consumer reliance on the integrity of vehicle design and operation.[1561] Additionally, through a letter offered at the hearing by Auto Alliance, the National Network to End Domestic Violence expressed its concern that the proposed exemptions would make it easier for violent partners and predators to monitor, stalk, and harm victims through access to what is now protected internal automobile systems and technology.[1562] Opponents also argue that both state and federal regulatory regimes are designed to prevent many of the activities that would fall within the exemption. In particular, they point out that commercial providers are prohibited from knowingly modifying vehicles to take them out of compliance with emissions and safety standards.[1563]

Opponents acknowledge that it is difficult to quantify the potential negative impacts on the existing regulatory regime.[1564] They also recognize that not all of the activities allowed under the exemption would necessarily have deleterious effects on compliance with regulatory standards.[1565] They assert, however, that negative impacts would appear to be an inescapable consequence of allowing unrestricted modification of vehicle ECUs.[1566] Additionally, they suggest that if the Librarian were to create an exemption to allow circumvention of what are now legally protected TPMs, the public

---

[1559] Auto Alliance Class 21 Post-Hearing Resp. at 1.

[1560] 17 U.S.C. § 1201(a)(1)(C)(v); see also, e.g., GM Class 21 Opp'n at 23-24; Global Automakers Class 21 Opp'n at 6-8; John Deere Class 21 Opp'n at 14-15; Auto Alliance Class 21 Opp'n at 16-21.

[1561] See, e.g., GM Class 21 Opp'n at 23-24; Global Automakers Class 21 Opp'n at 6-8; John Deere Class 21 Opp'n at 14-15; Auto Alliance Class 21 Opp'n at 16-21; Tr. at 27:15-28:20 (May 19, 2015) (Lightsey, GM).

[1562] Letter from Cindy Southworth, Exec. Vice President and Founder of the Safety Net Tech. Project at Nat'l Network to End Domestic Violence to Jacqueline C. Charlesworth, Gen. Counsel and Assoc. Register of Copyrights, USCO, at 1 (May 18, 2015).

[1563] Auto Alliance Class 21 Opp'n at 16-17 (citing 42 U.S.C. § 7522(a)(3) (knowingly removing or rendering inoperative after delivery to the purchaser "any device or element of design" installed in or on a motor vehicle in compliance with emissions standards regulations is prohibited); 49 U.S.C. § 30122(b) (providing that "motor vehicle repair business[es] [as well as dealers] may not knowingly make inoperative any part of a device or element of design installed on or in a motor vehicle or motor vehicle equipment in compliance with an applicable motor vehicle safety standard")).

[1564] See, e.g., id.

[1565] See, e.g., id. at 18-19.

[1566] See, e.g., id. at 19.

LOC_AR_00001058

will perceive the exemption as a government endorsement of unrestricted modification of vehicles, notwithstanding any other laws or regulations that might prohibit those activities.[1567]   Opponents also suggest that the proposed exemption could raise product liability issues because the exemption would make it difficult to determine whether modifications to ECUs were contributing factors in accidents.[1568]   In addition, opponents urge that "software manipulation in a vehicle is typically undetectable by most consumers" and that a downstream purchaser of a used automobile would not know whether any software modifications had been made.[1569]

Finally, opponents recognize that the non-copyright factors that they identify have not played a significant role in the Register's consideration of proposed exemptions in prior rulemakings.[1570]   But, they urge that the instant exemption is different because of its potential to impact the highly regulated automotive sector directly.[1571]

### 3.  Discussion

#### a.  Noninfringing Uses

The Register concludes that the overall record supports proponents' claim that reproducing and altering the computer programs on ECUs for purposes of facilitating diagnosis, repair and modification of vehicles may constitute a noninfringing activity as a matter of fair use and/or under the exception set forth in section 117.

##### i.   Fair Use

Regarding the first factor of fair use, the record establishes that the purpose and character of the proposed uses tend to support a finding of fair use because at least some of the proposed uses of ECU computer programs are likely to be transformative.  These uses include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair.[1572]   Such uses may also extend to modification of ECU computer programs to "interoperate" with different auto parts.[1573]

While it is often a negative factor in the fair use analysis, a finding of fair use is not necessarily precluded when the new use coincides generally with the original use of a work.  In the course of recommending an exemption for the "jailbreaking" of

---

[1567] *See, e.g., id.* at 17.

[1568] *Id.* at 20.

[1569] GM Class 21 Post-Hearing Resp. at 2; *see also* GM Class 21 Opp'n at 6-7.

[1570] Auto Alliance Class 21 Opp'n at 16, 20-21.

[1571] *Id.*

[1572] *See, e.g.,* EFF Class 21 Supp. at 8.

[1573] *Cf.* 2010 Recommendation at 93-94 (noting that uses that enable interoperability are favored under the first factor).

LOC_AR_00001059

smartphones, for example, the Register previously concluded that the first factor may favor fair use where "the purpose and character of the use is noncommercial and personal" and facilitates the intended use of smartphones by their owners.[1574]  Here, similarly, the proposed uses for diagnosis and repair would presumably enhance the intended use of ECU computer programs.

At the same time, the record supports distinguishing ECUs that are chiefly designed to operate vehicle entertainment and telematics systems.  Access controls on entertainment system ECUs not only preserve the integrity of the ECU itself, but also protect the content that is played through the entertainment system.  Telematics systems, too, rely on TPMs to protect proprietary offerings.  Opponents' concerns of unauthorized access to the content made available through such systems were not effectively rebutted by proponents.  The record is sparse concerning noninfringing uses that would be facilitated by allowing circumvention of the TPMs protecting these systems.[1575]  The focus of proponents' request was instead on ECUs used to control vehicle functions like ignition, gear shifting, and engine power.[1576]  Thus, the Register finds that, on the current record, the first factor is generally favorable to proponents, except with respect to ECU computer programs that are primarily designed to support vehicle entertainment and telematics systems.

Concerning the second factor, the nature of the work, opponents generally recognize the Register's established position that computer programs such as those contained in ECUs are essentially functional works used to operate a device.[1577]  Although opponents urge the Register to treat vehicle software differently, the Register is unable to discern a meaningful difference between computer programs used to operate a vehicle and those used to operate a phone.[1578]  Vehicle software is at least as functional as a phone's operating system, in that it is used to support operational and mechanical processes.  Contrary to opponents' view, vehicle software is not especially "expressive;" it is not meant to be consumed as a creative work.  The Register therefore concludes that the second fair use factor favors a finding of fair use.

In addressing the third factor, which considers the amount of the work used, proponents concede that in most cases the proposed uses would involve reproduction of copyrighted computer programs in their entirety, and there is nothing in the record to

---

[1574] 2012 Recommendation at 74.

[1575] In response to post-hearing questions, EFF states that "[i]t is important that the vehicle software of telemetry and entertainment systems be accessible under the proposed exemption."  EFF Class 21 Post-Hearing Resp. at 1.  But EFF fails to offer specific noninfringing uses that would be facilitated by extending the exemption.

[1576] *See, e.g.*, EFF Class 21 Supp. at 2.

[1577] *See, e.g.*, Auto Alliance Class 21 Opp'n at 8 (citing 2012 Recommendation at 73); John Deere Class 21 Opp'n at 7-8.

[1578] *See* 2012 Recommendation at 73.

235

LOC_AR_00001060

suggest otherwise.[1579]  As EFF observes, however, courts have been willing to permit extensive copying of the original work where it is necessary to accomplish a transformative purpose.[1580]  Thus, while the third factor arguably disfavors a fair use finding, the weight to be given to it under the circumstances is slight.

Factor four, regarding the effect on the market for or value of the copyrighted work, is concerned with market substitution and includes evaluating "not only the extent of market harm caused by the particular actions of the [user], but also whether unrestricted and widespread conduct of the sort engaged in by the [proponent of fair use] . . . would result in a substantially adverse impact on the potential market."[1581]  Proponents persuasively establish that computer programs on the majority of ECUs are only meaningful in connection with the vehicle, that the copies are generally sold only with the vehicle, and that the consumer pays for those copies when purchasing the vehicle.  Indeed, some of the opponents themselves recognize that "there is no separate market for the computer programs and other works at issue here aside from the vehicle in which they are embedded."[1582]  Proponents have thus established that there is not a significant independent market for ECU computer programs that can be harmed.[1583]

Opponents, however, point to the potential negative impact on the public's trust in the safety and security of vehicles in which the computer programs exist,[1584] and John Deere goes on to assert a consequential depressive effect on the secondary market for automobiles.[1585]  But the Register finds opponents' concerns regarding reputational harms due to modification and repair activities to be unsupported and speculative.  Vehicle owners have long repaired and modified their automobiles and farm equipment— adjusting brakes and enhancing suspensions, for example—including before the advent of computerized vehicle systems.  It is thus not readily apparent these activities would cause unusual or undue harm.  Moreover, opponents fail to identify actual instances in which repairs or modifications involving ECU software have affected resale values.  Nor do opponents explain how modified ECU computer programs in existing vehicles would adversely impact the market for ECU computer programs in new vehicles offered by a manufacturer.  In sum, at least on the record in this proceeding, opponents have failed to establish market harm.

---

[1579] *See, e.g.*, IPTC USC Class 21 Supp. at 12; EFF Class 21 Supp. at 10.

[1580] EFF Class 21 Supp. at 10; *see also HathiTrust*, 755 F.3d at 98 ("For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use."); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003) (holding that the third fair use factor did not weigh against copier when entire-work copying was reasonably necessary).

[1581] *Campbell*, 510 U.S. at 590 (internal quotations omitted).

[1582] IPTC USC Class 21 Reply at 10 (citing Auto Alliance Class 21 Supp. at 9).

[1583] EFF Class 21 Supp. at 11.

[1584] GM Class 21 Opp'n at 23; John Deere Class 21 Opp'n at 13.

[1585] *See, e.g.*, John Deere Class 21 Opp'n at 13; GM Class 21 Opp'n at 17-18.

LOC_AR_00001061

On balance, the fair use analysis suggests that—with the exception of computer programs on ECUs that are primarily designed to operate vehicle entertainment and telematics systems—many of the proposed uses of ECU computer programs to facilitate diagnosis, repair and modification of vehicles, including agricultural machinery, are likely noninfringing under section 107.

### ii.    Section 117

Class 21 proponents argue that making copies and adaptations of vehicle computer programs is an essential step in the process of diagnosis, repair and modification and qualifies as a noninfringing use under section 117.[1586]  Section 117 requires consideration of two questions in this context:  whether a vehicle owner is also an owner of an embedded ECU computer program, and whether creating a new copy or adaptation of that program is an "essential step" in the utilization of the program with the vehicle.

In past rulemaking proceedings, the Register has reviewed case law governing the determination of ownership of a copy of a computer program for purposes of section 117 when formal title is lacking and/or a license or agreement imposes restrictions on the use of the computer program, and has concluded that the application of the law may be unclear in some contexts.[1587]  The Register has observed that while *Vernor v. Autodesk, Inc.*[1588] and *Krause v. Titleserv, Inc.*[1589] may provide "useful guideposts," they are "controlling precedent in only two circuits and are inconsistent in their approach."[1590]

In *Krause*, the Second Circuit held that formal title was not necessary to demonstrate ownership under section 117 and that courts should look to a range of factors to determine whether a party "exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy."[1591]  These factors include: (1) whether substantial consideration was paid for the copy; (2) whether the copy was created for the sole benefit of the purchaser; (3) whether the copy was customized to serve the purchaser's use; (4) whether the copy was stored on property owned by the purchaser; (5) whether the creator reserved the right to repossess the copy; (6) whether the creator agreed that the purchaser had the right to possess and use the programs forever regardless of whether the relationship between the parties terminated; and (7) whether the purchaser was free to discard or destroy the copy anytime it wished.[1592]  By

---

[1586] *See, e.g.*, EFF Class 21 Supp. at 13.

[1587] *See* 2010 Recommendation at 90, 129 ("[T]he law relating to who is the owner of a copy of a computer program under [s]ection 117 is in flux."); 2012 Recommendation at 92 ("The Register concludes that the state of the law remains unclear.").

[1588] 621 F.3d 1102.

[1589] 402 F.3d 119.

[1590] 2012 Recommendation at 92.

[1591] *Krause*, 402 F.3d at 124.

[1592] *Id.*

JA126

LOC_AR_00001062

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 129 of 317

**Section 1201 Rulemaking: Seventh Triennial Proceeding**                    October 2018
**Recommendation of the Acting Register of Copyrights**

recorded content, *Sony* does not stand for the broader proposition that "space-shifting" is a fair use or that there exists an unfettered right to transfer and store copyrighted works.[1234]

In previous rulemakings, as well as in the Class 3 discussion above, the Office has consistently found insufficient legal authority to support the claim that space-shifting activity, generally, is likely to constitute fair use.[1235] For similar reasons, the Acting Register cannot find that this proposed activity is likely to be fair.

Finally, there was a brief discussion, following the close of written comments, regarding the need to repair vehicle infotainment/entertainment systems themselves.[1236] Given the sparse record, and particularly in light of opponents' countervailing concerns about unauthorized access to copyrighted content,[1237] there is insufficient information for the Acting Register to evaluate whether repair of these systems is likely noninfringing under the same analysis and if so, whether such activity is adversely affected by section 1201.

### 2) *Section 117*

Proponents contend that making copies and adaptations is an essential step in lawful diagnosis, repair, and modification, and therefore those activities are noninfringing under section 117.[1238] Section 117(a)(1) is a limited exemption for an "owner of a copy of a computer program,"[1239] and the inquiry into whether an individual qualifies as an "owner" is fact-intensive.[1240] Without putting forward specific facts regarding whether

---

[1234] *See* Harman Class 7 Opp'n at 5, 7–8; Joint Creators II Class 7 Opp'n at 8 n.3.

[1235] *See* 2015 Recommendation at 108, 121–24; 2012 Recommendation 162–65; 2006 Recommendation at 60, 69–72, 80–83; 2003 Recommendation at 130–31, 137–38.

[1236] *See* Auto Care & Dorman Class 7 *Ex Parte* Meeting Summary at 2–3 (Sept. 6, 2018); Tr. at 42:03–45:14 (Apr. 10, 2018) (Kealey, Dorman) (discussing configuration of infotainment systems and Dorman's interest in repairing infotainment modules).

[1237] *See also* 2015 Recommendation at 235 (noting that "[a]ccess controls on entertainment system ECUs not only preserve the integrity of the ECU itself, but also protect the content that is played through the entertainment system").

[1238] *See* EFF, ORI & ASCDI Class 7 Initial at 10; EFF, ORI & ASCDI Class 7 Reply at 2.

[1239] 17 U.S.C. § 117(a)(1). While section 117(c) is directed at purposes of maintenance and repair, it authorizes making copies only upon "activation" of a machine, which may be why proponents generally relied upon 117(a)(1), which permits a broader range of activities.

[1240] *See Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010). In *Krause,* the Second Circuit directed courts to look at whether there were sufficient incidents of ownership by considering: (1) whether substantial consideration was paid for the copy; (2) whether the copy was created for the sole benefit of the purchaser; (3) whether the copy was customized to serve the purchaser's use; (4) whether the copy was stored on property owned by the purchaser; (5) whether the creator reserved the right to repossess the

LOC_AR_00001431

vehicle telematics or entertainment software is likely owned, eBay argues that recalibrating vehicle software would be covered under section 117, if the Acting Register in fact concludes that the purchaser of the vehicle is also the owner of the vehicle software.[1241]  MEMA, with a tailored focus on third-party service providers, asserts that the diagnosis, repair, or modification of software on vehicles by such providers "and similar services are expressly authorized under [s]ection 117."[1242]

In opposition, Auto Alliance argues that proponents have not demonstrated that an owner of a vehicle is also the owner of copies of telematics and entertainment software under section 117(a).[1243]  It asserts:  "Many telematics and entertainment systems are subject to license agreements that clearly show the user does not own the copyrighted software.  Based on these license agreements, the Copyright Office in 2015 concluded that users may not own the computer programs that operate vehicle entertainment or telematics systems."[1244]  Even if the existence of such license agreements is not dispositive, Auto Alliance concludes, "proponents have not submitted any evidence to rebut this conclusion."[1245]

Auto Alliance is correct that the 2015 record included license agreements for telematics and entertainment system software in motor vehicles.[1246]  Proponents have not supplemented the record to support the proposition that the owner of a vehicle also owns copies of that vehicle's telematics or entertainment software.  Instead, opponents again attest that this software is likely to be licensed, including via subscriptions.[1247]  Therefore, the evidence overall again suggests that vehicle owners may more properly be considered lessees of at least some telematics and entertainment system software.  The Acting Register concludes that, on the current record, section 117(a)(1) does not cover these proposed uses.

---

copy; (6) whether the creator agreed that the purchaser had the right to possess and use the programs forever regardless of whether the relationship between the parties terminated; and (7) whether the purchaser was free to discard or destroy the copy anytime it wished.  402 F.3d at 124.  In *Vernor,* the Ninth Circuit held that "a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions.  621 F.3d at 1111.

[1241] eBay Class 7 Reply at 3.

[1242] MEMA Class 7 Reply at 2–3; *see also* MEMA Class 7 Initial at 3.

[1243] Auto Alliance Class 7 Opp'n at 11.

[1244] *Id.* (citing 2015 Recommendation at 238).

[1245] *Id.*

[1246] 2015 Recommendation at 238.

[1247] *See, e.g.,* Auto Alliance Class 7 Opp'n at 11–12.

LOC_AR_00001432

### ii. Other Devices

Commenters seeking an expansion to allow diagnosis, repair, and modification of devices outside the context of motorized land vehicles suggest that these activities are noninfringing under the fair use doctrine and section 117. As explained above, the following analysis considers these arguments in the context of those types of devices cognizably reflected in the record to varying degrees, namely home appliances, smartphones, video game consoles, computers and ancillary or peripheral computing devices, and consumables, plus a few examples of specific modified devices.

### 1) Fair Use

Following the path of the recent Section 1201 Report, this recommendation considers first repair and diagnostic activities, and then modification. Based on the factual allegations surfaced in the comments, the Acting Register further isolates specific issues with respect to video game consoles and consumables. Finally, when considering this expansion, the written comments and testimony focused on a desire to repair or modify the firmware embedded in these devices or to repair a functional component controlled by the firmware[1248]—as opposed to, for example, an app loaded on a device—and the following analysis reflects this limitation as well.

*Diagnosis, repair, and maintenance, generally.* Under the first fair use factor, proponents contend generally that these activities are favored because they are transformative and promote research to "understand the functional aspects of a copyrighted work."[1249] In opposition, Joint Creators II state that "[r]epair typically involves copying or adapting a work to cause the work to perform the same purpose it was originally intended to perform. That is not a transformative use."[1250] They further claim that "exposing expressive works to unauthorized access causes the first factor to weigh against fair use."[1251] Finally, Joint Creators II urge the Acting Register, if she recommends an

---

[1248] *See, e.g.,* Consumers Union Class 7 Initial at 2 (addressing "software that enables and governs—and restricts—the functioning of everyday consumer products in which it is embedded"); EFF, ORI & ASCDI Class 7 Initial at 3–10 (asserting fair uses of firmware on various devices); Tr. at 37:26–38:17 (Apr. 25, 2018) (Walsh, EFF; Wiens, iFixit) (asserting that there is no market for firmware tied to a particular device); Tr. at 96:07–15 (Apr. 10, 2018) (Shore, ASCDI) (describing issues of accessing firmware to repair devices).

[1249] EFF, ORI & ASCDI Class 7 Initial at 8.

[1250] Joint Creators II Class 7 Opp'n at 8 (citing *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't,* 447 F.3d 769, 778 (9th Cir. 2006)).

[1251] *Id.*

LOC_AR_00001433

USCA Case #23-5067     Document #2001858     Filed: 06/02/2023     Page 132 of 317

**Section 1201 Rulemaking: Seventh Triennial Proceeding**      October 2018
**Recommendation of the Acting Register of Copyrights**

expansion related to repair, to incorporate the definition of repair as provided by section 117(d)(2).[1252]

In analyzing the first fair use factor, the Acting Register notes that the Copyright Office's Software Study observed that, because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, "repair supports—rather than displaces—the purpose of the embedded programs."[1253] Applying similar logic, the 2015 rulemaking concluded that the first factor favored an exemption for vehicle repair because the activities were personal, noncommercial, and would "enhance the intended use" of the vehicle programs.[1254] Moreover, the Office's Section 1201 Report observed an emerging "general understanding that bona fide repair and maintenance activities are typically noninfringing."[1255] Because proponents express the same desire to engage in these bona fide repair activities with respect to other devices, the Acting Register concludes that this factor favors proponents.

Regarding the second factor, proponents assert that the nature of the work favors fair use because device firmware is primarily functional in nature.[1256] Proponents state that software code used as a "lockout" to restrict access to a device "bears only a thin copyright interest that is overcome by the need to use that code for interoperability."[1257] But ESA contends that "even if some elements of the console firmware are considered functional, the games, motion pictures and other works that are protected by the firmware are highly expressive."[1258]

As noted above, courts have found that this factor favors fair use where the relevant work is functional software.[1259] Here, it appears that the participants may agree that the works at issue are device firmware, and that this firmware is primarily functional. While specific concerns with respect to access to video game consoles and other conduits to highly expressive works are addressed below, the proposed uses are not to access these other expressive works, but rather to diagnose or repair the computer programs

---

[1252] Joint Creators Class 7 Opp'n at 5; *see* 17 U.S.C. 117(d)(2) ("the 'repair' of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine").

[1253] Software Study at 38-41.

[1254] 2015 Recommendation at 234–37.

[1255] Section 1201 Report at 90.

[1256] EFF, ORI & ASCDI Class 7 Initial at 9; Tr. at 37:05–10 (Apr. 25, 2018) (Walsh, EFF).

[1257] EFF, ORI & ASCDI Class 7 Initial at 8–9 (citing *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, Nos. Civ.A. 02-571, Civ.A. 04-84, 2007 WL 1485770, at *5 (E.D. Ky. Apr. 18, 2007)).

[1258] ESA Class 7 Opp'n at 8.

[1259] *See Oracle*, 886 F.3d at 1204–05; *Connectix*, 203 F.3d at 603–05; *see also* 2015 Recommendation at 235; 2012 Recommendation at 73.

LOC_AR_00001434

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 133 of 317

**Section 1201 Rulemaking: Seventh Triennial Proceeding**    October 2018
**Recommendation of the Acting Register of Copyrights**

that control the functioning of devices in which they are embedded. Accordingly, the Acting Register finds that this factor favors fair use.

Regarding the third factor, commenters do not squarely address the amount and substantiality of the work used in relation to the fair use analysis.[1260] As noted, the fact that the entirety of the work is used is not dispositive, as courts have permitted such uses where necessary to achieve a transformative purpose.[1261] Indeed, in 2015, the Register noted that although most of the proposed activity would involve reproducing copyrighted programs in their entirety, this factor should be given little weight because the copying was necessary to accomplish a transformative purpose.[1262] The Acting Register finds the same conclusion sound here.

Considering the fourth factor, proponents comment that because firmware is tied to a particular device, it has no independent commercial value.[1263] But opponents submit that "the fourth factor analysis for repair with respect to many devices will weigh against fair use."[1264] Opponents' comments are specifically directed to devices, including video game consoles, where the "software . . . is intended to prevent piracy."[1265] Opponents suggest that once the firmware on these devices is accessed, even for repair, it is compromised such that it can no longer prevent piracy and consequently, these uses diminish the value of and market for the devices and other creative works.[1266]

In 2015, the Register concluded that computer programs in vehicles are valuable only in connection with the vehicle and that no independent market for vehicle software exists.[1267] Similarly, in the Software Study, the Office focused on whether "these types of computer programs" were "distributed as standalone works," concluding that where

---

[1260] ESA does state that "virtually all of the hacks for video game consoles use nearly all of the code contained within the copyrighted computer programs," but it was not clear if the word "hacks" refers to diagnosis and repair activities. ESA Class 7 Opp'n at 8. Either way, this does not change the Acting Register's conclusion.

[1261] *See HathiTrust*, 755 F.3d at 98–99; *Arriba Soft*, 336 F.3d at 820–21; *Connectix*, 203 F.3d at 603–06.

[1262] *See* 2015 Recommendation at 235–36.

[1263] *See* EFF Class 7 Initial at 10 ("In the case of device firmware, the copyrighted work is sold to end-users along with an entire device."); Tr. at 37:26-38:17 (Apr. 25, 2018) (Walsh, EFF; Wiens, iFixit) ("[I]t's very unlikely that there's going to be market substitution as a result of these works where the work's utility and market value is connected to a physical device").

[1264] Joint Creators II Class 7 Opp'n at 9.

[1265] *Id.*

[1266] ESA Class 7 Opp'n at 8; Joint Creators Class 7 Opp'n at 9; *see also* DVD CCA & AACS LA Class 7 Opp'n at 4; DVD CCA & AACS LA Class 7 Post-Hearing Resp. at 2 (June 11, 2018); Joint Creators II Class 7 Class 7 Post-Hearing Resp. at 2 (June 11, 2018).

[1267] *See* 2015 Recommendation at 236.

LOC_AR_00001435

USCA Case #23-5067    Document #2001858    Filed: 06/02/2023    Page 134 of 317

**Section 1201 Rulemaking: Seventh Triennial Proceeding**    October 2018
**Recommendation of the Acting Register of Copyrights**

programs have no separable value, "repairing these programs is not likely to interfere with any market likely exploited by the copyright owner."[1268]  Now, the Acting Register must consider the fourth factor in relation to the current record, for the enumerated categories of specific devices raised above.  Apart from gaming consoles (discussed further below), the record seems to indicate that the TPMs at issue are generally restricting access to the device firmware, and not to other expressive works.[1269]  Further, in the case of smartphones specifically, although these devices can no doubt be used to consume expressive works, previous rulemakings have concluded that the firmware on smartphones is unlikely to have a significant independent market that can be harmed.[1270]  Thus, the Acting Register follows the conclusions of the 2015 rulemaking and the Software Study, and does not find that this factor disfavors the expanded exemption.

*Repair of video game consoles, specifically.*  Proponents contend that the same analysis should hold with respect to video game consoles.[1271]  Opponents, however, express concern that circumvention of TPMs on video game consoles creates risk of unauthorized access to content and piracy, because the TPMs also protect access to the games themselves.[1272]  Opponents claim that, even if circumvention were for legitimate repair, once TPMs are circumvented, it is questionable that they could be restored.[1273]  Further, ESA states that circumvention could result in a console being "unable to run properly licensed content."[1274]  They contend that these unique concerns militate against a fair use finding with respect to the first and fourth factors.

Opponents also claim the second and third factors disfavor fair use.  They argue that video game console firmware "contains elements protected by copyright and, even if some elements of the console firmware are considered functional, the games, motion pictures and other works that are protected by the firmware are highly expressive."[1275]

---

[1268] Software Study at 41.

[1269] *See, e.g.*, EFF, ORI & ASCDI Class 7 Initial at 3–10; Tr. at 37:26–38:17 (Apr. 25, 2018) (Walsh, EFF; Wiens, iFixit); Tr. at 96:07–15 (Apr. 10, 2018) (Shore, ASCDI).

[1270] *See* 2015 Recommendation at 163–64; 2012 Recommendation at 73–74; 2010 Recommendation at 97–100.

[1271] *See* EFF, ORI & ASCDI Class 7 Initial at 10, 13.

[1272] ESA Class 7 Opp'n at 2–5, 7–8 (noting that in both the 2012 and 2015 Recommendations, the Register "concluded that there is a strong link between console jailbreaking and piracy"); Tr. 15:04–25 (Apr. 25, 2018) (Williams, Joint Creators II); Tr. at 65:15–22 (Apr. 10, 2018) (Williams, Joint Creators II) (commenting that TPMs effectively ensure legitimate copies are played, whether a physical copy or in the cloud).

[1273] ESA Class 7 Opp'n at 5 (noting that "TPMs cease to serve their protective function once circumvented"); Tr. at 20:16-23:10 (Apr. 25, 2018) (Williams, Joint Creators II).

[1274] ESA Class 7 Opp'n at 5.

[1275] *Id.* at 8.

205

LOC_AR_00001436

They also contend that the "amount and substantiality of the portion used is not reasonable, because virtually all of the hacks used for video game consoles use nearly all of the code contained within the copyrighted computer programs."[1276]

In multiple past rulemakings, the Office has rejected proposed jailbreaking exemptions for video game consoles—including passing suggestions of the need to repair these consoles—because of the potential harm to the market.[1277]  For example, in 2012, the Register stated that:

> [O]pponents have provided compelling, uncontradicted evidence that circumvention of access controls to permit interoperability of video game consoles—regardless of purpose—has the effect of diminishing the value of, and impairing the market for, the affected code, because the compromised code can no longer serve as a secure platform for the development and distribution of legitimate content.[1278]

This rulemaking reflects similar console-specific concerns about potential market harm. Proponents have not provided a persuasive legal or factual analysis why the Acting Register should reach a different conclusion than in 2012 or 2015, and so she does not.

*Modification, generally.*  EFF, which focuses most of its arguments on the importance of modification, argues that "[m]odifying device software in order to enable new uses is the essence of a transformative use under the fair use doctrine."[1279]  ORI states that in many cases the modification of a device's functionality is the intended use (compared to an intention to modify the copyrighted work), though modification of the software may be necessary for that purpose.[1280]  EFF provides a handful of examples, including modifying a two-way radio to serve as a scanner to listen in on private talk groups and calls, jailbreaking the PlayStation 3 to run "software of [users'] choice," and modifying the Sony Aibo robotic dog to teach it "to dance, speak, obey wireless commands, and even share the video used for Aibo's vision."[1281]  From a legal basis, EFF relies upon two

---

[1276] *Id.*

[1277] 2015 Recommendation at 199–201; 2012 Recommendation at 42–44, 47.

[1278] 2012 Recommendation at 44.

[1279] EFF Class 7 Reply at 5; *see also* Tr. at 37:11–19 (Apr. 25, 2018) (Walsh, EFF).

[1280] *See* Tr. at 100:03–17 (Apr. 10, 2018) (Band, ORI) (stating that "a lot of times what we're really trying to do is modify the device. But . . . to modify the device, you might need to modify the software").

[1281] EFF, ORI & ASCDI Class 7 Initial at 3–6.

LOC_AR_00001437

Ninth Circuit cases, *Sega v. Accolade*[1282] and *Sony v. Connectix*,[1283] for the proposition that "enabling interoperability and increasing the utility of hardware are fair uses."[1284]

In response, opponents cite to the Copyright Office's Section 1201 Report concerning the challenges of defining "modification" and "tinkering" in such a way that would permit these activities without implicating the exclusive right to prepare derivative works.[1285] Opponents warn that user modifications may affect the market for future modifications to device software made and sold by the manufacturer.[1286] They also argue that the term "tinkering" could include accessing highly expressive content and unlawfully modifying that content.[1287] Opponents suggest that the Federal Circuit's recent decision in *Oracle America, Inc. v. Google, Inc.*[1288] diminishes the weight of the cases cited by proponents concerning transformative use, noting that the *Oracle* court held that verbatim copying for purposes of interoperability was only "moderately transformative activity."[1289]

In analyzing whether "modification" is likely to be noninfringing, the first hurdle is definitional. As the Section 1201 Report concluded, proponents "have suggested no reliable way to define with any precision a category of lawful adaptations, generally, for purposes of section 1201."[1290] While the existing exemption allows "lawful modification *of a vehicle* function,"[1291] the proposal for other devices is broader, seemingly encompassing any modification in connection with a device.[1292] In some cases, where a user seeks to modify only a functional element of a device for a personal, noncommercial use, that activity may well qualify as a fair use. In other cases, however, a modification under the proposed exemption may result in an infringing derivative work. Indeed, the statutory definition of "derivative work" requires an underlying work to "be recast, transformed, or adapted,"[1293] and at the hearings proponents appeared to acknowledge that at least some of the modifications they describe in their

---

[1282] 977 F.2d at 1522–23.

[1283] 203 F.3d at 608.

[1284] EFF, ORI & ASCDI Class 7 Initial at 8.

[1285] *See* Joint Creators II Opp'n at 9–10 (citing Section 1201 Report at 96–97).

[1286] *See* Tr. at 38:22–40:25 (Apr. 25, 2018) (Williams, Joint Creators II).

[1287] *See* Joint Creators II Opp'n at 9–10.

[1288] 886 F.3d at 1199–202.

[1289] Tr. at 40:08–25 (Apr. 25, 2018) (Williams, Joint Creators II).

[1290] Section 1201 Report at 96–97.

[1291] 37 C.F.R. § 201.40(b)(6) (2016) (emphasis added).

[1292] EFF, Auto Care, Dorman, iFixit, SmarTeks & Repair.org Class 7 Post-Hearing Resp. at 10 (June 11, 2018).

[1293] 17 U.S.C. § 101.

LOC_AR_00001438

### L.  Proposed Class 12: Computer Programs—Repair

#### 1.  Background

##### a.  Summary of Proposed Exemption

Six organizations submitted five petitions for new or expanded exemptions relating to the diagnosis, maintenance, repair, and modification of software-enabled devices.[1033] Two petitions—one from EFF, the other from iFixit and Repair Association—seek to merge and expand the two existing exemptions to cover all types of devices and vehicles.[1034]  These proponents also seek to permit "modification" of all devices.  Three other petitions propose expanding the existing device exemption to cover other specific types of devices.  Summit Imaging, Inc. ("Summit Imaging") and Transtate Equipment Co., Inc. ("Transtate") each petition to exempt circumvention of TPMs on software-enabled medical devices and systems for purposes of diagnosis, maintenance, and repair.[1035]  Public Knowledge and iFixit jointly petition for "a new exemption to allow for circumvention of TPMs to repair video game consoles and replace damaged hardware."[1036]

Comments in support of various proposals were submitted by the petitioners, as well as by ACA, FSF, and Kevin Kilkuskie.[1037]  Opposition comments were submitted by ACT; the Advanced Medical Technology Association ("AdvaMed"); the Alliance for Automotive Innovation ("Auto Innovators"); DVD CCA and AACS LA; the Equipment Dealers Association, its regional affiliates (collectively, "EDA"), and Associated Equipment Distributors ("AED"); Joint Creators; the Medical Imaging & Technology Alliance ("MITA"); and Philips North America, LLC ("Philips").[1038]  Reply comments were submitted by the American Farm Bureau Federation ("AFBF"), ACA, Consumer Reports, MEMA, the Specialty Equipment Market Association ("SEMA"), and an

---

[1033] See NPRM at 65,306–07.

[1034] EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2.

[1035] Summit Imaging Class 12 Pet. at 2; Transtate Class 12 Pet. at 2.

[1036] Public Knowledge & iFixit Class 12 Pet. at 2; Public Knowledge & iFixit Class 12 Reply at 4 (described as "a limited exemption to repair video game consoles with optical drives").

[1037] ACA Class 12 Initial at 2; EFF Class 12 Initial; iFixit & Repair Ass'n Class 12 Initial; FSF Class 12 Initial at 2; Kevin Kilkuskie Class 12 Initial at 2; Public Knowledge & iFixit Class 12 Initial; Summit Imaging Class 12 Initial; Transtate Class 12 Initial & Exs. 1–29.

[1038] ACT Class 12 Opp'n; AdvaMed Class 12 Opp'n; Auto Innovators Class 12 Opp'n; DVD CCA & AACS LA Class 12 Opp'n; EDA & AED Class 12 Opp'n; Joint Creators Class 12 Opp'n; MITA Class 12 Opp'n; Philips Class 12 Opp'n.  Auto Innovators is a combination of the Association of Global Automakers and the Alliance of Automobile Manufacturers.  See Auto Innovators Class 12 Opp'n at 1.

190

LOC_AR_00001763

USCA Case #23-5067     Document #2001858     Filed: 06/02/2023     Page 138 of 317
**Section 1201 Rulemaking: Eighth Triennial Proceeding**      October 2021
**Recommendation of the Register of Copyrights**

anonymous participant.[1039]  Finally, several individuals provided comments in support of the proposed exemption in an audience participation session during the public hearings.[1040]

### b.  Overview of Issues

Although petitioners' various proposals overlap to some extent—for example, the proposed expansion to cover all software-enabled devices would also cover the more targeted expansions specific to video game consoles and medical devices and systems—the issues raised by participants can generally be organized into four categories: (1) all software-enabled devices; (2) vehicles and marine vessels; (3) video game consoles; and (4) medical devices and systems.

*All software-enabled devices.*  Petitioners who seek an expansion to cover all software-enabled devices assert that such an expansion is warranted because the current device categories are "unnecessarily narrow and ambiguous in scope."[1041]  EFF states that a "scattershot approach" to defining a class limited to certain types of software-enabled devices "will fail to adequately alleviate the adverse effects on users" of the variety of devices that need repair.[1042]  Both petitions propose that—in addition to diagnosis, maintenance, and repair—"modification" of devices should be permitted under the exemption.[1043]  In response, opponents assert the proposed expansion to all devices is overbroad and that proponents have failed to develop a record that demonstrates sufficient commonalities among the various types of software-enabled devices.[1044]  Opponents also object to the class including specific types of devices—namely, e-readers, video game consoles, disc players, and medical devices—asserting that the

---

[1039] AFBF Class 12 Reply; Consumer Reports Class 12 Reply; MEMA Class 12 Reply; SEMA Class 12 Reply; Anonymous Class 12 Reply.  Petitioners also submitted four reply comments.  *See* EFF Class 12 Reply; iFixit & Repair Ass'n Class 12 Reply; Public Knowledge & iFixit Class 12 Reply; Transtate Class 12 Reply & Exs. 30–32.

[1040] *See* Tr. at 937:02–938:14 (Apr. 21, 2021) (Cade, Neb. Farm Bureau); Tr. at 946:24–948:21 (Apr. 21, 2021) (Reynolds, Colo. Ass'n of Biomed. Equip. Techs.); Tr. at 949:07–952:16 (Apr. 21, 2021) (O'Reilly, U.S. PIRG); Tr. at 953:04–955:03 (Apr. 21, 2021) (Gordon-Byrne, Repair Ass'n); Tr. at 955:17–960:09 (Apr. 21, 2021) (Roberts, SecuRepairs); Tr. at 960:18–962:15 (Apr. 21, 2021) (Schaffer); Tr. at 962:21–964:17 (Apr. 21, 2021) (Khanifar, Waveform).

[1041] iFixit & Repair Ass'n Class 12 Initial at 2.

[1042] EFF Class 12 Initial at 2.

[1043] EFF Class 12 Pet. at 2; iFixit & Repair Ass'n Class 12 Pet. at 2; *see also* FSF Class 12 Initial at 2 (noting that diagnosis and repairing hardware "increasingly requires modifying or replacing the software found on those devices").

[1044] *See* DVD CCA & AACS LA Class 12 Opp'n at 4–8; Joint Creators Class 12 Opp'n at 2, 7–8; Philips Class 12 Opp'n at 2–4.

LOC_AR_00001764

record is inadequate and that circumvention of TPMs on such devices carry unique risks for copyright owners.[1045] As for "modification," opponents contend that this proposed use is so broad that it would encompass both noninfringing and infringing activities, in some cases implicating copyright owners' exclusive right to prepare derivative works.[1046]

*Vehicles and marine vessels.* Although no petition specifically focuses on expanding the current vehicle repair exemption, two proposals suggest that the two existing repair exemptions be merged, which would effectively broaden the vehicle exemption by: (1) no longer limiting the class to "motorized land vehicles"; and (2) removing other limitations in the current vehicle exemption, including the requirement that users comply with other laws.[1047] In their initial comments, proponents elaborate that the current exemption for vehicles is too narrow because it only covers land vehicles and assert that operators of marine vessels face similar adverse effects.[1048] Opponents do not raise concerns specifically about marine vessels, but do object to removing language requiring compliance with other laws, also referred to as the "Illegality Limitation."[1049] In addition, opponents propose circumscribing the existing vehicle exemption by redefining what constitutes "repair" as well as explicitly excluding third-party assistance and provision of tools.[1050] In reply, commenters supportive of the vehicle exemption stressed the importance of third-party assistance and access to tools.[1051]

*Video game consoles.* Video game consoles, like marine vessels, fall under the two umbrella proposals covering all software-enabled devices.[1052] In addition, Public Knowledge and iFixit submitted a standalone proposal to permit circumvention to repair video game consoles, specifically, console optical drives.[1053] Proponents contend that authorized repair services are inadequate, particularly for certain legacy consoles

---

[1045] *See* Joint Creators Class 12 Opp'n at 2, 7–8; DVD CCA & AACS LA Class 12 Opp'n at 2–4; Philips Class 12 Opp'n at 3–4.

[1046] *See* ACT Class 12 Opp'n at 2, 5–6; DVD CCA & AACS LA Class 12 Opp'n at 1, 2–9; Joint Creators Class 12 Opp'n at 7–8.

[1047] *See* EFF Class 12 Pet. at 3; iFixit & Repair Ass'n Class 12 Pet. at 3; *see also* ACA Class 12 Initial at 1; ACA Class 12 Reply at 2–3.

[1048] *See* iFixit & Repair Ass'n Class 12 Initial at 8–10, 20; SEMA Class 12 Reply at 1.

[1049] Auto Innovators Class 12 Opp'n at 6–9; EDA & AED Class 12 Opp'n at 6–9.

[1050] *See* Auto Innovators Class 12 Opp'n at 2–6 (citing Auto Innovators Renewal Comment at 3–4); EDA & AED Class 12 Opp'n at 6–9, 12, Ex. B.

[1051] *See* AFBF Class 12 Reply at 4–6; ACA Class 12 Reply at 1–2; MEMA Class 12 Reply at 2–7.

[1052] *See* EFF Class 12 Pet. at 2; iFixit & Repair Ass'n Class 12 Pet. at 2.

[1053] Public Knowledge & iFixit Class 12 Pet. at 2; iFixit & Public Knowledge Class 12 Reply at 3.

LOC_AR_00001765

that manufacturers no longer support.[1054]  Opponents contend that circumvention of TPMs to repair consoles creates a risk of market harm for these devices that decisively tips the fair use and adverse effects analyses against granting an exemption.[1055]  Further, they assert that adequate alternatives to circumvention exist such that an exemption is not warranted.[1056]

*Medical devices and systems.*  The two proposals covering all software-enabled devices include some examples of medical devices.[1057]  Separately, Summit Imaging and Transtate each submitted petitions to permit circumvention of TPMs on medical devices and systems for purposes of diagnosis, maintenance, and repair.  Besides device software, these petitioners seek access to data files stored on medical devices and systems, including manuals and servicing materials.[1058]  Although some manufacturers provide access to device software and servicing materials, proponents assert that the materials provided vary and in many cases are inadequate to execute repairs.[1059]  Opponents object that the proposed uses, particularly when conducted by an unauthorized third-party servicer, are commercial in nature and would harm the market for medical devices and systems.[1060]  Further, opponents argue that an exemption is unnecessary because adequate authorized repair services exist.[1061]  Finally, they raise concerns that circumvention would undermine patient safety, create cybersecurity risks, and interfere with manufacturers' regulatory compliance obligations.[1062]

For the reasons discussed below, the Register recommends granting most of the proposed modifications, with certain limitations to address opponents' concerns.

---

[1054] *See* Public Knowledge & iFixit Class 12 Initial at 2, 4–5; Public Knowledge & iFixit Class 12 Reply at 6.

[1055] *See* Joint Creators Class 12 Opp'n at 2–7; *see also* DVD CCA & AACS LA Class 12 Opp'n at 11–20.

[1056] *See* Joint Creators Class 12 Opp'n at 3–5.

[1057] *See, e.g.,* iFixit & Repair Ass'n Class 12 Initial at 18 (including examples of medical devices such as motorized wheelchairs, CPAP machines; hearing aids, and blood glucose monitors).

[1058] *See* Summit Imaging Class 12 Pet. at 2; Transtate Class 12 Pet. at 2–3.

[1059] *See* Transtate Class 12 Reply at 2–5.

[1060] *See* ACT Class 12 Opp'n at 4–5; AdvaMed Class 12 Opp'n at 2, 7–8; MITA Class 12 Opp'n at 3–4, 9, 17–18; Philips Class 12 Opp'n at 4, 7–10, 17.

[1061] *See* AdvaMed Class 12 Opp'n at 11; Philips Class 12 Opp'n at 2, 5–6, 14–15.

[1062] *See* ACT Class 12 Opp'n at 3–4; AdvaMed Class 12 Opp'n at 6, 9, 11–16; MITA Class 12 Opp'n at 5–7, 9–11, 17–18; Philips Class 12 Opp'n at 16–19.

LOC_AR_00001766

## 2. Discussion

### a. Scope of the Proposed Class

The proposals to expand the repair exemption to cover all software-enabled devices, if adopted, would effectively subsume the device-specific proposals relating to video game consoles and medical devices and moot the need to separately evaluate these narrower proposals. Accordingly, as a threshold matter, the Register considers whether proponents have established a record that supports defining the class of works broadly by demonstrating that sufficient commonalities exist for the proposed uses across the full spectrum of software-enabled devices.

Petitioners argue that while there is a wide range of software-enabled devices, the proposed uses of these devices—diagnosis, maintenance, repair, and modification—are being adversely affected in the same way.[1063] They assert there are sufficient commonalities among the proposed uses and users of these devices that "no principled distinction" can be made to include some devices but not others. In support, proponents outline how the same types of TPMs restrict access to firmware and data in a variety of software-enabled consumer devices.[1064] In addition, they cite a few examples where TPMs inhibit repair of commercial and industrial systems, including facility management systems controlling commercial building access, supervisory control and data acquisition (SCADA) systems that facilitate operation of machinery, and PBX telephone systems.[1065]

Further, proponents point to drawbacks of the current exemption's device-by-device approach. For one, they assert that limiting the exemption to devices that fall within particular categories neither adequately addresses the current variety of existing software-enabled devices nor keeps pace with the ever-expanding types of devices.[1066]

---

[1063] See EFF Class 12 Initial at 13–14; iFixit & Repair Ass'n Class 12 Initial at 10; Tr. at 847:03–12 (Apr. 20, 2021) (Sheehan, iFixit).

[1064] See EFF Class 12 Initial at 13–14, 17–60; iFixit & Repair Ass'n Class 12 Initial at 17–18; see also iFixit & Repair Ass'n Class 12 Initial at 14–17 (cataloging software-enabled devices including various home appliances and home systems as well as power drills, battery gauges, and toolboxes); iFixit & Repair Ass'n Class 12 Reply at 6 (noting harm from inability to repair smart devices such as alarm clocks, lightbulbs, thermostats, washing machines, garage door openers, refrigerators, as well as vehicles and tractors); Tr. at 800:20–802:14 (Apr. 20, 2021) (Wiens, Repair Ass'n) (commenting on need to repair smart devices containing lithium batteries, computers, and computing peripherals).

[1065] See iFixit & Repair Ass'n Class 12 Initial at 19–20.

[1066] See iFixit & Repair Ass'n Class 12 Pet. at 2 ("Over the next three years, there will no doubt be new devices that don't also fit cleanly into existing categories and wouldn't fall neatly into new

194

LOC_AR_00001767

As a result, proponents say that exemption advocates and the Copyright Office are triennially burdened with considering whether the repair exemption should be expanded to include a new or different type of *device* even where the *uses* remain the same.[1067]  To illustrate, proponents observe that the current exemption covers smartphones, but not tablets, despite the fact that the firmware for both devices is "nearly identical" and the adverse effects on repair are the same.[1068]

A second drawback proponents suggest is that limiting the exemption to particular categories of devices can introduce ambiguity.[1069]  For example, under the current exemption, proponents query whether a CPAP machine qualifies as a "home appliance" and whether eligibility to circumvent TPMs to repair an appliance hinges merely on whether it resides in a home kitchen or an office pantry.[1070]

Opponents object that a class covering all software-enabled devices is overbroad and that the record does not demonstrate that sufficient commonalities exist among the uses and users of various devices.  DVD CCA and AACS LA comment that the legislative history's requirement that "the rulemaking proceeding should focus on distinct, verifiable, and measurable impacts . . . render[s] proponents' current request impossible, as this rulemaking could never handle the quantum of evidence that would be necessary to support an unbound exemption for all software-enabled devices."[1071]  Opponents note that, in 2018, the Acting Register declined to recommend a class covering "devices, generally" based on a "sparse" record; and they observe similar deficiencies in proponents' current petitions.[1072]  Joint Creators warn that "[d]ivorcing an exemption from the actual devices at issue would invite unforeseen harm," noting that permitting

---

categories that might be invented during this proceeding."); *see also* EFF Class 12 Pet. at 2 ("Software-enabled devices are ubiquitous in modern life."); FSF Class 12 Initial at 2 (noting "there are very few items on the market these days that do not come with some sort of software included"); iFixit & Repair Ass'n Class 12 Initial at 3–4; Tr. at 737:06–12, 737:25–738:06 (Apr. 20, 2021) (Sheehan, iFixit).

[1067] ACA Class 12 Initial at 2 ("Users should not have to apply for repair exemptions on a product-by-product basis where the principle of lawful repair is the same."); iFixit & Repair Ass'n Class 12 Initial at 3–4; Tr. at 737:13–19 (Apr. 20, 2021) (Sheehan, iFixit).

[1068] iFixit & Repair Ass'n Class 12 Initial at 3.

[1069] *Id.* at 2–4; Tr. at 737:20–24 (Apr. 20, 2021) (Sheehan, iFixit).

[1070] iFixit & Repair Ass'n Class 12 Initial at 3–4; *see also* iFixit & Repair Ass'n Class 12 Pet. at 2.

[1071] DVD CCA & AACS LA Class 12 Opp'n at 5–6 (citing Commerce Comm. Report at 37); *see also* Philips Class 12 Opp'n at 3–4 (asserting the proposed class is "facially impermissible, as it is overly broad and fails to account for any of the unique characteristics of medical devices").

[1072] DVD CCA & AACS LA Class 12 Opp'n at 6–7 (citing 2018 Recommendation at 191–92); Joint Creators Class 12 Opp'n at 7 (commenting that EFF provides the same examples as in 2018 and iFixit & Repair Ass'n do not discuss individual examples).

LOC_AR_00001768

**Section 1201 Rulemaking: Eighth Triennial Proceeding**                    **October 2021**
**Recommendation of the Register of Copyrights**

modification of all devices could be stretched to allow circumvention to engage in activities for which that the Library has denied exemptions, such as jailbreaking video game consoles.[1073] In the event that the Office recommends a broad class, opponents assert that certain devices—specifically, disc players and video game consoles—should be carved out.[1074]

In the 2018 rulemaking, the Acting Register noted that a class of works may be appropriate in scope "where the record establishes that users of such works are similarly affected by the prohibition on circumvention, and where . . . the class is further narrowed by reference to particular types of uses."[1075] When the Office first considered a repair exemption for a broad class of software-enabled devices in 2018, the limited record during that proceeding could only support evaluation of a few device categories.[1076] As some devices were not discussed until the post-hearing stage of the proceeding, there was insufficient information to properly evaluate whether sufficient commonalities existed among different device types.[1077] In comparison, here, proponents have established a record of illustrative examples and analysis showing users being hindered by similar TPMs across a variety of consumer devices.[1078] Moreover, the type of copyrighted work, *i.e.*, the computer program to which proponents are seeking access, is generally similar across different devices—the Linux operating system.[1079]

---

[1073] Joint Creators Class 12 Opp'n at 8; *see* Tr. at 747:15–750:05 (Apr. 20, 2021) (Williams, Joint Creators; Smith, U.S. Copyright Office) (discussing distinctions between categories of devices, in particular, video game consoles); Tr. at 759:06–760:06 (Apr. 20, 2021) (Reed, ACT) (noting that expanding the exemption could exacerbate an existing problem where even free software "is being pirated and an additional ad network is being installed underneath it").

[1074] DVD CCA & AACS LA Class 12 Opp'n at 7–8 (noting that proponents' examples of e-readers and Wi-Fi-connected speakers do not provide the evidentiary basis to cover players that enable motion picture playback); Joint Creators Class 12 Opp'n at 9; Tr. at 752:12–24 (Apr. 20, 2021) (Ayers, DVD CCA & AACS LA).

[1075] 2018 Recommendation at 289 (citing House Manager's Report at 7 (suggesting that Register should look to whether the prohibition on circumvention affects the availability of works in different categories in the same way)).

[1076] *See* 2018 Recommendation at 189–94.

[1077] *See id.* at 194 n.1199.

[1078] *See* EFF Class 12 Initial at 3–60; iFixit & Repair Ass'n Class 12 Initial at 2–23; EFF Class 12 Reply at 2–3, 8–9; iFixit & Repair Ass'n Class 12 Reply at 3–8, 10–12.

[1079] *See* Tr. at 742:11–744:08 (Apr. 20, 2021) (Wiens, Repair Ass'n) (noting that TPMs on software-enabled devices are largely enabled not to protect the firmware, but the device itself from security vulnerabilities); *see also* Tr. at 739:05–741:07 (Apr. 20, 2021) (Gagliano, EFF; Smith, U.S. Copyright

196

JA141

LOC_AR_00001769

Software-enabled consumer devices, besides predominating the rulemaking record, also share some common characteristics such that users of the proposed exemption are likely to be similarly situated. In the 2016 Software Study, the Office observed that "everyday products" containing embedded software share several traits including that (1) "they are consumer-grade"; (2) the "software within the product is often specifically created for a particular product to control that product's basic operations"; (3) the software may be "ancillary to the non-software (*e.g.*, mechanical or electrical) components of the product"; (4) the software "may be distributed along with the product itself without payment of a separate charge or fee"; and (5) the software may not be "readily copied, thus presenting somewhat diminished concerns about widespread infringement."[1080] Further, the Office observed the "ubiquity of copyrighted software in everyday products" and "evolving nature of the universe of these items."[1081] This evolution has continued over the past five years, during which time the "use of embedded software in consumer products has grown rapidly, and with it the deployment of TPMs."[1082] Given these commonalities, it seems likely that users of software-enabled consumer devices will be similarly affected by TPMs, so that it is appropriate to define the proposed class to encompass that category of products.

It is unclear, however, that commercial and industrial devices and systems share these commonalities. Proponents offer a few examples of TPMs preventing access to SCADA and commercial building systems, but it is not apparent from the record that users of commercial and industrial systems are similarly situated to users of consumer products. From the examples provided, it appears that some of these users had adequate alternatives to circumvention.[1083] It was also unclear whether the proposed uses would

---

Office) (discussing the scope of the exemption being limited to "firmware or embedded software," not other applications that may control the operation of a product); *see generally* Class 10 Computer Programs — Unlocking (finding that wireless devices integrate a limited number of modems that mostly employ chipsets from a single vendor).

[1080] U.S. COPYRIGHT OFFICE, SOFTWARE-ENABLED CONSUMER PRODUCTS 9 (2016), https://www.copyright.gov/policy/software/software-full-report.pdf ("Software Study").

[1081] *Id.* at 5, 10, 12.

[1082] ACA Class 12 Initial at 2; *see also* iFixit & Repair Ass'n Class 12 Initial at 14–16 (noting that "shipments of smart home devices are increasing annually at a rate of up to 31%").

[1083] For example, iFixit and the Repair Association cite a building owner being locked out of its facility management system after the only employee who had a password died; yet, the owner could still gain access albeit after resetting and reconfiguring the system instead of bypassing the TPM. *See* iFixit & Repair Ass'n Class 12 Initial at 19; Tr. at 744:15–747:04 (Apr. 20, 2021) (Wiens, Repair Ass'n; Smith, U.S. Copyright Office) (also discussing building automation system that caps the maximum number of key cards). The other example, involving Siemens's practice of hard-coding passwords into their SCADA systems, proposes a workaround where users could

LOC_AR_00001770

contravene negotiated licensing terms between commercial actors, which might affect the analysis of potential market harm.[1084] Indeed, the Software Study identified a distinction between "consumer-grade" and "industrial devices, the latter of which may be subject to contractual and licensing agreements between parties with similar bargaining power."[1085] Without a more developed record concerning devices designed primarily for commercial and industrial use, the Register cannot properly evaluate the purported similarities to consumer devices or analyze the claimed adverse effects.[1086]

Opponents also object to including certain consumer devices that provide access to other expressive works, namely, disc players and video game consoles. Neither petition covering all software-enabled devices nor the comments submitted in support of those petitions address video game consoles in any detail. Public Knowledge and iFixit's joint submissions, however, focus exclusively on repair of video game console optical drives.[1087] Because of the distinct record and unique issues pertaining to gaming consoles, the Register concludes that the proposal to repair console optical drives should be considered separately, as a subset of consumer devices.

In addition, the Register declines to collapse the separate exemptions for vehicles and other devices into a single exemption. The two existing exemptions each contain their own unique language and limitations, which commenters have separately petitioned to renew on the basis that there has been no material change in the facts, law, or other

---

develop their own "patch" rather than wait for Siemens to address the hacking vulnerability. *See* iFixit & Repair Ass'n Class 12 Initial at 19.

[1084] *See* Tr. at 756:13–757:15 (Apr. 20, 2021) (Reed, ACT) (commenting that circumvention of TPMs could be disruptive to "licensing and right-sizing of the products" because users could avoid paying for additional licenses); *see also* Andy Greenberg, *The Hacked McDonald's Ice Cream Machines—and Started a Cold War*, WIRED (Apr. 20, 2021), https://www.wired.com/story/they-hacked-mcdonalds-ice-cream-makers-started-cold-war/ (describing a dispute involving developers of a device designed to facilitate maintenance and repair of commercial ice cream machines, the manufacturer, authorized distributors, and McDonald's that implicates licensing and franchise agreements).

[1085] Software Study at 9.

[1086] *See* FTC, NIXING THE FIX: AN FTC REPORT TO CONGRESS ON REPAIR RESTRICTIONS 51 (May 2021), https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf ("FTC Report") ("When deciding the scope of expanded repair rights, policymakers should think about whether the rights should be limited to consumer goods or include capital items. Given the complexity and variation among products, it seems unlikely that there is a one-size fits all approach that will adequately address this issue.").

[1087] *See* Public Knowledge & iFixit Class 12 Pet. at 2; Public Knowledge & iFixit Class 12 Reply at 4.

198

LOC_AR_00001771

circumstances.[1088]  The Register will, however, consider whether the existing exemption for motorized land vehicles should be expanded to include marine vessels, for which proponents provide some support.[1089]  The Register will also consider the proposal to remove the Illegality Limitation for vehicles, specifically whether this limitation is adversely affecting users' ability to make use of the current exemption.[1090]

For medical devices and systems, the Register concludes that the specific proposals for diagnosis, maintenance, and repair of these devices and systems should be evaluated separately for several reasons.  First, most medical devices cited in the record are not "consumer devices" and vary in terms of their function, TPMs, and software licenses.[1091]  Second, beyond firmware access, petitioners seek access to data files and servicing materials associated with medical devices and systems.  Finally, participants have raised issues and submitted record materials, such as FDA reports and studies, that bear on whether medical equipment repair is being adversely affected by the prohibition against circumvention.

In sum, the Register will evaluate the following proposed classes for which sufficient commonalities exist: (1) computer programs in devices designed primarily for use by consumers, including video game consoles for the sole purpose of repairing optical drives; (2) computer programs in marine vessels; and (3) computer programs and data files in medical devices and systems.

### b.  Works Protected by Copyright

Computer programs, including those contained in consumer devices, marine vessels, and medical devices and systems, are protected under the Copyright Act.[1092]  In addition, some related data files stored on medical devices and systems, such as

---

[1088] *See* ACA Vehicle Repair Renewal Pet.; AFBF Vehicle Repair Renewal Pet.; CTA Vehicle Repair Renewal Pet.; MEMA Vehicle Repair Renewal Pet.; SEMA Vehicle Repair Renewal Pet.

[1089] *See* iFixit & Repair Ass'n Class 12 Initial at 8–10; SEMA Class 12 Reply at 1; AFBF Class 12 *Ex Parte* Letter at 2 (Aug. 3, 2021).

[1090] *See* ACA Class 12 Initial at 1; iFixit & Repair Ass'n Class 12 Initial at 20–21; ACA Class 12 Reply at 2–3; iFixit & Repair Ass'n Class 12 Reply at 11–12.

[1091] *See* Summit Imaging Class 12 Pet. at 3 (imaging equipment and ventilators with TPMs including "user-specific login credentials or security keys, among other measures"); Transtate Class 12 Pet. at 3 (imaging, endoscopy, and life-support devices with TPMs including "encryption, embedded software, and challenge-response mechanisms, access codes, passwords, keys, or digital signatures").

[1092] 17 U.S.C. § 101 (definitions of "computer program" and "literary works"); *see also* 2018 Recommendation at 194; 2015 Recommendation at 218; Software Study at 2–3.

LOC_AR_00001772

manuals and documentation, are copyrightable as literary works.[1093]  The Register therefore finds that at least some works included in the proposed class are protected by copyright.

### c. Asserted Noninfringing Uses

Proponents' asserted noninfringing uses—diagnosis, maintenance, repair, and modification—overlap somewhat among the three refined classes.  The terms "maintenance" and "repair" are defined in the current exemption for devices.[1094]  In its comments, EFF defines "modification" as "to add new features, load the software of one's choice, disable undesired functionality, or customize the operation of the device to one's preferences."[1095]  Based on these definitions, the Register evaluates whether the proposed uses are likely noninfringing as to each class.

#### i. Consumer Devices

Proponents suggest that diagnosis, maintenance, repair, and modification of software-enabled devices are noninfringing activities permitted under the fair use doctrine and section 117.

##### 1) Fair Use

The Register first considers whether diagnosis, maintenance, and repair of software-enabled consumer devices is likely to be fair use, and separately whether modification of

---

[1093] *See* U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 721.11 (3d ed. 2021) ("COMPENDIUM (THIRD)"); *see also* iFixit, *Medical Device Repair*, https://www.ifixit.com/Device/Medical_Device (last visited Oct. 15, 2021) (database of repair manuals and support documentation for medical devices).  Proponents assert that some data files, including error logs, and configuration files stored behind TPMs on medical devices may not be protected by copyright.  *See* Summit Imaging Class 12 Initial at 2; Transtate Class 12 Initial at 5.  Nonetheless, because some medical device and system data files may be protectable compilations provided they "feature[] an original selection and arrangement," the Register will consider whether accessing these files is necessary to engage in the proposed noninfringing uses. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991); *see* 2015 Recommendation at 393–94 (concluding that some medical device data outputs, such as batch reports, might be copyrightable compilations); *cf.* 2018 Recommendation at 316–17 (concluding that aircraft data collected and organized as required by industry standards did not qualify as a copyrightable compilation).

[1094] *See* 37 C.F.R. § 201.40(b)(10); *see also* 17 U.S.C. § 117(d).  These definitions are not part of the current exemption for vehicle repair.

[1095] EFF Class 12 Pet. at 3; EFF Class 12 Initial at 1.

200

LOC_AR_00001773

Section 1201 Rulemaking: Eighth Triennial Proceeding                    October 2021
Recommendation of the Register of Copyrights

those devices is likely to be fair use. Whether repair of video game consoles is likely to be fair use is also analyzed separately.

*Diagnosis, maintenance, and repair—consumer devices.* Citing the Office's previous conclusions, proponents assert that the same fair use analysis applies consistently across a broader class of software-enabled devices.[1096] Under the first fair use factor, proponents assert that, irrespective of the type of device, "the purpose of repair is to restore a device's functionality to its previous working state."[1097] On the second factor, they observe that the "underlying copyrighted software is essentially functional rather than expressive where the software is not meant to be consumed as a creative work."[1098] For the third factor, proponents argue that "use of the entire software work is reasonable when the purpose is repair" because it "often require[s] analysis of the full software program," and "the ultimate product does not contain infringing copies."[1099] Finally, proponents argue the fourth factor favors fair use because "there is no separable market for embedded software."[1100] Rather, "[p]recluding consumers, and their repairpersons of choice, from fixing an ever-expanding category of smart devices in fact may negatively impact the value of these works when, as this Copyright Office noted, 'repair supports—rather than displaces—the purpose of the embedded programs that control the device.'"[1101]

ACT objects that, given the scope of the proposed class, the uses do not permit a "blanket determination" on fair use.[1102] DVD CCA and AACS LA comment that "the 'repair' exemption does not extend to devices that provide access to other, expressive copyrighted works."[1103] They assert that the Office's previous decision to exclude video game consoles should apply equally to DVD and Blu-ray players because permitting

---

[1096] *See* iFixit & Repair Ass'n Class 12 Initial at 12 ("The key point is that, from a noninfringement perspective, *newly presented devices are no different than those covered by existing exemptions*; the only change is the increasing prevalence of TPM-encumbered devices."); iFixit & Repair Ass'n Class 12 Reply at 3–5 (citing Software Study at 33; 2018 Recommendation at 203–05); *see also* EFF Class 12 Initial at 14; Tr. at 736:25–737:05, 738:07–15 (Apr. 20, 2021) (Sheehan, iFixit).

[1097] iFixit & Repair Ass'n Class 12 Reply at 4 (citing *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005); *Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)).

[1098] iFixit & Repair Ass'n Class 12 Reply at 5 (citing 2015 Recommendation at 234–35).

[1099] *Id.* at 5.

[1100] *Id.* (citing 2018 Recommendation at 204–05).

[1101] iFixit & Repair Ass'n Class 12 Initial at 12 (quoting Software Study at 40); *see also* iFixit & Repair Ass'n Class 12 Reply at 5 (suggesting that where a use is transformative, "copyright owners cannot claim market harm").

[1102] ACT Class 12 Opp'n at 2.

[1103] DVD CCA & AACS LA Class 12 Opp'n at 1.

201

LOC_AR_00001774

circumvention for any purpose will compromise the digital ecosystem and lead to piracy of expressive content, which will consequently harm the market for these players.[1104] Responding to these concerns, iFixit and the Repair Association argue that "even for software-enabled devices that contain, display, or perform expressive content," the proposed uses do not harm the market for expressive works because the subject of the exemption is the firmware, and "in ensuring that devices remain operational, repair supports the market for [expressive] works."[1105]

The Register agrees with proponents that diagnosis, maintenance, and repair of software-enabled consumer devices are likely to be fair uses where the purpose is to restore device functionality. Indeed, the Office previously recognized this in its Software Study, observing that device repair is generally noninfringing. While cautioning that "fair use analysis is ultimately a fact-specific inquiry" that can vary based on the type of device, the Office concluded that "properly applied, the fair use factors—together with the existing case law—should ensure that consumers, repair technicians, and other interested parties will be able to engage in most traditional repair . . . activities without fear of copyright infringement liability."[1106] In 2018, the Acting Register found diagnosis, maintenance, and repair likely to be fair use for particular categories of devices, but declined to consider an exemption covering all software-enabled devices due, in part, to a sparse record and limited analysis of these devices.[1107] Here, proponents offer illustrative examples of a wide variety of devices.[1108] For the most part, opponents do not challenge this conclusion except to comment that circumvention of TPMs on devices that provide access to other expressive works may lead to piracy.[1109] The Register will consider that concern, and whether additional limitations on the proposed exemptions are appropriate, in the adverse effects analysis below.

*Repair of video game console optical drives.* Public Knowledge and iFixit assert that repairing video game consoles—specifically, accessing console software that controls device hardware to remove and replace an optical drive—is a fair use. Petitioners argue the first factor favors fair use because "[r]epair of a software-enabled good 'may be a

---

[1104] *See id.* at 11–16; Tr. at 753:23–754:10 (Apr. 20, 2021) (Ayers, DVD CCA & AACS LA).

[1105] iFixit & Repair Ass'n Class 12 Reply at 5.

[1106] Software Study at 39–41.

[1107] 2018 Recommendation at 191–94, 202–05.

[1108] *See, e.g.,* iFixit & Repair Ass'n Class 12 Initial at 12, 17–18; Tr. at 800:20–802:14 (Apr. 20, 2021) (Wiens, Repair Ass'n).

[1109] *See* DVD CCA & AACS LA Class 12 Opp'n at 11–16.

LOC_AR_00001775

favored purpose when directed at preserving the functionality of a device.'"[1110]  In addition, they note that the use is noncommercial because it is intended "to allow for continued personal use of a device."[1111]  On the second fair use factor, proponents stress that the "software controlling access between a motherboard and optical drive is functional, rather than creative."[1112]  Proponents assert the third factor likewise favors fair use because "[t]he amount of code accessed in the course of repairs is proportionally small," and that, in any event, copying the entire program may be permitted "when used to facilitate repair."[1113]  Finally, proponents contend that there is "no known market" for the software that pairs console motherboards with optical drives, which has "no independent value."[1114]

In opposition, Joint Creators contend that the analysis for video game consoles in previous rulemaking cycles should continue to apply—that is, console repair is not a fair use because it would "enable[] unauthorized access to and use of works distributed through consoles, including television programs, movies, and sound recordings," and "the market for the firmware would deteriorate if it was compromised."[1115]  Although opponents concede that "hardware repair . . . might be non-infringing in some circumstances," they express concern that "circumventing access controls on console firmware enables consoles to load and run infringing games and other content, regardless of the circumventor's stated purpose."[1116]  Petitioners respond that opponents' reliance on previous rulemakings is misplaced because the proposed use here is narrower than that addressed in past proposals and must be considered "on its own merits."[1117]

For essentially the same reasons that the Register concludes that repair of software-enabled consumer devices is likely to be fair use, the Register finds that certain video game console repair is also likely fair use.  Accessing console firmware for the limited purpose of repairing an optical drive to restore the console's functionality is unlikely to affect the value of such software, for which there appears to be no independent market

---

[1110] Public Knowledge & iFixit Class 12 Initial at 3 (quoting 2018 Recommendation at 196); Public Knowledge & iFixit Class 12 Reply at 6–7.

[1111] Public Knowledge & iFixit Class 12 Initial at 3.

[1112] *Id.* at 3.

[1113] *Id.* at 4 (citing 2015 Recommendation at 214); *see also* 2018 Recommendation at 198.

[1114] Public Knowledge & iFixit Class 12 Initial at 4.

[1115] Joint Creators Class 12 Opp'n at 5–6 (citing 2018 Recommendation at 205–06; 2012 Recommendation at 48).

[1116] *Id.* at 6.

[1117] Public Knowledge & iFixit Class 12 Reply at 6–7.

LOC_AR_00001776

separate from the console itself.[1118]  Opponents acknowledge that repair activity is in some cases noninfringing;[1119] and to the extent that users go beyond the "stated purpose" of repairing the optical drive, that activity is outside the scope of the proposed exemption.[1120]  Because the record is devoid of evidence involving other types of console repair, the Register declines to consider whether repair of any other element of the console firmware or hardware is noninfringing.  The Register will also consider, in addressing adverse effects below, whether imposing additional limitations on the proposed exemption to safeguard expressive works is appropriate.

*Modification, generally.*  Proponents assert that "modification" of software-enabled devices is also fair use.  In support, EFF conducts an individualized fair use analysis of modifications for eight separate devices, concluding that "the analysis for each example is identical in all key respects, demonstrating the uniformity of the issues across modifications and device types."[1121]  EFF argues the first factor favors fair use because the modifications are for personal, noncommercial uses that are transformative in nature, such as installing new features and increasing the utility of the device.[1122]  On the second fair use factor, EFF observes that functional software is primarily factual, not expressive; and code that controls device functionality is minimally creative.[1123]  For the third factor, EFF notes that the entirety of the work generally must be copied to allow for modifications because the firmware needs to be decrypted and analyzed to understand it and to identify the portions of the code to modify.[1124]  Finally, addressing the fourth

---

[1118] *See Sony Comput. Entm't v. Connectix Corp.*, 203 F.3d 596, 603–08 (9th Cir. 2000); *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1522–28 (9th Cir. 1992); Software Study at 41.

[1119] *See* Joint Creators Class 12 Opp'n at 6.

[1120] *See* Tr. at 788:22–795:07 (Apr. 20, 2021) (Sheehan, iFixit; Amer, U.S. Copyright Office; Burke, Public Knowledge; Williams, Joint Creators; Ayers, DVD CCA & AACS LA) (discussing whether limitations on the scope of the proposal are sufficient to prevent piracy).

[1121] EFF Class 12 Initial at 15.

[1122] *See id.* at 14; *id.* at 17–19 (citing *Connectix*, 203 F.3d at 599, 609; *Sega*, 977 F.2d at 1522–23) (customizing digital camera functionality); *id.* at 22–24 (customizing cat litter box cleaning cycles); EFF Class 12 Initial at 27–29 (customizing printer firmware); *id.* at 32–34 (customizing programmer/debugger, including to install new features); *id.* at 38–39 (modifying camera gimbal and creating related educational materials); *id.* at 43–45 (customizing e-reader to enable use of additional screensavers, fonts, apps, and file types); *id.* at 49–50 (customizing robotic companion firmware to install new features); *id.* at 54–56 (modifying digital mobile radio to allow multichannel monitoring); *see also* Tr. at 760:16–762:21 (Apr. 20, 2021) (Gagliano, EFF).

[1123] *See* EFF Class 12 Initial at 14, 19 (citing *Connectix*, 203 F.3d at 603–05; *Sega*, 977 F.2d at 1524), 24, 29–30, 34–35, 40, 45–46, 51, 56–57.

[1124] *See* EFF Class 12 Initial at 14, 19–20 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221–22 (2d Cir. 2015); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1167–68 (9th Cir. 2007); *Kelly v. Arriba*

LOC_AR_00001777

fair use factor, EFF asserts there is no market harm because there is no market for the firmware separate from the device, and modification may actually result in increased sales of a device because of the availability of alternative firmware options.[1125] Separately, iFixit and the Repair Association also assert that device modification is noninfringing fair use, relying on their analysis for repair as applicable to modification.[1126]

Opponents object that "unqualified modification" as applied to a broad class of devices is so expansive that it defies a singular fair use determination.[1127] Because "modification" can have a different meaning depending on the device, opponents caution that some modifications could implicate a software owner's derivative work right.[1128] And as with device repair, opponents argue that modification of software on devices that provide access to expressive content, even for facially benign reasons, could compromise digital ecosystem protections, leading to unauthorized access to and piracy of expressive works.[1129] Opponents also warn that "modification" could be interpreted to include jailbreaking video game consoles, a use that the Register has "repeatedly denied."[1130]

---

*Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003); *Connectix*, 203 F.3d at 605–06; *Sega*, 977 F.2d at 1526; *Field v. Google*, 412 F. Supp. 2d 1106, 1120–21 (D. Nev. 2006)); *id.* at 25, 30–31, 35–36, 41–42, 46–47, 51–52, 57–58. For example, to modify some device firmware, a user must "view the original code in its entirety to identify the checksum value in the code so they can match it when installing the modified firmware." *Id.* at 25.

[1125] *Id.* at 14–15, 20, 25–26, 31, 36, 41, 47, 52–53, 58; EFF Class 12 Reply at 5 ("Software-enabled devices are not sold as bare metal waiting for a separate purchase of operating firmware; they are sold with a copy of the firmware, and the copyright owner receives their compensation.").

[1126] *See* iFixit & Repair Ass'n Class 12 Reply at 4–5 (citing *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 450 (1984); *Connectix*, 203 F.3d at 602, 603; *Sega*, 977 F.2d at 1527); Tr. at 767:25–768:08 (Apr. 20, 2021) (Sheehan, iFixit); *see also* Tr. at 754:24–756:03 (Apr. 20, 2021) (Burke, Public Knowledge) (noting that limited "modification for a functional purpose" may be necessary to perform a video game console repair); EFF Class 12 *Ex Parte* Letter at 1 (July 28, 2021) (noting its proposal "includes . . . modification in furtherance of repair").

[1127] DVD CCA & AACS LA Class 12 Opp'n at 8–9 (faulting the "dearth of information" provided about modification as fatal to evaluating whether the proposed use is noninfringing); *see also* ACT Class 12 Opp'n at 2.

[1128] *See* DVD CCA & AACS LA Class 12 Opp'n at 8 (citing 2018 Recommendation at 210); Joint Creators Class 12 Opp'n at 8 ("[T]he modification language proposed allows for the creation of derivative works of software/firmware resident in every device or machine.").

[1129] DVD CCA & AACS LA Class 12 Opp'n at 4, 9–11; Joint Creators Class 12 Opp'n at 8–9; Tr. at 753:03–13 (Apr. 20, 2021) (Ayers, DVD CCA & AACS LA) (noting that modification that "chang[es] the functionality of a device" could allow playback of pirated content).

[1130] Joint Creators Class 12 Opp'n at 8.

LOC_AR_00001778

As in 2018, the Register cannot conclude that modification of software-enabled devices generally is likely to be fair use.  Although she credits EFF for providing several examples of device modification and analyzing the fair use factors as applied to those proposed modifications, the term "modification" is insufficiently precise and encompasses activities so broad that the proposal resists a unified analysis across all devices.  Unlike diagnosis, maintenance, and repair, which have been defined for software-enabled devices in this rulemaking partly by drawing on definitions in section 117,[1131] "modification" is undefined by statute.[1132]  As opponents observe, it is not difficult to imagine modifications that would arguably infringe the derivative work right.[1133]  And while it is true that the current exemption for repair of motor vehicles encompasses certain modifications, that language is expressly limited to "lawful modification *of a vehicle function.*"[1134]  Proponents have offered no analogous language to cabin the scope of the modifications contemplated here.[1135]  Accordingly, on the present record, the Register cannot conclude that modification generally constitutes a noninfringing use.

### 2) *Section 117*

Proponents offer section 117 as an alternative basis to conclude that diagnosis, maintenance, repair, and modification are noninfringing uses of software-enabled devices.[1136]  EFF asserts that section 117(a)(1) "specifically protects adaptation when the 'adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.'"[1137]  Proponents also rely on section 117(c), arguing that many repair-related activities—for example, entering a password, reading device values, or changing software settings—do not require

---

[1131] *See* 37 C.F.R. § 201.40(b)(10); *see also* 17 U.S.C. § 117(d).

[1132] The term "modification" does, however, appear in the definition for "derivative work" as the type of change that, if original, constitutes a "derivative work." *See* 17 U.S.C. § 101.

[1133] *See* 2015 Recommendation at 193–94 (denying jailbreaking proposal for e-readers); *id.* at 199–201 (denying jailbreaking proposal for video game consoles); 2012 Recommendation at 42–44, 47–50 (same).

[1134] *See* 2018 Recommendation at 197, 199 (emphasis added) (lawful modification of a vehicle function "does not extend to gaining unauthorized access to entertainment content").

[1135] *See* 2015 Recommendation at 220–21, 224, 234–37, 239–44.

[1136] *See* EFF Class 12 Initial at 15 (citing Software Study at 35–38); iFixit & Repair Ass'n Class 12 Initial at 12–13.  As noted above, Public Knowledge and iFixit make no argument that repair of optical drives in video game consoles is noninfringing under section 117.

[1137] EFF Class 12 Reply at 4 (quoting 17 U.S.C. § 117(a)(1)); *see also* iFixit & Repair Ass'n Class 12 Initial at 12–13.

LOC_AR_00001779

making software copies "other than those that normally occur when turning on the device."[1138]

In response, Joint Creators comment that "[t]o the extent firmware must be reproduced or modified for repair, Section 117 of the Copyright Act does not make the use at issue lawful."[1139] They note that only the owner of a copy of a program is eligible for the section 117(a) exemption, and observe that software in devices such as video game consoles is licensed.[1140] As to section 117(c), opponents argue that there is insufficient evidence that devices can be restored to "normal functionality" after TPMs have been circumvented.[1141]

The Register affirms that, "[p]roperly construed, section 117 should adequately protect most repair and maintenance activities" for software-enabled devices.[1142] The rulemaking record, however, is insufficient to conclude that repair or modification of software-enabled consumer devices is likely covered under this section. With respect to section 117(a), "the inquiry into whether an individual qualifies as an 'owner' is fact-intensive."[1143] Proponents focus on ownership of a *device*, but do not establish that the embedded *copy* of the copyrighted software is also owned. With respect to section 117(c), the Register observes that some "maintenance" and "repair" activities anticipated by the proposal likely fall under this statutory exemption. At the same time, section 117(c) covers a narrower range of activities than those proposed here; any uses that involve loading or accessing software that are not necessary to activate the machine likely would not be protected under the statute.[1144] Accordingly, the Register concludes that although some of the proposed uses may be noninfringing under section 117, the record lacks sufficient evidence to assess whether that section might serve as an alternative basis to conclude that diagnosis, maintenance, repair, and modification of software-enabled consumer devices, in general, is noninfringing.

---

[1138] iFixit & Repair Ass'n Class 12 Initial at 13.

[1139] Joint Creators Class 12 Opp'n at 5.

[1140] *See id.* at 5–6 (citing license agreements for Nintendo Switch, Sony PlayStation, and Microsoft Xbox console firmware).

[1141] *Id.* at 6.

[1142] Software Study at 35–38 (internal quotations omitted).

[1143] 2018 Recommendation at 200–01 (citing *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010)); *see also Universal Instruments v. Micro Sys. Eng'g*, 924 F.3d 32, 44–45 (2d Cir. 2019).

[1144] *See* Software Study at 37–38.

LOC_AR_00001780

### ii. Marine Vessels

Proponents assert that diagnosis, maintenance, repair, and modification of software in marine vessels are noninfringing.  Proponents do not offer a separate fair use analysis specifically for marine vessels because their position is that the same analysis applies across all device types, including land vehicles and marine vessels.[1145]  In support, they note that three manufacturers make engines and diagnostic tools for both land vehicles and marine vessels.[1146]  Opponents raise no specific objections that the proposed activities are not fair use as to marine vessels.

For essentially the same reasons outlined above for software-enabled consumer devices, and consistent with the 2015 and 2018 Recommendations concerning repair of land vehicles,[1147] the Register concludes that diagnosis, repair, and lawful modification of a vessel function are likely to be noninfringing fair uses of marine vessel software.

### iii. Medical Devices and Systems

Proponents of an exemption covering medical devices and systems assert that accessing equipment software and data files for purposes of diagnosis, maintenance, and repair is fair use and noninfringing under section 117.  Because proponents do not seek an exemption to modify medical devices or systems, or their software, the Register does not consider whether modification is noninfringing.

Regarding the first fair use factor, proponents argue that the proposed uses are intended "to make the devices useful for the purpose for which they are intended."[1148]  In addition, Transtate asserts that where original equipment manufacturers ("OEMs") fail to provide servicing materials as required by the FDA for certain devices and systems, then accessing those materials via the equipment is a purpose that favors fair use.[1149]  In response, opponents primarily argue that the first factor weighs against the fair use because the proposed activities are for a "commercial" purpose.[1150]  They base this, in part, on the fact that petitioners are independent service organizations ("ISOs") that derive a "commercial benefit" from medical equipment repair services.[1151]  Proponents

---

[1145] iFixit & Repair Ass'n Class 12 Initial at 8, 12.

[1146] *Id.* at 3, 9.

[1147] *See* 2018 Recommendation at 195–200; 2015 Recommendation at 234–37.

[1148] Summit Imaging Class 12 Initial at 5–6; *see* Transtate Class 12 Initial at 16.

[1149] *See* Transtate Class 12 Pet. at 3; Transtate Class 12 Initial at 16.

[1150] *See* AdvaMed Class 12 Opp'n at 7–8; MITA Class 12 Opp'n at 9; Philips Class 12 Opp'n at 7–8 (citing *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) for the proposition that commercial uses are "presumptively . . . unfair").

[1151] MITA Class 12 Opp'n at 9.

LOC_AR_00001781

concede that the proposed uses "involve a commercial setting" and that equipment repair can be done for profit, but argue that this is not determinative on the first factor.[1152]

The Register agrees that opponents overstate the significance of the commercial purpose element to the fair use analysis. Commerciality is not fatal to a fair use determination; rather the Supreme Court has clarified that there is no "hard evidentiary presumption" against commercial uses and that such uses must be addressed through a "sensitive balancing of interests."[1153] Here, the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials.[1154] The Register has previously concluded that diagnosis and repair are likely to be transformative uses.[1155] The Register accordingly concludes that proponents' proposed use is likely transformative and so the first factor favors fair use.

On the second fair use factor, proponents assert that medical equipment computer programs and data files are "functional works" that are "used to support operation, mechanical, and electronic processes of the medical systems."[1156] Opponents argue that medical equipment software is "creative" and its design involves substantial effort.[1157] Philips asserts that, in contrast to "functional" software embedded in video game consoles and vehicles, medical device software is of "comparatively much higher value

---

[1152] Transtate Class 12 Reply at 11.

[1153] *Campbell v. Acuff-Rose*, 510 U.S. 569, 584–85 (1994) (quoting *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 455 n.40 (1984)); *see Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021) ("[M]any common fair uses are indisputably commercial.").

[1154] *See* Transtate Class 12 Reply at 11 ("Servicing the medical equipment owned by lawful possessors is primarily for public benefit, as access to materials required for servicing is imperative in treating patients, and is especially critical during a pandemic such as the current COVID-19 crisis."), Ex. 5 (decl. of Kevin Melvin ¶ 7), Ex. 6 (decl. of John Kahler ¶ 16), Ex. 7 (decl. of Abigail Lane-Savage ¶¶ 17–19)).

[1155] 2015 Recommendation at 234–35.

[1156] Transtate Class 12 Initial at 17 (adding that "manuals are technical and contain data, namely information of the functions of the systems or devices and the operating specifications") (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 536 (6th Cir. 2004); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000)); *see* Summit Imaging Class 12 Initial at 6 (citing same cases); Transtate Class 12 Reply at 11–12 ("The software itself is not dictated by any creative expression, but by the specific technical needs of the machine.").

[1157] MITA Class 12 Opp'n at 9–10.

209

LOC_AR_00001782

and complexity and invoke[s] patient safety and information security concerns."[1158] Opponents further note that some medical device software is unpublished.[1159]

The Register finds that the second factor favors fair use. Even if proponents are correct that medical device software is highly complex and valuable, the second factor "calls for recognition that some works are closer to the core of intended copyright protection than others."[1160] Here, the computer programs and data embedded in medical devices and systems are not used for their expressive qualities, but rather for their functional and informational aspects that enable users to control and understand the operation of the equipment.[1161] And even assuming some programs may be unpublished, that does not outweigh the functional nature of the works.[1162]

Proponents contend that the third fair use factor favors fair use because the amount used is necessary for the purpose of diagnosing, maintaining, and repairing medical devices and systems.[1163] Further, proponents assert that "[t]he servicing computer programs and data files involved can be but a small portion of the entire software package."[1164] Opponents challenge the assertion that the proposed uses only implicate a portion of the copyrighted works, suggesting that these activities would require use of the entirety of works stored on medical devices and systems, weighing against fair use.[1165] Even if that

---

[1158] Philips Class 12 Opp'n at 8–9.

[1159] *See* AdvaMed Class 12 Opp'n at 8.

[1160] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994).

[1161] *See Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1202, 1208–09 (2021); *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 536 (6th Cir. 2004); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000); *see generally* Class 9 Literary Works — Medical Device Data.

[1162] *See* 17 U.S.C. § 107 ("The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the [statutory] factors."); *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 554 (quoting S. REP. NO. 94-473, at 65 (1975)) ("[T]he unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a defense of fair use.").

[1163] Summit Imaging Class 12 Initial at 6 ("It is necessary to execute the computer programs and access the data files during servicing activities to understand system or device performance and . . . update the data files such as service logs."); *see also* Transtate Class 12 Initial at 17.

[1164] Transtate Class 12 Initial at 17; *see also* Summit Imaging Class 12 Initial at 6; Transtate Class 12 Reply at 12.

[1165] *See* AdvaMed Class 12 Opp'n at 8; MITA Class 12 Opp'n at 10 (noting that circumvention "would expose the full range of programs, manuals, computer code, logs, and other intellectual property to public view"); Philips Class 12 Opp'n at 9 ("By circumventing Philips' access controls, ISOs gain unauthorized access to Philips' copyrighted advanced service software. ISOs

LOC_AR_00001783

is true for some equipment, courts have nonetheless concluded that use of the entirety of a work is permissible where necessary to achieve a transformative purpose.[1166] As in previous rulemakings, the Register finds that this factor should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair.[1167] Accordingly, the Register finds the amount used is reasonable relative to the purpose of the use.

Considering the fourth fair use factor, proponents argue that the proposed uses would have a "minimal" effect on the market for or value of the copyrighted works because medical device and system software and data files are sold with the equipment and have no independent value separate from the devices.[1168] Specifically addressing device and system manuals, Transtate observes that "electronic manuals merely provide technical information," which manufacturers "provided freely" in the past, suggesting that their use "ha[s] a demonstrated neutral effect on the market."[1169]

Opponents dispute proponents' characterization of market harm, commenting that there is a "standalone" market for medical device software.[1170] AdvaMed notes that "[s]ome software on medical devices is activated and maintained through a subscription model," and other device software can "function on independent, unrelated computers."[1171] Further, it argues that because some medical devices use embedded software that is owned by a software developer that licenses it to the device manufacturer, any maintenance of the software by an unauthorized user may contravene licensing terms.[1172] Finally, opponents warn that unauthorized repair, particularly if widespread,

---

then copy and use those *entire copyrighted* works to service Philips systems more efficiently or modify Philips systems for commercial gain.").

[1166] *See Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1205 (2021) ("The 'substantiality' factor will generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose."); *Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596, 603–06 (9th Cir. 2000).

[1167] *See* 2018 Recommendation at 204; 2015 Recommendation at 235–36.

[1168] Summit Imaging Class 12 Initial at 6; Transtate Class 12 Initial at 17–18, Ex. 1 (decl. of Robert A. Wheeler ¶ 35); Transtate Class 12 Reply at 13–14.

[1169] Transtate Class 12 Initial at 18.

[1170] AdvaMed Class 12 Opp'n at 8.

[1171] *Id.* at 8. *But see* MITA Class 12 Opp'n at 10 ("Although there is no separate market for the medical imaging device software beyond the medical imaging devices containing that software, disabling of TPMs would damage the market for the medical imaging devices *and* the software contained therein.").

[1172] *See* AdvaMed Class 12 Opp'n at 8–9.

211

LOC_AR_00001784

"can result in patient injury, compromise patient privacy, and place valuable intellectual property at risk, all of which can harm the value of the copyrighted work."[1173]

Consistent with findings in prior rulemakings and for the other types of software-enabled devices evaluated above, the Register credits proponents' assertion that most medical device and system software and data files generally have no independent value separate from being used with the equipment.[1174] Although the record suggests that some system features on certain devices may be separately licensed through a subscription service, the purpose of the proposed uses is not to enable ongoing unauthorized access to enhanced features, but merely to restore functionality so the equipment performs as intended.[1175] Even where the software could be installed on another "standalone" computer, there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed. With respect to opponents' concerns about the proposed exemption being abused, if a user were to reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption. Overall, the Register concludes that diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software and this factor favors fair use.

Taken together, the factors indicate that the proposed uses are likely to be noninfringing fair uses. In light of that conclusion, it is unnecessary for the Register to address proponents' separate argument that the proposed activities are noninfringing under section 117.[1176]

### d. Causation

The record shows that the statutory prohibition on circumvention of access controls limits users' ability to diagnose, maintain, and repair software-enabled consumer devices, including repair of video game console optical drives. In addition, the prohibition impedes the ability to engage in the diagnosis, repair, and modification of a vessel function for marine vessels. Finally, the prohibition limits users' ability to

---

[1173] *Id.* at 9; MITA Class 12 Opp'n at 10–11; Philips Class 12 Opp'n at 10.

[1174] *See* 2018 Recommendation at 204–05; 2015 Recommendation at 236; Software Study at 41.

[1175] *See* 2018 Recommendation at 198–99 (concluding that although certain vehicle telematics and entertainment software "can have independent value, and may be accessed through subscription services," where access is necessary to engage in vehicle repair, it is not likely to harm the market for the software).

[1176] Moreover, under the analysis above regarding consumer devices, the Register concludes that section 117 would not fully the cover the proposed uses here.

LOC_AR_00001785

diagnose, maintain, and repair medical devices and systems. But for the prohibition, users likely could gain lawful access to the copyrighted computer programs and related data files, including medical device servicing materials, for noninfringing repair-related purposes.

### e. Asserted Adverse Effects

Having concluded that certain repair-related activities are likely noninfringing as to the three classes identified above, the Register evaluates whether these activities are being adversely affected by the prohibition against circumvention.

#### i. Consumer Devices

The Register considers the adverse effects on repair activities for software-enabled consumer devices, in general, before analyzing the same for video game consoles, specifically. In doing so, the Register considers to what extent the legal and factual circumstances have changed since 2018, when similar proposed exemptions for software-enabled devices were denied, in part, because there was insufficient evidence that the proposed uses were being adversely affected.[1177]

*Software-enabled consumer devices, generally.* Proponents assert that as "[s]oftware is increasingly embedded in every imaginable type of product" and TPMs are more commonly deployed, "[t]his often has the undesirable effect—intended or unintended—of hindering diagnosis, maintenance, and repair, traditional uses of those products."[1178] They argue that because the number of software-enabled devices protected by TPMs is growing at a rate that outpaces the triennial rulemaking, a broad access exemption for repair-related purposes is necessary to remove "legal uncertainty and the risk of harsh penalties."[1179]

In support, proponents offer a few illustrative examples where the current device-by-device approach adversely affects users seeking to repair consumer devices.[1180] iFixit and the Repair Association note that while circumventing TPMs to repair smartphones is exempt under current regulations, doing so to repair tablets is not.[1181] In opposition, ACT asserts that adequate alternatives to circumvention exist, observing that many

---

[1177] *See* 2018 Recommendation at 220.

[1178] iFixit & Repair Ass'n Class 12 Initial at 10.

[1179] *Id.* at 10, 15 (noting that shipments of smart home devices are "increasing annually at a rate of up to 31%" and the worldwide number of Internet of Things devices "is projected to increase to 43 billion by 2023").

[1180] *See* EFF Class 12 Initial at 13–14, 17–60; iFixit & Repair Ass'n Class 12 Initial at 14–18; iFixit & Repair Ass'n Class 12 Reply at 6; Tr. at 800:16–802:14 (Apr. 20, 2021) (Wiens, Repair Ass'n).

[1181] iFixit & Repair Ass'n Class 12 Initial at 17–18.

LOC_AR_00001786

devices are covered by damage warranties and certified repair options are sufficient.[1182]
But proponents note that even where device manufacturers offer repair services, these
services may be insufficiently timely, limited to specific types of repairs, or discontinued
when a manufacturer goes out of business.[1183]  Consequently, some users for whom
repair, not replacement, of a specific device is essential are without options.[1184]  In
addition, proponents comment that the alternatives proposed by opponents are
inadequate for "people with limited mobility and those in rural areas," particularly with
in-person services restricted during the COVID-19 pandemic.[1185]

In 2018, proponents were able to show that repair of smartphones and home appliances
and home systems was being inhibited, but the record for other types of devices was
"insufficient . . . to adequately identify and evaluate any asserted adverse effects on
noninfringing uses."[1186]  Compared to 2018, proponents have developed a record of
adverse effects on diagnosis, maintenance, and repair for a wider variety of consumer
devices.[1187]  Accordingly, the Register finds that the current rulemaking record is
adequate to consider the statutory factors for the refined class.

---

[1182] *See* ACT Class 12 Opp'n at 2, 5 (suggesting that users "who want to build their own solutions
or fix their own devices have plenty of options available to them" and can chose between "closed
and open-source systems," including certified repair options like Apple Repair).

[1183] *See* iFixit & Repair Ass'n Class 12 Initial at 16 n.98 (citing a consumer complaint about
unavailability of local authorized repair services); *id.* at 18 (citing Joe Keegan, *Why Can't I Fix My
Own Phone, Toaster, or Tractor?*, THE MARKUP (Oct. 20, 2020), https://themarkup.org/ask-the-
markup/2020/10/20/0-electronics-right-to-repair-ventilators-iphone) (noting Apple's authorized
service providers perform only four types of iPhone repair: display, battery, speaker, and
camera)); EFF Class 12 Reply at 8–9 (inadequacy of disc player repair alternatives); iFixit & Repair
Ass'n Class 12 Reply at 7–8 (Wi-Fi-connected thermostat manufacturer neglected to timely
address software bug "leaving many users in the cold without heat in the middle of winter"); Tr.
at 764:23–767:18 (Apr. 20, 2021) (Sheehan, iFixit; Smith, U.S. Copyright Office) (discussing
adequacy of authorized repair services).

[1184] *See* iFixit & Repair Ass'n Class 12 Initial at 18 (describing specialized repair services, not
offered by manufacturer, to repair damaged devices to recover images and videos for personal or
law enforcement purposes); iFixit & Repair Ass'n Class 12 Reply at 7.

[1185] iFixit & Repair Ass'n Class 12 Reply at 7; Tr. at 799:07–19 (Apr. 20, 2021) (Burke, Public
Knowledge) (stressing importance of device repair when there are disruptions in supply chain for
replacement devices).

[1186] 2018 Recommendation at 220.

[1187] *See* iFixit & Repair Ass'n Class 12 Initial at 14–15 (noting that the "average household
contained eleven software-enabled devices" and "one in ten households is a smart home," any of
which "may be encumbered by a TPM"); Tr. at 800:20–802:14 (Apr. 20, 2021) (Wiens, Repair
Ass'n); *see also* Soo Youn, *Ovens, Dishwashers and Washing Machines Are Breaking Down Like Never*

LOC_AR_00001787

The first section 1201 statutory factor favors an exemption for consumer devices because the proposed uses "extend the useful life of the devices by facilitating repair and restoration of device functionality," thereby increasing availability of device software for use.[1188]  iFixit and the Repair Association comment that "[s]oftware can only be used when the device it enables functions," so repairing broken devices makes "software lying dormant" available for use.[1189]  In addition, EFF asserts that an expanded repair exemption will promote the creation of additional new works, that is, "videos and writings" discussing how to repair software-enabled devices.[1190]  In opposition, ACT contends that allowing circumvention of TPMs will compromise protections on licensed software, which will "allow[] software competitors access to product codes, which is a disincentive to innovation."[1191]  DVD CCA and AACS LA suggest that the Register "look[] past the copyright in the code, and more fully consider[] the copyrights that the code is intended to protect" and how circumvention will harm investment in making new motion pictures.[1192]  But there is no indication that permitting the proposed repair-centric uses, would disincentivize creation of either device software or other creative works.[1193]

The second and third statutory factors weigh slightly in favor of an exemption, as it would remove impediments to repairing devices for educational purposes.  Proponents note that exempting repair activities will "enable hand-on-learning and research into the nature and function of devices."[1194]  DVD CCA and AACS LA view these factors as "inconsequential" to evaluating the proposals, and they assert that preserving disc players, unlike video game consoles, is not justified because disc players are inexpensive to replace.[1195]  The Register agrees that these factors have limited relevance to the proposed uses, but nonetheless concludes that repair education and commentary are

---

*Before. But There's Nobody to Fix Them.*, WASH. POST (Oct. 22, 2020), https://www.washingtonpost.com/road-to-recovery/2020/10/22/appliance-repair-services-pandemic/; Louise Matakis, *Best Buy Made These Smart Home Gadgets Dumb Again*, WIRED (Nov. 12, 2019), https://www.wired.com/story/best-buy-smart-home-dumb/.

[1188] 2018 Recommendation at 221.

[1189] iFixit & Repair Ass'n Class 12 Reply at 10.

[1190] EFF Class 12 Initial at 16.

[1191] ACT Class 12 Opp'n at 5.

[1192] DVD CCA & AACS LA Class 12 Opp'n at 16–17 (citing analysis of video game consoles in 2012 Recommendation at 51).

[1193] *See* iFixit & Repair Ass'n Class 12 Reply at 10–11; EFF Class 12 Reply at 5–6.

[1194] iFixit & Repair Ass'n Class 12 Initial at 22; *see* EFF Class 12 Initial at 16.

[1195] DVD CCA & AACS LA Class 12 Opp'n at 17–19.

LOC_AR_00001788

diminished by the current prohibition against circumvention, as users may be unwilling to risk liability to demonstrate repair-related activities.

Addressing market harm under the fourth statutory factor, ACT warns that "the potential damage to all software markets—mobile apps, enterprise software, and firmware—is significant if these exemptions are approved."[1196] To illustrate how circumvention can lead to such harm, ACT notes that pirates are circumventing TPMs even on free smartphone apps and redistributing the apps with the pirate's ad network installed on the pirated version.[1197] Offering similar piracy-related concerns, DVD CCA and AACS LA comment that "any repair exemption of independent code protecting the DVD or Blu-ray player threatens to disrupt the content protection ecosystem."[1198] EFF observes that there is no opposition to a repair exemption for the "vast majority of devices."[1199] Further, EFF notes opponents' concerns about market harm are "speculative" and have not been borne out by "evidence of increased infringement" resulting from the existing jailbreaking and repair exemptions.[1200] With respect to disc players, proponents comment that circumvention of TPMs of the players alone would not permit unauthorized access to expressive works; rather, it may expose an encryption key that could be used to make a separate circumvention of TPMs on the discs, an activity that would not be covered by the proposed exemption.[1201] As to whether the exemption would harm the market for device firmware, proponents argue there is no market for firmware independent of the device because a user of the firmware "would need to own the hardware device for it to work."[1202]

---

[1196] ACT Class 12 Opp'n at 2; *see also* ACT Class 12 Opp'n at 5–6 (noting that "[l]icensed software is part of most products with digital content embedded in them" and permitting circumvention of TPMs protecting that software undermines "investment and distribution in existing products and future innovations").

[1197] *See* Tr. at 759:06–760:06 (Apr. 20, 2021) (Reed, ACT).

[1198] DVD CCA & AACS LA Class 12 Opp'n at 19–20; *see also* Tr. at 771:24–774:08 (Apr. 20, 2021) (Amer, U.S. Copyright Office; Ayers, DVD CCA & AACS LA) (discussing how TPMs protecting firmware in disc players control access to cryptographic keys that can be used to decrypt content stored on discs); Tr. at 776:03–777:14 (Apr. 20, 2021) (Cheney, NTIA; Ayers, DVD CCA & AACS LA) (same).

[1199] EFF Class 12 Reply at 5.

[1200] *Id.* at 5–6; *see also* iFixit & Repair Ass'n Class 12 Initial at 22; Tr. at 762:10–21. (Apr. 20, 2021) (Gagliano, EFF).

[1201] *See* EFF Class 12 Reply at 6; Tr. at 763:21–764:22 (Apr. 20, 2021) (Sheehan, iFixit); *see also* Tr. at 784:18–785:17 (Apr. 20, 2021) (Gagliano, EFF) (observing that, despite Blu-ray encryption being "widely publicly available" since 2007, this has not diminished licensing and release of works on DVD and Blu-ray).

[1202] EFF Class 12 Reply at 5.

LOC_AR_00001789

The Register finds that this factor does not disfavor an exemption because consumer device firmware generally does not have independent value separate from the device. Opponents' concerns that expanding the exemption to cover devices that permit access to other expressive works—including e-readers, disc players, and Wi-Fi connected speakers—would lead to infringement have not been substantiated.[1203] Similar concerns about exemptions creating a path to piracy were raised by opponents of current exemptions for devices and media that access expressive works, but evidence of infringement attributable to exemption misuse has not materialized. Indeed, the Register is recommending these exemptions be renewed, in part, because they received no meaningful opposition reflecting changed circumstances.[1204] Moreover, as noted above, opponents' concerns largely relate to the proposal to *modify* content-oriented devices.[1205] Because the Register declines to find that device modification in general is likely to be noninfringing, these concerns should be allayed if not moot. Nonetheless, the Register concludes it is appropriate to retain the definitions of "maintenance" and "repair," as well as to require that circumvention not be "accomplished for the purpose of gaining unauthorized access to other copyrighted works." These restrictions appropriately circumscribe the proposed uses and help to ensure that the exemption is not misused as a shield for piracy.

Turning to the fifth statutory factor, participants dispute whether the Office should consider the overlap of the proposed exemption with other laws and regulations. Opponents assert that device manufacturers use TPMs to comply with obligations concerning user privacy and safety as well as to protect trade secrets and other intellectual property.[1206] Proponents argue that the Register should decline to consider non-copyright related factors and should not condition the exemption on compliance with other laws or regulations.[1207] The Office has previously stated that "it will generally decline to consider health, safety, and environmental concerns" as part of the triennial proceeding, but that "granting of an exemption provides no defense to those

---

[1203] *See* NPRM at 65,300; DVD CCA & AACS LA Class 12 Opp'n at 3–4, 7–8, 11–15.

[1204] *See* NPRM at 65,295–300 (recommending renewal of jailbreaking smartphones, tablets, and smart TVs; educational, accessibility, and other uses of motion pictures on DVD and Blu-ray discs; and repair of smartphones).

[1205] *See* DVD CCA & AACS LA Class 12 Opp'n at 9–11; Joint Creators Class 12 Opp'n at 9 (faulting the proposal to allow modification as "abstract").

[1206] *See* ACT Class 12 Opp'n at 6; EDA & AED Class 12 Opp'n at 16–17.

[1207] *See* Consumer Reports Class 12 Reply at 2; EFF Class 12 Reply at 7–8; iFixit & Repair Ass'n Class 12 Reply at 11; Tr. at 768:17–24 (Apr. 20, 2021) (Sheehan, iFixit). Proponents also note environmental benefits to repair. *See* iFixit & Repair Ass'n Class 12 Initial at 22–23; Public Knowledge & iFixit Class 12 Initial at 6.

LOC_AR_00001790

who use it as an excuse to violate other laws and regulations."[1208]  The Register adheres to that view here.

Also relating to the fifth factor, proponents observe that TPMs can have an anticompetitive effect on independent repair and self-repair.[1209]  Related to proponents' concerns, the Office takes notice of recent government initiatives to address anticompetitive conduct in the repair sector.  In May 2021, the Federal Trade Commission issued a report to Congress on repair restrictions.  The report discussed how TPMs are used by manufacturers to "impede repairs by individuals and independent repair shops" while noting that the section 117(c) repair exception and the current temporary exemptions to section 1201(a) indicate that repair restrictions are "not insurmountable."[1210]  Following the FTC Report, on July 9, the President issued an Executive Order encouraging the FTC to exercise its rulemaking authority to address "unfair anticompetitive restrictions on third-party repair or self-repair of items."[1211]  The Register concludes that these initiatives to address anticompetitive conduct provide further support for an expanded exemption for consumer device repair.

*Video game consoles.*  The Office has scrutinized previous proposals involving circumvention of TPMs on video game consoles due to a close association between console TPMs and prevention of piracy.[1212]  Opponents have raised similar concerns in this rulemaking, though the proposed exemption is narrower than past proposals because the proposed use is limited to repair of console optical drives.

---

[1208] Section 1201 Report at 126 (citing 2015 Recommendation at 11); *see* 2018 Recommendation at 5 (summarizing that the Acting Register "did not accord significant weight to such considerations" in the 2018 proceeding and noting that despite "the seriousness of these issues, they generally are best addressed through other legal frameworks and by agencies with expertise in those areas").

[1209] *See* Transtate Class 12 Pet. at 4; ACA Class 12 Initial at 2; EFF Class 12 Initial at 15; Kevin Kilkuskie Class 12 Initial; Summit Imaging Class 12 Initial at 3, 5; EFF Class 12 Reply at 5; iFixit & Repair Ass'n Class 12 Reply at 7–8, 11; Consumer Reports Class 12 Reply at 2; Tr. at 765:11–19 (Apr. 20, 2021) (Sheehan, iFixit).

[1210] FTC Report at 24–26.

[1211] Exec. Order No. 14,036 of July 9, 2021, 86 Fed. Reg. 36,987, 36,992 (July 14, 2021); *see also* 86 Fed. Reg. at 36,992 (encouraging FTC to exercise regulatory authority to address "any other unfair industry-specific practices that substantially inhibit competition."); FTC, File No. 212 3126, Resolution Directing Use of the Compulsory Process Regarding Repair Restrictions (Sept. 2, 2021); FTC, File No. 211 0160, Resolution Directing Use of the Compulsory Process Regarding Abuse of Intellectual Property (Sept. 2, 2021).

[1212] *See* 2018 Recommendation at 205–06; 2015 Recommendation at 199–201; 2012 Recommendation at 42–44, 47; Tr. at 792:22–793:02 (Apr. 20, 2021) (Williams, Joint Creators).

LOC_AR_00001791

**Section 1201 Rulemaking: Eighth Triennial Proceeding**                    October 2021
**Recommendation of the Register of Copyrights**

Proponents assert that where an optical drive is not functioning, console firmware must be accessed to remove and replace the drive.[1213]  Proponents claim this process requires circumvention of TPMs to "divorce" the old drive from and "marry" the new drive to the console motherboard.[1214]  All participants agree that the console will not function properly if console TPMs are not restored after the drive repair is executed.[1215]  While opponents question whether this can be accomplished and warn that an exposed console would facilitate video game piracy,[1216] proponents insist that restoring console TPMs is feasible.[1217]  Opponents also assert that a repair exemption is unnecessary because console manufacturers "provide easy, reliable, and affordable repair services"—both under warranty and post-warranty—as well as "comprehensive online and offline support networks that help consumers to remotely troubleshoot issues."[1218]  Proponents contend that repair services for consoles have become "substantially less available" since the 2018 rulemaking, noting for example that Microsoft has discontinued support for certain pre-2016 consoles.[1219]  Finally, opponents suggest circumvention is unnecessary

---

[1213] *See* Public Knowledge & iFixit Class 12 Initial at 2–3.

[1214] *Id.* at 3.

[1215] *See* Tr. at 755:12–756:03 (Apr. 20, 2021) (Burke, Public Knowledge); Tr. at 783:17–784:15 (Apr. 20, 2021) (Amer, U.S. Copyright Office; Williams, Joint Creators); Tr. at 787:11–16 (Apr. 20, 2021) (Wiens, Repair Ass'n).

[1216] *See* Tr. at 777:25–778:23 (Apr. 20, 2021) (Reed, ACT) (asserting that replacing and flashing an Xbox drive can facilitate playing pirated content); Tr. at 782:01–783:03 (Apr. 20, 2021) (Williams, Joint Creators); Tr. at 794:20–24 (Apr. 20, 2021) (Ayers, DVD CCA & AACS LA); ESA Class 12 *Ex Parte* Letter at 2 (Aug. 12, 2021).

[1217] Public Knowledge & iFixit Class 12 Reply at 8–9 (noting that a console must be "re-locked" to function correctly and restore access to stored device data—"effective repair *requires* that the pre-repair and post-repair level of security remain identical"); *see also* Tr. at 774:11–775:25 (Apr. 20, 2021) (Burke, Public Knowledge); Tr. at 779:04–780:10 (Apr. 20, 2021) (Wiens, Repair Ass'n) (noting "the device isn't repaired unless the copy protection is restored" which requires running "a software tool that pairs [an off-the-shelf] optical drive to the machine"); Chris Green, Comment to *Replacement Disc Drive won't play games but will play movies*, iFixit (May 3, 2011), https://www.ifixit.com/Answers/View/51505/Replacement+Disc+Drive+won't+play+games+but+will+play+movies (recommending swap of controller board from original drive to new drive).

[1218] Joint Creators Class 12 Opp'n at 3–4; *see* Tr. at 792:12–18 (Apr. 20, 2021) (Williams, Joint Creators); Tr. at 802:25–804:03 (Apr. 20, 2021) (Williams, Joint Creators).

[1219] Public Knowledge & iFixit Class 12 Initial at 2, 4–5; Public Knowledge & iFixit Class 12 Reply at 6; Tr. at 789:04–791:02 (Apr. 20, 2021) (Sheehan, iFixit; Burke, Public Knowledge) (commenting that video game repairers "have storage rooms full of hundreds of consoles that they've been unable to fix for their customers, because without the ability to replace a broken optical drive on its own, the repairs are too costly, too risky, and the parts are too hard to find"); Tr. at 798:15–799:06 (Apr. 20, 2021) (Burke, Public Knowledge); Kyle Wiens, Op-ed, *Copyright Law is Bricking*

219

LOC_AR_00001792

because users can replace both the malfunctioning optical drive and its paired motherboard with a functioning hardware combination.[1220]  Proponents argue that the cost and difficulty in locating parts makes this an inadequate alternative compared to replacing only the optical drive.[1221]

The record indicates that circumvention is necessary to repair optical drives and that restoration of the same TPMs, including copy controls and authentication mechanisms, is possible and necessary to restore console functionality in accordance with its original or authorized specifications.  Unlike in previous rulemakings, the proposed exemption is limited to a specific, recurring hardware issue.  In addition, compared to 2018, proponents here have identified some consoles for which manufacturer repair services are neither available nor adequate.[1222]  For these reasons, the Register concludes that there are potential adverse effects to consider under the section 1201 statutory factors.

Regarding the first statutory factor, proponents assert that the inability to execute hardware repairs diminishes the availability for use of the console firmware.[1223]  Looking beyond the firmware to the video games, opponents assert that "[u]nauthorized repair will undermine the security of consoles, thereby threatening the ecosystems that consumers currently enjoy" and potentially harming the availability of games.[1224]  Proponents respond that the availability of video games is also adversely affected by an unrepaired console, and that an exemption for repair "will give users enduring, lawful access to content that they have legally purchased and licensed from creators, while also enabling them to legally purchase and play new content on their repaired console."[1225]  The Register agrees with proponents that this factor favors an exemption because, provided that all TPMs are restored, console repair is more likely to increase availability of works for use than it is to deter video game developers from creating new works.

Considering the second and third statutory factors together, while they are of limited relevance to the proposal, the Register finds that they weigh slightly in favor of an exemption, as the proposed uses may benefit console preservation and, to a lesser extent, education about consoles.  Opponents argue that "repair of consoles is not in

---

*Your Game Console. Time to Fix That*, Ars Technica (Dec. 12, 2020), https://arstechnica.com/tech-policy/2020/12/copyright-law-is-bricking-your-game-console-time-to-fix-that/.

[1220] *See* Joint Creators Class 12 Opp'n at 5 & n.14; ESA Class 12 *Ex Parte* Letter at 2 (Aug. 12, 2021).

[1221] *See* Tr. at 789:04–791:02 (Apr. 20, 2021) (Sheehan, iFixit; Burke, Public Knowledge).

[1222] *Compare* 2018 Recommendation at 219–20, *with* Public Knowledge & iFixit Class 12 Initial at 2–5.

[1223] Public Knowledge & iFixit Class 12 Initial at 5.

[1224] Joint Creators Class 12 Opp'n at 6.

[1225] Public Knowledge & iFixit Class 12 Reply at 9; Tr. at 787:24–788:16 (Apr. 20, 2021) (Wiens, Repair Ass'n); Tr. at 953:24–954:04 (Apr. 20, 2021) (Gordon-Byrne, Repair Ass'n).

LOC_AR_00001793

furtherance of archiving, preserving, or educating people about video games," is "frequently a commercial enterprise," does not provide commentary on video games, and that any research only relates to repair, "not any broader topic."[1226]  The Register agrees that the connection between repair and these other uses is tenuous, but nonetheless agrees with proponents that repair may provide some educational value about how optical drives function within gaming consoles.[1227]

On the fourth statutory factor, opponents assert there is no reason for the Register to deviate from previous rulemakings where "console-specific concerns about potential market harm" weighed against exemptions.[1228]  As one example, opponents point to a recent criminal indictment against a hacking group that created circumvention tools for certain consoles, which allowed users to access libraries of unauthorized copies of video games.[1229]  Proponents agree that concerns about video game piracy are valid, but argue that opponents have made no showing that permitting repair of console optical drives, specifically, would increase piracy.[1230]  Moreover, proponents assert that there is no independent market for console firmware and that repair of consoles will actually increase the market for games played using discontinued or older consoles.[1231]

The Register appreciates opponents' legitimate concerns over video game piracy, but it is unclear how the targeted repair activities proposed here would further such activity. Indeed, the criminal piracy cited by opponents appears to involve console modification, which is outside the scope of the proposal.[1232]  Overall, this factor does not disfavor an exemption because restoration of TPMs following repair diminishes the piracy risk,

---

[1226] Joint Creators Class 12 Opp'n at 6.

[1227] Public Knowledge & iFixit Class 12 Initial at 5; Public Knowledge & iFixit Class 12 Reply at 9–10.

[1228] Joint Creators Class 12 Opp'n at 6–7 (quoting 2018 Recommendation at 206); *see* Tr. at 747:20–748:03, 749:18–25 (Apr. 20, 2021) (Williams, Joint Creators); Tr. at 793:03–20 (Apr. 20, 2021) (Williams, Joint Creators) (commenting that limiting language does not address "big picture concerns that the 1201 statute really set a marketplace expectation for typical consumers" that, when altered, results in market harm).

[1229] *See* Joint Creators Class 12 Opp'n at 3.

[1230] Public Knowledge & iFixit Class 12 Reply at 9–10; Tr. at 755:12–756:03 (Apr. 20, 2021) (Burke, Public Knowledge); Tr. at 953:20–953:24 (Apr. 20, 2021) (Gordon-Byrne, Repair Ass'n).

[1231] Public Knowledge & iFixit Class 12 Initial at 6; Public Knowledge & iFixit Class 12 Reply at 10.

[1232] *See* Indictment, U.S. v. Louarn, No. CR20-127 (Aug. 20, 2020), ECF 1 (outlining criminal piracy allegations involving modification of consoles using USB ports and MicroSD ports, not consoles with optical drives); Matthew Gault, *Nintendo Threatens Repair Shop for Advertising Switch Mod Chip Installs*, Vice Motherboard (June 18, 2020), https://www.vice.com/en/article/7kpxbb/nintendo-threatens-repair-shop-for-advertising-switch-mod-chip-installs.

221

LOC_AR_00001794

console firmware has little if any independent value outside of the device, and restoring more consoles to functionality may increase the potential market for video games.

The Register finds no additional factors raised by participants about repair of video game consoles relevant to her determination.

After weighing the statutory factors, the Register concludes that the prohibition on circumvention of TPMs is causing, or is likely to cause, adverse effects on the noninfringing diagnosis, maintenance, and repair of software-enabled devices designed primarily for use by consumers. Carrying forward the language of the existing exemption, the Register concludes the definitions of "maintenance" and "repair" appropriately focus these activities on the restoration of device functionality, including restoring TPMs that serve other beneficial purposes such as protecting user privacy, security, and safety. In addition, the Register concludes that the distinct record for repair of video game consoles, and the unique concerns raised by circumvention of TPMs on those devices, warrant a more limited exemption.

### ii. Vehicles and Marine Vessels

As noted above, the Register has determined that the exempt activities for land vehicles—diagnosis, repair, and lawful modification of a vehicle function—are also likely to be noninfringing for marine vessel. The Register proceeds to evaluate whether the prohibition on circumvention is adversely affecting these noninfringing uses for marine vessels. In addition, she considers whether the limitation in the current vehicle exemption that requires users to comply with other laws is adversely affecting users' ability to engage in noninfringing uses.[1233] For the following reasons, the Register concludes the vehicle exemption should be expanded to include marine vessels and that the language requiring compliance with other laws should be removed.

Proponents assert that users of marine vessels are adversely affected in the same manner as users of land vehicles, in particular, tractor owners. iFixit and the Repair Association explain that boat dealers that service these marine vessels "are often located far from where the vehicles are used and the manufacturers will not sell their diagnostic software to the owners themselves."[1234] Consequently, at least some vessel users do not have

---

[1233] Some opposition comments also propose changes to the existing vehicle exemption that would restrict its scope. *See* EDA & AED Class 12 Opp'n at 7–9. The Register declines to consider changes that would limit the scope of the proposed exemption, which should have been submitted in opposition to the renewal petitions. To the extent that comments are relevant to proponents' request to remove the Illegality Limitation, the Register considers them here.

[1234] iFixit & Repair Ass'n Class 12 Initial at 8; *see also* AFBF Class 12 *Ex Parte* Letter at 2 (Aug. 3, 2021) (noting that "'farming' may include crop cultivation in a marine environment through water-based transport and machinery").

LOC_AR_00001795

adequate access to repair options and diagnostic information.[1235]  Proponents further observe that the same manufacturers of land vehicle engines also manufacture marine vessel engines, so that excluding marine vessels from the exemption is "a distinction without a difference."[1236]  In support, SEMA notes that it is "aware of an engine tuning product that is legal under the DMCA exemption for land vehicles but has been challenged for its application in boats given the current Class 12 limitation."[1237]  No opposition comments address or object to extending the exemption for land vehicle repair to marine vessels.  Because the Register credits the similarities between marine vessels and land vehicles, and finds no reason to deviate from the adverse effects analysis in the previous recommendations for land vehicles,[1238] she concludes that the current prohibition against circumvention is or is likely to adversely affect diagnosis, repair, and lawful modification of a vessel function for marine vessels.

Turning to the requirement that users comply with other laws and regulations when circumventing TPMs to repair vehicles, iFixit and the Repair Association assert that any exemption "should not be conditioned on compliance with non-copyright-related laws and regulations."[1239]  Opponents respond that proponents' arguments are the same that the Office rejected in previous rulemakings, and that proponents fail to provide evidence of changed circumstances that warrant reconsideration.[1240]

---

[1235] *See* iFixit & Repair Ass'n Class 12 Initial at 9, 20 (noting that "[f]requently, the electronic engine installed in ships does not have a diagnostic gauge or display mounted in the control panel" and "[t]his real-time engine diagnostic information is essential for engine operators").

[1236] *Id.* at 9.

[1237] SEMA Class 12 Reply at 1.

[1238] *See* 2018 Recommendation at 212–16; 2015 Recommendation at 240–44, 248.

[1239] iFixit & Repair Ass'n Class 12 Pet. at 3 ("The DMCA is not a catch-all extra punishment for violation of EPA regulations or breach of contract, and an exemption . . . does not immunize people from punishment for violating other laws and regulations."); *see also* ACA Class 12 Initial at 1 ("[T]he exemption has never been shown . . . to interfere with a vehicle's safety and environmental controls."); Tr. at 836:02–15 (Apr. 20, 2021) (Sheehan, iFixit) (suggesting the limitation "compounds liability").

[1240] *See* Auto Innovators Class 12 Opp'n at 6–8; Tr. at 750:15–751:11, 839:14–840:09 (Apr. 20, 2021) (Rosenbaum, Auto Innovators).  Citing the 2018 Recommendation, Auto Innovators offers the following reasons to justify retaining the limiting language: (1) the limitation is not impeding legitimate vehicle repair as "other laws" still apply regardless of the exemption; (2) proponents have not shown "any incremental impact on noninfringing repair activities" from DMCA enforcement of this limitation; (3) the limitation is consistent with language found in other permanent and temporary exemptions; and (4) there is concern that removing the limitation could "will cause confusion and mislead automobile owners regarding whether they must comply with other laws."  *See* Auto Innovators Class 12 Opp'n at 8–9.

223

LOC_AR_00001796

The Register has received requests to remove similar references to other laws from the exemptions pertaining to medical device data (Class 9) and security research (Class 13). In those classes, the Office received comments from the FDA and DOJ, the federal agencies tasked with enforcement of the relevant regulatory schemes. Those offices advised the Office that they would not object to removal of the challenged language.[1241] They concluded that it is unnecessary to condition eligibility for the exemption on compliance with other laws, as the latter will continue to apply regardless of whether the user is exempted from liability under section 1201. The Register agrees with those views, and accordingly has recommended removing the "other laws" language from Classes 9 and 13, and replacing it with a clarifying statement that eligibility for the exemption is not a safe harbor or defense to liability under other applicable laws. The Register concludes that the same reasoning is applicable in this class, and therefore is recommending a similar change to the regulatory language here.

### iii. Medical Devices and Systems

Finally, the Register considers whether the prohibition against circumventing TPMs on medical devices and systems to access computer programs and data files, including equipment manuals, is adversely affecting the repair of those devices and systems. Proponents describe the use of various TPMs as an effort by OEMs "to try to prevent or hinder access to the software tools and other programs and data files in which they claim copyright needed for the diagnosis, repair, and maintenance of medical devices."[1242] To illustrate the adverse effects on repair, proponents point to instances where medical facilities have been unable to use equipment due to inadequate repair options, particularly during the COVID-19 pandemic.[1243] They assert that where users,

---

[1241] Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office at 2 (Aug. 13, 2021); DOJ Class 13 Reply at 5.

[1242] Summit Imaging Class 12 Pet. at 3; *see* Transtate Class 12 Pet. at 2–3 (noting that OEMs use "TPMs such as encryption, embedded software, and challenge-response mechanisms, access codes, passwords, keys, or digital signatures" to restrict access to device software and "manuals and technical data . . . being provided via electronic media, sometimes as data files installed on the medical systems or devices"); Tr. at 949:12–950:10 (Apr. 21, 2021) (O'Reilly, U.S. PIRG).

[1243] *See* Summit Imaging Class 12 Initial at 3–4; Transtate Class 12 Initial at 11 & Ex. 21 (citing Lauren Goode, *Right-to-Repair Groups Fire Shots at Medical Device Manufacturers*, WIRED (May 19, 2020), https://www.wired.com/story/right-to-repair-medical-equipment-ifixit/); *see also* Joe Keegan, *Why Can't I Fix My Own Phone, Toaster, or Tractor?*, THE MARKUP (Oct. 20, 2020), https://themarkup.org/ask-the-markup/2020/10/20/0-electronics-right-to-repair-ventilators-iphone (reporting on a biomedical technician unable to repair ventilators in the Strategic National Stockpile); Adi Robertson, *Right-to-Repair Advocates Say Hospitals Need New Rules to Keep Equipment Working*, THE VERGE (July 9, 2020), https://www.theverge.com/2020/7/9/21318551/right-

LOC_AR_00001797

specifically ISOs, have engaged in circumvention to repair medical devices and systems, manufacturers have alleged violations of section 1201.[1244]

Opponents assert that adequate alternatives to circumvention nullify the basis for an exemption. AdvaMed comments that "[r]obust service and repair offerings already exist through OEMs and authorized ISOs" and "[o]wner or lessee users of medical devices can also have their staff become authorized . . . through training programs and undertaking certain [FDA reporting] obligations."[1245] Similarly, Philips comments that it "provides ISOs with access to . . . materials that allow them to setup and service Philips' medical imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities."[1246] Proponents acknowledge that certain OEMs provide equipment owners and ISOs with some access to software and servicing materials, but contend that this access is often not sufficient to diagnose, maintain, and repair the equipment.[1247] For example, Transtate comments that "basic" repair "documentation and software is not available on all medical systems," and even where it is provided, "many systems" are not properly configured or "require[] the purchase of thousands of dollars in hardware per engineer" to service the equipment.[1248] Moreover, proponents assert authorized repair options are inadequate to provide timely, cost-effective service, which can be essential to avoid negative patient outcomes.[1249] In

---

to-repair-hospital-equipment-rules-third-party-pirg-survey; U.S. PIRG, HOSPITAL REPAIR RESTRICTIONS (July 2020), https://uspirgedfund.org/reports/usp/hospital-repair-restrictions.

[1244] *See* Summit Class 12 Pet. at 2; Transtate Class 12 Pet. at 4; Summit Imaging Class 12 Initial at 2; Tr. at 806:09–808:13 (Apr. 20, 2021) (Kerwin, IAMERS); Tr. at 952:05–16 (Apr. 21, 2021) (Smith, U.S. Copyright Office; O'Reilly, U.S. PIRG).

[1245] AdvaMed Class 12 Opp'n at 2, 10–11; *see also* MITA Class 12 Opp'n at 3; Tr. at 825:06–827:22 (Apr. 20, 2021) (Reed, ACT) (confirming that TPMs limit access to some device manuals to authorized servicers).

[1246] Philips Class 12 Opp'n at 5–6 & Ex. A (decl. of Jacqueline Dickson ¶¶ 2–11) (describing Philips' customer service intellectual property policies, including the access levels for different types of authorized users).

[1247] *See* Summit Class 12 Initial at 3; Transtate Class 12 Initial at 8, 14; Transtate Class 12 Reply at 4–5.

[1248] Transtate Class 12 Reply at 4–5, 8 n.24; *see also* Summit Imaging Class 12 Initial at 3; Tr. at 812:14–813:03 (Apr. 20, 2021) (Inacker, Transtate); Tr. at 948:07–21 (Reynolds, Colo. Ass'n of Biomed. Equip. Technicians); Isaac Scher, *Hospitals Need Ventilators to Keep Severe COVID-19 Patients Alive. They Might Not Be Able to Fix Them Without Paying the Manufacturer $7,000 per Technician.*, BUS. INSIDER (June 3, 2020), https://www.businessinsider.com/ventilator-manufacturers-dont-let-hospitals-fix-coronavirus-right-to-repair-2020-5.

[1249] *See* Summit Imaging Class 12 Initial at 3–4 (commenting that because medical providers "cannot troubleshoot and conduct repairs promptly" due to a lack of access to "software and files

225

LOC_AR_00001798

addition, proponents comment that manufacturers in some cases no longer provide repair support for older equipment that can still be used by medical facilities to provide treatment.[1250]

Relevant to the first section 1201 statutory factor, proponents assert that the prohibition on circumventing TPMs restricts the availability for use of medical device software and manuals in which OEMs are claiming copyright.[1251] Opponents respond that "medical device software is broadly licensed and available" to providers, although TPMs may limit "what aspects of the device software may be viewed and copied."[1252] Philips comments that it makes available all the copyrighted material "needed to permit basic repair and servicing" of its devices, and asserts that the "copyright-protected options and features" that proponents seek are "beyond essential repair and servicing."[1253] Further, it asserts that copyrighted software on older devices that have received an "End of Service" designation should not be accessible for the proposed uses because "the equipment is no longer safe and effective to operate."[1254] While the Register acknowledges opponents' safety concerns and will address those below, she concludes that this factor favors an exemption because the prohibition on circumvention makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair.

Regarding the second and third statutory factors, MITA asserts that the "commercial nature" of petitioners' interest runs contrary to the nonprofit nature of the purposes outlined in these factors.[1255] Although repair of medical devices and systems that are no longer supported by OEMs arguably preserves the availability for use of the

---

needed to service their equipment," repair is delayed and medical equipment remains out of service, leading to "negative patient outcomes"—an issue exacerbated by the COVID-19 pandemic); Tr. at 805:18–806:06 (Apr. 20, 2021) (Kerwin, IAMERS) (commenting that rural and regional hospital facilities are underserved by OEMs in terms of cost and timeliness of repair); Tr. at 807:23–808:04 (Apr. 20, 2021) (Kerwin, IAMERS) (observing a price differential of $150-200 per hour for ISO repair compared to $600-800 per hour for OEM repair with a four-hour minimum); Tr. at 818:13–819:01 (Apr. 20, 2021) (Sheehan, iFixit) (noting delays in servicing wheelchairs and ventilators).

[1250] *See* Summit Imaging Class 12 Initial at 2; Transtate Class 12 Initial at 6; Transtate Class 12 Reply at 5.

[1251] Summit Imaging Class 12 Initial at 2–3; Transtate Class 12 Initial at 2, 4–5; Transtate Class 12 Reply at 4–5.

[1252] MITA Class 12 Opp'n at 3.

[1253] Philips Class 12 Opp'n at 15.

[1254] *Id.* at 15–16.

[1255] MITA Class 12 Opp'n at 3.

226

LOC_AR_00001799

equipment's software and servicing materials, the Register finds these factors not especially relevant to the determination.

On the fourth factor, opponents warn that permitting circumvention "would severely harm" the market for and value of medical equipment software because it would give "full access" to entities requesting it "for purely commercial purposes."[1256] Specifically, they contend that allowing circumvention "would expose intellectual property, including valuable know-how in addition to the copyrighted information, to competitors and the general public," who could "view and replicate valuable innovations."[1257] AdvaMed also expresses "concerns about accessing and activating software modules that are purchased or licensed separately following an additional purchase or subscription model," noting that unauthorized access would harm the value of those works.[1258] Transtate responds that opponents' focus on ISOs' commercial motives is "misplaced" because the exemption would apply only to "lawful possessors of the medical devices and the third party servicers performing services requested by the lawful possessors."[1259]

The Register concludes that the narrow proposed uses and additional limitations on the scope of these activities limit any potential market harm. To the extent a user is accessing the software and manuals to diagnose, maintain, or repair the device or system, those uses support rather than displace the embedded computer programs.[1260] As with other software-enabled devices, the functional software and manuals for medical devices and systems have no independent value separate from the equipment they operate or explain.[1261] Further, to appropriately circumscribe the proposed uses, the Register determines that the definitions of "maintenance" and "repair" used in the current exemption for devices should likewise apply to the proposal for medical devices and systems. This factor therefore does not disfavor an exemption.

Under the fifth statutory factor, the Librarian has discretion to consider additional factors she deems appropriate. Proponents argue that the public interest in deterring anticompetitive behavior favors the requested exemption. They assert that medical equipment repair "is dominated by OEMs who use . . . TPMs to hinder competition by

---

[1256] Philips Class 12 Opp'n at 17.

[1257] MITA Class 12 Opp'n at 3

[1258] AdvaMed Class 12 Opp'n at 11.

[1259] Transtate Class 12 Reply at 9

[1260] *See* 2018 Recommendation at 203 (quoting Software Study at 40).

[1261] Indeed, one opponent acknowledges that "there is no independent market for the medical imaging device software beyond the devices themselves," though also comments that the market for medical devices and integrated software together will be harmed by "loss of public confidence in the safety and efficacy of medical imaging." MITA Class 12 Opp'n at 4.

227

LOC_AR_00001800

ISOs."[1262]  Proponents argue that OEMs charge higher prices and that medical service providers must spend more to service their equipment than if they were able to engage in self-repair or have an ISO perform repairs on their behalf.[1263]  ISOs have asserted antitrust claims in litigation against OEMs, with mixed results.[1264]  Opponents respond that the rulemaking process should not be used as "a means of regulating competitive markets or promoting commercial outcomes."[1265]  Consistent with the discussion above, the Register concludes that an exemption to facilitate repair of medical devices and systems could help to address the broader competitive concerns recently highlighted by the Executive Branch.[1266]  This factor provides further support for the proposed exemption.

Opponents assert that the potential consequences of unauthorized circumvention on patient safety should factor into if not decisively tilt the analysis against an exemption. Opponents comment that "unauthorized ISOs" present an acute risk to patient safety because, unlike OEMs, these organizations are not obligated to adhere to FDA Quality System Regulation (QSR) requirements.[1267]  AdvaMed comments that it is "aware of at least 281 adverse events . . . from 2012 to 2017 associated with third party servicing."[1268]  Opponents further warn that some ISOs cross the line from "servicing" into "remanufacturing,"[1269] which the FDA has said "can have a significant impact on the

---

[1262] Transtate Class 12 Pet. at 4; *see* Summit Class 12 Initial at 3; Transtate Class 12 Reply at 6.

[1263] Summit Imaging Class 12 Initial at 3; Transtate Class 12 Pet. at 4; Transtate Class 12 Initial at 10 & Ex. 18 (Medical Equipment Maintenance Market Report); Tr. at 806:15–807:10 (Apr. 20, 2021) (Kerwin, IAMERS); *see also* FTC Report at 40.

[1264] *Compare Philips N. Am., LLC v. Summit Imaging Inc.*, Case No. C19-1745JLR, 2020 WL 6741966, at *6-7 (W.D. Wash. Nov. 16, 2020) (dismissing ISO antitrust counterclaims against OEM for monopolization and attempted monopolization, including theories based on refusal to deal and essential facilities), *with* Jury Verdict, Red Lion Medical Safety Inc. v. GE Co. Inc., 2:15-cv-00308 (E.D. Tex. Apr. 26, 2017), ECF No. 165 (jury verdict finding OEM liable for anticompetitive conduct relating to servicing of anesthesia machines).

[1265] *See, e.g.*, Philips Class 12 Opp'n at 7–8.

[1266] *See* Exec. Order No. 14,036 of July 9, 2021, 86 Fed. Reg. 36987, 36992 (July 14, 2021); FTC Report at 40.

[1267] *See* AdvaMed Class 12 Opp'n at 10–12; MITA Class 12 Opp'n at 5–7; Philips Class 12 Opp'n at 17–19; Tr. at 813:25–815:04 (Apr. 20, 2021) (Reed, ACT) (noting that cost savings from ISO repair can be attributed to ISOs not having to comply with FDA QSR requirements).

[1268] AdvaMed Class 12 Opp'n at 12–15 (providing illustrative examples of unauthorized servicing); Tr. at 813:18–24 (Apr. 20, 2021) (Reed, ACT) (commenting that 1% of adverse incidents attributable to ISO repair from the FDA's 2017 Medical Device Review ("MDR") amounted to "40 deaths, 294 serious injury, 38,50021 patients and/or operators exposed to potential harm").

[1269] *See* AdvaMed Class 12 Opp'n at 13; MITA Class 12 Opp'n at 3–5, 19–36.

LOC_AR_00001801

safety and effectiveness of the device."[1270]  Opponents also assert that expanding access to medical devices and systems has the potential to introduce security vulnerabilities to the device and any facility network to which the device is connected.[1271]

As noted above, the Register generally does not consider other regulatory schemes as part of the adverse effects analysis because the focus of this proceeding is on copyright-related considerations.  The Register notes, however, that the FDA submitted comments in this proceeding highlighting a 2018 report in which it "determined that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing" and "did not justify imposing additional regulatory requirements on ISOs."[1272]  With respect to opponents' concern about device "remanufacturing," the Register again notes that "modification" is not part of the proposed exemption for medical devices; rather, the exemption requires the device to be restored to normal functionality and no changes be made to the firmware.[1273] Accordingly, opponents' concerns, while significant, do not provide a basis for denying the requested exemption.

After weighing the statutory factors, the Register concludes that the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems.

---

[1270] U.S. FOOD AND DRUG ADMIN., FDA REPORT ON THE QUALITY, SAFETY, AND EFFECTIVENESS OF SERVICING OF MEDICAL DEVICES 24 (May 2018), https://www.fda.gov/media/113431/download ("2018 FDA Report").

[1271] *See* AdvaMed Class 12 Opp'n at 5–6; MITA Class 12 Opp'n at 5; Philips Class 12 Opp'n at 2, 18–19.

[1272] Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office at 3 (Aug. 13, 2021) (citing 2018 FDA Report at 23); *see also id.* at 3 (Aug. 13, 2021) (citing U.S. FOOD & DRUG ADMIN., STRENGTHENING CYBERSECURITY PRACTICES ASSOCIATED WITH SERVICING OF MEDICAL DEVICES: CHALLENGES AND OPPORTUNITIES (June 2021), https://www.fda.gov/media/150144/download) (noting the FDA's views that "[ISOs] may be well positioned to help identify and address security vulnerabilities" and that circumvention for repair-related purposes would not "necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity").

[1273] *See* Tr. at 819:10–822:07 (Apr. 20, 2021) (Bartelt, U.S. Copyright Office; Wiens, Repair Ass'n; Kerwin, IAMERS) (discussing how medical devices would be restored to compliance with OEM specifications); Tr. at 828:04–07 (Apr. 20, 2021) (Inacker, Transtate) ("[F]or a medical device, after TPM circumvention, the data remains on the device.  The software remains intact.  The device is left in its original state after the repair is complete.").

229

LOC_AR_00001802

### iv. Third-party assistance and tools

Finally, a number of participants submitted comments addressing issues with third-party assistance and access to tools in furtherance of the proposed uses.[1274] These issues have been addressed in previous recommendations, the NPRM to this rulemaking, and Office policy studies.[1275] Because the legal circumstances have not materially changed, the Register adheres to the views expressed in the 2018 Recommendation and reiterated in the NPRM.[1276] Consistent with these views, and cognizant that the Librarian's authority under the statute to grant exemptions to the anti-circumvention provisions does not extend to the anti-trafficking provisions, the Register does not recommend modifying any language relating to third-party assistance or provision of tools.[1277]

### 3. NTIA Comments

NTIA recommends expanding the current exemptions for vehicles and certain devices by merging them into a single exemption that would permit circumvention "for the diagnosis, maintenance, and repair of all software-enabled devices, machines, and systems."[1278] In addition, NTIA recommends allowing "lawful modification that is necessary for a repair or maintenance" and "modifications of software regarding the functionality of a device," machine, or system.[1279] Concerning the scope of the class, NTIA observes that "in contrast to the record developed in 2018, . . . the current record reflects that all such devices share critical features with regard to repair."[1280] NTIA

---

[1274] *See* FSF Class 12 Initial at 1–2; iFixit & Repair Ass'n Class 12 Initial at 17–18; Summit Imaging Class 12 Initial at 4, 7; Transtate Class 12 Initial at 20–21; ACT Class 12 Opp'n at 6; AdvaMed Class 12 Opp'n at 12; Auto Innovators Class 12 Opp'n at 2–6; EDA & AED Class 12 Opp'n at 6–7, 12; Joint Creators Class 12 Opp'n at 4 n.9; Philips Class 12 Opp'n at 10, 15, 19 n.75; ACA Class 12 Reply at 1–3; AFBF Class 12 Reply at 4–6; EFF Class 12 Reply at 9–11; iFixit & Repair Ass'n Class 12 Reply at 9–10; MEMA Class 12 Reply at 2–7; Transtate Class 12 Reply at 7–9; Tr. at 769:11–24, 810:02–22, 831:22–832:16, 845:01–12 (Apr. 20, 2021) (McHargue, AFBF); Tr. at 840:19–842:19 (Apr. 20, 2021) (Rosenbaum, Auto Innovators); Tr. at 856:23–846:04 (Apr. 20, 2021) (Sheehan, iFixit); Tr. at 848:05–13 (Apr. 20, 2021) (Williams, Joint Creators); Tr. at 937:02–938:14 (Apr. 21, 2021) (Cade, Neb. Farm Bureau).

[1275] *See* NPRM at 65,299–300; 2018 Recommendation at 222–26; 2015 Recommendation at 239, 246–47; Section 1201 Report at 52–62; Software Study at 32–33, 36–38.

[1276] *See* NPRM at 65,300; 2018 Recommendation at 222–26.

[1277] The Office has expressed support for a statutory change to facilitate the provision of assistance to exemption beneficiaries in appropriate circumstances. *See* Section 1201 Report at 59–60.

[1278] NTIA Letter at 76, 84.

[1279] *Id.* at 76, 84.

[1280] *Id.* at 77; *see also id.* at 79 (noting examples provided by proponents of TPMs "curtailing repair or modification by entities other than the OEM or its authorized agents").

230

LOC_AR_00001803

concludes that the proposed uses of these devices are fair uses as well as noninfringing under sections 117(a) and 117(c).[1281]  It finds opponents' piracy-related arguments unpersuasive because the exemption would not permit "unlawfully accessing or copying specific content."[1282]  For similar reasons, NTIA suggests that the exemption should not make compliance with other applicable laws a condition of the exemption and "instead recommends adding an appropriate notice in the regulatory text."[1283]

The Register largely agrees with NTIA's support for expanding the exemptions to cover a broader swath of software-enabled devices and systems.  But, as noted above, while many devices share commonalities, the Register observes distinctions in the present record among the various proposals and the types of devices, which warrant separate analyses and determinations.  In addition, for the reasons explained above, the Register does not conclude that "modification" as a general matter is noninfringing.

Addressing third party assistance, NTIA recommends that the exemption expressly apply to both the device "owner" as well as "a third party authorized by the owner."[1284]  In support, NTIA observes that this change would address harm arising from anticompetitive restrictions, as addressed in the Executive Order and FTC report discussed above.[1285]  As noted, the Register finds that these Executive Branch initiatives constitute an additional factor favoring an exemption for repair-related activities.  The Register, however, declines to recommend express language regarding third-party assistance because the legal circumstances concerning "whether vehicle or other repair services may run afoul of the anti-trafficking provisions when engaging in circumvention on behalf of customers" have not materially changed since 2018.[1286]

### 4.  Conclusion and Recommendation

After thorough consideration, the Office recommends expanding the two current exemptions for vehicle and device repair, and adding a third exemption specifically for medical device and system repair.

First, in recognition of the commonalities among uses and users across a diversity of software-enabled devices, the Register recommends expanding the exemption for certain

---

[1281] *See* NTIA Letter at 80–82.

[1282] *Id.* at 83–84.

[1283] *Id.* at 82–84 (finding opponents' safety and privacy concerns unpersuasive).

[1284] *Id.* at 84.

[1285] *Id.* at 78 (citing Exec. Order No. 14,036 of July 9, 2021, 86 Fed. Reg. 36987 (July 14, 2021); FTC Report at 3, 6, 40); *see also id.* at 83 (finding opponents' safety concerns about third-party repair unpersuasive).

[1286] 2018 Recommendation at 225.

LOC_AR_00001804

categories of devices to cover diagnosis, maintenance, and repair of any lawfully acquired device that is primarily designed for use by consumers. To address opponents' concerns that the exemption not be misused to gain unauthorized access to other copyrighted works beyond the device firmware, the Register carries forward the requirement that the circumvention is "not accomplished for the purpose of gaining access to other copyrighted works," as well as the existing definitions of "maintenance" and "repair."

With respect to video game consoles, the recommended exemption is limited to one specific type of repair—namely, repair of optical drives. To be clear, if a console does not contain an optical drive, it is not eligible under this exemption; and if circumvention is done to repair any part of a console other than the optical drive, that activity too falls outside the scope of the exemption. Narrowing the exemption for consoles in this manner appropriately balances the specific adverse effects experienced by users against opponents' legitimate concerns over links between console circumvention and piracy.

Second, the Register recommends that the existing exemption for land vehicles be expanded to cover marine vessels.

Finally, the Register recommends a new exemption allowing circumvention of TPMs restricting access to firmware and servicing materials on medical devices and systems for the purposes of diagnosis, maintenance, and repair. Like the consumer device exemption, the Register incorporates the definitions of "maintenance" and "repair" from section 117 into the proposal.

Accordingly, the Register recommends that the Librarian designate the following classes:

> **(1) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle or vessel function, where such circumvention is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency.**

> **(2) Computer programs that are contained in and control the functioning of a lawfully acquired device that is primarily designed for use by consumers, when circumvention is a necessary step to allow the diagnosis, maintenance,**

LOC_AR_00001805

or repair of such a device, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(14):

> (i) The "maintenance" of a device is the servicing of the device in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device; and

> (ii) The "repair" of a device is the restoring of the device to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device. For video game consoles, "repair" is limited to repair or replacement of a console's optical drive and requires restoring any technological protection measures that were circumvented or disabled.

(3) Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. For purposes of this paragraph (b)(15):

> (i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

> (ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

233

JA178

LOC_AR_00001806



UNITED STATES COPYRIGHT OFFICE

# Petition for New Exemption Under 17 U.S.C. § 1201

8th Triennial Rulemaking

Please submit a separate petition for each proposed exemption.

**note:** Use this form if you are seeking to engage in activities not currently permitted by an existing exemption. If you are seeking to engage in activities that are permitted by a current exemption, instead of submitting this form, you may submit a petition to renew that exemption using the form available at **https://www.copyright.gov/1201/2021/renewal-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit both a petition to renew the current exemption, and, separately, a petition for a new exemption using this form that identifies the current exemption, and addresses only those issues relevant to the proposed expansion of that exemption.

## Item A. Petitioner and Contact Information

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity proposing the exemption.

---

Petitioner:
Summit Imaging, Inc.
15000 Woodinville-Redmond Rd. NE
Suite B800
Woodinville, WA 98072

Petitioner may be contacted through its counsel:
Marc Levy
Seed IP Law Group, LLP
701 Fifth Ave., Suite 5400
Seattle, WA 98104
(206) 684-4811
marcl@seedip.com

---

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

LOC_AR_00002356

Iᴅᴇᴀ B. Dᴇꜱᴄʀɪᴘᴛɪᴏɴ ᴏꜰ Pʀᴏᴘᴏꜱᴇᴅ Nᴇᴡ Exᴇᴍᴘᴛɪᴏɴ

Provide a brief statement explaining the nature of the proposed new or expanded exemption. The information that would be most helpful to the Office includes the following, to the extent relevant: (1) the types of copyrighted works that need to be accessed; (2) the physical media or devices on which the works are stored or the services through which the works are accessed; (3) the purposes for which the works need to be accessed; (4) the types of users who want access; and (5) the barriers that currently exist or which are likely to exist in the near future preventing these users from obtaining access to the relevant copyrighted works.

Petitioners need not propose precise regulatory language or fully define the contours of an exemption class. Rather, a short, plain statement describing the nature of the activities the petitioners wish to engage in will be sufficient, as proponents will have the opportunity to further refine or expound upon their initial petitions during later phases of the rulemaking. The Office anticipates that in many cases petitioners will be able to adequately describe in plain terms the relevant information in a few sentences, or even a single sentence, as with the examples below.

---

A. Proposed New Exemption

Petitioner requests an exemption under 17 U.S.C. § 1201(a)(1) to allow circumvention of technological measures applied to software programs and data files that are contained in and control the functioning of a computer-controlled medical device for the purpose of diagnosis, maintenance, or repair of such a device.

B. Introduction

Manufacturers of computer-controlled medical devices such as imaging equipment and ventilators typically employ technological measures (or what are alleged to be technological measures) to prevent owners of such devices or their chosen service providers from being able to diagnose, maintain, and repair them. Unless hospitals or other owners of medical devices purchase expensive service contracts from the manufacturer, they may be unable to repair their own equipment (or have it repaired by an independent service provider) without risking a lawsuit against them or their service provider for allegedly violating the anti-circumvention provisions of the Digital Millennium Copyright Act ("DMCA"). The threat of such litigation is real as petitioner itself along with a number of other independent services organizations are currently defending themselves against lawsuits by original equipment manufacturers ("OEMs") alleging that they have violated the DMCA in the course of providing their repair services.

The need for this exemption has been magnified by the current COVID-19 pandemic as hospitals have an urgent need to maintain and repair lifesaving equipment. While the need now is particularly urgent in light of the pandemic, the strong public interest in public health and positive health outcomes supports the implementation of this exemption generally.

C. Additional Information

(1) the types of works that need to be accessed

Software tools and other programs and data files (e.g. error logs) in which OEMs claim copyright used for diagnosing, maintaining, or repairing the device.

(2) the physical media or devices on which the works are stored or the services through which the works are accessed.

The software tools and other programs and data files in which OEMs claim copyright to which access is needed are typically contained on hard drives contained in the medical device.

(3) the purposes for which the works need to be accessed.

The software tools and other programs and data files in which OEMs claim copyright need to be accessed for fair and noninfringing uses under Sections 107 and 117 of the Copyright Act, including the diagnosis, repair, and maintenance of medical devices.

---

LOC_AR_00002357

I___ B. D_____ __ P_____ N__ E___ ____ *(____'_)*

4) the types of users who want access.

The types of users who desire access include the hospitals and other owners of the medical devices and the persons they engage to provide service on their behalf, including independent service organizations.

5) the barriers that currently exist or which are likely to exist in the near future preventing these users from obtaining access to the relevant copyrighted works.

Medical device OEMs typically employ user-specific login credentials or security keys, among other measures, in order to try to prevent or hinder access to the software tools and other programs and data files in which they claim copyright needed for the diagnosis, repair, and maintenance of medical devices.

LOC_AR_00002358



UNITED STATES COPYRIGHT OFFICE

# Petition for New Exemption Under 17 U.S.C. § 1201
## 8th Triennial Rulemaking

Please submit a separate petition for each proposed exemption.

**NOTE:** Use this form if you are seeking to engage in activities not currently permitted by an existing exemption. If you are seeking to engage in activities that are permitted by a current exemption, instead of submitting this form, you may submit a petition to renew that exemption using the form available at **https://www.copyright.gov/1201/2021/renewal-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit both a petition to renew the current exemption, and, separately, a petition for a new exemption using this form that identifies the current exemption, and addresses only those issues relevant to the proposed expansion of that exemption.

## ITEM A. PETITIONERS AND CONTACT INFORMATION

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity proposing the exemption.

---

Petitioner and Contact Information

Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging

---

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## ITEM B. DESCRIPTION OF PROPOSED NEW EXEMPTION

Provide a brief statement explaining the nature of the proposed new or expanded exemption. The information that would be most helpful to the Office includes the following, to the extent relevant: (1) the types of copyrighted works that need to be accessed; (2) the physical media or devices on which the works are stored or the services through which the works are accessed; (3) the purposes for which the works need to be accessed; (4) the types of users who want access; and (5) the barriers that currently exist or which are likely to exist in the near future preventing these users from obtaining access to the relevant copyrighted works.

Petitioners need not propose precise regulatory language or fully define the contours of an exemption class. Rather, a short, plain statement describing the nature of the activities the petitioners wish to engage in will be sufficient, as proponents will have the opportunity to further refine or expound upon their initial petitions during later phases of the rulemaking. The Office anticipates that in many cases petitioners will be able to adequately describe in plain terms the relevant information in a few sentences, or even a single sentence, as with the examples below.

---

A. Proposed Class

Petitioner submits the following petition and respectfully asks the Librarian of Congress to exempt for the years 2021-2024 the following class of works from 17 U.S.C. § 1201(a)(1)'s prohibition on the circumvention of technological protective measures:

Electronic servicing materials in the form of computer programs and data files that control functions of or store data relating to the functioning of lawfully acquired medical systems and devices, when circumvention is undertaken by or on behalf of the owners or lessees of the medical systems and devices to enable the unfettered diagnosis, repair, and maintenance of the medical systems and devices to ensure compliance with manufacturer and regulatory specifications; and where such circumvention does not constitute a violation of any other applicable law.

This exemption is sought to allow for timely critical servicing activities required for medical systems and devices (also "medical equipment") used by hospitals and other medical service providers to care for individuals in need of medical attention.  It will also allow access to non-copyrightable files such as configuration files when stored along with allegedly copyrightable works.

B. Background

This petition is brought for the benefit of owners, lessees, and independent service organizations ("ISOs") hired by owners and lessees, that diagnose, repair, and maintain ("servicing activities") medical systems and devices that employ technological protective measures ("TPMs"), or what are alleged to be TPMs, that deny or restrict access to computer programs and data files, including databases, configuration files, and manuals, ("electronic servicing materials") used for controlling operation or functions of the medical equipment, or which store information pertaining to the medical equipment, but which are necessary for conducting servicing activities to ensure compliance with manufacturer and regulatory specifications.  The proposed exemption follows and builds on the 2015 and 2018 exemptions for computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle; and the 2018 exemption for computer programs that are contained in and control the functioning of a lawfully acquired smart-phone, home appliance, or home system.

Medical devices and systems used to be composed only of mechanical and electrical parts, that is, hardware. The specifications and other information relating to the functions of the devices and systems were provided in hard copy manuals. These devices and systems could be serviced by technicians with access to the manuals and with the relevant mechanical and electrical knowledge and tools.  However, increasingly, hardware components are being replaced by computing processors and software.  Also, manuals and technical data are being provided via electronic media, sometimes as data files installed on the medical systems or devices.  Hence, servicing activities now require access to and use of computer programs or modules thereof, and electronic data files, including databases and electronic manuals.

---

LOC_AR_00002363

**ITEM B. DESCRIPTION OF PROPOSED NEW EXEMPTION** *(CONT'D)*

While this switch to reliance on software conceptually does not pose an issue, original equipment manufacturers ("OEMs") equip modern medical systems and devices with technologies that they consider to be TPMs such as encryption, embedded software, and challenge-response mechanisms, access codes, passwords, keys, or digital signatures. These alleged TPMs prevent or hinder medical equipment owners and lessees and their lawful agents from repairing, diagnosing, and maintaining the medical systems and devices they own by restricting or denying access to necessary electronic service materials installed in the medical equipment or otherwise provided via electronic media. Additionally, electronic servicing materials, although not stored in the medical systems or devices, may be stored on other electronic media with access prevented or hindered by these alleged TPMs.

In order to ensure that the critical servicing activities required for medical equipment continues, Petitioner seeks an exemption for the purpose of diagnosing, repairing, and maintaining medical systems and devices with efficiency and timeliness to improve their functionality, and to ensure compliance with manufacturer and regulatory specifications. This will allow lawful possessors of such medical systems and devices to obtain the benefits of the exemption, and perform, or have performed on their behalf, servicing activities on their systems and devices.

C. The Proposed Exemption is for Non-infringing Uses

The execution of computer programs and access to related data files and manuals by owners of medical systems and devices, or those acting at their behest, such as ISOs, for the purpose of diagnosing, repairing, or maintaining their systems and devices, does not constitute copyright infringement for at least three reasons. First, such activities constitute fair use under 17 U.S.C. § 107. Second, such activities are exempted as permitted machine maintenance and repair under 17 U.S.C. § 117(c). Third, such activities are exempted from infringement for owners of the servicing materials as an essential step in the utilization of a computer program in conjunction with a machine under 17 U.S.C. §117 (a)(1).

The four-factor fair use analysis is in favor of the use by owner, lessees, and their agents of the servicing materials to diagnose, maintain, and repair medical equipment. First, although the use of the servicing materials involves or could involve a commercial setting, it does so only to ensure that the medical equipment complies with OEM and regulatory specifications. The purpose and character of the servicing materials are not otherwise commercial in nature. Working medical equipment is imperative in treating patients, and especially critical during a pandemic such as the current Covid-19 crisis. Second, the electronic servicing materials are non-fictional, scientific works, which benefit the public by having functioning and compliant equipment, as well as equipment that is serviced more quickly. Third, the amount of use of the servicing materials is not substantial. The diagnosis, maintenance, and repair of the medical equipment is but a small part of the overall operations of the equipment. Further, the service materials are not used in the manufacture of competing new equipment. Finally, the fourth factor relates to the effect of the use on the potential market for and value of the servicing materials. This factor is a balance between the benefit to the public would derive and the personal gain the copyright owners would receive. Here, the benefit to the public would be immense. Functioning and compliant medical equipment is imperative for the diagnosis and treatment of patients. However, the servicing materials are only useful for the particular equipment in which they are embedded. Thus they have no value outside of the equipment which they are contained and there is no market for reselling or distributing the materials.

Further, to perform the servicing activities, it is necessary to activate the computing processors and to execute software to operate the various components of the medical equipment, or simply to open a data file to obtain specification information. When performing the servicing activities, the diagnostic and testing modules are used to diagnose the operating conditions and to determine if the system or device is performing according to specifications. Data files may be opened to diagnose system or device issues, confirm operating information, or to otherwise update servicing information for proper record keeping.

LOC_AR_00002364

**ITEM B. DESCRIPTION OF PROPOSED NEW EXEMPTION** *(CONT'D)*

Following a servicing activity, except for any updated data reflecting servicing information, the computer programs and data files are left in their original condition. There are no copies that need to be destroyed. However, deactivation or reactivation of the medical imaging systems will automatically "destroy" any "new" copy of the computer programs pending in volatile memory. Thus, the copying of the servicing materials for servicing also would not infringe because it is permitted machine repair and maintenance copying.

Finally, it is clear that use of the electronic servicing materials is an essential step in the use of the medical equipment as there is no other way to ensure compliance with OEM and regulatory specifications via diagnosis, repair, and maintenance of the equipment. Owners of the equipment and, hence, owners of the copies of the servicing materials, are entitled to make further copies, and have others make copies, when conducting such servicing activities.

D. Allowing Anti-Circumvention Claims in this Area Adversely Affects, and Will Continue to Adversely Affect, Critical Medical Equipment Servicing Activities

The United States medical equipment servicing market is a $7.7 billion industry, which is expected to grow to $12.6 billion by 2024. See, e.g., United States Medical Equipment Maintenance Market Research Report 2019: Industry Size, Share, Trends and Growth Forecast through 2024, Markets and Research, PRNewswire, Sept. 25, 2019. This industry is dominated by OEMs who use the technologies they allege are TPMs to hinder competition by ISOs such as Petitioner. The result is that hospitals and other medical service providers are forced to expend approximately 30% to 50% more of their limited resources on servicing activities, because they are forced into using the OEMs to service their equipment. See, e.g., Medical Equipment Maintenance Market by Device (Imaging (MRI, CT, X-ray, Ultrasound), Endoscopy, Life Support Devices), Type (Preventive, Operation), Service Provider (OEM (Multi-Vendors), ISO, In-house Maintenance) & End User (Public, Private) - Forecast to 2023, page 3 (MarketandMarkets.com). Given this undue advantage provided by the alleged TPMs to OEMs, there is no incentive for them to end such use of the alleged TPMs, and the adverse effects on the medical equipment owners and lessees and their agent ISOs will continue unabated.

The ability to diagnose, maintain, and repair medical equipment is a public health priority, particularly in the midst of a global health crisis because proper servicing is critical to the safe and effective use of medical equipment. Without an exemption, medical equipment owners and lessees cannot access the information necessary to provide repair, diagnosis, and maintenance to and of their medical systems and devices in a safe, secure, and effective manner. In turn, the medical professionals and health care providers who use medical equipment and services provided by entities like Petitioner cannot provide safe, secure and effective medical services to the public. Petitioner's success as an ISO, as well as the success of other ISOs, is dependent upon the ability to quickly and efficiently respond to service requests from these owners and this significantly enhances patient safety. Without the exemption, OEMs will continue to hamper, if not outright prohibit, the legitimate service and maintenance activities of medical equipment, devices, and imaging systems by owners and ISOs.

In addition, Petitioner, like many others, faces a current and credible threat of lawsuits under the DMCA. In fact, Petitioner and others are involved in various pending lawsuits, and this demonstrates that such prosecutions are not merely theoretical. Such prosecutions are likely only to increase given the increasing desires and efforts of OEMs to prevent servicing of equipment by ISOs.

E. Conclusion

For all of the reasons set forth above, the non-infringing uses described above are, and are likely to be, adversely affected by the anti-circumventions prohibitions of Section 1201(a), and should therefore be exemptions for the period 2021-2024.

LOC_AR_00002365

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced, but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

[  ] **Check here if multimedia evidence is being provided in connection with this comment**

### ITEM A. COMMENTER INFORMATION

Summit Imaging, Inc.
15000 Woodinville-Redmond Rd. NE
Suite B800
Woodinville, WA 98072

c/o
Marc Levy, counsel
Seed IP Law Group LLP
701 Fifth Ave., Suite 5400
Seattle, WA 98104
Tel: (206) 694-4811
Email: marcl@seedip.com

### ITEM B. PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair (specifically, Medical Devices)

### ITEM C. OVERVIEW

Petitioner Summit Imaging, Inc. ("Summit") is an independent service provider ("ISO") for medical imaging devices. Summit provides repair services and replacement parts for diagnostic medical imaging equipment to hospitals and other medical providers nationwide. Summit focuses its services on ultrasound and mammography diagnostic imaging devices.

Today, medical imaging devices are controlled by computers installed on-board the devices. The computers are integral to the operation and maintenance of the systems. These computers typically run on standard operating system environments such as Microsoft Windows. The original equipment manufacturer ("OEM") adds its own application software to the computer to provide both for the clinical operation of the device and its maintenance.

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579).
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00002909

Servicing of medical devices and their components requires the use of the installed software and data files. For example, to diagnose error or faults in a medical imaging device requires access to error log files stored on the system. And access to the error log files requires access to the software driving the system.

OEMs, however, restrict access to diagnostic software and data files in their medical imaging systems through the use of access codes, passwords, keys, or other similar technological measures ("TPMs"). OEMs use TPMs and the anti-circumvention provision of the DMCA to deter owners, lessees, and their ISO agents from accessing the software, including error log files, by threatening and filing lawsuits. OEMs allege that their TPMs constitute a "technological measure that effectively controls access to a work protected under [Title 17]" the circumvention of which is prohibited by the DMCA. And yet, OEMs use these threats and lawsuits to prevent access to all data files on their systems, including error logs, configuration files, and other unprotected works. By using TPMs to restrict access to both protected and unprotected works, OEMs are using the DMCA to prevent access to unprotected works and interfere with basic service for medical imaging devices.

Summit itself is currently the subject of a pending lawsuit by an OEM claiming that Summit has violated the anti-circumvention provisions of the DMCA. *Philips North America LLC, et al. v. Summit Imaging, Inc.*, at al., Case No. 2:19-cv-01745 (W.D. Wash. 2019). In this case, Philips specifically alleges that Summit is liable under the DMCA for accessing log files on Philips ultrasound systems. Philips' case against Summit is not unique. Over just the last few years, Philips has filed numerous lawsuits against ISOs stating DMCA claims for allegedly circumventing Philips' access controls in connection with the service of Philips medical imaging devices. *E.g., Philips Med. Sys. Nederland B.V., TEC Holdings, Inc., et al.*, Case No. 3:20-cv-00021 (W.D.N.C. 2020); *Philips Med. Sys. Puerto Rico, Inc., et al. v. Alpha Biomedical and Diagnostic Corp.*, Case No. 3:19-cv-01488 (D.P.R. 2019), *Philips N. Am. LLC, et al. v. 626 Holdings, Inc.*, et al., Case No. 9:19-cv-81263 (S.D. Fla. 2019); *Philips N. Am. LLC v. KPI Healthcare Inc.*, Case No. 19-1765 (C.D. Cal. 2019).

OEMs' use of TPMs to prevent access to software and files needed to service medical devices is particularly pernicious when it comes to older equipment that OEMs no longer support because they claim they have reached the end of their commercial life. For such older equipment, OEMs do not provide access codes at all. Thus owners and their ISO agents are preventing from accessing the computer programs and data files needed to service their equipment. Medical providers operating under tight budgets desire to keep older equipment properly serviced. OEMs' use of TPMs prevents them from doing that.

**ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

As described above, OEMs restrict access to the computer programs and data files on their medical devices using access codes, passwords, and keys. For example, one method used by Philips is an access key contained on a flash drive or dongle. The access key must be present to

2

LOC_AR_00002910

identify the access level of the user. Philips provides dongles to its field service engineers that give them access to the software and data needed to service Philips equipment. For owners, however, Philips only provides basic access to the clinical features of the device unless they purchase an expensive service contract. This limited access is insufficient to allow owners or their ISO agents to service the device.

Another method OEMs use to restrict access is a combination of username and password to access a medical device system. As with the dongles, owners' passwords will not provide access to the software and files needed to service the medical device.

ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

**Adverse Effects Caused by Prohibition**

Hospitals and other medical providers who own medical devices are directly adversely affected by the DMCA anti-circumvention provision. They are affected in two primary ways. First, the prohibition reduces competition from ISOs. Medical providers are left to seek service from OEMs who charge much higher prices for service than ISOs. Absent effective competition from ISOs, OEMs can be expected to charge higher prices still. Second, the DMCA prevents medical providers from servicing their own equipment using in-house service departments. Without access to the software and files needed to service their equipment, medical providers are captive to the OEMs and cannot troubleshoot and conduct repairs promptly.

This last adverse effect highlights the most significant adverse effect: harm to public health and safety. Delayed repair of medical equipment has real effects on patient outcomes. The longer needed medical equipment remains out of service, the longer patients are denied the benefit of that equipment. In smaller facilities such as rural hospitals or clinics, that may result in the delay of essential medical service that requires the use of that equipment. Delayed medical services, in turn, can lead to negative patient outcomes.[1]

Much has been written on this subject, particularly recently in light of the COVID-19 pandemic. In the case of ventilators, the availability of a working ventilator can make the difference between life and death. Over 300 medical device technicians signed a letter in May calling for OEMs to stop withholding what technicians need to fix their medical devices such as ventilators.[2]  Five state treasurers called on OEMs to release service information to repair

---

[1] *See, e.g.*, Rona Bahreini, Leila Doshmangir, and Ali Imani, Influential factors on medical maintenance management In search of a framework, Journal of Quality in Maintenance Engineering, Volume 25, Issue 1 (June 12, 2018) ("Lack of proper maintenance of medical equipment leads to equipment downtime, reduces the level of device performance, and wastes costs and resources . . . If preventive maintenance [on a medical device] is not well monitored in a hospital, patients' lives are in grave danger").

[2] https://calpirg.org/news/cap/hospital-repair-professionals-just-let-us-fix-life-saving-devices-ventilators.

3

LOC_AR_00002911

ventilators.[3]  Nader Hammoud, manager of biomedical engineering at John Muir Health in Walnut Cree, California stated in May:

> It's not that it could mean life or death—it's definitely life or death, especially during a pandemic. … I had situations in the past, before Covid-19, where we had to come into the hospital in the middle of the night and try to pull parts from different devices, different sources, because a patient was waiting on a device. We've had to do this multiple times throughout my career.[4]

This is one of the reasons why Senator Wyden recently introduced his bill entitled The Critical Medical Infrastructure Right to Repair Act, seeking immediate exemptions for the DMCA during the pandemic.[5]

When the proper functioning of a machine can be a difference between life and death, hospitals and other machine owners need as many service options as possible to keep their machines up and running. As the FDA has recognized in a 2018 report: "The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system."[6]

**Proposed Exemption Covers Non-Infringing Uses**

Running computer software and accessing data files by owners of medical devices or those acting on behalf, such as ISOs, for the purpose of diagnosing, repairing, or maintaining their systems and devices, is non-infringing. This is for at least three independent reasons:

1. Fair use (17 U.S.C. § 107);

2. Essential step in the utilization of a computer program in connection with a machine (17 U.S.C. § 117(a)(1)); and

3. Machine maintenance and repair (17 U.S.C. § 117(c)).

Each of these reasons is discussed more fully below.

---

[3] patreasury.gov/newsroom/archive/2020/04-14-Call-On-Manufacturers.html

[4] Quotation from https://www.wired.com/story/right-to-repair-medical-equipment-ifixit/.
[5] wyden.senate.gov/news/press-releases/wyden-and-clarke-introduce-bill-to-eliminate-barriers-to-fixing-critical-medical-equipment-during-the-pandemic-.
[6] FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download

4

LOC_AR_00002912

1.  Fair Use

The Copyright Act sets forth four factors to consider when determining whether a use of a copyrighted work is noninfringing fair use:

- the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

- the nature of the copyrighted work;

- the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

- the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

In connection with existing exemptions, the Librarian has recognized the fair use of computer programs for the diagnosis, repair, and modification of motorized land vehicles and the fair use of computer programs for the maintenance and repair of appliances. 37 CFR § 201.40(b)(9), (10). In its 2018 Recommendation[7] in support of the latter exemption, the Registrar wrote as follows:

> In analyzing the first fair use factor, the Acting Register notes that the Copyright Office' Software Study observed that, *because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, "repair supports— rather than displaces—the purpose of the embedded programs."* Applying similar logic, the 2015 rulemaking concluded that the first factor favored an exemption for vehicle repair because the activities were personal, noncommercial, and would "enhance the intended use" of the vehicle programs. Moreover, the Office's Section 1201 Report observed an emerging "general understanding that bona fide repair and maintenance activities are typically noninfringing." Because proponents express the same desire to engage in these bona fide repair activities with respect to other devices, the Acting Register concludes that this factor favors proponents.

2018 Report at p. 203.

The same reasoning applies to medical devices. Repair supports rather than displaces the purpose of the embedded programs. The whole point of repair is to make the devices

---

[7] 2018 Recommendation of the Acting Registrar of Copyrights for Rule Making: Seventh Triennial Proceeding to Determine Exemptions on the Prohibition on Circumvention (Oct. 2018).

LOC_AR_00002913

useful for the purpose for which they are intended.

The second factor also supports fair use. The computer programs and data files at issue are functional works used to control the operation of the medical device systems and the diagnosis, repair, and maintenance of them. For example, error logs are computer files containing events that occur during the use of a medical device by its owner. As such, they are the property of the equipment owner, not the OEM. In any event, because they are functional, they are no protected by copyright. *Lexmark International, Inc. v. Static Control Components, Inc.*, 3877 F.3d 522, 536 (6th Cir. 2004) (configuration files and lock-out codes generally "fall on the functional-idea rather than the original-expression side of the copyright line"); *Sony Comput. Entm't, Inc. v. Connectix Cor.*, 203 F.3d 596,603 (9th Cir. 2000) ("[T]he fair use doctrine preserves public access to the ideas and functional elements embedded in copyright computer software programs.").

The third fair use factor similarly supports fair use. It is necessary to execute the computer programs and access the data files during servicing activities to understand system or device performance and, in several instances, update the data files such as service logs. The computer programs and data files involved are but a small portion of the entire software package used to operate and service medical imaging devices and are integrated into the machine. For example, the software on a Philips ultrasound system consists of a number of different components, most of which are involved in the clinical operation of the machine. The software for diagnosing problems with the system, including error logs, comprise only a small part of the system software.

Finally, the fourth factor also supports fair use. The effect of the use upon the potential market for or value of the copyrighted work is minimal.[9] The computer programs and data files are necessary for the operation and control of the medical equipment, including the basic servicing of the equipment, and are sold together with the equipment in which they are employed. They have no other use. Thus, the OEMs must include them or make them available to enable operation, control, and servicing of new equipment. Although OEMs might sell or make available updates to their software, there is no independent market for the computer programs and data files outside of the purchase of new equipment because the software is not of any value outside of use on this equipment.

Of course, the TPMs that restrict access to the computer programs and data files provide value to the OEMs by allowing them to control the market for repair services for their machines. But, as the Registrar recognized in its 2017 policy review of Section 1201[8] (the "1201 Report"), this is not a valid purpose of Section 1201. "[V]irtually all agree that section 1201 was not intended to facilitate manufacturers' use of TPMs to facilitate product tying or to achieve a lock-in effect under which consumers are effectively limited to repair services offered by the manufacturer." 1201 Report at 92.

---

[8] Section 1201 of Title 17-A Report of the Registrar of Copyrights (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

6

LOC_AR_00002914

OEMs will argue that their investments in computer software enable them to serve customers better than ISOs. The FDA rejected this proposition in its 2018 report on the quality, safety, and effectiveness of servicing medical devices ("FDA Report").[9] Faced with OEMs requesting that the FDA impose additional regulations on ISOs, the FDA rejected the invitation concluding: "the objective evidence indicates that many OEMs and third party entities provide high quality, safe, and effective servicing of medical devices." FDA Report at i.

2. Essential Step (17 U.S.C. § 117(a)(1))

Title 17 U.S.C. §117 (a)(1) provides:

(a)(1) Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

The access, use, and modification of computer programs and data files embedded in medical equipment is an essential step in the servicing and repair activities associated with that equipment and in maintaining its usefulness. The software is integrated into and is inseparable from the machines. Medical equipment purchases represent substantial investments by their owners. And that equipment is useless without the included software. Some OEMs attempt to only "license" the embedded software. However, there is no alternative to the software as it is tailored to the equipment, and there are no market alternatives. Regardless, the owner of the machine owns the copy of the computer programs installed on that machine. To the extent that the owners or the service companies that work on that their behalf copy or adapt that copy, they are "created as an essential step in the use of the computer program in conjunction with a machine," and "used in no other manner."[10]

---

[9] FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download.

[10] *See, e.g., Krause v. Titleserv, Inc.,* 402 F.3d 119 (2d Cir. 2005) (holding company's modification of copyrighted computer programs created for it by former consultant, after consultant declined to turn over source code, was "essential step" in their utilization, within meaning of Copyright Act's safe harbor provision; modifications, which fixed bugs, allowed company to add new client information, adapted program so it would function on company's new system, and added new features, were necessary if company was to make use of programs on its machines); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.,* 924 F.3d 32 (2d Cir. 2019) (holding that modifications made by licensee, a medical device company, to server software customized by software developer for licensee's multi- phased test handling system project that allowed existing

7

LOC_AR_00002915

3.  Hardware Maintenance and Repair (17 U.S.C. § 117(c))

Title 17 U.S.C. §117 (c) provides:

> Machine Maintenance or Repair.—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—
>
> > (1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and
> >
> > (2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

To perform service on a medical imaging device, it is necessary to activate the device. In performing service, diagnostic software and data files such as error logs are used to diagnose the operating conditions to determine if the device and its components are performing according to their specifications. Data files may be accessed to diagnose issues, confirm operating information, or to update servicing information.

Following a servicing activity, except for any updated data reflecting the service, the computer programs and data files are left in their original condition. To the extent that any new copy is created, it is destroyed upon deactivation or reactivation of the device.

**Conclusion**

For the foregoing reasons, Summit requests that the Librarian determine that the non-infringing uses described above are, and are likely to be adversely affected by the anti-circumvention provisions of Section 1201(a) and therefore approve the proposed exemptions.

---

server software to interact with additional systems in manner intended when source code was developed for licensee was essential step in utilization of computer programs in conjunction with machine).

8

LOC_AR_00002916



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

[  ] Check here if multimedia evidence is being provided in connection with this comment

## ITEM A.  PETITIONER INFORMATION

Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert Andrew Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone: 312-867-2578
david.metzger@dentons.com
taaj.reaves@dentons.com

## ITEM B.  PROPOSED CLASS ADDRESSED

Class 12: Computer Programs—Repair, and, in particular, the subset of Electronic Servicing Materials for Diagnosis, Maintenance, Repair of Medical Equipment

The Librarian of Congress is requested to exempt from the anti-circumvention provision of the Digital Millennium Copyright Act (17 U.S.C. § 1201) ("**DMCA**"), the circumvention of technological measures (also referred to herein as technological protective measures ("TPMs"))[1] undertaken by or on behalf of the owners or lessees of the medical systems and devices, for the purpose of accessing and using medical equipment servicing materials in the form of computer programs and data files (including databases and manuals) which are necessary for servicing

---

[1] In using the terms "technological protective measure" and "TPM," Petitioner does not admit or concede that the technological measures discussed herein meet the definition of a "technological measure" that "effectively controls access to a protected work," as defined in 17 USC § 1201(a)(3)(B).

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00002917

(diagnosis, repair, and maintenance) of the medical devices and systems, thereby ensuring proper operation and compliance with manufacturer and governmental specifications; and where such circumvention does not constitute a violation of any other applicable law.

This exemption will allow owners and lessees of medical systems and medical devices, and their authorized agents, to access and use the servicing materials and perform servicing activities that are essential to the repair, diagnosis, and maintenance of their own medical equipment, without the threat of legal action should the need arise to actually or allegedly circumvent a TPM. This exemption will also alleviate the unintended consequences of the application of copyright law enacted for developers of software applications for stand-alone computers, to specialty medical equipment integrated with software.

## ITEM C. OVERVIEW

Petitioner Transtate Equipment Company (d/b/a Avante Diagnostic Imaging) ("Petitioner") is a member of the Avante Health Solutions group of companies (https://avantehs.com) that, among other things, (a) provide high quality refurbished medical devices and systems (also referred to herein as "**medical equipment**" or "**equipment**"); (b) provide post warranty repair, diagnosis, and maintenance of medical systems and devices ("**servicing activities**"); and (c) sells new and used parts, all manufactured by Original Equipment Manufacturers ("**OEMs**" or "**manufacturers**"). Petitioner focuses on ionizing radiation emitter medical imaging systems, namely catheterization and angioplasty X-ray systems and computed tomography systems. Petitioner has several sister companies, including Dre Medical, Inc. d/b/a Avante Medical Surgical, Pacific Medical, Inc. d/b/a Avante Patient Monitoring, Global Medical Imaging, Inc. d/b/a Avante Ultrasound, and Oncology Services International, Inc. d/b/a Avante Oncology Services.[2] Petitioner and its sister companies are independent service organizations ("**ISOs**").[3]

Petitioner's sister company, Avante Medical Surgical, focuses on surgical equipment including C-Arm fluoroscopy devices, anesthesia machines, and electrosurgical units.[4] Sister company Avante Patient Monitoring focuses on monitoring systems including patient monitors, telemetry systems, gas analyzers, and fetal monitors. Sister company Avante Ultrasound focuses on ultrasound machines. Sister company Avante Oncology Services focuses on linear accelerators and CT simulators.[5]

Exemplary medical equipment are shown below.

---

[2] *See* Wheeler Declaration, attached hereto as Exhibit 1, at ¶ 5; *see also* (https://avantehs.com/), attached hereto as Exhibit 2.

[3] ISOs are entities, other than the manufacturer or healthcare establishments, that, among other things, maintain, restore, refurbish, or repair a finished device after distribution, for purposes of returning it to the safety and performance specifications established by the manufacturer and to meet its original intended use; *see also* Wheeler Decl. at ¶ 5.

[4] *See* Spencer Declaration, attached hereto as Exhibit 3, at ¶ 1.

[5] Wheeler Decl. at ¶ 5.

2

LOC_AR_00002918





GE Innova 3100 Cath/Angio System

Philips Intellivue MP70 Patient Monitor







Puritan Bennett 840 Ventilator

Siemens SOMATOM Perspective CT Scanner

3

LOC_AR_00002919

Petitioner realizes that it likely will be the only ISO or one of very few ISOs to provide comments with respect to the medical device servicing issues. However, the limited number of ISO Petitioners should not be taken as a lack of interest in this exemption or the desire of others for the requested exemption. On the contrary, this issue is of widespread concern among medical technicians.[6] The ISOs in the medical equipment servicing market are small compared to the OEMs, and operate under the fear of retaliation in the form of access restrictions and slow deliveries of, or refusal to deliver parts, in addition to the ongoing threat imposed by the DMCA. In addition, two of the larger ISOs enjoy a high level of cooperation from the OEMs, and, presumably, do not want that relationship jeopardized, and thus are not getting involved. These unique circumstances should be better understood by way of the following explanation.

In the past, medical devices and systems were composed only of mechanical and electrical parts, *i.e.*, hardware. For example, X-ray machines initially were analog devices and consisted of an X-ray tube to radiate X-rays and film for capturing an image. Later, film was replaced by digital image capturing devices, making the X-ray machines digital rather than analog. The specifications and other information relating to the functions of these older analog medical devices and systems were provided in hard copy manuals. The devices and systems could be serviced by technicians with access to the manuals, as well as with the relevant mechanical and electrical knowledge, experience, and tools.[7]

However, hardware components have since been replaced by computing processors and software. As computers developed, computerized functions have become incorporated into the medical equipment. For example, stand-alone computers were used to control the digital image capturing devices in X-ray systems. Subsequently, more and more functions have become controlled or performed by computers, and the computers have become integrated into the devices such that the devices and the computers (i.e., the "hardware") and the software are inseparable. Now large sophisticated systems such as MRI and catheterization and angioplasty X-ray systems (often referred to as "cath lab" systems) are completely controlled by specially programmed computers integrated into the systems.[8]

As a result, today, medical devices and systems are, for all intents and purposes, specialized computers, although some use software running in common operating system environments such as Linux or Microsoft Windows®. The devices and systems often also include software specific to the medical devices, that is to say, the software from one OEM for one type of device likely cannot be used on the similar device from another OEM. Further, the devices are integrated to such a degree that the devices will not function without the software, and servicing of the devices often is not possible without use of the installed software and data files. Indeed, to properly diagnose faults and errors in the operation of a device, it is often necessary to access error logs to decipher the causes of errors, and this requires access to certain software.[9]

---

[6] *See, e.g.* Exhibit 4 (Add final exhibit to Letters for Right to Repair).
[7] Wheeler Decl. at ¶ 9.
[8] Wheeler Decl. at ¶ 10.
[9] Wheeler Decl. at ¶¶ 14, 33; *see also* Melvin Declaration, attached hereto as Exhibit 5, at ¶ 5; *see also* Kahler Declaration, attached hereto as Exhibit 6, at ¶¶ 6-14; *see also* Lane-Savage Declaration, attached hereto as Exhibit 7, at ¶ 5; *see also* Grogan Declaration attached hereto as Exhibit 8, at ¶ 6.

4

LOC_AR_00002920

Also, manuals and other service information documents often are provided by OEMs via electronic media, sometimes as data files installed on the medical systems or devices. Hence, servicing activities require access to and use of computer programs or modules thereof, electronic data files, including databases, and electronic manuals (collectively also referred to herein as, **"electronic service materials"**).[10]

While this switch to reliance on software conceptually does not pose an issue, OEMs overwhelmingly equip modern medical systems and devices with **TPMs** such as encryption, embedded software, and challenge-response mechanisms, involving access codes, passwords, keys, or digital signatures. These TPMs prevent or hinder medical equipment owners, lessees, and their agents from repairing, diagnosing, and maintaining the medical systems and devices they own or lease by restricting or denying access to necessary electronic service materials installed in the medical equipment or otherwise provided via electronic media.[11]

Additionally, electronic servicing materials, although not stored within the medical systems or devices, may be stored on other electronic media where access is prevented or hindered by TPMs, *e.g.*, encryption.[12]

The OEMs use the TPMs and the anti-circumvention provision of the DMCA to deter owners, lessee, and their ISO agents from accessing the necessary software by threatening and filing lawsuits. The TPMs are alleged to be "technological measures," the circumvention of which is allegedly prohibited by the DMCA. While ISOs deny these allegations, the owner and lessee medical centers and ISOs are attuned to these threats. Indeed, as detailed below, the owners and lessees, while wanting to hire ISOs to service their medical equipment, refrain from doing so.

What makes the DMCA anti-circumvention provision so atrocious is its application to the mere "access" to protected works regardless whether the works are actually used or are comingled with unprotectable works.[13] Wily, OEMs place data files, including error logs, configuration files, and other unprotected works, behind the same TPMs.[14] This results in unprotected works being inaccessible because, in order to access the unprotected works, one must also access protected works (as defined in the DMCA) and therefore risk violating or being accused of violating the DMCA. Thus, by co-mingling protected and unprotected works, OEMs are able to prevent access to unprotected works as well and thwart even the most basic servicing of the medical equipment.[15]

The anti-circumvention restrictions of the DMCA have been aggressively invoked by OEMs in various assertions and lawsuits to prevent access to such computer software and data files, with Philips being particularly aggressive. *See, e.g., Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.) (Count V at 48-54)[16];

---

[10] Wheeler Decl. at ¶ 17; *see also* Melvin Decl. at ¶ 3.
[11] Wheeler Decl. at ¶ 33; *see also* Spencer Decl. at 5; *see also* Melvin Decl. at ¶ 5; *see also* Lane-Savage Decl. at ¶ 10.
[12] Melvin Decl. at ¶ 11; *see also* Kahler Decl. at ¶ 7.
[13] Petitioner does not admit that any particular work is "protected" as that term is used in the DMCA, or that any particular work enjoys enforceable rights.
[14] Wheeler Decl. at ¶ 20; *see also* Grogan Decl. at ¶ 6; *see also* Lane-Savage Decl. at ¶ 5.
[15] Wheeler Decl. at ¶ 20; *see also* Lane-Savage Decl. at ¶ 3; *see also* Melvin Decl. at ¶ 4.
[16] Exhibit 9

LOC_AR_00002921

*Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.*, Case No: 3:19-cv-01488-CCC (D.P.R.) (Third Cause of Action at 25-26)[17]; *Philips N. Am. LLC et al v. 626 Holdings, Inc. et al.*, Case No: 9:19-cv-81263 RS (S.D. Fla.) (Count VI at 22-25)[18]; *Philips, et al. v. Zetta Med. Techs. LLC, et al*, C.A. No. 17-3425 (N.D. Ill.) (Count III at 18-19)[19]; *Philips N. Am. LLC v. KPI Healthcare Inc.*, C.A. No. 8:19-cv-1765 (C.D. Cal.) (Fourth Cause of Action at 28-30)[20], and *Philips N. Am. LLC et al. v. Summit Imaging Inc. et al.*, Case No: 2:19-cv-01745-JLR (W.D. Wash.) (First Cause of Action at ¶¶ 77-106).[21]  Such frequent invocations of the anti-circumvention provisions of the DMCA show just how acute the issue presented by this petition is.  Without the exemption, the OEMs will continue to prevent or unduly hinder lawful servicing activities by owners, lessees, and their ISO agents on medical systems and devices by threatening or taking legal action.

As noted below, servicing activities can legitimately be performed by owners (including refurbishers such as Petitioner), lessees, and their ISO agents, and do not need to be performed by OEMs.  But, again, to perform these activities, it is necessary to access the computer software, data files, and electronic service materials necessary for performing these servicing activities.[22]

Additionally, many owners have older equipment that OEMs no longer support because the OEMs have deemed the equipment to have reached end of commercial life, and hence the equipment is considered obsolete.  As a result, the OEMs do not provide renewed access codes and keys; or the access codes and keys are obsolete, damaged, or malfunctioning, so that they cannot be disabled and, therefore, owners are prevented from accessing the computer software and data files needed for servicing activities.  However, with proper servicing by owners or ISOs, such systems can still function well and continue to be used, thus saving healthcare providers significant sums of money.[23]

In order to ensure that the critical servicing activities required for medical equipment continues, an exemption from the anti-circumvention provision of the DMCA is needed to eliminate an unintended impediment to the servicing of medical equipment.  This will allow owners, lessees and ISOs hired by owners and lessees, to diagnose, repair, and maintain medical systems and devices that employ TPMs to deny or restrict access to the computer software, or modules thereof,[24] data files, and manuals used for controlling operation or functions of the medical equipment, or which store information pertaining to the medical equipment, but which are necessary for conducting servicing activities.[25] The proposed exemption will enable timely and

---

[17] Exhibit 10
[18] Exhibit 11
[19] Exhibit 12
[20] Exhibit 13
[21] Exhibit 14
[22] Melvin Decl. at ¶ 8; *see also* Kahler Decl. at ¶ 7; *see also* Grogan Decl. at ¶ 5.
[23] Wheeler Decl. at ¶ 30; *see also* Kahler Decl. at ¶ 16; *see also* Melvin Decl. at ¶ 8; *see also* Lane-Savage Decl. at ¶ 15.
[24]  Some medical systems, such as medical imaging systems, are controlled by software packages only a portion of which are necessary for performing servicing activities.  This portion can comprise one or more discrete applications or one or more modules of a larger integrated computer program.  The one or more modules may be invocable by a larger already running computer program, or as branches within an already running integrated program.
[25] That the computer software and data files used for servicing activities are copyright protected works currently is in dispute in various courts. *See, e.g., Philips Medical Systems Nederland B.V. et al. v. TEC Holdings, Inc. et al.*,

LOC_AR_00002922

efficient diagnosis and maintenance of medical systems and devices to improve their functionality, and to ensure compliance with manufacturer and regulatory specifications.

This exemption builds on the following previously-granted exemptions:

- The 2018 exemption for "*Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle, or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works.*"

- The 2018 exemption for "*Computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC, or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works.*"

- The 2015 exemption for "*Computer programs that are contained in and control the functioning of a motorized land vehicle such as a personal automobile, commercial motor vehicle or mechanized agricultural vehicle, except for computer programs primarily designed for the control of telematics or entertainment systems for such vehicle, when circumvention is a necessary step undertaken by the authorized owner of the vehicle to allow the diagnosis, repair or lawful modification of a vehicle function; and where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency; and provided, however, that such circumvention is initiated no earlier than 12 months after the effective date of this regulation.*"

### ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION[26]

Nearly all OEMs that restrict or deny owners and ISOs access to these necessary computer software, data files and manuals use challenge-response TPMs, involving access codes, passwords, keys, digital signatures, or encryption. These TPMs are implemented under the guise that the computer software and data files contain propriety information. Below are several examples of the TPMs OEMs employ.

---

3:20-cv-00021-MOC-DCK (W.D.N.C.) (alleging Defendants, including Petitioner, infringed Plaintiff's copyrighted works by servicing its X-ray systems, and violated the DMCA anti-circumvention provisions by bypassing TPMs to gain unauthorized access to Plaintiff's alleged copyrighted works).

[26] Just as in fn. 1 Petitioner does not admit that the technological measures discussed herein meet the definition of a "technological measure" that "effectively controls access to a protected work," as defined in 17 USC § 1201(a)(3)(B), Petitioner does admit that any particular method of circumvention discussed herein constitutes a prohibited circumvention under the DMCA.

7

LOC_AR_00002923

Philips imaging systems employ a Field System Framework that provides multiple levels of access to a system. Philips imaging systems employ an access key dongle ("Access Key"), in the form of a flash drive, that attaches to a computer port and, allegedly, must be present to run software and to identify the access level of a user. The Access Key must be "recharged" through Philips every 30 days. When a user attaches his or her Access Key to a system, the software provides the user with access only to the computer software and data files that Philips, in its sole discretion, allows. Philips alone controls the active status of an Access Key and, thus, controls at will when an Access Key will work.[27] However, the limited subset of computer software, data files, and manuals to which Philips provides access to owners and ISOs does not allow Petitioner and other ISOs to perform the full gamut of authorized servicing activities necessary to ensure that a given medical system can operate safely and conforms to manufacturing and regulatory specifications.

Notably, even AIAT material (discussed below), which the FDA mandates must be freely available to ISOs such as Petitioner, requires access via the Field System Framework. And, to obtain a key to obtain the lowest level of access to this information, one must first register with Philips.General Electric ("GE") also uses a dongle in the form of a flash drive on which is stored a passcode or license key.[28] Like the Philips dongles, a GE dongle contains a license key which is read by the servicing software to determine if access is to be permitted, and to what degree access is permitted.

Siemens provides a 256-bit passcode in the form of a hexadecimal string that is entered into the servicing software system that then determines if access is permitted, and to what level.[29]

Other OEMs, including Nihon Koden, Spacelabs, and Welch Alynn do not provide software access to parties who are not employees of customers, for monitors and modules.[30]

Dräger and Penlon also manufacture certain medical equipment that require access codes in the form of passwords to access the software embedded in the machines.[31]

Several ultrasound devices from various OEMs, including GE, Philips, Siemens, Toshiba, and Samsung, restrict or limit access to embedded servicing software with the use of TPMs. Examples of the ultrasound devices that use TPMs to restrict or limit access to software include the Logiq E9, Vivid E9, Vivid E95, Logiq E10, Vivid IQ, Loqiq E, Logiq I, Vivid I, Vivid E, Voluson I, Voluson E, Voluson S Series, Voluson E6/8, and Voluson E10 Series from GE; the Epiq, Affiniti, CX50, iU22, iE33, HD- Series, and Volcano IVUS models from Philips; all of the S – Series models, the SC2000, and New Sequoia models from Siemens; and the Aplio300/500 and i800 models from Toshiba.[32]

These TPMs can be bypassed in several ways, some of which are discussed below.

---

[27] *See, e.g., Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.,* Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.), Second Amended Complaint, ¶¶ 43-47. *See also* Lane-Savage Decl. at ¶ 11.
[28] Wheeler Decl. at ¶¶ 21, 25; Spencer Decl. at ¶ 5.
[29] Wheeler Decl. at ¶ 21.
[30] *See* Peloso Declaration, attached hereto as Exhibit 15, at ¶ 15.
[31] Spencer Decl. at ¶ 5.
[32] Peloso Decl. at ¶ 3-4.

8

LOC_AR_00002924

Presumably without implicating the anti-trafficking provisions of the DMCA, dongles can be cloned. The Internet has many sites that explain how to do so or that offer do it for a fee.[33]

Also without implicating the anti-trafficking provisions of the DMCA, as noted above, the servicing software on many, if not all large OEM machines runs in an operating system such as Microsoft Windows® or Unix. The servicing software is run under a special user account. It is possible to access the user account management of the operating system using the administrator account and simply "blank out" the password for the special user account (*i.e.*, set it to null), thereby eliminating the need for a password altogether.[34]

Yet further without implicating the anti-trafficking provisions of the DMCA, time consuming, brute force passcode tools can be used to determine a passcode that will unlock access. Such tools are available via the Internet.[35]

And yet further without implicating the anti-trafficking provisions of the DMCA, a dongle or passcode can be obtained from an alternative source such as borrowed either from some medical provider clients or a co-worker.

Petitioner also notes that there are websites that advertise that they can generate passcodes. These sites appear to have reverse engineered the passcode generating algorithms. *See, e.g.*, www.service-password.com (offering service passwords for use with CT and MRI scanners manufactured by Siemens, Philips, GE, Toshiba, and Ultrasonix).[36] A purchaser's purchase and use of such a passcode would seem to not implicate the anti-trafficking provisions of the DMCA. Petitioner does not offer an opinion herein.

And, an imperfect action that might be undertaken in the face of lack of access to the electronic service materials, is to rely on experience and device behavior.[37] The resulting diagnosis, while informed by experience, is of course, just a guess.

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

The adverse effects of the DMCA anti-circumvention provision are varied. Those affected include medical equipment owners and lessees, ISOs, hospital patients, and taxpayers.[38]

Without circumvention, owners and lessees are forced to pay inflated prices for OEM service calls and sufficient access. The cost for such access runs $20,000.00 to 25,000.00 USD per year per device, or $2,500.00 to $5,000.00 USD per event and device. OEMs typically charge 30% to 50% more for service calls than ISOs.[39] Without the competition of ISOs, OEMs will see no

---

[33] *See, e.g.*, https://www.donglify.net/. *See, also,* the results of a simple search at Exhibit 16.
[34] *See, e.g.* https://www.raymond.cc/blog/change-xp-administrator-password-without-knowing-it/; *see also*, https://answers.microsoft.com/en-us/windows/forum/windows_10-security-winpc/how-to-change-local-standard-account-password/e226df9a-f9df-4ae4-bed3-f529cfe7a7f3; *see also*, https://www.cyberciti.biz/faq/linux-set-change-password-how-to/; *see also*, https://www.howtogeek.com/howto/windows-vista/change-your-forgotten-windows-password-with-the-linux-system-rescue-cd/.
[35] *See, e.g.*, https://www.softwaretestinghelp.com/password-cracker-tools/
[36] Exhibit 17.
[37] Peloso Decl. at ¶8; Lane-Savage Decl. at ¶22.
[38] *See, e.g.*, Peloso Decl. at ¶¶ 9-10; *see also* Lane-Savage Decl. at ¶ 21; *see also* Kahler Decl. at ¶ 10.
[39] Melvin Decl. at ¶ 6 .

9

LOC_AR_00002925

reason to lower their prices or provide prompter service. Further, without sufficient access by owner in-house service departments, troubleshooting or diagnosis of machine faults can take days or weeks instead of hours, preventing more rapid service.[40]

Without circumvention, ISOs are being driven out of the medical equipment servicing market altogether. The OEMs enjoy a large a share of the servicing market, and that share continues to grow.[41] OEMs can and do refuse to provide ISOs with sufficient access to electronic service software and materials, which often are the only tools that can be used to service the equipment.

Taxpayers and patients are affected because the costs for the access keys and higher service charges by OEMs are then passed on to them as part of the overhead covered by the medical provider's fees.[42]

Patients surely are also severely affected by delayed servicing caused by an inability of owners and ISOs to troubleshoot malfunctioning equipment.[43] Long service times caused by the need to wait for an OEM to send a technician with a key, lead to rescheduling of procedures and appointments. Consequently, patients' frustration with rescheduling due to unnecessary and avoidable delays are expressed in patient reporting, which is reported to the Centers for Medicare & Medicaid Services (CMS) through the Hospital Outpatient Quality Reporting Program ("Hospital OQR Program") under a mandate by the Tax Relief and Health Care Act of 2016.[44] Under the Hospital OQR Program, hospitals have a financial incentive high patient reporting.

Additionally, the TPMs are used to block access to unprotected works such as configuration files, service logs, error logs, and the like.[45] For example, as discussed below in Section 1 ("Fair Use"), purely functional materials such as service and error logs and configuration files are placed behind the TPMs.[46] Thus, the TPMs adversely prevent access to and use of unprotected works which should be freely available to the owners and lessees of medical equipment.

Patient safety also is affected. The longer necessary medical equipment remains out of service, the longer patients are denied the benefit of that equipment.[47] In facilities where there is little or no redundancy of equipment, for example a smaller rural hospital or clinic, surely that can translate into a lack of medical services dependent on that equipment. Delayed medical services in turn can lead to exasperated illness or even death. Also, rather than waiting for a delayed

---

[40] Melvin Decl. at ¶ 7; *see also*, Lane-Savage Decl. at ¶¶ 13-14.

[41] *See, e.g.*, Medical Equipment Maintenance Market Report - Forecast to 2023 *available at* https://www.marketsandmarkets.com/Market-Reports/medical-equipment-maintenance-market-69695102.html (defining, describing, and forecasting the medical equipment repair market size based on device type, service type, service provider, end user, and region; stating that the medical equipment maintenance market is project to reach USD 74.49 billion by 2023 from USD 28.97 billion in 2018 and noting that OEMs are "expected to dominate market") provided herein as Exhibit 18.

[42] Kahler Decl. at ¶ 16; *see also* Lane-Savage Decl. at ¶ 21

[43] Lane-Savage Decl. at ¶¶ 15-16; *see, e.g.*, Peloso Decl. at ¶ 10.

[44] *See, e.g.*, https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HospitalQualityInits/HospitalOutpatientQualityReportingProgram provided hereto as Exhibit 19; *see also* Lane-Savage at ¶ 23.

[45] Peloso Decl. at ¶ 5; *see also*, Melvin Decl. at ¶ 5; *see also* Grogan Decl. at ¶ 6; *see also* Kahler Decl. at ¶ 6; *see also* Lane-Savage Decl. at ¶ 5.

[46] Wheeler Decl. at ¶¶ 14, 33; *see also* Melvin Decl. at ¶ 5; *see also* Kahler Decl. at ¶¶ 6-14; *see also* Lane-Savage Decl. at ¶ 5; *see also* Grogan Decl. at ¶ 6.

[47] Lane-Savage Decl. at ¶ 17.

LOC_AR_00002926

troubleshooting of the medical equipment (when a clinical technician could instead readily access the error logs), medical personnel are prone to retry use of the equipment to confirm that the equipment is malfunctioning.[48] Thus, for example, if an error occurs partway through an X-ray scan, the patient might get rescanned, thereby being subjected to extra X-ray dosing.[49]

In that regard, restrictions placed on the repair of medical devices is a risk to public safety.[50] Particularly at the height of the COVID-19 pandemic, repair and maintenance issues have increased on essential medical devices like ventilators.[51] Providing access to repair medical equipment safely and efficiently is a matter of life and death.[52]

More specifically, medical systems and devices play a pivotal role in the screening and diagnosis of COVID-19. For example, reverse-transcription polymerase chain reaction (RT-PCR), which is an essential tool for medical laboratories, and chest computerized tomography (CT) are used as diagnostic tests for COVID-19.[53] Additionally, chest X-ray machines are integral to the treatment of COVID-19 positive patients and the study of the long-term effects. Given the ubiquitous nature of COVID-19, there exists a need for hospitals, medical schools, and other medical providers to allow unfettered diagnosis, repair, and maintenance of these life-saving tools without having to wait for the limited resources of the OEMs.[54]

In an area where properly functioning machines can literally be a matter of life and death to patients, hospital and other machine owners need as many quality options as possible to keep the machines functioning properly. Petitioner's business model as an ISO, as well as the business models of other ISOs, is dependent upon the ability to quickly and efficiently respond to service requests from these owners and lessees, which significantly enhances patient safety.[55] As noted

---

[48] Kahler Decl. at ¶ 13.

[49] *Id.*

[50] *See, e.g.,* Rona Bahreini, Leila Doshmangir, and Ali Imani, Influential factors on medical maintenance management In search of a framework, Journal of Quality in Maintenance Engineering, Volume 25, Issue 1 (June 12, 2018) ("Lack of proper maintenance of medical equipment leads to equipment downtime, reduces the level of device performance, and wastes costs and resources . . . If preventive maintenance [on a medical device] is not well monitored in a hospital, patients' lives are in grave danger") provided herein as Exhibit 20; *see also* Lane-Savage Decl. at ¶ 15-18; *see also* Peloso Decl. at ¶ 10

[51] *See, e.g.,* Lauren Goode, Right-to-Repair Groups Fire Shots at Medical Device Manufacturers, Wired, *available at* https://www.wired.com/story/right-to-repair-medical-equipment-ifixit/ (May 19, 2020) ("COVID-19 has exposed not only our biological vulnerabilities but also our structural, society, and political shortcomings. Producing, procuring, and distributing all kinds of medical equipment is a complicated labyrinth outside of a pandemic; within the context of a global pandemic, every move or maneuver has the potential for more dire consequences.") provided herein as Exhibit 21; *see also* Lane-Savage Decl. at ¶ 18.

[52] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download ("The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.") provided herein as Exhibit 22; *see also* ¶ Peloso Decl. at ¶ 16-17.

[53] *See* Tao Ai, et al., *Correlation of Chest CT and RT-PCR Testing for Coronavirus Disease 2019 (COVID-19) in China: A Report of 1014 Cases,* 296 Radiology E32-E40 (Aug. 2020); *see also* Youxin Wang, et al., *Combination of CT and RT-PCR in screening and diagnosis of COVID-19,* 10 J. Global Health 1-3 (June 2020) provided herein as Exhibits 23-24, respectively.

[54] Peloso Decl. at ¶¶ 16-18; *see also* Lane-Savage Decl. at ¶ 15; *see also* Melvin Decl. at ¶ 7; *see also* Kahler Decl. at ¶ 15.

[55] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download (provided herein as Exhibit 25; *see also* Peloso Decl. at ¶¶ 11-13.

11

LOC_AR_00002927

above, without the exemption, OEMs will continue to hamper, if not outright prohibit, the legitimate service and maintenance activities of medical equipment, devices, and imaging systems by owners, lessees, and ISOs. And, even if certain limited access is provided by OEMs, it is provided at undue expense in time and money and is lacking essential information and capabilities required for proper maintenance. In short, failure to provide this exemption will continue to allow OEMs to improperly harm legitimate competition and cause unnecessary death or injury to countless patients by using TPMs to block access to portions of customer-owned medical devices needed to repair and maintain such devices in the field.

**The Copyright Office's Earlier Policy Studies**

In two policy studies, the Copyright Office previously considered the core issues this petition raises. In 2016, the Copyright Office considered the issues in connection with software enabled consumer products. *See*, U.S. Copyright Office, Software-Enabled Consumer Products (2016), https://www.copyright.gov/policy/software/software-ful-report.pdf ("**Software Study**"). In 2017, the Registrar considered the issues in connection with its policy review of Section 1201. Section 1201 of Title 17-A Report of the Registrar of Copyrights (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ("**1201 Report**").

In the Software Study, the Office considered how to allow repair of and tinkering with consumer products with software. The Office recognized that repair activities are often protected from infringement claims by multiple copyright law provisions, including the fair use doctrine and Section 117.[56]

In the 1201 Report, the Office examined statutory exemptions to permit circumvention to fix obsolete, damaged, or malfunctioning TPMs, to engage in diagnosis, maintenance, and repair of a device protected by a TPM, noting that software has become central to the repair of many devices.[57] The 1201 Report noted The Repair Ass'n & iFixit comments that the "'use of electronic locks that prevent repair' are really 'about protecting the competitive position of the manufacturers for repair services' and outside the purpose of copyright."[58]. The Office concluded that:

> ... a properly-tailored exemption for repair activities could alleviate concerns regarding section 1201's effect on consumers' ability to engage in legitimate activities that did not previously implicate copyright law, without creating a material risk of harm to the market for or value of copyrighted works. As discussed above, virtually all agree that section 1201 was not intended to facilitate manufacturers' use of TPMs to facilitate product tying or to achieve a lock-in effect under which consumers are effectively limited to repair services offered by the manufacturer.[59]

---

[56] *See* Software Study at 33, 39-41, which is provided herein as Exhibit 26.
[57] *See* 1201 Study at 88.
[58] *Id.* at 89
[59] *Id.* at 92.

12

LOC_AR_00002928

**Other Policy Considerations**

ISOs like Petitioner and OEMs are required to comply with safety or regulatory requirements set by the Food and Drug Administration ("**FDA**").[60]

The FDA's authority to regulate the servicing of medical devices by any entity, including ISOs, is grounded in the agency's authority to regulate medical devices and radiation-emitting electronic products under the Federal Food, Drug, and Cosmetic Act ("FD&C"). Notably, the FDA has concluded that third-party service providers such as Petitioner and other ISOs "provide high quality, safe, and effective servicing of medical devices." *See*, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download. *See also*, Conor Hale, FDA Passes On Setting New Regulations For Medical Device Servicing, Fierce Biotech, (Published May 17, 2018; Last Accessed July 20, 2020) *available at* https://www.fiercebiotech.com/medtech/fda-passes-setting-new-regulations-for-medical-device-servicing) (describing the FDA's decision not to require formal regulatory action, including obligatory registration and reporting of adverse events, of third party service providers of medical devices despite the Medical Imaging and Technology Alliances' urging Congress to pass legislation that would require the same).[61]

The FDA specifically recognizes and provides for third party servicing of medical imaging devices. The FDA refers to this as AIAT (assembly, installation, adjustment, and testing) servicing activities of medical imaging equipment.[62] Per the FDA, "**assembly**" refers to fitting together the parts or pieces of a component or system; "**installation**" refers to setting up for use by verifying that proper assembly and adjustments were made to assure compliance with federal performance specification; "**adjustment**" refers to bringing various component parts up to a true or more effective relative position for performance purposes; and "**testing**" refers to critical examination, observation, or observation of such conditions and operations through procedures provided by the manufacturer that will prove the unit meets specifications.[63]

Manufacturers of ionizing radiation emitting medical imaging systems are subject to information disclosure obligations by the FDA so that AIAT servicers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing of a medical imaging system to ensure it meets federal performance standards. To that end, the FDA requires at 21 C.F.R. § 1020.30(g) that:

> Manufacturers of components listed in paragraph (a)(1) of this section shall provide to assemblers subject to paragraph (d) of this section and, upon request, to others at a cost not to exceed the cost of publication and distribution, instructions

---

[60] The FDA is required to protect the public health from unnecessary exposure to electronic product radiation by, among other things, requiring that electronic products meet performance standards. *See* Section 532 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §360ii. The standards for ionizing radiation emitting devices are set forth at 21 C.F.R. § 1020. The standards for ionizing radiation emitting medical imaging devices are set forth at 21 C.F.R. §§ 1020.30-1020.33.

[61] Attached herein as Exhibit 27.

[62] *See* 21 C.F.R. § 1020.

[63] *See* Guidance Document--*Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems - Guidance for Industry and FDA Staff* (September 2003), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/information-disclosure-manufacturers-assemblers-diagnostic-x-ray-systems-guidance-industry-and-fda. Attached herein as Exhibit 28.

13

LOC_AR_00002929

> for assembly, installation, adjustment, and testing of such components adequate to assure that the products will comply with applicable provisions of this section and §§ 1020.31 [Radiographic equipment], 1020.32 [Fluoroscopic equipment], and 1020.33 [Computed tomography (CT) equipment], when assembled, installed, adjusted, and tested as directed. Such instructions shall include specifications of other components compatible with that to be installed when compliance of the system or subsystem depends on their compatibility. Such specifications may describe pertinent physical characteristics of the components and/or may list by manufacturer model number the components which are compatible.

Bundling of AIAT information with allegedly other proprietary software does not relieve an OEM from having to readily disclose the AIAT information. The aforementioned FDA Guidelines are quite explicit on this point: "Some manufacturers bundle AIAT information covered by § 1020.30(g) with other types of proprietary software; in some instances the proprietary software cannot be deleted from the bundled information. Nothing in § 1020.30 prohibits bundling software information or programs; however, the practice does not relieve manufacturers of their responsibilities under the performance standard to provide AIAT documentation or the AIAT software at cost." Moreover, the FDA regulations further provide that "[t]he owner of a diagnostic X-ray system who uses the system in a professional or commercial capacity may modify the system, provided the modification does not result in the failure of the system or component to comply with the applicable requirements of this section or of 1020.31, 1020.32, or 1020.33."[64] However, as noted above, the OEMs still place the unprotected AIAT material behind TPMs, thereby forcing owners, lessees, and ISOs to go through cumbersome, time consuming and unnecessarily expensive procedures to gain access to this information. Further, OEMs often fail or refuse to classify all relevant software and information as AIAT information.

**The Proposed Exemption is for Noninfringing Uses[65]**

The execution of computer programs and access to related data files and manuals by owners of medical systems and devices, or those acting at their behest, such as ISOs, for the purpose of diagnosing, repairing, or maintaining their systems and devices, does not constitute copyright infringement for at least three reasons. First, such activities constitute fair use under 17 U.S.C. § 107. Second, such activities are exempted from infringement as an essential step in the utilization of a computer program in conjunction with a machine under 17 U.S.C. §117 (a)(1). Third, such activities are exempted as permitted machine maintenance and repair under 17 U.S.C. § 117(c).

**1.     Fair Use**

The Copyright Act sets forth four factors to consider when determining whether a use of a copyrighted work is noninfringing fair use.[66]  :

---

[64] *See* 21 C.F.R. § 1020.30(q)(2).
[65] Petitioner is engaged in litigation with Philips and the arguments expressed herein should not be construed or interpreted as limiting arguments that may be applicable to that litigation depending on the specific facts and laws at issue in the pending action(s).
[66] *See* 17 U.S.C. § 107

LOC_AR_00002930

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

In prior and current exemptions, the Librarian has recognized the fair use of computer programs for the diagnosis, repair, and modification of motorized land vehicles both in 2015 and 2018 for many of the same reasons Petitioner relies upon. In 2018, the Librarian also recognized the fair use of computer programs for the maintenance and repair of appliances:[67]

(9) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle, or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works.

(10) Computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC, or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(10):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

The 2015 Recommendation of the Registrar of Copyrights for Rule Making: Sixth Triennial Proceeding to Determine Exemptions on the Prohibition on Circumvention (Oct. 2015) ("**2015 Recommendation**") and the 2018 Recommendation of the Acting Registrar of Copyrights for Rule Making: Seventh Triennial Proceeding to Determine Exemptions on the Prohibition on

---

[67] *See* 37 C.F.R. § 201.40(b)(9) & (10)

LOC_AR_00002931

Circumvention (Oct. 2018) ("**2018 Recommendation**")[68] contain extensive discussions of these factors in the contexts of ECUs for land motor vehicles and software for appliances and other devices.

The 2018 Recommendation is particularly instructive.

> With respect to the first factor, the purpose and character of the use of the computer programs and data files by or on behalf of an owner is clear. The computer programs and data files are used to either (i) assemble and install their new systems and devices, or (ii) repair and maintain their existing systems and devices.

From page 203 of the 2018 Recommendation (footnotes omitted):

> In analyzing the first fair use factor, the Acting Register notes that the Copyright Office' Software Study observed that, because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, "repair supports—rather than displaces—the purpose of the embedded programs." Applying similar logic, the 2015 rulemaking concluded that the first factor favored an exemption for vehicle repair because the activities were personal, noncommercial, and would "enhance the intended use" of the vehicle programs. Moreover, the Office's Section 1201 Report observed an emerging "general understanding that bona fide repair and maintenance activities are typically noninfringing." Because proponents express the same desire to engage in these bona fide repair activities with respect to other devices, the Acting Register concludes that this factor favors proponents.

With respect to medical systems and devices generally, it is equally true that "repair supports—rather than displaces—the purpose of the embedded programs." The systems and devices continue to be useful after repair and provide the intended functions in a safe and reliable manner. Further, it ensures patient and medical personnel safety and well-being. Indeed, it can be the difference between life and death for some individuals.

With respect to diagnostic X-ray systems in particular, as noted above, those systems are subject to information disclosure obligations so that AIAT servicers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing of an X-ray system to ensure it meets federal performance standards.[69] In its guidance for compliance with this rule, the FDA requires that when OEMs supply the AIAT information in the system software, that software must be made available to those performing AIAT servicing activities. Moreover, the federal regulations further provide that "[t]he owner of a diagnostic X-ray system who uses the system in a professional or commercial capacity may modify the system, provided the modification does not result in the failure of the system or component to comply with the applicable requirements of this section or of 1020.31, 1020.32, or 1020.33."[70] Thus, the first factor weighs in favor of fair use.

---

[68] Attached herein as Exhibit 29.
[69] 21 C.F.R. § 1020.30(g).
[70] 21 C.F.R. § 1020.30(q)(2).

LOC_AR_00002932

Regarding the second factor, the nature of the computer programs and data files involved is that they are entirely functional or essentially functional works used to control operation of the systems and the diagnosis, repair, and maintenance of the systems. They are used to support operation, mechanical, and electronic processes of the medical systems. If computer programs and data files are expressive at all, the expressiveness is *de minimis*. For example, error logs are computer files containing lists of noted faults that occur during use of a medical device. Event logs are lists of other non-fault events, such as tasks computer calls and internet connections, to name two. Configuration files simply have set up the configuration of the machine at a very base level. For the sake of argument, while such files do not express any human creativity or, to the extent thin copyright protection may be warranted, the equipment owner, such as a hospital, owns these automatically generated files.[71] The equipment owner requires access to such programs and files for maintenance and repair. There is no conceptual difference between these types of computer programs and data files and those used, *e.g.*, in modern-day land-based vehicles or appliances. The manuals are technical and contain data, namely information of the functions of the systems or devices and the operating specifications. These are not novels or highly creative works. The creativity, if any, is *de minimis*. Thus, the second factor weighs in favor of fair use for the same reasons the Office articulated in the 2018 Recommendation.

Regarding the third factor, it is necessary, i.e., required, to execute the computer programs and access the data files during servicing activities to understand system or device performance and, in several instances, update the data files such as service logs. As noted above, the machines are, for all intents and purposes, specialized computers in which the software is inseparable from the hardware and the machines cannot function without the computer programs and data files. The servicing computer programs and data files involved can be but a small portion of the entire software package used to operate and service the medical imaging system and are integrated into the machine. For instance, the software on a Philips Allura system comprises various modules used to control different portions of the system or to perform different functions, only some of which are involved in the servicing activities. In the Allura software, the Field Service Framework and associated service logs are invoked for servicing of an X-ray diagnostic system. Simply put, no "copies" of the Allura code—or even portions of the code—are ever made other than what is necessarily executed when using the particular customer-owned machine. Moreover, any "copies" of service logs should not constitute infringement.

Further, manuals are needed to understand the manufacturers specifications for the systems and devices, and to correctly identify replacement parts. With this understanding, an owner or its agent can ensure the medical system or device is operating safely and in compliance with the specifications. Thus, the third factor also weighs in favor of a finding of fair use.

Regarding the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work is minimal.[72] The computer programs and data files are necessary for the

---

[71] *See Lexmark International, Inc. v. Static Control Components, Inc.*, 3877 F.3d 522, 536 (6th Cir. 2004) (configuration files and lock-out codes generally "fall on the functional-side rather than the original-expression side of the copyright line"); *Sony Comput. Entm't, Inc. v. Connectix Cor.*, 203 F.3d 596,603 (9th Cir. 2000) ("[T]he fair use doctrine preserves public access to the ideas and functional elements embedded in copyright computer software programs.")

[72] Although OEMs will argue that their investments in computer software enable them to better serve customers, this is not so. According to the FDA Report conducted in 2018, twenty-nine complaints alleged inadequate servicing by OEMs in addition to others that complained about OEMs not providing service manuals, not providing critical

LOC_AR_00002933

operation and control of the medical equipment, including the basic servicing of the equipment, and are sold together with the equipment in which they are employed. They have no other use. Thus, the OEMs must include them or make them available to enable operation, control, and servicing of medical equipment. Although OEMs might sell or make available updates to their software, there is no independent market for the computer programs and data files outside of the purchase of new equipment because the software is not of any value outside of use on this equipment.[73]

The electronic manuals merely provide technical information. They too have no value or use other than to provide information for the servicing of the systems and devices. Moreover, manuals used to be provided freely by OEMs and thus have a demonstrated neutral effect on the market.

The value to OEMs is in the TPMs that restrict access to the computer programs and data files. The value is not in the computer programs or data files themselves. That is to say, the computer programs and data files must be included for anyone to operate or perform any servicing activities on the systems and devices, given the replacement of electrical and mechanical parts by software-based components. There is no need to otherwise copy or access the computer programs and data files. But, as recognized in the 1201 Study, the TPMs allow the OEMs to maintain a monopoly or near monopoly on the servicing of the systems and devices they sell because they can control the equipment even after its sale.

Because the use by ISOs does not affect the market for or value of the computer programs and data files involved, the fourth factor also weighs in favor of a finding of fair use.

## 2.    Use is an Essential Step under 17 U.S.C. § 117(a)(1)

Congress exempted from infringement certain executions of computer programs in connection with the repair and maintenance of machines.

Title 17 U.S.C. §117 (a)(1) provides:

> (a)(1) Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

Access, use and/or adaptation of the computer programs and data files embedded in medical equipment is undeniably an essential step in the servicing and repair activities associated with the medical equipment and in maintaining the usefulness of the systems and devices. As mentioned above, the software is integrated into and is inseparable from the machines if the machines are to operate. Owners, including refurbishers like Petitioner, pay substantial consideration in

---

replacement parts, providing poor technician training, knowingly falsifying service records and device serial numbers, and conducting repairs using broken replacement parts. *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download.
[73] Wheeler Decl. at ¶ 35.

LOC_AR_00002934

exchange for ownership of medical equipment (*i.e.*, hardware) that invariably includes—due to the complex nature of modern medical systems—software embedded within the equipment. The equipment is useless without the software embedded by the OEMs. Some OEMs attempt to only "license" the embedded software. However, there is no alternative to the software as it is tailored to the equipment, and there are no market alternatives. But licenses are only for the intellectual property rights. The copies of the software are included as part of the purchase of the machines. Accordingly, the equipment owners are "owners" of copies of computer programs copies of which are "created as an essential step in the use of the computer program in conjunction with a machine," and "used in no other manner." [74] To conduct repair and maintenance of the medical equipment they own, hospitals and other medical care providers, and ISOs like Petitioner, use the computer software embedded in the medical equipment as an essential step in the utilization of the equipment in order to repair, diagnose, and maintain the equipment. Thus, use of the servicing computer programs and data files is exempt from infringement under Section 117.

Petitioner and ISOs like it are lawful possessors of diagnostic medical equipment, and the right of possession to the hardware they own is perpetual. That some OEMs may claim they only "license" the software is not relevant.[75] Licensing is a concept relating only to intellectual property rights. Thus, the "licensing" is only relevant to how an OEM attempts to control use of the software. It does not control who owns the copy of the software on a machine, which is included in purchase of the machine. Additionally, and because use of the software is an essential step in the use of the machine, as explained above, Section 117 provides an exception as to any controls attempted by the licensing terms.

---

[74] *See, e.g., Krause v. Titleserv, Inc.*, 402 F.3d 119 (2nd Cir. 2005) (holding company's modification of copyrighted computer programs created for it by former consultant, after consultant declined to turn over source code, was "essential step" in their utilization, within meaning of Copyright Act's safe harbor provision; modifications, which fixed bugs, allowed company to add new client information, adapted program so it would function on company's new system, and added new features, were necessary if company was to make use of programs on its machines); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32 (2nd Cir. 2019) (holding that modifications made by licensee, a medical device company, to server software customized by software developer for licensee's multi-phased test handling system project that allowed existing server software to interact with additional systems in manner intended when source code was developed for licensee was essential step in utilization of computer programs in conjunction with machine).

[75] *See e.g.*, Raymond Nimmer, The Law of Computer Technology § 1.18[1] p. 1–103 (1992) ("Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy."); *Compare, e.g., Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.), Second Amended Complaint, ¶ 33 (alleging that when Philips sells medical equipment, "the agreement establishes that the presence of Proprietary Service Materials will not give the customer any right or title to such property or any license or other rights to access or use such property").

19

LOC_AR_00002935

3.    **Hardware Maintenance and Repair 17 U.S.C. § 117(c).**

Congress exempted from infringement certain executions of computer programs in connection with the repair and maintenance of machines.

Title 17 U.S.C. §117 (c) provides:

> (c) Machine Maintenance or Repair.—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—
>
> > (1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and
> >
> > (2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

To perform the servicing activities, it is necessary to activate the central controlling computer to operate the various components of the medical system or device, and simply to obtain diagnosis information. When performing the servicing activities, the diagnostic and testing modules are used to diagnose the operating conditions and to determine if the system or device is performing according to specifications. Data files such as event logs and error logs may be opened to diagnose system or device issues, confirm operating information, or to otherwise update servicing information for proper record keeping. Configuration files may be reviewed for proper configuration of the machines.

Following a servicing activity, except for any updated data reflecting servicing information, the computer programs and data files are left in their original condition. There are no copies to be destroyed. However, deactivation or reactivation of the medical imaging systems will automatically "destroy" any "new" copy of the modules and data files. Thus, use of the servicing computer programs and data files is exempt from infringement under Section 117.

**ISOs Working at the Direction of the Owners and Lessees Should Not be Excluded From the Exemption**

In its 2018 Recommendation for making the exemptions for land vehicles and appliances noted above, the Copyright Office specifically declined to exclude third party assistance and declined to include language that the circumvention be "undertaken by the authorized owner."[76] The proposed exemption for servicing materials for medical devices is similarly fashioned and will enable owners and lessees who do not have the ability to service their medical equipment or skills and equipment to circumvent TPMs. This would be in concert with the Office's 2018

---

[76] Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention ("**2018 Recommendation**") at 224-225.

20

LOC_AR_00002936

position that in future rulemakings it would "seek to avoid recommending unduly narrow definitions of exemption beneficiaries."[77] Further, the proposed exemption is easily understood that it would apply to the extent it does not implicate the anti-trafficking provisions Section 1201(a)(2) as it would be limited to circumvention where such circumvention does not constitute a violation of any other applicable law.

**Conclusion**

For all of the reasons set forth above, the Librarian should determine that the non-infringing uses described above are, and are likely to be, adversely affected by the anti-circumvention prohibitions of Section 1201(a), and therefore approve the proposed exemptions for the period 2021-2024.

DOCUMENTARY EVIDENCE

Copies of the Exhibits referred to in this comment, including declarations, are attached hereto.

---

[77] Section 1201 Report at 62.

LOC_AR_00002937





UNITED STATES COPYRIGHT OFFICE

## Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

ITEM A.  COMMENTER INFORMATION

The Advanced Medical Technology Association (AdvaMed) is a trade association representing the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems.  Together, our members manufacture much of the life-enhancing and life-saving health care technology purchased annually in the United States and globally. AdvaMed members range from the largest to the smallest medical technology producers and include hundreds of small companies with fewer than 20 employees. Our members are committed to developing new technologies and services that allow patients to lead longer, healthier, and more productive lives. The devices made by AdvaMed members help patients stay healthier longer and recover more quickly after treatment and enable clinicians to detect disease earlier and treat patients as effectively and efficiently as possible.  Strong intellectual property protections, including copyright protection for source code and device outputs, are essential to developing and bringing medical technologies to market.

Christopher L. White
Chief Operating Officer and General Counsel
Advanced Medical Technology Association (AdvaMed)
701 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004
cwhite@advamed.org
202-783-8700

ITEM B.  PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair and the proposed expansion to Medical Devices

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (PL. 93-579).

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004010

ITEM C. OVERVIEW

For the reasons stated below, we respectfully request that the Copyright Office oppose the inclusion of medical devices in Proposed Class 12.

Position Summary

- Allowing unauthorized circumvention of Technological Protection Measures (TPMs) in medical devices can harm patients, compromise patient privacy, and place valuable intellectual property at risk.

- Permitting unauthorized circumvention to maintain, repair, or modify a medical device without FDA oversight and without the manufacturer's consultation will endanger patients.

  o AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

- No exemption should be granted to permit modification of a medical device

  o Under FDA regulations, modifications to a medical device, including changes to service parts and servicing instructions, must be evaluated to determine if the changes trigger a new FDA review or approval for safety and efficacy.

  o Unauthorized Independent Service Organizations (ISOs), which are commercial organizations in the business of providing maintenance and repair services, are not regulated by the FDA. As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a medical device during servicing. For example, it was reported that an unauthorized ISO used replacement parts from a hardware store instead of Original Equipment Manufacturer (OEM) verified parts, which are required to be tested for biocompatibility, toxicity, strength, and other specifications essential to the safety and efficacy of the device.

- No exemption should be granted for medical device diagnosis, maintenance, or repair by Unauthorized ISOs.

  o Robust service and repair offerings already exist through OEMs and *authorized* ISOs (third-party service/repair organizations that the OEM authorizes, trains, and ensures has the necessary equipment to perform maintenance and repair services on OEM devices). These entities can ensure that the necessary protections for patient safety, patient privacy, and intellectual property are in place and maintained.

2

JA216

- ▪ These protections include obligations to adhere to FDA Quality System Regulation (QSR) requirements, which include the following (among others):

  - the obligation to develop and preserve proper records regarding servicing of each device;

  - training – including documentation of training – and maintenance of certification for service personnel;

  - calibration of equipment used to repair devices;

  - use of appropriately tested and validated replacement parts;

  - reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

  - registration of facilities to enable FDA inspection of compliance to these FDA QSR regulations.

- o Unauthorized ISOs have no obligation to follow rigorous QSR requirements.

- o 17 USC 117(c) limitations do not apply to the use of some medical device embedded diagnostic software accessed by unauthorized ISOs through TPM circumvention and utilized to diagnose maintenance and repair issues.

  - ▪ This diagnostic software embedded in the medical devices is both (1) not necessary for the activation or routine operation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device.

    - Such embedded diagnostic software is specifically excluded from what is sold, leased, or licensed to the device owner/lessee, and only authorized servicers are permitted to access it.

    - The sales/lease agreements for these medical devices also include provisions that control how and who may service the device.

- o An exemption for medical device diagnosis, maintenance, and repair has the potential to embolden piracy of accessory/add-on functionality, subscription-based functionality, and standalone software on medical devices.

- An exemption that includes medical devices may also negatively impact medical technology innovation, health care costs, and supply chain integrity.

3

LOC_AR_00004012

**ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

The following are examples of the Technical Protection Measures (TPMs) used on medical devices and/or how they may be circumvented. This list is not exhaustive, and not all TPMs may be applicable or required for each device type.

Limit Access to Trusted Users Only

- TPMs that ensure secure communications with the device using strong encryption and authentication.

- Limit access to use or communicate with devices through the authentication of users (e.g., user ID and password, smartcard, biometric, or digital certificates). If digital certificates used for strong authentication are not stored in a highly secure manner, it may be possible to compromise and use them to gain access to the device improperly.

- Use automatic timed methods to terminate sessions within the system where appropriate for the use environment;

- Controlling and limiting the times that the device is able to communicate to reduce the window for possible attacks. Through observation and monitoring of the device through circumvention activities, an actor could determine when or under what conditions the device is available for communications.

- Encryption data on the device. If the schema for encrypting data on the device is not sufficiently complex, or that schema has been compromised by others before, circumvention activities may be possible to "un-encrypt" and view the data. Additionally, if the digital key that contains the encryption details is not sufficiently protected or is exposed by circumvention activities, encryption can be bypassed.

- Where appropriate, a layered authorization model is employed by differentiating privileges based on the user role (e.g., caregiver, system administrator) or device role;

- Use appropriate authentication (e.g., multi-factor authentication to permit privileged device access to system administrators, service technicians, maintenance personnel);

- Strengthen password protection by preventing the use of a "hardcoded" password or common words (i.e., passwords which are the same for each device, difficult to change, and vulnerable to public disclosure) and limit public access to passwords used for privileged device access;

- Where appropriate, providing physical locks on devices and their communication ports to minimize tampering; and

4

LOC_AR_00004013

- Require user authentication or other appropriate controls before permitting software or firmware updates, including those affecting the operating system, applications, and anti-malware.

### Limit Access to Purchased or Leased Functionality/Services and Prevent Unauthorized Copies

- TPMs, such as a layered authorization model, are used to limit access to only those functionalities or services that were purchased or leased.

  - Additional functionalities, analytics, and integrations are made available for purchase, lease, or subscription and are often provided for, at least in part, by copyrighted software.

  - In some medical devices, the copyrighted software code can perform certain operations on another independent computer (e.g., personal computer with a Unix operating system) that was not purchased or leased with the medical device.

  - Some copyrighted software in medical devices is owned by an entity that is not the medical device manufacturer and is licensed to certain specified entities that do not include the owner/lessee of the device. In some of these instances, the medical device manufacturer is contractually obligated to protect the software code from unauthorized access and copying.

  - TPMs are also used to protect some diagnostic software embedded in medical devices that is both (1) *not* necessary for the activation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device. Such diagnostic software is only licensed for access and use by specified authorized servicers.

### Ensure Trusted Content

- Restrict software or firmware updates to authenticated code. One authentication method manufacturers may utilize is code signature verification;

- Use systematic procedures for authorized users to download version-identifiable software and firmware from the manufacturer; and

- Ensure capability of secure data transfer to and from the device, and when appropriate, use methods for encryption.

### Detect, Respond, Recover

- TPMs (security software) on the device to ensure that the security and integrity of the device source code is protected. If the security software is not configured correctly or a new vulnerability is discovered in that software, it may be possible to compromise the security software and access the device source code.

5

LOC_AR_00004014

- Technical Protection Measures that protect the device from malicious code via regular software updates and/or malware protection software. If new security vulnerabilities are discovered in a particular type of device, and the device software and/or the malware software on the device has not been updated to eliminate the vulnerability, malicious actors could engage in circumvention activities that exploit the vulnerability to inject malicious code into a device, and take control of it.

- Implement features that allow for security compromises to be detected, recognized, logged, timed, and acted upon during normal use;

- Develop and provide information to the end-user concerning appropriate actions to take upon detection of a cybersecurity event;

- Implement device features that protect critical functionality, even when the device's cybersecurity has been compromised; and

- Provide methods for retention and recovery of device configuration by an authenticated privileged user.

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

*Whether the proposed class includes at least some works protected by copyright.*

1.  **The Extension of Proposed Class 12 to Cover Computer Programs that are Contained in and Control the Function of Medical Devices Includes At least Some Works Protected by Copyright**

   While such determinations are fact-specific, copyright protection generally extends to computer programs on medical devices. The source code and object code in a medical device can include protectable original expressions under copyright law.[1] Copyright protection may extend beyond the literal code to the software's structure, sequence, and organization.

   Outputs from a medical device can also constitute copyrightable subject matter. While such a determination is also fact-specific, copyright protection in device outputs may extend to, for example, the structure, format, and arrangement of the output data.[2]

---

[1] See *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1248-49 (3d Cir. 1983) ("[A] computer program, whether in object code or source code, is a "literary work" and is protected from unauthorized copying, whether from its object or source code version.")

[2] *See Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1345 (5th Cir. 1994) (holding that user input/output formats are protectable); *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F. Supp. 2d 531, 535 (N.D. Tex. 2003) (holding that SQL data structures meet the requisite degree of creative expression).

6

LOC_AR_00004015

*Whether the uses at issue are noninfringing under title 17.*

## 2. Uses at Issue are Infringing Under Title 17

### (a) Fair Use

In determining whether the use made of a copyrighted work in any particular case is a noninfringing fair use, the following four factors are considered: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.[3]

#### (i) The Purpose and Character of the Use is Commercial in Nature

Repairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use.[4] The primary proponents are for-profit Independent Service Organizations (ISOs) who are in the business of providing maintenance and repair services for medical devices. They seek the inclusion of medical devices in Proposed Class 12 to expand their commercial offerings to also include the diagnosis, maintenance, repair, and modification of medical devices without an OEM's authorization. The commercial nature of this use weighs against considering this use to be fair.

Some unauthorized ISOs have circumvented TPMs on medical devices and accessed copyrighted software to utilize software programs that were not sold/leased/licensed to the device's owner/lessee. This includes embedded software that is not necessary for the activation of the device. Examples of such embedded software are programs that diagnose maintenance and repair issues, collect and transmit certain data, perform analytics that are not essential to the device's operation, aid in planning medical treatments, and enhance or reconstruct images.

Similar unauthorized ISOs have circumvented TPMs and cloned the software on a medical device they serviced for one client and copied that software onto another client's devices. In one case, embedded treatment planning software, which is sold as an entitlement and not enabled unless separately purchased, was purchased by one client for a single device. An unauthorized ISO cloned the software in its enabled form and copied it onto 40 devices owned by

---

[3] 17 U.S.C. §107

[4] U.S. Copyright Office, Software-Enabled Consumer Products 39 (2016), https://www.copyright.gov/policy/software/software-full-report.pdf

7

LOC_AR_00004016

unrelated entities that did not purchase the treatment planning software. While this use is outside the scope of Proposed Class 12, there are legitimate concerns that granting the proposed exemption would embolden such acts of piracy.

There is also a commercial benefit to offering maintenance and repair services without authorization. Unauthorized ISOs have fewer costs relative to authorized ISOs who are contractually obligated to undergo OEM approved training, adhere to FDA Quality System Regulation (QSR) requirements, protect patient privacy, and protect intellectual property. Authorized ISOs are provided with a license and an authorized means to access copyright-protected software on medical devices that includes software that is involved in the function of the device (e.g., software to enter settings) and software that is not necessary for the function of the device (e.g., software that diagnoses maintenance and repair issues), which is not sold/leased/licensed to the device owner/lessee.

**(ii) Some Copyright Work on Medical Devices is Unpublished in Nature.**

The use of unpublished work is less likely to be considered fair. Some copyright protected software on medical devices is not published.

**(iii) Diagnosis, Maintenance, Repair, and Modification of Medical Devices Often Involve Using All or Substantial Portions of the Copyrighted Work.**

Using all or substantial portions of a copyrighted work weighs against considering this use to be fair.

**(iv) Uses at Issue Have the Potential to Harm the Value of the Copyrighted Work**

Unlike software-enabled consumer products, there is a market for some medical device software modules as standalone works. Some software on medical devices is activated and maintained through a subscription model. Other software in medical devices can also function on independent, unrelated computers (e.g., a personal computer with a Unix operating system can run certain analytical and image processing software installed in some diagnostic imaging workstations).

In some instances, the medical device manufacturer is not the owner of the copyright of certain software modules integrated into a medical device. For example, some medical devices are developed through a collaboration between a medical device manufacturer and a robotics and software company. In certain instances, some limitations in the software license are due to constraints imposed by a third-party collaborator (in the above example, the robotics and software company that owns the copyright to certain software modules), which are distributed with the device via written licensing

8

JA222

LOC_AR_00004017

agreements.  In such instances, there are contractually obligated limitations specifying that maintenance and repair of certain aspects of the device may only be performed by the third-party robotics and software developer (i.e., the device manufacturer itself may not perform the maintenance or repair on certain aspects of the device).

The use at issue is the diagnosis, maintenance, repair, or modification of a medical device by an ISO that is not authorized by the OEM.  Such uses can result in patient injury, compromise patient privacy, and place valuable intellectual property at risk, all of which can harm the value of the copyrighted work.  Unauthorized ISOs have no obligation to follow rigorous FDA Quality System Regulation (QSR) requirements.  These patient safety concerns are not hypothetical.  Please see the section covering the fifth statutory factor below for a more fulsome discussion with examples.

**(b) Section 117 Limitations of Exclusive Rights**

    **(i)  The section 117(a)(1) limitation on exclusive rights does not apply to a number of medical devices where the owner of the device is not an owner of a copy of one or more software modules that control certain functions of the device.**

Section 117(a) only applies to the "owner of a copy of a computer program."[5] The software on numerous medical devices is provided through a written license agreement.

Some software program modules and associated functionalities are activated and maintained through a time-based subscription service.  Where software is integrated into a device that is sold, the *Vernor* test can be used to determine whether a transaction should be characterized as a sale or a license.  Under *Vernor*, "a software user is a licensee rather than an owner of a copy where the copyright owner: (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions."[6]  For some software modules, a nontransferable license is provided, or transfer of the license requires the copyright owner's consent.  Such licenses generally prohibit modification, translation, and reverse-engineering and may impose use restrictions.  For example, the medical device discussed above in 2(a)(iv) above contractually limits maintenance and repair to the third-party robotics and software company that co-developed the medical device with the manufacturer.

---

[5] 17 U.S.C. § 117(a)

[6] *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)

9

LOC_AR_00004018

Other software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the operation or function of the device. Examples of this include software that diagnoses maintenance and repair issues, data collection software, and data analytics software, among others.

**(ii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to the proposed use of modifying a medical device.**

One of the uses at issue for Proposed Class 12 is the modification of a medical device. The section 117(c) defense is limited to maintenance and repair as defined in section 117(d). Although the definition includes "any changes to those specifications authorized for that machine," the lessee of a medical device would generally violate a contractual obligation by modifying or authorizing a third party to modify the device without the authorization of the lessor. A similar violation occurs in analogous situations where the software is provided under a written licensing agreement, which generally prohibits modification of the device.

**(iii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to embedded diagnostics software that is not necessary for the machine to be activated.**

Some software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the activation of the medical device, which is excluded from the limitation on rights for maintenance and repair under 17 USC 117(c)(2). Examples include embedded software that diagnoses maintenance and repair issues, collects data, and performs analytics. Unauthorized ISOs circumvent TPMs to utilize embedded software programs during unauthorized servicing.

**3. Users are Not Likely to be Adversely Affected in their Ability to Make Noninfringing Uses.**

In assessing the adverse effect, the following five statutory factors in 17 USC §1201(a)(1)(C) must be balanced: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.

**(i) The availability for use of copyrighted works is not impacted**

Proponents offer that access to copyrighted works is diminished because unauthorized ISOs are deterred due to the prohibition on circumventing TPMs and claim that the situation has worsened because of the pandemic. However, there is no evidence that hospitals are having any difficulty finding properly trained servicers for their devices,

10

JA224

LOC_AR_00004019

either from the original manufacturer or their authorized repair technicians. These authorized servicers are conducting on-site repairs, providing remote technical assistance, and delivering necessary replacement parts without interruption to patient care. Medical technology companies are successfully working hand-in-glove with hospitals, clinics, and other health care institutions to service, repair, and maintain crucial medical devices. Ultimately, to ensure patient safety, unauthorized ISOs need more than just access to a repair manual to fix and maintain these sophisticated, life-saving medical technologies properly. They need the same knowledge, training, and expertise the OEMs and authorized ISOs have. Even one minor miscalculation could lead to catastrophic injury—to the patient or the device user. Until there is evidence of an actual shortage of properly trained service technicians, the movement to lower medical device repair standards remains a solution in search of a problem. Alternatives that do not require circumvention exist to diagnose, maintain, and repair medical devices. Authorized ISOs have OEM-granted access mechanisms to diagnose, maintain, and repair devices and are a preferred alternative for patient safety. Owner or lessee users of medical devices can also have their staff become authorized to diagnose, maintain, and repair devices through training programs and undertaking certain QSR obligations.

**(ii) The availability for use of works for nonprofit archival, preservation, and educational purposes is not especially relevant to the use at issue.**

**(iii) The impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research is also not particularly relevant to the use at issue.**

**(iv) The circumvention of technological measures has the potential to affect the value of copyrighted works negatively.**

The circumvention of access controls on medical devices could result in a diminution in the value of copyrighted works if those medical devices could no longer reliably protect the computer programs, patient data, and analytics operating on and produced by the medical devices. There are also concerns about accessing and activating software modules that are purchased or licensed separately following an additional purchase or subscription model. Activating such software modules without authorization would obviously negatively affect the value of that copyrighted work.

**(v) Such other factors as the Librarian considers appropriate.**

Patient safety should be the highest priority concern and substantially outweigh other factors. Medical device manufacturers are highly regulated to ensure that devices continue to be safe and effective for patients for their intended use. OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, by regulation, design changes to a medical device, including changes to service parts and servicing instructions, must be

11

LOC_AR_00004020

evaluated to determine if the changes trigger a new FDA review or approval before they can be implemented.

ISOs are not regulated by the FDA. As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a device during servicing. For example, in one instance, an unauthorized ISO used replacement parts from a hardware store instead of the OEM verified parts, which are required to be tested for biocompatibility, toxicity, strength, etc. The result is that unauthorized ISO serviced devices may no longer be as safe and effective as the original device, with the potential for serious patient or user injuries.

In contrast, OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, OEMs must follow other regulatory requirements, including those from the FDA Quality System Regulation (QSR), which require the following (among others):

- the development and preservation of proper records regarding servicing of each medical device;

- training – including documentation of training – and maintenance of certification for service personnel;

- calibration of equipment used to repair devices;

- use of appropriately tested and validated replacement parts;

- reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

- registration of facilities to enable FDA inspection of compliance to FDA regulations.

Under the QSR, OEMs are required to update and maintain strict revision control on servicing documentation and device software, and to ensure that their trained and authorized service representatives are utilizing the most up-to-date information. OEMs are also required to audit their service representatives to ensure they are using appropriate servicing documentation for the model of the device they are servicing. Failure to do so could have serious implications for patient safety.

ISOs authorized by OEM are contractually obligated to implement these requirements.

These patient safety concerns are not hypothetical. AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

LOC_AR_00004021

***Actual or potential patient and/or operator impacts from these reports include:***

- Screwdriver tip lodged in a patient;

- Operator injury, counterpoise support system arm (80-93 pounds) struck operator;

- Potential for repeat CT scans and contrast administration with the concomitant risk of additional radiation exposure;

- Potential for burns including internal or oral 3rd-degree burns, which may not be apparent until burning tissue is sensed;

- Delayed surgery (potential for worsening patient condition);

- Prolonged surgery (may result in longer exposure to anesthesia, a greater potential for infection, and more blood loss);

- Potential for concussions and/or fractures;

- Infusion therapy - Air in System – potential harms include death, neurological changes, stroke, seizures, cardiac and/or respiratory arrest, pain, decreased oxygenation, arrhythmia, pulmonary hypertension;

- Delays in infusion therapy with the delay of pharmacological effects and/or worsening of condition including death;

- Insufficient or excessive infusion therapy or interruption of therapy and/or worsening of condition including death; and

- Temporary hearing loss; ringing in ears.

- Below are examples of unauthorized ISO "servicing" (which should actually be deemed remanufacturing under FDA regulations).



*Figure 1. The angle cover on an endoscope was replaced with a material resembling plastic wrap.*

13

LOC_AR_00004022



*Figure 2. The shaft adapter on an endoscope was repaired using a putty-like material of questionable provenance.*

In these examples, unauthorized ISOs clearly used components that are not likely biocompatible and likely would not withstand the reprocessing and sterilization process. It is also likely that these repairs, particularly Figure 1, compromised the device's ability to perform its key function of accessing a patient's anatomy.



*Figure 3. An Olympus component was inserted into a KARL STORZ endoscope shaft.*



*Figure 4. Broken image fibers in an endoscope.*

Examples in Figure 3 and Figure 4 are equally if not more concerning than the previous examples because they show that a device can be modified such that the physician or patient cannot see the change.

14

LOC_AR_00004023

Granting an exemption to allow circumventing TPMs to diagnose, maintain, or repair medical devices also raises concerns about whether the TPMs will be safely restored. Critical design details and software code could be accessed more easily by entities with malicious intent who could use the information to develop counterfeit devices, counterfeit software (for the software modules that stand alone), or who could intentionally modify devices in order to harm patients. Lastly, if an exception is granted for medical devices, there may be a negative impact on medical technology innovation, health care costs, and supply chain integrity.

15

LOC_AR_00004024



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

## Item A. Commenter Information

As the leading trade association representing the manufacturers of medical imaging equipment, contrast agents, radiopharmaceuticals, and focused ultrasound devices, the Medical Imaging & Technology Alliance (MITA) is writing in response to the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act. Commenter may be reached through the following individuals:

Holly Grosholz
Senior Manager, Government Relations, MITA
Office Phone: 703.841.3228
Email: hgrosholz@medicalimaging.org

Peter Weems
Senior Director, Policy & Strategic Operations, MITA
Office Phone: 703.841.3283
Email: pweems@medicalimaging.org

Peter Tolsdorf
General Counsel and Secretary
National Electrical Manufacturers Association (NEMA)
Office Phone: 703.841.3204
Email: peter.tolsdorf@nema.org

## Item B. Proposed Class Addressed

Proposed Class 12: Computer Programs—Repair.

## Item C. Overview

Petitioners Transtate Equipment Company and Summit Imaging, Inc., seek an exemption under 17 U.S.C. § 1201 to allow the circumvention of technological protective measures (TPMs) for purposes of diagnosis, modification, and repair of medical imaging devices. These petitions come within Proposed Class 12: Computer Programs—Repair. The below comments submitted by MITA address the proposed exemption regarding medical imaging devices, including magnetic resonance imaging (MRI) scanners, computed tomography (CT) scanners, and X-Ray machines.

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (PL, 93-579).

This authority for requesting this information is 17 U.S.C. §§ 120 (a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004095

**ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

Medical imaging device manufacturers (OEMs) use a range of TPMs to protect copyrighted material from being accessed and copied without authorization from the copyright holder. These TPMs include passwords, encryption, access codes, physical access keys with embedded authorization codes, and digital signatures. The methods currently used to circumvent TPMs include copying or cloning physical access keys, "brute force" password cracking, improperly accessing passwords or access keys from authorized users, and the use of passcode-generating algorithms.

**ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES**

**I.    The users of the copyrighted works are not adversely affected by the prohibition in their ability to make noninfringing uses of the copyrighted works**

Under 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress and Register of Copyrights shall consider whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works." In conducting such rulemaking, the Librarian shall examine—

  (i)     the availability for use of copyrighted works;
  (ii)    the availability for use of works for nonprofit archival, preservation, and educational purposes;
  (iii)   the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;
  (iv)    the effect of circumvention of technological measures on the market for or value of copyrighted works; and
  (v)     such other factors as the Librarian considers appropriate.

These criteria apply only with respect to "noninfringing uses." For the reasons discussed below, the intended uses are broadly infringing. Even assuming such uses were non-infringing, the petitioners fail to establish any of these elements, and several of these elements weigh strongly against the petitioners.

In applying these factors, the Register "balances '[t]he harm identified by a proponent of an exemption . . . with the harm that would result from an exemption.'" Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018, at 15. The rulemaking should consider the positive as well as the adverse effects of TPMs on the availability of copyrighted materials. *Id.*

As a threshold matter, MITA encourages the Register to construe the phrase "users of a copyrighted work" in its appropriate breadth. Medical service providers operate medical imaging equipment, but the ultimate "users" are the patients themselves undergoing the medical imaging

2

LOC_AR_00004096

procedures. This consideration is appropriate because considering "adverse effects" solely with regard to the operator of a medical imaging device but without regard to the actual user of that device—the patient—would fail to take full and appropriate account of the adverse effects of granting the petition.

The petitioners fail to establish the first factor of adverse harm because the availability for use of the copyrighted works is not impacted by the TPMs. The medical imaging device software is broadly licensed and available to medical service providers. A TPM does not restrict medical service providers from using the medical imaging device software, it simply limits what aspects of the device software may be viewed and copied. If a hardware component needs maintenance or repair, an unregulated independent service operator (unregulated ISO) may have an interest in accessing that software to more readily determine how to repair the device hardware, but that interest extends beyond "the availability for use" of the copyrighted work. The copyrighted work itself remains usable even though a physical component of the medical imaging device needs maintenance or repair.

The petitioners cannot establish the second factor of adverse harm because the copyrighted works do not implicate nonprofit archival, preservation, and educational purposes. Similarly, with respect to the third factor, the proposed exemption would not impact criticism, comment, news reporting, teaching, scholarship or research. These factors highlight the degree of incompatibility between the statutory factors and the commercial nature of the interest of the petitioners in seeking this exemption.

Regarding the fourth statutory factor of adverse harm, an exemption would damage the market for or value of medical imaging device software and materials. Disabling of TPMs would expose intellectual property, including valuable know-how in addition to the copyrighted information, to competitors and the general public. That itself would severely harm OEMs by allowing competitors to view and replicate valuable innovations. Although patented innovations could be defended, replication of uncovered intellectual property protected by copyright would be extremely difficult to detect in copycat products. Such exposure would also chill future innovation because the innovations themselves would be unprotected. There is a massive cost to develop and secure premarket clearance from the U.S. Food and Drug Administration (FDA) for medical imaging devices. If innovators are not able to recoup those costs by protecting their valuable intellectual property embodied in software and related materials, the incentives for future innovations will be weakened.

The value of medical imaging device software and materials would also be harmed because the disabling of TPMs would lead to an increase in medical imaging device repairs by unregulated ISOs, thereby increasing patient risk and contributing to a loss of public confidence in the safety and reliability of medical imaging devices and the constituent software. As discussed in more depth below, unregulated ISOs are not subject to the FDA regulations that apply to OEMs, and they are not subject to the same training and quality control measures. Together, this disparate level of FDA regulation, training, and quality control will risk patient safety and public confidence in medical imaging procedures. A representative sample of faulty repairs appears in

3

LOC_AR_00004097

Appendix 1. These negative impacts will extend to medical imaging devices and the market for the embedded device software and related materials that allow those devices to function.

The fact that there is no independent market for the medical imaging device software beyond the devices themselves undermines the basis for the requested exemption. In considering whether to grant a Section 1201 exemption for motor vehicles in 2015, the Register concluded that the lack of an independent market for the vehicle's software weighed in favor of granting the exemption. Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation to the Register of Copyrights, October 2015 (2015 Register Report) at 236. That reasoning does not extend to medical imaging devices because harm to patients and loss of public confidence in the safety and efficacy of medical imaging harms the market for the integrated software to the same extent as the market for the device itself.

The fifth statutory factor provides for consideration of "such other factors as the Librarian considers appropriate." MITA asks the Register to consider the patient safety aspects of unregulated ISO repair that this exemption would implicate. MITA also asks the Register to consider the regulatory implications to this proposed exemption. MITA recommends that the Register communicate with the FDA Center for Devices and Radiological Health on the relevant regulatory and policy issues governing medical devices, particularly medical imaging device software.

Improper repair or servicing of a medical imaging device presents a wide range of risks for patients and medical service providers. These risks would be exacerbated by granting the petitions and allowing unregulated ISOs and the general public to access medical device software and related materials protected by TPMs. There are numerous risks associated with improper servicing of medical imaging devices, depending on the imaging modality in question.

- **Electrical shock.** All medical imaging devices require electricity to function. If, after servicing, the device has not been properly rewired or has unvalidated parts installed, there is an increased risk of shock to patients and those operating the device.

- **Overexposure to ionizing radiation.** Some imaging devices, including X-Ray and CT scanners, emit ionizing radiation, resulting in potential over-exposure if not properly calibrated or maintained. Improper servicing can inadvertently bypass internal safeguards and severely harm or kill patients.

- **Mechanical failure.** If a medical imaging device suffers a mechanical failure due to improper servicing, significant and irreversible harm to the patient or user can occur, including pinching or crushing.

- **Air embolism.** In the case of injection devices (such as imaging contrast agent power injectors), if the device has undergone improper servicing, the patient could experience a potentially fatal air embolism.

4

LOC_AR_00004098

- **Improper dosing.** For injection devices, if the device has undergone improper servicing, a patient could experience a potentially fatal underdose or overdose of medication.

- **Infection.** For ultrasound probes and other patient contact devices, if the device has not been properly sterilized or disinfected as specified by the OEM requirements and instructions, transfer of infection or disease between patients could result.

- **Burns.** Incorrect replacement materials or parts in an MRI system may disrupt the path of radiofrequency energy, causing excessive heating and potentially resulting in significant and irreversible patient burns.

- **Interference with other equipment.** If a device's electromagnetic interference shielding has undergone improper servicing, operation of the device could potentially interfere or degrade the proper operation of other equipment in the surrounding area.

- **Cybersecurity.** Whenever software is installed or adjusted for a medical imaging device, or if software tools are used to access a device for diagnostic and maintenance purposes, the integrity of the software may be compromised. Unvalidated software without confirmed authenticity or system integration may present significant potential security vulnerabilities and operational issues. Expanded and uncontrolled access to medical imaging device operating systems and software applications creates the potential for increased cybersecurity risks, as the opportunity to intentionally or unintentionally introduce security vulnerabilities to the device and to any networks to which the device is connected (e.g. hospital) also expands.

- **Delay in patient care.** Any failure in a device to perform when needed as a result of improper servicing, or to provide accurate results, may result in a delay of care, including incorrect diagnosis, resulting in delayed or incorrect treatment of a patient's condition.

- **Misdiagnosis.** Improper servicing could cause a medical imaging device to perform in a manner that does not produce diagnostic-quality images. This could lead to a missed diagnosis or a misdiagnosis.

OEMs have difficulty upgrading medical imaging devices if the service history is unknown, improper parts have been used, or if the device has otherwise been altered. The lack of required regulatory reporting by unregulated ISOs can impair the tracking of significant events for the device and can complicate root cause investigations of device malfunctions. Unauthorized repair can also void electrical safety certifications.

Because of these patient risks, the FDA requires OEMs to comply with a range of regulatory requirements. ***These requirements do not, however, extend to unregulated ISOs***. The regulatory requirements that apply to OEMs include the following.

- Establishment Registration (21 CFR Part 807)

5

LOC_AR_00004099

- o Manufacturers (both domestic and foreign), remanufacturers, and initial distributors (importers) of medical imaging devices must register their establishments with the FDA.

- Medical Device Listing (21 CFR Part 807)

  - o Manufacturers must list their devices with the FDA. Establishments required to list their devices include: manufacturers; contract manufacturers that commercially distribute the device; contract sterilizers that commercially distribute the device; repackagers and relabelers; specification developers; reprocessors of single-use devices; remanufacturers; manufacturers of accessories and components sold directly to the end user; and U.S. manufacturers of "export only" devices.

- Premarket Notification (21 CFR Part 807 Subpart E) or Premarket Approval (21 CFR Part 814)

  - o Devices requiring the submission of a Premarket Notification 510(k) cannot be commercially distributed until the manufacturer receives a letter of substantial equivalence from FDA authorizing it to do so. A 510(k) must demonstrate that the device is substantially equivalent to one legally in commercial distribution in the United States: (1) before May 28, 1976; or (2) to a device that has been determined by FDA to be substantially equivalent.

  - o Devices requiring Premarket Approval (PMA) are high risk devices that pose a significant risk of illness or injury, or devices found not substantially equivalent to Class I and II predicate through the 510(k) process.

  - o Modifications to devices that impact the safety or performance specifications of the device require the manufacturer to file a 510(k) or PMA.

  - o Servicing activities that significantly change the safety or performance of the device cross over into remanufacturing require submission of a 510(k) or PMA. As noted in the FDA May 2018 report (https://www.fda.gov/media/113431/download) on device servicing, many instances of improper servicing appear to cross the line into remanufacturing.

- Quality System Regulation (21 CFR Part 820)

  - o Includes requirements related to designing, purchasing, manufacturing, packaging, labeling, storing, installing and servicing of medical imaging devices.

  - o Manufacturing facilities undergo periodic FDA inspections to assure compliance with the quality system requirements.

  - o Manufacturers develop training curricula for employees to then implement and maintain training records subject to internal audits by qualified auditors.

6

LOC_AR_00004100

- o The entire quality system is audited periodically, and the results are reviewed by the Management Review process in a predetermined interval.

- Labeling (21 CFR Part 801)

  - o Labeling includes labels on the device as well as descriptive and informational literature that accompanies the device.

- Medical Device Reporting (21 CFR Part 803)

  - o Incidents in which a device malfunction has caused or may have caused or contributed to a death or serious injury must to be reported to FDA under the Medical Device Reporting program. The MDR regulation is a mechanism for FDA and manufacturers to identify and monitor significant adverse events involving medical imaging devices. The goals of the regulation are to detect and correct problems in a timely manner.

The application of these requirements to OEMs but not to unregulated ISOs leads to greater regulatory control, oversight, and accountability for OEMs as compared to unregulated ISOs. This in turn leads to a higher degree of quality in the repair and maintenance activity and a corresponding risk to patients and the public in the use of unregulated ISOs.

## II.    The intended uses broadly infringe the copyrights of OEMs

To obtain the requested exemption, the petitioners must demonstrate that users of a copyrighted work are adversely affected by the prohibition on circumvention in their ability to make *noninfringing* uses of a class of copyrighted works or are likely to be so adversely affected in the next three years. The intended uses that the granting of this petition would allow would nearly uniformly infringe. The petitioners have a high burden of proof to establish noninfringing uses:

> The Register will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing. The statutory language requires that the use is or is likely to be noninfringing, not merely that the use might plausibly be considered noninfringing. As the Register has indicated previously, there is no "rule of doubt" favoring an exemption when it is unclear that a particular use is a fair or otherwise noninfringing use. Thus, [the record] must show more than that a particular use could be noninfringing. Rather, the [record] must establish that the proposed use is *likely to qualify* as noninfringing under relevant law.

Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018 (2018 Register Report), at 15 (emphasis added).

7

LOC_AR_00004101

The petitioners argue that the fair use doctrine, codified at 17 U.S.C. § 107, would allow unauthorized ISOs to access and copy the full range of medical imaging device software and materials currently protected by TPMs. For the reasons described below, fair use will almost never permit such copying and use.

As a threshold matter, however, a fair use determination is a richly fact-specific inquiry and is therefore fundamentally incompatible with a categorical application. The plain text of the statute requires its application in a "particular case." 17 U.S.C. § 107. In litigation, fair use claims can prevail or fall based on slender contextual nuances. The factors that courts apply in individual cases before them do not lend themselves to categorical application, especially considering the complexity and varied applications of medical imaging devices. "[F]air use analysis must always be tailored to the individual case. The nature of the interest at stake is highly relevant to whether a given use is fair. *Harper & Row v. Nation Enterprises, Inc.*, 471 U.S. 539, 553 (1985) (internal citations omitted). The U.S. Copyright Office itself has recognized that "fair use is a fact-intensive inquiry, and [] the outcome of a particular lawsuit does not guarantee a similar outcome in cases involving other types of products." United States Copyright Office, Software-Enabled Consumer Products, A Report of the Register of Copyrights (December 2016) (2016 Software Report) at 39 (available at https://www.copyright.gov/policy/software/software-full-report.pdf).

It would therefore not be appropriate to base the requested exemption on fair use grounds in these circumstances. Even if, however, it were appropriate to apply a fair use analysis to the access and copying of medical imaging device software and materials, nearly all cases would fail the test. The statute provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. Critically, the fair use must be "for purposes such as criticism, comment, news reporting, teaching … scholarship, or research." That provision, standing alone, is fatal to the fair

LOC_AR_00004102

use argument for these petitions. The petitioners are not political or social critics, news reporters, teachers, scholars, or researchers. They are for-profit companies seeking to use the copyright laws to promote their commercial interests.

Because the petitioners do not satisfy the purposes of the fair use exception, the remaining four statutory factors are inapposite. Nonetheless, even if those factors were to apply, they do not support a fair use determination. First, the "purpose and character of the use" is clearly of a commercial nature rather than for a nonprofit educational purpose. The purpose of disabling the TPMs and copying the information protected by the TPMs is to further the business interests of unregulated ISOs. The "character of the use" is inherently commercial. Petitioner Summit Imaging, for example, advertises on its website homepage: "Lowering healthcare facilities' total cost of ownership." https://www.mysummitimaging.com/. Transtate asserts that it is making it "more affordable for every hospital, clinic and medical practice to have the very best equipment, supplies and service." https://avantehs.com/.

In examining fair use arguments in this very context, the U.S. Copyright Office itself has recognized that "[r]epairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use." 2016 Software Report at 40.

In considering the "purpose and character of the use," courts in individual cases consider whether the use of the copyrighted work is transformative in some manner. There is nothing transformative about an unregulated ISO accessing and copying medical imaging device software and materials for a commercial purpose. No new intellectual property is created. For this reason, the Register's prior finding of fair use for "transformative" changes to motor vehicle computer programs does not extend to medical imaging devices. The 2015 recommendations for motor vehicle computer programs noted: "These uses include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair. Such uses may also extend to modification of ECU computer programs to "interoperate" with different auto parts." 2015 Register Report at 234. Such tinkering would be dangerous with respect to medical imaging devices. Given the nature of medical imaging devices, the repair must *not* be transformative because it would remove the device from its FDA-approved function and performance and would risk patient safety. Crowd-sourced coding, while innovative and useful in some contexts, has no place in medical imaging device repair and maintenance.

The nature of the copyrighted work as a whole is also protected as a creative expression. Courts consider "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1154 (9th Cir. 1986). The petitioners take an unreasonably narrow view of "creative expression." Such a concept is not limited to musical or artistic works. It extends to the creativity inherent in animating and controlling devices that create medical images and other diagnostic information to support human life and health. Each developer of medical imaging device software approaches the challenges of aiding the diagnoses of patients in its own way, based on its unique set of institutional learnings, preferences,

9

LOC_AR_00004103

inventiveness, and look-and-feel elements. Even if, for the sake of argument, the medical imaging device software and related materials fall closer to the informational-side of the spectrum rather than the expressive side, such software and materials reflect a substantial investment of time and labor in anticipation of a final return. *See Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 534 (E.D. Pa. 1990) (reversed on other grounds) (finding that copying of computer code, including portions that were purely informational in nature, was not fair use because the code overall was the product of the substantial creative effort of the copyright holder in anticipation of financial returns).

The third factor—the amount and substantiality of the portion used in relation to the copyrighted work—also weighs against the petition because granting a TPM exemption would expose the full range of programs, manuals, computer code, logs, and other intellectual property to public view. Under this third factor, courts in individual cases consider both the quantity and quality of the copyrighted material used. If the use includes a large portion of the copyrighted work, fair use is less likely to be found; if the use employs only a small amount of copyrighted material, fair use is more likely when the other factors also support fair use. Here, allowing unauthorized third parties to bypass TPMs would expose medical imaging device software and the related materials to public view.

The fourth fair use factor considers the impact of the use upon the potential market for or value of the copyrighted work. This captures "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market.'" 2018 Register Report at 198 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)). By disabling TPMs on medical imaging devices, the valuable intellectual property of medical imaging device innovators will be exposed to the general public and to competitors. Once certain intellectual property is exposed to the market and to competitors, the value that intellectual property will be compromised.

Moreover, given the breadth of the requested exemption, there could also be confidential patient information within the materials accessed by the unregulated ISO. The legal and reputational risk that the disclosure of such information could produce would harm the market for medical imaging devices and erode public trust and confidence in medical imaging procedures.

Although there is no separate market for the medical imaging device software beyond the medical imaging devices containing that software, disabling of TPMs would damage the market for the medical imaging devices *and* the software contained therein. That is because, as the petitioners themselves recognize, the hardware and software are an integrated whole. One cannot function without the other. If the petition is granted, repair and maintenance by regulated ISOs would likely increase. That would risk patient safety and undermine public confidence in the safety and efficacy of medical imaging procedures. The resulting harm to the medical imaging device market would impact the embedded software in equal measure.

In manner and degree, this risk differs from the disabling of TPMs for motor vehicle operating software. The 2015 Register Report noted: "Vehicle owners have long repaired and modified

10

LOC_AR_00004104

their automobiles and farm equipment— adjusting brakes and enhancing suspensions, for example—including before the advent of computerized vehicle systems. It is thus not readily apparent these activities would cause unusual or undue harm." 2015 Register Report at 236. The long history of vehicular self-repair does not translate to medical imaging device self-repair, and the risks of faulty repair are far graver in the medical imaging device context. A faulty vehicle repair usually only risks the safety of the vehicle owner and any passengers (and, to a lesser degree, other motorists and pedestrians). By contrast, a faulty repair of an CT scanner or X-ray machine by an unregulated ISO poses far greater risk to the general public. A botched repair may expose hundreds or even thousands of patients to excessive levels of radiation. Other faulty repairs may instead compromise the visual or other informational outputs from the scan. That misinformation could contribute to missed diagnoses or incorrect diagnoses, leading to unnecessary medical procedures and even death.

## III.    An exemption is not warranted under 17 U.S.C. § 117(a)(1)

Section 117(a)(1) does not support an exemption allowing the circumvention of TPMs for medical imaging devices. Under 17 U.SC. § 117(a)(1), "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of any other copy or adaptation that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." A categorical exemption under this provision is not available because OEMs generally license the operating system and related materials to medical service providers rather than convey ownership of the software and materials. The licensing agreements also generally impose substantial restrictions on the allowed uses for such programs and materials.

The legislative history makes clear that Section 117(a)(1) is intended simply to allow the owner of a computer program to activate the computer program on a computer—and thereby cause a copy of the program to be made between the computer's hard drive and the computer's RAM—without triggering a copyright infringement. See Final Report on the National Commission on New Technological Uses of Copyrighted Works, National Commission on New Technological Uses of Copyrighted Works (1981) at 13 (available at https://repository.law.uic.edu/cgi/viewcontent.cgi?article=1573&context=jitpl).[1] Under this provision, it would not be an act of copyright infringement for the owner of a computer program contained within a medical imaging device to simply activate the medical imaging device, whereby the activation of the device causes copyrighted software to be copied within the device itself from the hard drive to the RAM.

---

[1] Congress established the National Commission on New Technological Uses of Copyright Works (CONTU) in 1974 to consider and make recommendations concerning, among other matters, the extent to which computer programs should be protected by copyright law. Because Congress adopted the recommendations of the majority of CONTU virtually unchanged, courts look to the CONTU final report as the legislative history of provisions recommended by CONTU. *Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 532 n.8 (E.D. Pa. 1990).

LOC_AR_00004105

Critically, this exemption extends only to owners of copies of the copyrighted material. In considering the application of Section 117(a)(1), courts scrutinize whether the entity copying the computer program is in fact the "owner" of the copyright program. In the Ninth Circuit, "a software user is a licensee rather than an owner of a copy [under Section 117(a)(1)] where the copyright owner (1) specified that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010); *see also MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir., 2010) (applying the *Vernor* factors to conclude that software users were licensees rather than owners because the copyright owner held title, provided a non-exclusive and limited license to the licensee, imposed transfer restrictions, and imposed a variety of use restrictions).

In *Krause v. Titleserv, Inc.,* 402 F.3d 119 (2d Cir. 2005), the Second Circuit, in determining whether a software user was a licensee or owner under Section 117(a)(1), considered: (1) whether substantial consideration was paid for the copy; (2) whether the copy was created for the sole benefit of the purchaser; (3) whether the copy was customized to serve the purchaser's use; (4) whether the copy was stored on property owned by the purchaser; (5) whether the creator reserved the right to repossess the copy; (6) whether the creator agreed that the purchaser had the right to possess and use the programs forever regardless of whether the relationship between the parties terminated; and (7) whether the purchaser was free to discard or destroy the copy anytime it wished. *Id.* at 124.

In *DSC Communications Corporation v. Pulse Communications*, 170 F.3d 1354 (Fed. Cir., 1999), the Federal Circuit scrutinized the legal relationship between a copyright holder and a licensee under Section 117(a)(1). The court concluded that ownership was not established—and therefore the defense to infringement under Section 117(a)(1) was unavailable—because of the restrictions on the software user's rights in the program, which included restrictions on disclosing or making the software available to any third parties and using the software on hardware other than that provided by the copyright holder. *Id.* at 1362. Because the license "substantially limit[ed] the rights" of the licensee, the court did not consider the licensee an "owner" for purposes of Section 117(a)(1). *Id.*

The U.S. Copyright Office itself has recognized the "ownership" requirement under Section 117(a):

> In section 117, the Copyright Act provides a number of limitations on exclusive rights for computer programs. Section 117(a) allows copies or adaptations of computer programs to be made either "as an essential step in the utilization of the computer program in conjunction with a machine" or for archival purposes. It also allows for the transfer of any copies prepared in accordance with the exceptions, though adaptations may only be transferred with the authorization of the copyright owner. Section 117(a), like the provision regarding first sale, may only be invoked by "the owner of a copy of a computer program." This raises complex questions

12

LOC_AR_00004106

> regarding whether a consumer owns a copy of software installed
> on a device or machine for purposes of section 117(a) when formal
> title is lacking or a license purports to impose restrictions on the
> use of the computer program.

2016 Software Report at 19. The variability and fact-specific nature of this inquiry makes a general exemption to TPMs inappropriate. Although in some cases a court might find that the relevant factors support ownership under the copyright laws, in many other cases a court may find that the license is simply a license and therefore Section 117(a)(1) is unavailable.

Medical imaging device manufacturers generally license the operating software and other materials to medical providers rather than sell copies of the software and convey ownership of the copy. Certain diagnostic tools may be licensed together with or separately from the operating software, or not licensed at all. Medical imaging device manufacturers impose a range of significant use restrictions on that software and other materials. A blanket exemption pursuant to Section 117(a)(1) would therefore not be supported because the ownership requirement is generally not satisfied.

## IV.    An exemption is not warranted under 17 U.S.C. § 117(c)

The statutory defense to copyright infringement under Section 117(c) for "machine maintenance and repair" provides that it is not a copyright violation for the owner of a machine to make or authorize the making of a copy of a computer program: (1) if the copy is made "solely by virtue of the activation of a machine" that contains an authorized copy of the program; (2) if the copy is made "for purposes only of maintenance or repair of the machine;" (3) if the new copy is not used in any other manner and is destroyed immediately after the maintenance or repair is completed; and (4) with respect to any computer program or part of the program that is not "necessary for [the] machine to be activated," the program "is not accessed or used other than to make a new copy by virtue of the activation of the machine." 17 U.S.C. § 117(c).

This provision is principally aimed at protecting independent repair technicians from copyright liability when they turn on a machine that results in the automatic copying of software from the machine's hard drive onto the machine's RAM. 2016 Software Report at 37. By its plain terms, the statute authorizes making copies only upon "activation" of a machine, and therefore would not extend to any copying after initially turning on a machine.

The legislative history of this provision makes clear that the scope of protection is far narrower than the petitioners argue. The full relevant provisions of the Senate report are reproduced below, with key language emphasized.

> Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure
> that independent service organizations do not inadvertently become liable for copyright
> infringement *merely because they have turned on a machine in order to service its
> hardware components*. When a computer is activated, that is when it is turned on, certain
> software or parts thereof (generally the machine's operating system software) is
> automatically copied into the machine's random access memory, or ''RAM.' During the

13

LOC_AR_00004107

course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. ***This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made. This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software.*** Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. ***This title also does not relieve from liability persons who make any unauthorized copies of software other than those caused solely by activation of the machine.***

S. Rep. No. 105-190, at 21-22 (1998) (emphasis added).

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider—a person unaffiliated with either the owner or lessee of the machine—to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or ''RAM.''A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), thereby calling into question the right of an independent service provider who is not the licensee of the computer program resident on the client's machine to even activate that machine for the purpose of servicing the hardware components. This section does not in any way alter the law with respect to the scope of the term ''reproduction'' as it is used in the Copyright Act. ***Rather, this section it is narrowly crafted to achieve the objectives just described—namely, ensuring that an independent service provider may turn on a client's computer machine in order to service its hardware components, provided that such service provider complies with the provisions of this section designed to protect the rights of copyright owners of computer software.***

S. Rep. No. 105-190, at 56-57 (1998) (emphasis added).

Subsection (c)—Machine maintenance or repair.—The bill creates a new subsection (c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. This new subsection states

LOC_AR_00004108

that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program must have been made *solely and automatically by virtue of turning on the machine* in order to perform repairs or maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), *the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did not need to be so loaded in order for the machine to be turned on*. A hardware manufacturer or software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products—either as freestanding programs, or pursuant to separate licensing agreements. Indeed, *a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs*. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). *This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the*

15

LOC_AR_00004109

> *copyright owner, the initial reproduction of the program shall not be deemed exempt from infringement by this subsection.*

S. Rep. No. 105-190, at 57-58 (1998) (emphasis added).

The leading case that interprets the scope of Section 117(c) illustrates exactly why a categorical exemption to TPMs for medical imaging devices is not supported by the law and why its application would result in widespread copyright infringement. *Storage Tech Corp. v. Custom Hardware Engineering and Consulting*, 421 F.3d 307 (Fed. Cir., 2005) involved a company, StorageTek, that manufactures automated tape cartridge libraries that store large amounts of computer data. The tape backup and management system are controlled by a computer program. Upon computer startup, a "maintenance code" and "functional code" are automatically copied from the computer's hard drive to the computer's RAM, thereby allowing the computer to perform its programmed tasks.

Custom Hardware Engineering & Consulting, Inc. (CHE), is an independent business that repairs data tape libraries manufactured by StorageTek. In order to diagnose problems with the libraries, CHE intercepts and interprets error codes produced by the maintenance code. StorageTek protects those error codes through password protection to disallow unauthorized access to the error codes. CHE uses technologies to "crack" the password and to mimic functions of the system to generate error codes that can be intercepted.

StorageTek sued CHE, alleging that CHE committed copyright infringement when CHE rebooted and reconfigured the computer program to reveal and generate the error codes that CHE then used to repair the systems. StorageTek sought a preliminary injunction, which a federal district court granted. On appeal to the Federal Circuit, CHE defended against the copyright infringement claims by arguing that its actions are protected by 117(c) because the owners of the tape libraries authorize CHE to turn on the computer program to maintain and repair the tape libraries, and the duplication of the software into RAM is necessary for the machine to function. StorageTek responded that CHE's activities fail to satisfy 117(c) because the maintenance code is not "necessary for the machine to be activated."

The court considered whether the copying of the maintenance code—in addition to the functional code—into RAM at computer startup violated Section 117(c)'s requirement that "with respect to any computer program or part therof that is not necessary for the machine to be activated, such program or part thereof is not accessed or used." StorageTek argued that the copying of the maintenance file onto the computer system's RAM at startup was not necessary for the machine to be activated, and therefore the access and use of that program violated StorageTek's copyright and was not exempted by Section 117(c). The court disagreed, finding that "[i]n this case, however, both parties agree that the maintenance code is so entangled with the functional code that the entire code must be loaded onto RAM for the machine to function at all. That is, loading the maintenance code into RAM is necessary for [the machine] 'to be turned on.'" 421 F.3d at 1314. The court further held that an anti-circumvention claim under Section 1201 would be foreclosed because the underlying copying itself was not copyright infringement. *Id.* at 1318.

16

LOC_AR_00004110

This holding does not, however, establish the general proposition that any file that is loaded from a computer system's hard drive to RAM during system startup is subject to access and copying by a third-party repair company. Quite the contrary, the court was careful to explain that its holding was grounded in the fact that the part of the system code necessary for the machine to turn on was entangled with other code that did more than simply allow the computer to turn on.

In that regard, the court noted that "separate, 'freestanding programs' that load into RAM upon startup *clearly may not be accessed* under section 117(c)(2)." *Id.* (emphasis added) Additionally, "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the computer and make that determination, *goes too far*…." *Id.* (emphasis added). The court also noted that "[i]n some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." *Id.*

As this decision makes clear, an analysis of whether copies made by reason of turning on a computer are covered by Section 117(c) is a fact-based inquiry that turns on the specific nature of the program at issue and how the programs may interrelate or not with other programs that may also be activated at system startup. This decision also makes clear, however, that Section 117(c) does not authorize access to any program or part of a program that is not required to turn on the machine.

This fact-based and case-specific inquiry is fundamentally incompatible with the blanket exemption to TPMs that the petitioners seek. A blanket exemption to allow circumvention of TPMs would only be appropriate if Section 117(c) were uniformly available to unauthorized ISOs for the vast array and diversity of medical imaging devices that they seek to repair. As the *StorageTek* court made clear, the application of Section 1201 depends on whether the underlying copying itself is infringement. That fact-dependent inquiry would be vitiated by a categorical exemption under Section 1201.

## V.    Conclusion

In conclusion, the requested exemption is not warranted because users of the copyrighted works are not adversely affected by the TPMs and the legal arguments under fair use and Sections 117(a)(1) and 117(c) are without merit.

- **Users of the copyrighted works are not, under the factors of Section 1201, adversely affected by the prohibition on circumvention and are not likely to be adversely affected.** Medical imaging device software is widely available and broadly licensed to medical service providers. Medical imaging device software and the related materials protected by TPMs do not implicate nonprofit archival, preservation, and educational purposes because such software is used in a commercial setting among commercial parties. An exemption is not necessary for criticism, comment, news reporting, teaching, scholarship, or research because medical imaging device software is unrelated to those endeavors. An exemption would also negatively impact the market value for medical imaging device software because it would undermine the intellectual property protections that lead to innovation and would lead to greater use of unregulated ISOs that are not

17

LOC_AR_00004111

required to implement the same quality, safety, and regulatory requirements as OEMs, thereby risking patient safety and contributing to a public loss of confidence in medical imaging devices. The risks to patient safety weigh against granting the exemption.

- **The proposed exemption would infringe the protected works and is not supported by the fair use doctrine.** The fair use doctrine generally allows transformational use of copyrighted works for purposes of criticism, comment, news reporting, teaching, scholarship, or research. The petitioners seek to access and copy medical imaging device software and related materials to better sell their repair services to customers. Applying the individual fair use factors also demonstrates why the exemption does not apply: the purpose and character of the use is purely commercial; medical imaging device software and related materials are protected works; the petitioners seek to access and copy the full range of medical imaging device software and materials protected by TPMs rather than a minor part; and the impact of the copying will negatively impact the market for medical imaging device software by disincentivizing innovation, risking patient safety, and undermining the public's confidence in medical imaging devices.

- **The proposed exemption is not supported by 17 U.S.C. § 117(a)(1).** Section 117(a)(1) provides simply that the owner of a computer program is not liable for a copyright violation if the owner turns on his or her computer and thereby causes a software copy to be made as certain programs are loaded from the computer hard drive to the computer's RAM to enable the computer to function. That provision does not support the proposed exemption because nearly all users of medical imaging device software license, rather than own, the software and related materials.

- **The proposed exemption is not supported by 17 U.S.C. § 117(c).** Section 117(c) protects third party repair technicians from copyright liability when they turn on a computer and thereby cause software to be automatically copied from the computer's hard drive to the computer's RAM. This provision does not apply to the proposed exemption because by its plain terms Section 117(c) does not extend beyond computer code that is automatically copied from a computer's hard drive to RAM during system startup. Moreover, the legislative history makes clear that this provision is not intended to undermine TPMs and allow copying of software beyond those aspects that are necessary to start a computer.

**DOCUMENTARY EVIDENCE**

Appendix 1: Examples of Improper Servicing by Unregulated Third Parties

Hole drilled into X-Ray system
A third-party servicer drilled out the holes on an X-Ray system in order to get a replacement X-Ray tube to fit, creating a patient safety issue if the tube had fallen out.

18

JA247

LOC_AR_00004112



19

JA248

LOC_AR_00004113

High voltage cables wrapped in hardware store vacuum hose

These high voltage cables for an X-Ray system had been wrapped in vacuum hose from a local hardware store. Use of this kind of unqualified part created infection control issues and increased the risk that the cables could have been damaged, resulting in fire or electrocution hazards.



20

LOC_AR_00004114

Improper venting of MR system

A third-party servicer installed an MRI ventilation system such that it ventilated into the attic above the imaging suite. If the MR magnet had quenched, liquid helium would have ventilated into the attic, creating an asphyxiation hazard and potentially resulting in structural damage to the building.



21

JA250

LOC_AR_00004115



22

JA251

LOC_AR_00004116

Power injector duct taped to IV pole

A third-party servicer removed a power injector from its usually support system and duct taped it to an IV pole. This jerry-rigged system could fall apart mid-procedure, delaying patient care or causing improper dosing.



23

LOC_AR_00004117

Overhead Counterpoise System held together with zip ties. This product suspends power injectors, often over patients while they are getting scanned. If these zip ties broke, the power injector could fall onto the patient, causing serious injury.



24

LOC_AR_00004118

Aluminum Foil Used for Shielding

A third-party servicer used aluminum foil to shield some of an MRI system's cables in the scan room. This can present safety and electrical issues when used within the MRI filter panel that contains high voltage.



25

JA254

LOC_AR_00004119

Shoulder Coil Serviced with Tape
This MRI shoulder coil was found damaged with several attempted repairs using a white tape.
The use of tape would prevent proper cleaning of the coil and could have resulted in the coil
failing to perform as specified.



26

LOC_AR_00004120

Improper Part in an Angiographic Power Injector System
A third-party service vendor inappropriately replaced an OEM steel pin with a simple wood screw to hold a syringe turret in place.

Angiographic power injectors can inject fluid at pressures of up to 1200 psi. If this wood screw were to fail during a procedure, the turret could break free, potentially causing the turret and connected syringe to act as dangerous projectiles. Additionally, this improper part could cause vibrations during the injection, thereby leading to issues such as delay of procedure and diagnosis due to unexpected equipment behavior.



27

LOC_AR_00004121

Improper Servicing of an MRI System
This 0.3T permanent magnet MRI had ghosting on multiple images as a result of improper wiring. The healthcare provider had been experiencing machine downtime due to the inability to properly scan patients. Poor image quality could have resulted in misdiagnosis or need for repeat scans. Rewiring a device with non-qualified parts could have resulted in electrocution or fire.



Speaker wire connecting power supply to unknown points and terminated with wire nuts



Example of ghosting on medical images

*(Continued on next page)*

28

LOC_AR_00004122



The primary power supply cables lacked strain relief and protection from abrasion

LOC_AR_00004123

Improper Servicing of a Nuclear Medicine Camera
This nuclear medicine camera had numerous masked adjacent pixels in the detector which could obscure any heart defects in the image. Further, the cooling unit was improperly connected to external power, bypassing the system's isolated power and grounding system, potentially compromising patient safety and device performance.

When adjacent pixels are removed, a portion of the imaging detector is lost, meaning parts of the heart might not be imaged and a defect could go undetected.

The improper power connection of the cooling system violated the manufacturer's power and grounding isolation scheme, creating risks of fire and electrocution



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals

30

LOC_AR_00004124



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals



Masked pixels



Masked pixels

31

LOC_AR_00004125

Improper Repair of an MRI Coil

In a 0.3T permanent magnet MRI RF coil, the signal cable had been pulled out of a connector housing and was repaired with zip ties and plastic tubing. This could have resulted in:

Misdiagnosis or need for additional scans due to lost signal or imaging artifacts

Electrical arcing, resulting in electrocution or burns



Coil with plastic tubing and zip ties used to cover damaged cable



Example of failed coil that was hidden using zip ties and plastic tubing

32

LOC_AR_00004126

Improper Servicing of a CT Scanner

A facility reported to the OEM that it had been having issues with a CT table, workstation, and tube for approximately six months. An OEM service engineer identified table cabling connections that were modified to be non-standard, exposed wiring, non-OEM fuses installed, improperly exposed and non-OEM soldering connections, cable connections routed and repaired using electrical tape, bent table bolt, and defective transmit cable. Excessive oil was also found in the device, creating risk for fire or other kind of device failure.



> 1. The bank of black fuses is not connected to cables, per OEM design and manufacturing specifications
> 2. Cables have been field repaired with fuses taped to the cable
> 3. Grease identified in cabling area

*(Continued on next page)*

33

JA262

LOC_AR_00004127



4. Non-qualified fuse, with field repair to reform connector to fit around non-qualified



5. Transmit wire connection repaired previously and taped and visible and exposed at joint of green wire

*(Continued on next page)*

34

JA263



6. Bent screw found, preventing table from full range of horizontal motion

7. OEM service engineer identified horizontal travel distance blocked by bent screw



*(Continued on next page)*

35

LOC_AR_00004129



8. Excessive oil identified



9. Oil and debris identified in back corners of gantry

36

LOC_AR_00004130

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced, but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**Please submit a <u>separate</u> comment for each proposed class.**

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

ITEM A. COMMENTER INFORMATION

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

James C. Martin
David A. Bender
Daniel E. Alperstein
REED SMITH LLP
K Street, N.W.
1000, East Tower
Washington, D.C. 20005

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004131

Philips is well known in the healthcare industry as a trusted provider of electronic medical imaging devices for use in in-patient and outpatient hospital care throughout the United States. Philips' high quality products include ultrasound systems, computed tomography ("CT") scanners, positron emission tomography ("PET") scanners, X-ray machines, magnetic resonance ("MR") scanners, and nuclear medicine scanners. Importantly for this process, Philips supports, maintains, repairs and services these medical imaging devices using authorized repair technicians who know the devices and are regulated by statute, through oversight provided by the Food and Drug Administration ("FDA"). Building on years of innovation, Philips' medical devices are highly sophisticated and relied upon by medical professionals for diagnosis, treatment, and life-saving support of patient lives.

Given their complexity and the necessity that they operate precisely as designed, the FDA's regulations extend to every aspect of the medical devices, including their maintenance and repair, to protect the public health and safety. Philips' supervision of its authorized repair technicians complies with and furthers these paramount regulatory goals. For purposes of device repair, access to Philips' copyrighted software on medical devices is protected so that the functionality and integrity of the devices is maintained.

The Proponents of proposed exemption Class 12 fit into two categories. The first group is comprised of multiple organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally, or types of software-enabled devices that bear no relation to medical devices. The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – that separately petition for an exemption allowing circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of *medical devices*, specifically.

While the former category of Proponents seek an overbroad exemption of almost limitless scope, the latter category of Proponents have purely commercial motivations. They seek to circumvent Philips' and other medical device manufacturers' access controls in order to obtain copyrighted materials far in excess of that which is necessary to perform basic repair or maintenance. The granting of the exemption they seek would improperly allow them to circumvent Philips' security measures to access Philips' copyright-protected software installed on its medical devices. It also would threaten the functionality, integrity, safety and security of Philips' and other OEMs' medical devices by compromising the devices and making them susceptible to hacking by cybercriminals and other threat actors (i.e., a result antithetical to the longstanding efforts of OEMs and a host of federal agencies that work aggressively to reduce the threat of cybersecurity to medical devices).

With respect to the medical devices involved here, the proposed exemptions do not build off prior exemptions in any colorable respect. No prior exemptions have involved FDA-regulated devices implicating public health and safety. No prior exemptions have been sought for commercial purposes or facilitated the copying of protected software and information unnecessary to equipment repair. None of these results, moreover, align with the purpose or goals of the exemption process.

2

LOC_AR_00004132

Finally, there is no demonstrable non-commercial need for the proposed exemptions. Philips does not prevent access to any of its devices for purposes of basic repairs with copyright assertions. There likewise is no real, or even imagined, repair market crisis for the devices. Rather, as the FDA has concluded, the repair market, on analysis, appears to be adequately served by independent and licensed repair personnel.

Philips accordingly submits the following comments in opposition to proposed exemption Class 12.

ITEM B.  PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs – Repair

Philips' comments in opposition are specifically made with respect to the petitions for an exemption that would allow circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of medical devices.

ITEM C.  OVERVIEW

Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers. Philips medical imaging systems include Philips' proprietary hardware and software, encompassing Philips' trade secrets, which are necessary to operate, service, and repair Philips' systems. Philips' proprietary software enables certain functions on Philips medical imaging systems, which can only be modified by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace. Philips' high quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

In particular, Philips medical imaging systems include Philips' copyrighted software that Philips technicians can use to service the equipment. Philips includes access controls – described in greater detail below – on its medical imaging systems to protect its copyright-protected software and to restrict access to its proprietary software to authorized personnel. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use. The Proponents seek to circumvent these access controls.

As noted above, the Proponents fit into two categories. The first group is comprised of several organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally. Such a request is facially impermissible, as it is overly broad and fails to account for any of the unique characteristics of medical devices. The Registrar previously has declined to consider broad categories of devices grouped together, and has instead considered each class of device on an incremental, case-by-case basis.[1] Since the breadth of device categories

---

[1] *See* Section 1201 Rulemaking:  Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation Of The Register Of Copyrights (Oct. 2018) ("2018 Recommendation") 191-92.

3

LOC_AR_00004133

encompassed by proposed exemption Class 12 is exceedingly broad, and the circumvention of access controls on certain devices (such as medical devices) carry significant ramifications, Philips strongly believes that the Copyright Office should decline any invitation to consider software-enabled devices as a general class.

The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – who separately seek an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices, specifically. But their motivations are commercially driven and their request should have no place in the Triennial Rulemaking Process. Summit and Transtate (and other ISOs) already have access to extensive documentation and software sufficient to perform basic servicing of Philips medical imaging systems.[2] They simply want *more* access; and they have a track record of circumventing Philips' access controls – without an exemption – for their own commercial gain. Summit and Transtate, as they admit, are defendants in ongoing litigation in which Philips has alleged DMCA violations against both companies due to their having modified files on Philips' systems to gain unauthorized access to Philips' copyrighted software and files that they cannot access with their legitimate repair and maintenance accounts.[3] Since Summit and Transtate seek to use the exemption process to achieve their purely commercial ends and facilitate their unlawful conduct, their request for an exemption should be rejected summarily.

Finally, as explained below, proponents of a petitioned exemption carry a significant evidentiary burden. To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[4] As the following sections demonstrate, Proponents have not met that burden, and their requested exemptions should be denied for this independent reason.

**ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

*Describe the technological protection measure(s) that control access to the work and the relevant method(s) of circumvention. It would be most helpful to the Office if sufficient information is provided to allow the Office to understand the nature and basic operation of the relevant technologies, as well as how they are disabled or bypassed.*

---

[2] Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), https://www.fda.gov/downloads/MedicalDevices/ResourcesforYou/Industry/UCM385149.pdf ("[T]here are limits on the information that 21 CFR 1020.30(g) and 21 CFR 1020.30(h) require the manufacturer of the original system to provide. The manufacturer of the original system is not required to disclose trade secrets or confidential information. Also, the manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions.")

[3] *See, e.g., Philips Med Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, No. 3:20-cv-00021-MOC-DCK (W.D.N.C.) and *Philips N. Am. LLC et al. v. Summit Imaging Inc. et al.*, No: 2:19-cv-01745-JLR (W.D. Wash.).

[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. 54,010, 54,011 (Oct. 26, 2018).

4

LOC_AR_00004134

Philips' Integrated Security Tool ("IST") is a suite of applications designed to secure Philips' Customer Service Intellectual Property ("CSIP"), including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products, from unauthorized access or use.[5] Philips' IST solution provides a mechanism to manage user entitlements to access CSIP. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns entitlements to the user's account specifying the CSIP materials the user can access. Users may then install Philips IST client on their personal computer and request Philips to issue an encrypted IST certificate to enable the user to access Philips' proprietary CSIP information. Upon receiving such a request, Philips' IST system generates a user-specific and computer-specific encrypted IST certificate with information including the user's entitlements and sends the certificate to the user.[6] The user can then use his or her IST certificate and password to access CSIP materials Philips authorizes the user to access.

In the United States, Philips provides an account with CSIP Level 0 entitlements at cost to anyone who requests such an account. CSIP Level 0 entitlements provides access to materials that Philips makes available upon request to comply with regulatory requirements as well as other basic service documentation and software.[7] Philips provides CSIP Level 1 entitlements to customers who have a current contract that provides CSIP Level 1 access and have received any requisite training.[8] Philips provides CSIP Level 2 entitlements to its employees and to certain trade partners under contract.[9]

Philips' IST solution uses multi-factor authentication to confirm that only authorized users can access Philips' proprietary CSIP materials. For example, to access Philips' proprietary CSIP materials on a medical imaging system, a user must present his or her IST certificate and password to the system.[10] If the user has the correct password, the system will decrypt the certificate and provide the user with access to software and files according to the entitlements in the user's certificate.[11] Thus, engineers employed by independent service providers may log into Philips' medical imaging systems with their IST certificates and have complete access to Philips' CSIP Level 0 materials. They cannot, however, access the software and files that Philips reserves for its licensees or its own employees. Licensees with CSIP Level 1 access can log into Philips medical imaging systems with their IST certificates and they will receive access to additional CSIP materials, but not materials that Philips reserves for only its employees or trade partners. Philips employees and trade partners with CSIP Level 2 access receive even greater access to specialized service tools and files.[12]

Through their Philips-issued accounts, the vast majority of the thousands of ISOs in the U.S. have sufficient access to service Philips' medical imaging systems. Philips provides ISOs with access to the CSIP Level 0 materials that allow them to setup and service Philips' medical

---

[5] Declaration of Jacqueline Dickson, attached hereto as Exhibit A, at ¶ 6.
[6] *Id.*
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶¶ 4, 8.
[9] *Id.* at ¶¶ 5, 9.
[10] *Id.* at ¶ 10.
[11] *Id.*
[12] *See id.*

5

LOC_AR_00004135

imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities.[13]

Nevertheless, through its policing efforts, Philips has learned of a few ISOs that use methods to circumvent Philips' IST multi-factor authentication security to gain unauthorized access to Philips' copyrighted CSIP materials. The specific methods used by those ISOs vary, but their circumvention methods achieve a common result of providing the ISOs with unlicensed access to Philips' copyrighted software. The ISOs use that unlicensed access to sell advanced services for Philips' medical imaging systems. Philips has pending lawsuits against several ISOs that circumvent Philips' access controls to gain unauthorized access to its copyrighted CSIP. For example, Robert A. Wheeler, the CEO of Transtate Equipment Company, developed exploit software that Transtate uses to modify files within Philips medical imaging systems to effectively disable their access controls and allow Transtate employees to gain access unlicensed access to Philips' copyrighted materials.[14] Summit Imaging developed a different software program designed to circumvent Philips' access controls and provide unauthorized access to Philips' proprietary copyright protected software within Philips medical imaging systems.[15]

## ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

## I.      No Exemption is Permissible Because The Uses Are Not Noninfringing

### A.      Legal Standards

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this rule." The Register will recommend granting an exemption ***only when*** the "preponderance of the evidence in the record shows that the conditions for granting an exemption have been met."[16] Such evidence must show that it is "***more likely than not*** that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make ***noninfringing uses*** of a particular class of copyrighted works." *Id.* at 112 (emphasis added).

To establish a case for an exemption, "proponents must show ***at a minimum*** (1) that uses affected by the prohibition on circumvention ***are or are likely to be noninfringing***; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an ***adverse impact*** on those uses."[17] More particularly, "[i]t is not enough that a particular use ***could be*** noninfringing. Rather, the Register

---

[13] *Id.* at ¶ 7.

[14] Second Amended Complaint at ¶¶ 59-65, *Philips Med. Sys. Nederland B.V.,* No. 3:20-cv-00021-MOC-DCK (May 23, 2019), ECF No. 139.

[15] Third Amended Complaint at ¶¶ 6, 40-44, *Philips N. Am. LLC,* No. 2:19-cv-01745-JLR (Dec. 28, 2020), ECF No. 99.

[16] U.S. Copyright Office, Section 1201 of Title 17 at 111 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

[17] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.

6

LOC_AR_00004136

will assess whether the use is *likely to be* noninfringing based on current law."[18] "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing." *Id.*

## B.    The Requested Uses Do Not Satisfy the "Fair Use" Test of 17 U.S.C. § 107

Proponents of proposed exemption Class 12 argue—by conclusion only—that the petitioned uses are likely to be noninfringing under 17 U.S.C. § 107 (fair use). These conclusory contentions are, however, unsubstantiated and flawed.

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. On balance, these factors weigh conclusively against the proposed Class 12 exemption for medical devices.

### i.    The Purpose and Character of the Requested Use Weighs Against an Exemption

The first factor in the fair use analysis – the purpose and character of the use – evaluates whether the use is of a commercial nature or is for nonprofit educational purposes, and examines "to what extent the new work is transformative" and does not simply "'supplant'" the original work.[19] "Commercial use of copyrighted material is '*presumptively* an *unfair* exploitation of the monopoly privilege that belongs to the owner of the copyright.'"[20] This factor unquestionably weighs against Proponents.

Here, the requested uses under Class 12 with respect to medical devices are purely commercial and are thus "presumptively . . . unfair."[21] Both Transtate Equipment Company, Inc. d/b/a/ Avante Diagnostic Imaging ("Transtate") and Summit Imaging, Inc. ("Summit") are independent service providers ("ISOs") who seek to circumvent the access controls installed on Philips' medical devices for purely commercial (i.e., business) purposes. That is, Transtate's and Summit's motivations are financial, plain and simple. Their businesses stand to profit from an exemption that would allow them to circumvent Philips' and other medical device manufacturers' access controls that protect the integrity and security of their medical devices. But the Triennial Rulemaking Process is not a means of regulating competitive markets or promoting commercial outcomes. Nor should the Triennial Rulemaking Process

---

[18]    U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6, https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf (last visited Feb. 5, 2021) (emphasis added).
[19] *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).
[20] *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)) (emphasis added).
[21] *See Leadsinger*, 512 F.3d at 530 (quoting *Sony Corp.*, 464 U.S. at 451).

7

LOC_AR_00004137

be used as a means of promoting unlawful conduct or avoiding liability for past unlawful conduct – the other motivations underlying Transtate's and Summit's unfair use.

Transtate indicates in its comments in support of proposed exemption Class 12 "that it likely will be the only ISO or one of very few ISOs to provide comments with respect to the medical device servicing issues. However, the limited number of ISO Petitioners should not be taken as a lack of interest in this exemption or the desire of others for the requested exemption."[22] But there is more to the story of what motivated Transtate's and Summit's petitions for an exemption: both companies – along with several others – are defendants in ongoing federal litigation in which they have been accused of violating the anti-circumvention provisions of the DMCA.[23] Because the requested uses of copyrighted material are commercial – and thus, presumptively *unfair* – and because the requested uses would not transform the copyrighted material, the first "fair use" factor weighs conclusively against Proponents.[24]

### ii.    The Nature of the Original Work Weighs Against an Exemption

The second factor in the fair use analysis – the nature of the copyrighted work – evaluates the "value of the materials used."[25] In relation to the other fair use factors, some federal courts have recognized that this second factor is relatively insignificant in the overall balancing analysis.[26] In the specific context of medical devices, however, this factor weighs just as heavily against Proponents.

Philips' IST – i.e., the access controls installed on Philips' medical devices – is designed to secure Philips' CSIP, including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products from unauthorized access or use. Philips' copyrighted service software is complex, highly expressive content designed to protect the integrity and efficacy of Philips' life-saving medical devices.

Although the Copyright Office has previously found access controls on video games to be primarily functional, and some aspects of telematics software on motorized land vehicles to

---

[22] Transtate Class 12 Comments at 4.

[23] *See, e.g., Philips Med Sys. Nederland B.V.* No. 3:20-cv-00021-MOC-DCK; *Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.*, No. 3:19-cv-01488-BJM (D.P.R.); *Philips N. Am. LLC et al. v. 626 Holdings, LLC et al.*, No. 9:19-cv-81263 RS (S.D. Fla.); *Philips Med. Sys. (Cleveland), Inc., et al. v. Zetta Med. Techs. LLC, et al,* No. 1:17-cv-03425 (N.D. Ill.); *Philips N. Am. LLC v. KPI Healthcare Inc.*, No. 8:19-cv-01765-JVS-JDE (C.D. Cal.), and *Philips N. Am. LLC* No. 2:19-cv-01745-JLR.

[24] *See Campbell.*, 510 U.S. at 569, 579 (recognizing that in addressing the first factor of the "fair use" test, one considers "whether the new work merely 'supersedes the objects' of the original creation,…or instead adds something new, with a further purpose or different character . . . [;] in other words, whether and to what extent the new work is 'transformative.'" (brackets and citations omitted).

[25] *Campbell*, 510 U.S. at 586 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (C.C.D. Mass. 1841)).

[26] *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1205 (Fed. Cir. 2018) (Federal Circuit noting that the "Ninth Circuit has recognized . . . that this second factor 'typically has not been terribly significant in the overall fair use balancing.'") (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)); *see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) ("This factor 'has rarely played a significant role in the determination of a fair use dispute,' and it plays no significant role here.") (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015)).

LOC_AR_00004138

be functional, the service software designed by OEMs and installed on medical devices are of comparatively much higher value and complexity and invoke patient safety and information security concerns. That is because with their medical devices, OEMs make every decision about service software – from the types to create, to the functions it will perform, to its design and implementation.

Controls restricting access to such proprietary software are essential to preserving the functionality, integrity, safety and security of those devices. Without them, the sophisticated and complex medical devices involved are unsecure, susceptible to alteration, a loss of data, or availability, and vulnerable to hacking and misuse. In the specific context of health care, in which patient lives often depend upon the safety and efficacy of medical devices – some of which are designed for implantation in the human body – the OEM developed software on a device is fundamental and inextricably tied to the value of the device itself.

### iii.     The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole Weighs Against an Exemption

The third factor in the fair use analysis – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – evaluates "both the quantity of the work taken and the quality and importance of the portion taken."[27] "[T]his factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."[28] This factor also weighs decidedly against Proponents.

First, Philips uses multiple layers of technological controls to protect its copyright-protected works from unauthorized access. These controls include user specific access codes and hardware keys, which enable the software access and control features for a particular user. These user-specific access controls permit access to enabled Philips tools and features based on a user's registered access authorization level. Philips provides ISOs with access to Philips' copyrighted software and information necessary for basic repair and maintenance of medical imaging systems.  By circumventing Philips' access controls, ISOs gain unauthorized access to Philips' copyrighted advanced service software.  ISOs then copy and use those *entire copyrighted* works to service Philips systems more efficiently or modify Philips systems for commercial gain.

Second, Philips' ability to control access to its copyrighted software not only provides Philips with a means of protecting its valuable intellectual property, but it also protects the public from the dangers associated with modification or alteration of Philips' medical devices by unauthorized or insufficiently trained users. Unlimited access to Philips' copyrighted software would allow untrained—and unregulated—individuals to make unauthorized changes to Philips' medical devices, potentially rendering the devices ineffective or unavailable for clinical use or dangerous when used. That is, the requested exemption not only would open attempts to repair or modify medical devices without device-specific training, but circumvention of the access controls would essentially give such ISOs unfettered access Philips' *entire copyrighted* works, as well as other proprietary information within the medical devices.

---

[27] *Disney Enters.*, 224 F.Supp.3d at 973 (citing *Campbell*, 510 U.S. at 586).
[28] *Campbell*, 510 U.S. at 587.

9

LOC_AR_00004139

Third, as discussed more fully in Section E(I)(B)(iii) below, Philips already provides domestic ISOs with extensive documentation and software that enables them to perform basic servicing of Philips' medical imaging systems, including documentation and software required by relevant FDA regulations.[29] This information enables ISOs, including Transtate and Summit, to perform repair and maintenance on Philips' medical devices. Neither Transtate nor Summit have explained – much less provided evidence – showing why it would be necessary to circumvent Philips' security access controls in order to perform repair and maintenance on Philips' devices. By comparison, allowing them unfettered access to enhance their business objectives would defeat the lawful copyright protection properly afforded to Philips' operating software and create safety and security risks that are avoided without the exemption.

Given that the requested exemption would give ISOs access to information that goes well beyond that which would be necessary for repair and maintenance, and would effectively grant ISOs access to the medical device manufacturers' entire copyrighted works and other proprietary information and trade secrets contained in the medical devices for purely commercial use, the third "fair use" factor weighs just as heavily against an exemption as the first two.

### iv.     The Effect of the Requested Use Upon the Potential Market for or Value of the Copyrighted Work Weighs Against an Exemption

The fourth factor in the fair use analysis – the effect of the use upon the potential market for or value of the copyrighted work – requires the Office to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market....'"[30] At least one federal circuit court of appeals has held that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed."[31] Here, as to Transtate and Summit, there is no question that the requested exemption as applied to medical devices is sought for commercial purposes, and thus, market harm will result.

Circumvention of access controls on Philips' and other medical devices is of significant commercial value because it permits ISOs to modify such medical devices, and to attempt to provide maintenance and support services (without appropriate training or regulatory oversight) on such devices. Moreover, allowing untrained and unregulated third parties unfettered access to make modifications to such devices could result in improper operation, lack of reliability, or potentially even safety or hacking risks, all of which would create market harm for the medical devices, including their copyrighted software.

### v.     Fair Use Summary

On analysis, each fair use factor plainly tips against granting the proposed Class 12 exemption and, when taken together, an analysis of those factors compels that the proposed exemption should be rejected. The factorial analysis must weigh strongly in favor for an

---

[29] *See, e.g.,* 21 C.F.R. § 1020.30.
[30] *Campbell*, 510 U.S. at 590 (citation omitted).
[31] *Leadsinger*, 512 F.3d at 531 (quoting *Sony*, 464 U.S. at 451).

10

LOC_AR_00004140

exemption to be granted. Whatever else might be said, that is not the case for proposed Class 12 as related to the medical devices addressed by these comments.

### C.    The Uses Do Not Fall Under the Exception for Essential Steps in the Utilization of a Computer Program

Proponents assert, in a conclusory manner, that their intended uses are protected by 17 U.S.C. § 117(a)(1). That provision permits "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" provided that the copy or adaptation "is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." *Id.* Proponents cannot meet the requirements set forth in this provision.

First, it is well established that Section 117(a)(1) shelters only those who *own* the copy of the computer program—not mere licensees of the copy. Federal courts have explained that one is a licensee rather than a user—and thus unprotected by Section 117(a)(1)—if the copyright owner "'(1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use' restrictions."[32] In that regard, courts have held that facts demonstrating that a customer is a licensee include (1) the copyright owner's retention of title in the software and grant of a non-exclusive license,[33] (2) the imposition of transfer restrictions on the licensed software,[34] (3) the imposition of use restrictions specifying ways in which the software must (or cannot) be used,[35] (4) the ability of the copyright owner to terminate the license,[36] and (5) the requirement that the customer destroy or relinquish copies of the software upon termination.[37] All of these factors are present here, and demonstrate that Philips' customers are licensees, not owners, of the software Proponents seek to access.

Specifically, Philips' standard terms and conditions of sale for all medical imaging products makes explicit that: (1) Philips grants only a "nonexclusive and non-transferable right and license to use the computer software" and that Philips retains "exclusive ownership" of the software;[38] (2) the Customer is restricted in its ability to transfer the software and give access to the software;[39] (3) the Customer is restricted in how it may use the software, including being prohibited from using the software on any devices other than the device it comes with or for any purposes other than the operation of that device;[40] (4) Philips retains the ability to terminate the

---

[32] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) (quoting *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)); *see also Vernor*, 621 F.3d at 1110-11; *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44-45 (2d Cir. 2019).
[33] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[34] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[35] *MDY Indus.*, 629 F.3d at 938-39; *Vernor*, 621 F.3d at 1111.
[36] *MDY Indus.*, 629 F.3d at 939; *Vernor*, 621 F.3d at 1112.
[37] *MDY Indus.*, 629 F.3d at 939; *Universal Instruments*, 924 F.3d at 45.
[38] Philips Standard Terms and Conditions of Sale (Nov. 2020), Licensed Software, §§ 1.1, 1.3, https://www.usa.philips.com/c-dam/b2bhc/us/terms-conditions/philips-standard-terms-and-conditions-of-sale-all-products-112420.pdf.
[39] *Id.* §§ 1.2, 1.4; *see also id.*, Philips Proprietary Service Materials, § 9.1.
[40] *Id.*, Licensed Software, §§ 1.2, 1.5; *see also id.* § 2.2 (requiring the Customer to maintain the configuration of the device as it was originally designed and manufactured).

11

LOC_AR_00004141

license if the Customer does not comply with the terms and conditions of sale;[41] and (5) the Customer must "return the Licensed Software and any authorized copies thereof to Philips immediately upon expiration or termination of this License."[42] As a result, controlling law dictates that Section 117(a)(1) is unavailable to Proponents, and their efforts to amend what Section 117 otherwise requires through this process should be rejected.

By the same token, the Registrar previously has applied these principles in rejecting proposed exemptions. For instance, the Registrar has concluded that motor vehicle telematics and entertainment system software was licensed rather than owned by the vehicle owner, thus failing to qualify for Section 117(a)(1).[43] And the Registrar has emphasized that the question of ownership is a fact-intensive one requiring consideration on a case-by-case basis—yet another reason the generalized, overbroad exemption sought by proponents like EFF should be rejected.[44]

Second, section 117(a)(1) is applicable only if the copy of the computer program "is created as an essential step in the utilization of the computer program in conjunction with a machine." Proponents cannot satisfy this requirement either. There is, of course, clinical software installed on the devices and licensed by Philips that is necessary to use the device.[45] But it is not that software that proponents seek an exemption to access. Rather, proponents seek to go *beyond* that software and instead access additional, unlicensed software—or unlicensed service functionalities—that has not been purchased by the device purchaser.[46] Because none of *that* software is necessary to use the devices in their standard configurations, section 117(a)(1) does not shelter Proponents.

### D.    The Uses Do Not Fall Under The Exception for Machine Maintenance and Repair

Proponents claim protection under 17 U.S.C. § 117(c), which provides that "it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine." The copy must be used in no other manner and destroyed immediately after the completion of the maintenance or repair, and any portion of the program not necessary for the activation of the machine cannot be accessed or used.[47] Contrary to Proponents' arguments, this exception has no application here.

Congress' purpose in passing Section 117(c) was to ensure that servicers "'do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.'"[48] And Congress was clear that this

---

[41] *Id.* § 1.1.
[42] *Id.*
[43] 2018 Recommendation at 201.
[44] 2018 Recommendation at 200, 209.
[45] Declaration of Jacqueline Dickson, Ex. A, at ¶ 11.
[46] *Id.*
[47] *Id.*
[48] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1311-12 (Fed. Cir. 2005) (quoting H.R. Rep. No. 105-551, pt. 1, at 27 (1998)).

12

LOC_AR_00004142

exception is narrow; only software actually "necessary for the machine to be activated"—that is, software that "needs to be so loaded in order for the machine to be turned on"—qualifies for the exception.[49] For this reason, the Federal Circuit has held that "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the [machine]…, goes too far because access to those programs is not strictly necessary to verify that the [machine] is 'working in accordance with its original specifications.'"[50] Proponents, however, seek to do exactly that.

The software that Summit and Transtate seek to copy are additional, unlicensed software and unlicensed service functionalities. But as explained in Part I(C), *supra*, none of this software is necessary to activate the machine, and thus by definition cannot be copied "solely by virtue of the activation of a machine."[51] To the contrary, this software consists of "freestanding…programs, that are not needed to boot up the [machine]"—precisely the sort of software that the Federal Circuit has squarely held to be outside the scope of section 117(c).[52]

Indeed, Proponents essentially concede the point. Transtate, in making a perfunctory argument that section 117(c) applies, argues only that accessing Philips' diagnostic and testing software is necessary "[t]o perform the servicing activities."[53] Summit similarly—and also perfunctorily—argues that diagnostic software and data files must be accessed to "perform[] service."[54] But the question under section 117(c) is not whether the software is necessary *to perform servicing of the machine*; rather, the only question is whether the software "needs to be so loaded in order for the machine to be turned on." Proponents do not dispute that the answer to this question is "no." And that answer is dispositive; section 117(c) does not apply.

## II.    The Adverse Impact Factors Do Not Support An Exemption Here

The Librarian of Congress, on recommendation of the Register, must determine whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [against circumventing a TPM] in their ability ***to make noninfringing uses*** … of a particular class of copyrighted works." 17 U.S.C. § 1201(1)(C) (emphasis added). As explained above, because Proponents seek to use Philips' copyrighted works for *infringing* uses, they are barred categorically from using this Triennial Rulemaking Process to obtain an exemption for their conduct.

Apart from that, Section 1201(1)(C) sets out five factors for the Librarian to consider in determining whether to grant an exemption: (1) "the availability for use of copyrighted works"; (2) "the availability for use of works for nonprofit archival, preservation, and educational purposes;" (3) "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research"; (4) "the effect of circumvention of technological measures on the market for or

---

[49] *Id.* at 1314 (quoting H.R. Rep. No. 105-551, pt. 1, at 28) (brackets omitted).
[50] *Id.* (quoting 17 U.S.C. § 117(d)).
[51] 17 U.S.C. § 117(c).
[52] *Storage Tech.*, 421 F.3d at 1314.
[53] Transtate Class 12 Comments at 20.
[54] Summit Class 12 Comments at 8.

13

LOC_AR_00004143

value of copyrighted works"; and (5) "such other factors as the Librarian considers appropriate." *Id.* All five of these factors demonstrate that the proposed exemption should be rejected.

## A.    The Availability for Use of Copyrighted Works

Proponents argue that owners of medical devices are currently unable to obtain timely repair and servicing of the devices, necessitating an exemption permitting independent repairers to access copyrighted material to service such devices. But Proponents offer no credible evidence that the market for servicing and repair of medical devices is not adequately served by existing resources. A close look at the issue shows why.

To start with, the 2018 FDA Servicing Report evaluation involving all stakeholders declined to conclude that there was a prevalent health or safety concern presented by the servicing in the medical device market.[55] That same report noted that there is a robust market for independent servicing of medical devices, with an estimated number of medical device servicing firms numbering between 16,520 and 20,830.[56] And these independent servicing firms are organized and participate in trade associations such as the International Association of Medical Equipment Remarketers and Servicers (IAMERS).[57] The COVID crisis has not generated any credible evidence that this has changed so that equipment repairs are not being made or that public health and safety is threatened with respect to lack of servicing of lifesaving or life-enhancing healthcare devices. That lack of evidence is conclusive here.[58]

Going beyond the FDA requirements, Philips provides independent servicers with extensive documentation, software, and instructions sufficient to perform basic servicing of Philips medical imaging systems.[59] Many of these instructions refer to CSIP Level 0 service software that independent servicers can access with their Philips-issued certificates. The CSIP Level 0 documentation and software—which Philips provides to independent servicers at cost—allows for basic servicing of the systems. Proponents are fully aware of this; indeed, Transtate has an account with Philips to receive and use these materials.[60] Therefore, the argument that independent servicers are cut off from the repair market is fiction.

The companion argument that the proposed exemption is necessary for independent servicers to perform repair and servicing of medical devices is just as flawed. No exemption is

---

[55] U.S. Food and Drug Administration, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), at i.

[56] *Id.* at 19.

[57] *See* International Association of Medical Equipment Remarketers and Servicers, "IAMERS Campaigning for Healthcare Providers Right to Choose," https://iamers.org/ (last visited Feb. 8, 2021).

[58] Proponents offer a few isolated and undocumented incidents where delays allegedly occurred in obtaining OEM servicing. Philips, for its part, has no record of any reduction in service capabilities or customer inability to obtain service during the COVID crisis. *See* Declaration of James Salmons, attached hereto as Exhibit B, at ¶¶ 7-8. Medical device maintenance services were not materially delayed even with customers' reporting an overall increase in volume of service. *Id.* at ¶ 8. Notably, the handful of incidents identified by Proponents does not establish any *systemic* problem of access to OEM servicing in the marketplace – the only relevant issue for the Copyright Office. Finally, unlike Proponents, the FDA has looked at the marketplace and did not find any systemic evidence of inadequate servicing or repairs for medical devices.

[59] 21 C.F.R. § 1020.30(g).

[60] Declaration of Jacqueline Dickson, Ex. A, at ¶ 7.

14

LOC_AR_00004144

needed to permit basic repair and servicing of Philips medical devices because Philips already provides independent servicers with all the information they need to conduct such servicing—and will continue to do so, as required by FDA regulations. In fact, Philips routinely acts as a third-party servicer in repairing and servicing non-Philips medical devices—and has always managed to do so perfectly well with the materials made available to all independent servicers, without the circumvention Proponents insist is necessary for third-party servicers to do their jobs.[61] Accordingly, what proponents really seek through this exemption is the ability to go *beyond* essential repair and servicing of the devices and to access additional, copyright-protected options and features for commercial gain.

To that end, the pending litigation against Summit and Transtate revolves around their modification of files on Philips systems to gain unauthorized access to Philips' proprietary service software and files that they cannot access with their legitimate CSIP Level 0 accounts. They exploit this heightened access for commercial gain by utilizing Philips' proprietary documents and software to provide services that only Philips and its authorized licensees are permitted to provide. Proponents' attempt to use the need for repair and servicing as a vehicle to pursue their commercial interests provides no justification for granting this exemption and should not be entertained.

In support of their position, Proponents offer a handful of declarations that existing servicing options cause increased cost and delay. But this meager showing—a handful of declarants claiming that the exemption would lower costs—cannot compete with the clear evidence described above, including FDA conclusions and regulations, that demonstrates otherwise. This is especially true given the heavy burden Proponents bear to establish the appropriateness of the exemption, *see* Part I(A), *supra*. Simply put, there is no market vacuum or crisis requiring this exemption. For these reasons, it is clear that the medical devices at issue here differ fundamentally from other categories of devices that the Registrar previously has found lack adequate servicing through manufacturer-approved channels—such as vehicle telematics systems[62] and smartphones.[63] Proponents have failed to demonstrate that Philips' copyrighted works will be unavailable to medical device owners unless proponents obtain an exemption allowing them to access Philips' protected intellectual property. In reality, the opposite is true.

Finally, Proponents press the argument that an exemption is necessary to permit servicing of older equipment that has reached the end of its commercial life and thus does not receive servicing from OEMs.[64] But Proponents misrepresent the status of this equipment and omit the substantial risks inherent in their proposed exemption.

First of all, there is no reason why "older" and "newer" equipment should be treated differently when it comes to the need to protect proprietary software contained in the devices. As discussed above and below, Philips medical devices contain proprietary software protected by copyright, and Proponents' attempts to gain access to that software for their own commercial gain (and to the detriment of public safety) through this exemption process is flatly

---

[61] Declaration of James Salmons, Ex. B, at ¶¶ 3-4.
[62] 2018 Recommendation at 213-14.
[63] 2018 Recommendation at 216.
[64] Summit Class 12 Comments at 2; Transtate Class 12 Comments at 6.

LOC_AR_00004145

inappropriate. This remains just as true for "older" devices as it does for "newer" devices, and Proponents cannot show otherwise.

As for certain medical devices that have received an End of Service (EOS) designation from the OEMs, Proponents argue that an exemption is needed to permit independent servicers to repair and service these devices because OEMs will phase out their servicing. But Proponents fail to point out that servicing can be phased out for a variety of reasons, specifically including that the equipment is no longer safe and effective to operate. Apart from that prevalent safety concern, the Proponents' hypothesized claim of purported service inadequacies related to EOS equipment certainly does not support the categorical exemption Proponents demand for all devices under all circumstances. Finally, Proponents do not provide support for any market-wide problem as related to older equipment either. Without that substantiation, there is no basis to even consider the exemption.

### B.    The Availability for Use of Works for Nonprofit Archival, Preservation, and Educational Purposes

Proponents advance no argument whatsoever that independent servicers must be permitted to circumvent Philips' protective measures for purposes of nonprofit archival, preservation, or educational purposes; to the contrary, they seek to use Philips' software in a commercial setting. Because Proponents bear the burden to establish the propriety of an exemption, their failure to do so here must weigh against them.

The Electronic Frontier Foundation does advance an argument on this factor, claiming that "tinkering is itself educational and is a common path for young people to become interested in studying science and engineering."[65] But the Foundation's arguments are aimed at its desired (and overbroad) exemption for virtually all software-enabled devices.[66] Whatever the persuasiveness of such arguments in the context of a "smart litterbox,"[67] they clearly have no application to Philips' FDA-regulated medical devices. It should go without saying that the "educational" benefits of tinkering with expensive, life-sustaining medical devices cannot justify the enormous accordant risks to human life. This factor therefore does not support the proposed exemption.

### C.    The Impact that the Prohibition on the Circumvention of Technological Measures Applied to Copyrighted Works Has on Criticism, Comment, News Reporting, Teaching, Scholarship, or Research

Proponents do not argue that prohibiting unauthorized parties from obtaining the copyrighted software in medical devices such as Philips' unduly hinders free speech, criticism, news reporting, teaching, or research. Again, the Electronic Frontier Foundation advances such an argument for software-enabled devices generally.[68] But no such argument is made or can

---

[65] Electronic Frontier Foundation Class 12 Comments at 16.
[66] *Id.* at 1-2.
[67] *Id.* at 22.
[68] *Id.* at 16.

LOC_AR_00004146

seriously be made for medical devices. Therefore, this factor weighs against the proposed exemption as well.

### D.     The Effect of Circumvention of Technological Measures on the Market for or Value of Copyrighted Works

This factor does not support an exemption because the proposed exemption would severely harm the value of Philips' (and other manufacturers') copyrighted works or harm the market for those works. As explained in Part I(B)(iii), *supra*, the access requested by the Proponents is extensive. They seek to give independent servicers full access to the entire copyrighted works and other proprietary information contained within the medical devices. This wholesale invasion of intellectual property rights would destroy the value of those copyrighted works and undermine the incentive for Philips and other OEMs to produce medical devices with their related software in the first instance—an endeavor that requires substantial time and expense as OEMs develop and secure regulatory clearance for medical devices.

The fact that this access is being requested for purely commercial purposes—meaning that the likelihood of market harm "may be presumed,"[69] Part I(B)(iv), *supra*—further demonstrates that the effect (and perhaps the intention) of the exemption would be to devalue OEMs' intellectual property interests and increase the economic prospects of those seeking to exploit that intellectual property for their own gain. Once again, Proponents cannot demonstrate that this factor supports an exemption; the opposite is true.

### E.     Such Other Factors as the Librarian Considers Appropriate

Proponents argue that an exemption is warranted—indeed, required—for reasons of public and health and safety. But there is reason to pause on their unsupported assertion. As explained above, *see* Part II(A), Philips already provides enough information and resources to allow independent servicers to repair and service Philips medical devices. The proposed exemption, therefore, cannot be justified by appealing to the health and safety benefits of the servicing activities Proponents are perfectly capable of conducting. Beyond that, permitting this additional access would jeopardize, not protect, health and safety.

Philips, as a manufacturer of medical imaging equipment, is acutely aware of the impact that the proper—or improper—use of sensitive medical equipment has on public health and safety. So is the FDA, which has recognized the serious ramifications for health and safety that this area poses, and which for that reason extensively regulates the medical-device arena. Medical equipment manufacturers, like Philips, are subject to an extensive array of regulations designed to ensure that medical devices consistently meet safety and quality requirements. They are, for instance, subject to registration, listing, premarket notification and approval, quality system, labeling, and reporting requirements.[70] By comparison, independent servicers are not

---

[69] *Leadsinger*, 512 F.3d at 531.

[70] *See* 21 C.F.R. §§ 801 (labeling), 803 (incident reporting), 807 (registration, listing, and premarket notification), 814 (premarket approval), 820 (quality system regulation). These regulations also extend to the provision of information by OEMs to customers on assembly, installation and adjustment of certain devices to protect their functionality, integrity and availability. The FDA can intervene if the information provided is inadequate. *See* 21

17

LOC_AR_00004147

registered, not obligated to make reports, and not subject to regulated quality management systems or product training. Nor are they obligated to keep up with changes in equipment specifications, to use customized diagnostic tools, or to stay up to date on device history.

In addition, approved servicers are extensively regulated and must comply with a host of requirements; independent servicers are not. Approved servicers are trained to service and repair the specific medical device at issue and possess the latest diagnostic tools and device records and histories; independent servicers are not and do not. And approved servicers have up-to-date knowledge of device specifications and compatible products and parts, while independent servicers do not. Proponents' attempts to paint approved servicers—regulated, trained, and licensed to deal with the specific machinery at issue—as equivalent to independent servicers who are not subject to reporting, quality management, or other requirements, and who do not have the latest product knowledge, training, and tools, is wrong.

Beyond that, the profound difference between approved and independent servicers relates directly to the quality of the repairs and the proper functioning of the medical equipment. These concerns are magnified as one moves from the more basic repairs and servicing that independent servicers already conduct to the more advanced modifications and alterations—possible only by using Philips' proprietary tools—that Proponents seek an exemption to conduct. Permitting unapproved servicers to perform these advanced alterations on medical devices could lead to, for example, incomplete equipment records (which OEMs are required to maintain), assembly of the device without the proper tools or parts, a lack of up-to-date product calibration, a lack of ongoing market surveillance (which OEMs conduct), and a failure to report adverse events (which OEMs are required to report). There is no guarantee that the modified medical device will function as originally intended.

Finally, these potential malfunctions have serious ramifications for public health and safety. Improperly modifying life-saving medical equipment could cost human lives. Improper repair of diagnostic and treatment devices could lead to misdiagnoses of patients' conditions, ineffective or counterproductive treatment, and a host of other problems seriously jeopardizing patient health and safety. And circumvention of the access controls that Philips and other OEMs install on their medical devices also renders the devices susceptible to cybersecurity threats that OEMs and several federal agencies already work to protect against. Indeed, the FDA already "works aggressively to reduce cybersecurity risks [to medical devices]," a responsibility it shares with "device manufacturers, hospitals, health care providers, patients, security researchers, and other government agencies, including the U.S. Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) and U.S. Department of Commerce."[71] These concerns, which threaten the safety and security of the medical devices upon which human

---

U.S.C. § 337(a); 21 C.F.R. §§ 10.30(g), (h). These regulations do not require the disclosure of trade secrets and they permit OEMs to provide their own employees with more advanced software.

[71] U.S. Food and Drug Administration, "Medical Device Cybersecurity: What You Need to Know," https://www.fda.gov/consumers/consumer-updates/medical-device-cybersecurity-what-you-need-know (last visited Feb. 5, 2021); *see also* U.S. Food and Drug Administration, "FDA Fact Sheet: The FDA's Role in Medical Device Cybersecurity," https://www.fda.gov/media/103696/download (last visited Feb. 5, 2021).

18

LOC_AR_00004148

lives depend, cannot be justified by the exemption's alleged benefit of saving money on repairs.[72]

This is precisely why Proponents are wrong to equate the exemptions recommended in the Registrar's 2018 Recommendation with their proposed exemption here.[73] Modifying a medical imaging machine used to diagnose patients in need is not the same as repairing someone's smartphone. These devices do not exist in the "do it yourself" space, where modification and tinkering carry no collateral consequences except to the device's owner. The Registrar has emphasized the need to follow an incremental approach that considers each class of device on its own terms, precluding such a comparison between highly different classes of devices.[74] There is no reason to abandon that approach now. The FDA has considered and analyzed the servicing issues and will continue to do so.[75] Congress has taken up right-to-repair exemptions, and a comprehensive public debate can be held in that forum. The copyright exemption process should not be used to supplant either the regulatory oversight or broader public debate. There is no "lawful" right to modify the medical devices implicated in this analysis. By statute and under existing case law, the unlicensed copying of OEMs' proprietary works to perform repairs as championed by Proponents is unlawful, and absent action by Congress it should stay that way.

**DOCUMENTARY EVIDENCE**

*Commenters are encouraged to submit documentary evidence to support their arguments or illustrate pertinent points concerning the proposed exemption. Any such documentary evidence should be attached to this form and uploaded as one document through regulations.gov.*

---

[72] *See* Transtate Class 12 Comments at 9-10 (requesting the exemption because it would supposedly lower the cost of repairs and protect the income of independent servicers); Summit Class 12 Comments at 3 (urging the exemption out of concern that manufacturers may charge higher prices for servicing).

[73] *See* Transtate Class 12 Comments at 7.

[74] 2018 Recommendation at 191-92.

[75] The FDA's regulatory oversight is pervasive where medical devices are involved. This includes with respect to Proponents' rewriting of code (to bypass TPMs) that would be facilitated by the grant of the blanket exemption Proponents seek. The FDA does not directly regulate third-party servicers, which, as noted, creates its own set of security and safety risks in this context. But the FDA does regulate those who, like certain of the Proponents, would seek to rewrite code and place an adulterated system into the stream of commerce. *See* 21 C.F.R. § 820.3(o), (w) (subjecting to FDA quality-system-regulation requirements those who "significantly change[] the finished device's performance or safety specifications, or intended use"). These considerations are ignored by Proponents in urging that the exemption purportedly is needed to promote public health and safety. The FDA is unlikely to hold that view.

LOC_AR_00004149

**EXHIBIT A**

**Declaration of Jacqueline Dickson**

LOC_AR_00004150

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## DECLARATION OF JACQUELINE DICKSON

I, Jacqueline Dickson, hereby declare as follows based on my personal knowledge:

1.    I have held the position of Program Manager for Customer Service Intellectual Property Governance with Philips North America, LLC since 2016. In that position, I work with Philips' businesses and markets to ensure that Philips operates in compliance with its customer service intellectual property ("CSIP") policies and strategies. My work also involves CSIP enforcement, including coordinating with security groups to ensure the business takes appropriate actions to secure CSIP and supporting investigations and lawsuits when third parties breach Philips' security to gain unauthorized access to Philips' restricted CSIP materials.

2.    Philips' CSIP includes service software, service documentation, training materials, and other proprietary materials that Philips creates for servicing Philips medical imaging systems. Philips assigns CSIP "levels" to these materials to specify those authorized to access the materials.

3.    Philips makes its CSIP Level 0 materials available to equipment owners, Independent Service Organizations ("ISOs"), and any other individuals in the United States who request such access. These CSIP materials include materials and service tools that Philips makes available to comply with regulatory requirements (such as 21 CFR 1020.30), as well as other documentation and software for performing basic maintenance and servicing on Philips imaging systems, including manufacturer's specifications for what planned maintenance activities need to be conducted at various intervals.

4.    Philips restricts access to its proprietary CSIP Level 1 materials to certain customers who contract for such access, subject to terms and conditions for the use of such materials. Those customers purchase a limited license to use Philips' CSIP materials to service their own Philips imaging systems. CSIP Level 1 materials include certain training materials as well as additional documentation and software to support planned maintenance activities and to execute common corrective maintenance activities.

5.    Philips reserves its proprietary CSIP Level 2 materials and tools for only its own employees and limited trade partners, such as subcontractors and manufacturing partners,

US_ACTIVE-158092444.1

JA286

LOC_AR_00004151

pursuant to contractual terms. CSIP Level 2 materials include Philips' internal information about changes to medical imaging systems (some of which may be part of campaigns required by regulatory bodies), as well as advanced training materials, documents, and software for advanced troubleshooting and advanced configuration of imaging systems (such as changes that may impact x-ray dosage).

6.    Philips developed its Integrated Security Tool ("IST") solution to secure its CSIP materials. Philips' IST solution provides a mechanism to manage entitlements to access CSIP materials and tools. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns to each user entitlements that specify the CSIP Materials the user can access, based on the CSIP rules as described above and subject to any pertinent contractual terms. Philips creates an encrypted IST certificate for each user containing various information, including the user's CSIP entitlements. Philips also offers, at cost, IST smartcards that can be used to access CSIP materials on its medical imaging systems in accordance with user entitlements.

7.    The default CSIP access level for IST accounts in the United States is CSIP Level 0 access. This includes individuals employed by ISOs, like petitioners Summit Imaging, Inc. and Transtate Equipment Co., Inc. I searched our IST records and observed that individuals from Transtate in fact have created IST accounts with Philips that provide them with CSIP Level 0 entitlements. They can use their existing accounts to access Philips' CSIP Level 0 materials. Summit does not have IST accounts and it appears they have not requested Level 0 access.

8.    Philips assigns CSIP Level 1 entitlements to accounts for employees of licensed customers once those employees have satisfied the prerequisites for such access, such as entering into confidentiality agreements and completing any training necessary to safely and effectively use the materials.

9.    Philips assigns CSIP Level 2 entitlements primarily to its own employees once they complete necessary training.

10.    Philips' IST solution includes an IST client application for installation on a field service engineer's computer. The IST client application requires a user to enter his or her IST certificate password. If the password is entered correctly and the individual has a valid IST certificate on their computer, IST will allow the user to access CSIP materials according to the user's entitlements in the IST certificate. A user with CSIP Level 0 access will be able to read Philips' CSIP Level 0 documents and run Philips CSIP Level 0 software, but would be restricted from accessing any CSIP Level 1 or 2 materials. A user with CSIP Level 1 access will be able to decrypt Philips' CSIP Level 1 documents and run Philips' CSIP level 1 software as well. Both the CSIP Level 0 and 1 users would be unable to decrypt or read Philips' CSIP Level 2 documents or to execute software requiring CSIP Level 2 entitlements. A Philips employee with CSIP Level 2 access would be able to access CSIP Level 0 and 1 materials.

11.    Philips' IST solution also includes an IST application that runs on Philips medical imaging systems, including ultrasound systems, computed tomography scanners, positron emission tomography scanners, X-ray machines, magnetic resonance scanners, and nuclear medicine scanners. When started, Philips medical imaging systems load software for clinical use

- 2 -

## JA287

of the system. To access Philips' field service software and information, a field service engineer may plug an IST smartcard charged with his or her IST certificate into a USB drive on the imaging system, provide his or her certificate password, and then choose to run field service software or access other field service information. The imaging system will then provide the user with access to software and information according to his or her entitlements. A CSIP Level 0 user, such as an ISO employee, would get access to various programs and information that allow them to set up and service Philips medical imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities. Philips' licensees and employees in turn receive higher levels of access based on their entitlements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on February 5, 2021 in Northfield, Ohio.

Jacqueline Dickson

LOC_AR_00004153

**EXHIBIT B**

**Declaration of James Salmons**

LOC_AR_00004154

Declaration submitted in support of Comments from:
> Philips North America, LLC
> 2000 Minuteman Road
> M/S 109
> Andover, MA 01810

### <u>DECLARATION OF JAMES SALMONS</u>

I, James Salmons, hereby declare as follows based on my personal knowledge:

1.　　I have held the position of Head, Global Multivendor Services at Philips North America, LLC since 2019.  This includes overseeing Philips' companies AllParts Medical and AGITO Medical.

2.　　Philips' multivendor services provide vendor-agnostic, multi-modality solutions for maintenance, lifecycle, and performance services for imaging systems and other biomedical assets.  Philips multivendor services range from traditional maintenance services to comprehensive solutions that incorporate a portfolio of added capabilities, such as data driven tools to identify equipment usage and replacement opportunities.

3.　　Philips' multivendor group services medical imaging systems from a variety of Original Equipment Manufacturers ("OEMs"), including systems from GE and Siemens.

4.　　Philips' multivendor group accesses software and information on systems according to OEM specifications.  OEMs typically make service specifications available to Independent Service Organizations ("ISOs"), such as Philips' multivendor group, to enable ISOs to perform authorized services.  For example, Siemens makes service documentation and information available through an "Online Library."  GE similarly provides a "Customer Documentation Portal" where ISOs can access service documentation and other information.

5.　　If a medical imaging system that Philips' multivendor group is servicing lacks necessary system software or if there is an issue that Philips cannot resolve with its level of access to the OEM's service documentation and software, the customer or Philips will contract the appropriate OEM to acquire the necessary software or access.

6.　　If Philips cannot acquire authorized access to OEM software or information necessary to perform a particular service on a medical imaging system, then the customer or Philips can contact the appropriate OEM to provide the necessary service.

7.　　Philips saw no extended reduction in service capabilities or reduction in customers' ability to access maintenance services due to COVID.

US_ACTIVE-158093220.2

LOC_AR_00004155

8.    From the perspective of Philips' multivendor services, medical device maintenance services were not materially delayed due to the COVID crisis.  Service companies that we materially supported reported an overall increase in volume of service in 2020.  This includes increased activity from Siemens, GE, and major ISOs.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected.  Executed on February 8, 2021 in Tennessee.

James Salmons

LOC_AR_00004156





UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

*Please submit a <u>separate</u> comment for each proposed class.*

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

## ITEM A. COMMENTER INFORMATION

Petitioner and Contact Information

Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

---

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## ITEM B.  PROPOSED CLASS ADDRESSED

Class 12: Computer Programs—Repair, and, in particular, the subset of Electronic Servicing Materials for Diagnosis, Maintenance, Repair of Medical Equipment

The Librarian of Congress is requested to exempt from the anti-circumvention provision of the Digital Millennium Copyright Act (17 U.S.C. § 1201) ("DMCA"), the circumvention of technological measures (also referred to herein as technological protective measures ("TPMs"))[1] undertaken by or on behalf of the owners or lessees of the medical systems and devices, for the purpose of accessing and using medical equipment servicing materials in the form of computer programs and data files (including databases and manuals) that are necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, thereby ensuring proper operation and compliance with manufacturer and governmental specifications; and where such circumvention does not constitute a violation of any other applicable law.

This exemption will allow owners and lessees of medical systems and medical devices, and their authorized agents, to access and use the servicing materials and perform servicing activities that are essential to the repair, diagnosis, and maintenance of their own medical equipment, without the threat of legal action should the need arise to actually or allegedly circumvent TPMs.  This exemption will also alleviate the unintended consequences of the application of copyright law enacted for developers of software applications for stand-alone computers, to specialty medical equipment integrated with software.

## ITEM C.  REPLY COMMENT

## I.    Introduction

The Period 2 comments by Philips, MITA, and AdvaMed (hereinafter, collectively, "OEM Commenters") are the only comments filed in direct opposition to Transtate's (and Summit Imaging's) comments in support of an exemption under the anti-circumvention provisions of the DMCA for accessing medical device electronic servicing materials.[2,3]  All three comments actually support the need for an exemption.  Critically, the comments focus not on the purpose of the DMCA, but rather underscore that (a) original equipment manufacturers ("OEMs") believe that they are entitled to be the arbiters of who, if any one at all, gets to service their medical

---

[1] In using the terms "technological protective measure" and "TPM," Petitioner does not admit or concede that the technological measures discussed herein meet the definition of a "technological measure" that "effectively controls access to a protected work," as defined in 17 USC § 1201(a)(3)(B).

[2] "Transtate" refers to Petitioner Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging. "Summit Imaging" refers to Petitioner Summit Imaging, Inc.
"Philips" refers to Opponent Philips North America LLC.
"MITA" refers to Opponent Medical Imaging & Technology Alliance.
"AdvaMed" refers to Opponent Advanced Medical Technology Association.

[3] "Electronic service materials" are defined in Transtate's Period 1 comments at 5 as "computer programs or modules thereof, electronic data files, including databases, and electronic manuals"

2

LOC_AR_00004508

devices, as well as when, and under what conditions, and (b) the purpose of the OEMs' TPMs is to allow the OEMs to be the arbiters.

There is no dispute that the electronic servicing materials embedded or stored on medical devices and hidden behind TPMs include uncopyrightable (and hence unprotected) materials and works subject to fair use.[4] Even Philips acknowledges that it is obligated to make electronic service materials available for what it calls "basic servicing of Philips medical imaging systems,"[5] yet hides them behind TPMs, and thus, they are not available unless one obtains an Integrated Security Tool ("IST") key, at undue expense and with other burdens.[6]

To be clearer, Transtate's petition and Period 1 comments distinguish between two types of electronic servicing materials.[7] The **necessary electronic service materials** are those necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, **thereby ensuring proper operation and compliance with manufacturer and governmental specifications**.[8] The **unnecessary electronic service materials** are those **specialized materials OEMs include for their own benefit**. Transtate is seeking for all lawful possessors of medical devices and third party servicers working on behalf of the lawful possessors to be relieved of the DMCA guillotine should the need arise to circumvent the TPMs to access the necessary electronic service materials.[9] Further, no one is seeking access to remanufacture or modify the

---

[4] Petitioner does not admit that any particular work is "protected" as that term is used in the DMCA, or that any particular work enjoys enforceable rights.

[5] Philips Period 2 comments at 4.

[6] The FDA mandates that Assembly, Installation, Adjustment, and Testing ("AIAT") information be made available "at a cost not to exceed the cost of publication and distribution." 21 U.S.C. § 1020.30(g). In its 2003 Guidance, the FDA elaborated:

> The agency has explained that manufacturers may charge for the cost of producing each additional package or unit of instructions. The charge can incorporate factors such as the cost of paper, labor, use of a copying machine, or other costs associated with each package the manufacturer provides under the performance standard. This principle should govern the calculation of the costs for all information subject to disclosure, whether printed, encoded in software, or any other format. For software, recoverable charges equivalent to printed materials would include such factors as the cost of the technical labor of producing such additional package or unit, computer disks, and packaging materials used to produce each additional unit of software. Using a reasonable set of factors should govern the calculation of the costs for any materials that are provided. *See* Ex. 28

Despite this, there are financial burdens far greater than the cost of "publication and distribution" placed on lawful possessors and third-party assistants by OEMs in order to access even its "basic" Level 0 access keys. *See*, declarations of Michael Spencer (Ex. 3 at ¶ 8), Abigail Lane Savage (Ex. 7 at ¶7),and Jacqueline Dickson (attached in Philips Period 2 comments at ¶¶ 7-9).

[7] Transtate Period 1 comments at 1-2.

[8] Maintenance and repair are similarly defined at 17 USC §§ 117(d)(1) and (2) as follows:

> (1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and
> (2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

[9] 21 C.F.R. § 1020.30(b): "Assembler means any person engaged in the business of assembling, replacing, or installing one or more components into a diagnostic x-ray system or subsystem."

3

LOC_AR_00004509

devices.  The exemption can be easily tailored, as proposed by Petitioner, to not exempt those situations.

The Copyright Office is not requested to determine what electronic service materials should be considered necessary electronic materials required for the purposes of servicing medical devices. However, it should concern the Copyright Office that TPMs and the DMCA are purposefully being used to restrict access to unprotected materials, fair use materials, and information the FDA mandates be made available.[10]

Philips' self-serving statement that it makes materials available for "basic service" is misleading in several respects.[11]  First, Philips alone determines what should be considered "basic service."  Second, Philips alone determines what materials are needed for such "basic service."  Third, Philips alone determines who has access to even these "basic" materials.  Fourth, Philips does not explain or address the hurdles it places on non-Philips' persons and entities to obtain access, such as the short expiration times of access keys, the expense for the access keys, and the refusal to train.  Fifth, the AIAT mandate to which Philips alleges it complies, applies only to ionizing radiation emitting devices, not all medical imaging devices, much less all medical devices. Regarding this last point, at footnote 2 of its Period 2 comments, Philips misrepresents the facts and fails to completely quote the January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.  The letter concludes that (emphasis added): "The manufacturer of the original system is not required to disclose proprietary accessories or functions, additional documentation or enhanced software programs to third parties unless this information is part of the AIAT instructions specified in 21 CFR 1020.30(g) or part of the user information specified in 21 CFR 1020.30(h)."  Thus, the Deputy Director is clarifying that in fact OEMs must disclose and make available proprietary accessories or functions, additional documentation and enhanced software programs to third parties if they are covered by the AIAT disclosure requirements.  Tellingly, this is the opposite of the impression Philips attempts to make in its' footnote.

The OEM Commenters argue that providing lawful possessors and third-party assistants with CSIP Level 0 access allows for "basic servicing of the systems". This is not accurate. First, Level 0 documentation and software is not available on all medical systems and modalities. Further still, many medical systems are not properly set up to use Level 0 documentation and software without prior configuration. Even when Level 0 is available, it requires the purchase of thousands of dollars in hardware per engineer in order to properly service medical equipment. As a result, and in contradiction to the FDA mandate that certain information be made available "at a cost not to exceed the cost of publication and distribution," lawful possessors, independent

---

[10] 21 C.F.R. § 1020.30(g).  *See also*, FDA Guidance Document (attached in Transtate Period 1 comments as Exhibit 28).

[11] Philips Period 2 comments at 5.

4

LOC_AR_00004510

service organizations ("ISOs"), and third-party assistants are forced to expend financial resources even before they are granted a limited amount of access and information to service medical equipment. [12] This "basic" level access also requires a tedious multistep process and certificates expire on a monthly basis, requiring lawful possessors, ISOs, and third-party assistants to endure the process at least twelve times per year and often more. Accordingly, and despite what the OEM Commenters state, Level 0 documentation and software is not sufficient.

Further, the OEM Commenters completely ignore that they do not always make keys for devices they deem to have reached end of life. This is an obvious impediment to servicing older medical devices.

OEMS could eliminate the TPMs for these materials and use TPMs only for the specialized unnecessary electronic servicing materials, but they have not done so because the threat of liability for violation of the DMCA to access the necessary electronic servicing materials gives the OEMs (undue) control over the medical device servicing market and makes lawful possessors beholden to the OEMs, as discussed below.

The concerns raised by the OEM Commenters regarding safety and cybersecurity also are not a concern in connection with this exemption seeking process, and, in any event, are based on speculation. [13] The incidences noted by AdvaMed and MITA relate to hardware issues, not use of software issues. Cybersecurity is already the subject of many other laws [14] and is an area addressed by the FDA. [15] More importantly, the OEM Commenters' self-serving concerns are unwarranted. The FDA also looked at the issues of patient safety and regulation of ISO's in 2017, and concluded in its 2018 report that there was <u>no</u> evidence to warrant further regulation of ISO's. [16] Again, the OEM comments are based on speculation. They provide no evidence of an ISO modifying software or otherwise committing a malicious or even reckless act via software. And, in any event, whether or not ISO's are regulated has nothing to do with the fact that TPMs are being used to hide non-protectable and necessary electronic servicing materials that are subject to non-infringing uses [17], and information the FDA has mandated be made available.

Accordingly, the requested exemption for medical devices is warranted.

## II.    The OEM Commenters Confirm That TPMs Are Not Being Used, Or At Least Used Primarily, By OEMs To Protect Copyrighted Material

### A.    All Three OEM Commenters Make Similar Arguments

---

[12] *See* supra fn. 6.
[13] Philips Period 2 comments at 2, 18; MITA Period 2 comments at 5; and AdvaMed Period 2 comments at 6.
[14] The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, is one example.
[15] 21 C.F.R. § 11.10.
[16] Ex. 22 at 25-26.
[17] Such infringing uses are Fair Use, Essential Steps, and Machine Maintenance and Repair, as discussed in Transtate's Period 1 Comments at 14-19, and infra in Sections E(1)-(2).

5

LOC_AR_00004511

Philips, MITA, and AdvaMed raise the specter of "unregulated" and "untrusted" ISOs servicing medical devices, insinuating that ISOs are presumed untrustworthy, and cannot be entrusted with servicing of medical devices unless they pass some approval process imposed by the OEMs and/or the FDA.[18]  The OEM Commenters also raise the specter that granting the exemption would endanger "patient safety."[19]  They also raise the specter of an exemption enabling "hacking" and compromising cybersecurity of the medical devices.[20]  But, these issues have already been addressed by the FDA, and, in any event, are irrelevant to the DMCA exemption request process.

### B.    The OEM Comments Are Not Relevant To The Purpose Of TPMs

The anti-circumvention provision of the DMCA was enacted for the purpose of protecting digital works in the then new digital media, *e.g.*, the Internet and storage devices, given the much greater ease with which digital works could be easily reproduced and distributed.  The provision was not enacted to regulate servicing of devices, be a mechanism for the OEMs to vet the technical qualifications of device servicing entities, to address patient safety concerns, for the OEMs to protect patient privacy, or to protect trade secrets.  All of the OEMs' arguments regarding these issues are irrelevant and only serve to lay bare that the OEMs' main intent is to act as marketplace controllers and to be the sole arbiters regarding who should be allowed to service medical devices.  And if this is not telling enough, the OEM Commenters direct all of their arguments against ISOs and do not mention any of these concerns with respect to the device owners and other lawful possessors who are in the same position as ISOs.  The OEM Commenters do not explain why it is that the lawful possessors are somehow "trustworthy" but ISOs are not.  It is clear the TPMs are used primarily, if not solely, to keep lawful medical device possessors beholden to the OEMs for servicing their devices and to eliminate ISOs from assisting the lawful possessors of the medical devices.

Indeed, the market for servicing medical devices is more accurately divided into OEMs and non-OEMs.  The non-OEMs include (a) the lawful possessors such as hospitals and other medical facilities as well as refurbishers/remarketers, and (b) ISOs.  The lack of or burdensome access to necessary electronic servicing materials is foremost an issue for the lawful possessors with in house servicing departments, whether they are staffed by employees or contractors, because of the unnecessary delays and costs in needing to rely on the OEMs for servicing, as outlined by Transtate's Period 1 declarants.[21]

Further, and as noted in Transtate's Period 1 comments, although some lawful possessors of medical devices can obtain some degree of access to the embedded servicing materials, it is at an

---

[18] Philips Period 2 Comments at 2 and 9-10.
[19] Philips Period 2 comments at  7; MITA Period 2 comments at 3-4, 9-10, 18, and 30; and AdvaMed Period 2 comments at 2, 9, and 11-12.
[20] Philips Period 2 comments at 2 and 9-10.
[21] *See* declarations of Melvin (Ex. 5 at ¶ 8); Kahler Ex. 6 at ¶¶ 13-16); and Grogan (Ex. 8 at ¶ 16).

6

LOC_AR_00004512

undue expense, and the access is insufficient. And, the electronic servicing materials to which access is given are entirely within the discretion of the OEMs.

What the OEM Commenters fail to mention, is the fact that there are other OEMs, such as Del Medical, Cannon, and Toshiba[22] that do not use TPMs, and who do not prevent non-OEM servicing of their devices. There is no mention by the OEM Commenters that there is any, much less a significant, concern for privacy breaches, safety incidences, cybersecurity issues, or copyright infringement in connection with non-OEM servicing of such devices without TPMs. This is because these issues are overblown and unsupported in the record.

### C.    The Safety And ISO Regulation Issues Are The Purview Of The FDA Which, Already Determined Not To Regulate ISOs Because ISOs Are Not Only Trusted, But Vital.

The patient safety and regulation of non-OEM servicing of medical devices is the purview of the FDA. Even the OEM Commenters recognize this. In its May 2018 Report,[23] the FDA noted that (emphasis added):

- The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
- Rather, the objective evidence indicates that many OEMs **and third party entities provide high quality, safe, and effective servicing of medical devices**;
- A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" **and not "servicing"**; and
- **The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system**.

If the FDA, the agency responsible for patient safety and regulation of the manufacture and servicing of medical devices has determined that third party entities provide high quality, safe, and effective servicing of medical devices and that the availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system, it is to that agency that the OEM Commenters should raise their concerns. The OEM Commenters' attempt to involve the Copyright Office and the Registrar in these issues is simply inappropriate and an improper attempt to raise irrelevant issues for the sole purpose of maintaining their exclusionary behavior.

---

[22] Grogan Decl., Ex. 8 at ¶ 12.
[23] FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), Ex. 22 at pg. i.

LOC_AR_00004513

Further, patient and operator safety is covered by a myriad of laws and regulations. It is in no one's interest to jeopardize patient or operator safety. The OEM comments in that regard are simply without any basis in fact. If anything, access to the necessary electronic servicing materials will enhance such safety because it will enable lawful possessors and their trusted third party assistants to address problems quickly.[24] The exemption will enable access when the need arises and the OEMs refuse or greatly hinder access.

Indeed, the OEMs have their own safety issues. The Department of Health and Human Services reviews complaints and tracks responses to complaints. Attached as **Exhibit 30**, are a sampling of issues raised by the HHS with respect to complaints against Philips. Many involve software issues. This further underscores that the OEMs' invocation of patient safety is nothing more than a smokescreen.

### D. The Cybersecurity Issues Raised By The OEM Commenters Are Covered By Other Statutes

The OEM Commenters arguments regarding the risk of malicious cybersecurity breaches or hacking to modify medical devices by exempting access to necessary electronic servicing materials is not relevant. Cybersecurity is both subject to multiple laws such as the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and various criminal statutes. The FDA also is active in this area.[25]

Aside from the fact that the OEM Commenters provide no evidence of malicious cybersecurity breaches committed by a non-OEM servicing entity, the exemption sought is for diagnosis, maintenance and repair, not remanufacture or alteration. One would still remain liable under all relevant laws for circumvention to perform acts other than servicing. Further, an exemption would not remove the TPMs, only liability for circumvention to service the medical devices under lawful conditions.

Bad actors will commit bad acts regardless of the laws meant to deter them. Circumvention of a TPM is a minimal concern for someone wishing to commit a malicious act. All the TPMs do in the present situation is make it more difficult and more expensive for lawful possessors to have

---

[24] As an example, after performing certain types of service on Philips' cath lab machines, including service permitted under Philips' "basic" access, you are required to calibrate the Interventional Work Station ("IWS"). Philips' "basic" access level does not permit access to this calibration. If IWS is not calibrated, it puts the patient's health and safety at risk. For example, without calibration, the images displayed through IWS may not be clear, necessitating taking multiple images, exposing the patient to unnecessary radiation. More significantly, lack of calibration may result in "image misregistration," where for example the location of a catheter that is being placed in a patient's body is not being accurately shown in the IWS image. This could cause major issues during surgery, resulting in injury or even death to the patient.

[25] *See* https://www.fda.gov/medical-devices/digital-health-center-excellence/cybersecurity.

8

JA299

LOC_AR_00004514

their medical devices serviced.  It also makes the lawful possessors more reliant on the OEMs for their servicing needs.[26]

### E.    Arguments Regarding the Commercial Motive of ISOs Are Misplaced

The OEM Commenters make much ado about the commercial motivation of ISOs.  But that is easily dispensed with.

First, the petition requests an exemption for lawful possessors of the medical devices and the third party servicers performing services requested by the lawful possessors.  As set forth in the declarations provided with Petitioner's Period 1 comments, lawful possessors such as hospitals invariably have in-house staff to perform the servicing to the extent they are able to do so.[27]  This reduces cost and delays.  Lawful possessors such as hospitals and medical facilities do rely on outside parties, whether OEMs or ISOs for some servicing.  Some contract out of their in-house departments, i.e., they are staffed by contractors, not direct employees.  These lawful possessors experience the same issues with the impediments imposed by the TPMs, namely high costs to obtain keys, higher servicing costs by OEMs, and no access to needed information such as error/failure codes and the like.  Ultimately, the benefit of allowing circumvention is for the lawful possessors to get faster and more affordable services from ISOs.

To focus exclusively on ISOs, while ignoring hospitals and other lawful possessors, is a clear indication that the OEM Commenters are intent on trying to persuade the Copyright Office using unwarranted scare tactics rather than to focus on the merits of TPMs and access to protected works.

### F.    The Failure to Separate the Necessary and Unnecessary Electronic Servicing Materials is the OEM's Achilles' Heel

To the limited extent that the OEM Commenters mention a concern for protecting copyright protectable material, they conveniently fail to separate out the necessary electronic servicing materials from the unnecessary electronic service materials, which presumably are materials for the benefit of the OEMs.  Because by definition there would be no need for anyone other than an OEM to access the unnecessary electronic servicing materials materials, there would be no risk of exposure of these materials because a non-OEM would not have a need to access these materials.  At the same time, the lawful possessors and those assisting them would be able to more easily, quickly, and with less expense ensure compliance of the medical devices with governmental and manufacturer specifications.

### IV.    The Making Of Copies Of Necessary Servicing Materials In Order To Conduct Servicing Of Medical Devices Indeed Is Exempt From Infringement

---

[26] *See* declarations of Melvin (Ex. 5 at ¶ 8), Kahler (Ex. 6 at ¶¶ 13-16); and Grogan ( Ex. 8 at ¶ 16).
[27] *Id.*

LOC_AR_00004515

### A.     The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device Is Fair Use

#### i.     The Purpose and Character of the Requested Use Supports Exemption

OEM Commenters argue that the lawful possessors, ISOs, and third-party assistants' requested uses are purely commercial and thus presumptively unfair,[28] however, they ignore the underlying non-commercial "purpose and character" of the proposed use, *i.e.*, that Transtate, lawful possessors and other third-party assistants' require access to the necessary electronic servicing materials for the purpose of adequately servicing medical devices used in furtherance of public health. The OEM Commenters also conveniently fail to mention that other lawful possessors (*i.e.,* hospitals and medical facilities) share similar "commercial" qualities.[29]

The OEM Commenters mischaracterize the emphasis on commercial use involved in consideration of the first factor for fair use. As articulated by Nimmer on Copyright, a less stark formulation of the same principle is that "commercial motivation and fair use can exist side by side," and considerations include "whether the alleged infringing use was primarily for public benefit or for private commercial gain"—which inclines against fair use in a commercial context, but leaves wide latitude for consideration of all the other factors that may outweigh this single fact under appropriate circumstances.[30] In other words, labeling a use as "commercial," should not end the analysis.[31] Accordingly, the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." Because the fact that a given use is commercial does not necessarily negate fair use, any presumption that a commercial use is *ipso facto* unfair should be regarded as "rebutt[able] by the characteristics of a particular commercial use."[32]

---

[28] *See* Phillips Period 2 Comments at pg. 7 citing *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) and *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016), for the conclusion that commercial use is presumptively unfair. However, the facts that represent "commercial use" in each of these cases are distinguishable from the facts at hand. In *Leadsinger, Inc. v. BMG Music Pub.,* a manufacturer of karaoke devices brought an action against music publishers seeking declaratory judgment that it was authorized to display lyrics to songs, either in print or displayed on a video screen, under the fair use doctrine. The court held that plaintiff's basic purpose—to sell its karaoke device for profit—was a commercial one. Similarly, in *Disney Enters., Inc. v. VidAngel, Inc.*, the plaintiffs were companies in the business of producing and distributing motion pictures and television programs and brought an action against an unauthorized provider of companies' copyrighted movies and television programs. Neither of these cases, nor the purposes for use of copyright protected materials articulated therein, is analogous to the type of use contemplated by Petitioner, that of service and repair of medical devices that directly impact the quality of public health.

[29] *See* supra at § E.

[30] *See* 4 Nimmer on Copyright § 13.05 (2020).

[31] *See* 4 Nimmer on Copyright § 13.05 (2020); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) ("The language of the statute makes clear that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character. Section 107(1) uses the term 'including' to begin the dependent clause referring to commercial use, and the main clause speaks of a broader investigation into "purpose and character'. . .).

[32] *See* 4 Nimmer on Copyright § 13.05 (2020).

LOC_AR_00004516

In determining the purpose and character of the use, "the crux of the profit/non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *See, e.g., Harper & Row, Publrs. v. Nation Enters.,* 471 U.S. 539, 562, 105 S. Ct. 2218, 2231, 85 L. Ed. 2d 588, 608, 1985 U.S. LEXIS 17, *43, 225 U.S.P.Q. (BNA) 1073, 1081, 53 U.S.L.W. 4562, 11 Media L. Rep. 1969; *Weissmann v. Freeman,* 868 F.2d 1313, 1315, 1989 U.S. App. LEXIS 2387, *1, 10 U.S.P.Q.2D (BNA) 1014, 1015, Copy. L. Rep. (CCH) P26,390, 101 A.L.R. Fed. 91 (one academic's use of another academic's materials was a for-profit use); *Society of Holy Transfiguration Monastery, Inc.,* 689 F.3d 29, 61 (1st Cir. 2012) ("In effect, the commercial-noncommercial distinction the law draws centers not on whether a user intends to line his own pockets, but rather on whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. Profit, in this context, is thus not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages.").

Here, the request to access fair use of the necessary electronic servicing materials would involve a commercial setting only to ensure that the medical equipment complies with OEM and regulatory specifications.[33] Petitioner is not aware of anyone in the business of selling access to such servicing materials. Moreover, remarketers, such as Petitioner, pay in full for the medical equipment at issue, and are lawful owners of the medical devices with the software integrated in them. Servicing the medical equipment owned by lawful possessors is primarily for public benefit, as access to materials required for servicing is imperative in treating patients, and is especially critical during a pandemic such as the current COVID-19 crisis.[34] Petitioner does not and is not seeking to provide, or for others to provide, the copyrighted works to third-parties, but instead seeks access to effectively service products that are lawfully owned. Accordingly, the Petitioner's proposed use of copyrighted works is not commercial in the ordinary sense.

Petitioner does not dispute that it is a for-profit entity. However, the commercial nature of Petitioner's business model does not outweigh the noncommercial nature of its servicing and repair work.

### ii.    The Nature of the Original Work Supports Exemption

OEM Commenters seek to downplay this factor precisely because it weighs in favor of exemption. The more informational or functional the work, the broader the scope of the fair use defense. *See, e.g.,* 4 Nimmer on Copyright § 13.05[A][2][a]; *Leadsinger, Inc. v. BMG Music Pub.,* 512 F.3d 522, 531 (9th Cir. 2008) *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 531 (9th Cir. 2007); *Stern v. Does,* 978 F. Supp. 2d 1031, 1046 (C.D. Cal. 2012), *aff'd,* 512 Fed. Appx. 701 (9th Cir.), *cert. denied,* 134 S. Ct. 423 (2013); *Cambridge Univ. Press v. Becker,* 863

---

[33] 21 C.F.R. §§ 1020.30(g)-(h)
[34] *See* declarations of Melvin (Ex. 5 at ¶ 7), Kahler ( Ex. 6 at ¶ 16), and Lane-Savage (Ex. 7 at ¶¶ 17-19).

LOC_AR_00004517

F. Supp. 2d 1190, 1225 (N.D. Ga. 2012), *rev'd on other grounds sub nom.*, *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014); *See Diamond v. Am-Law Corp.*, 745 F.2d 142 (2d Cir. 1984) ("informational works may be more freely published"); *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) ("Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater."), *cert. denied*, 469 U.S. 823, 105 S. Ct. 100, 83 L. Ed. 2d 45 (1984) (*but see later opinion*, 664 F. Supp. 753 (S.D.N.Y. 1987)).

The service software designed and blocked by OEMs is not creative nor fictional, expression; it is functional information required to safely service medical equipment. The software itself is not dictated by any creative expression, but by the specific technical needs of the machine. Indeed, because the copyrighted works held hostage by OEMs are integrated with functional medical equipment (*i.e.*, the hardware), access to this information is necessary to engage in diagnosis, repair, and lawful modification of medical device functions.[35] Petitioner seeks access and use of this functional information in order to obtain diagnostic data. Accordingly, the second factor supports fair use.

### iii. The Amount And Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whole Weighs In Favor Of An Exemption

The amount of use of the servicing materials would not be substantial and would be limited to those instances where circumvention was essential for critical diagnoses, maintenance, and repairs. As explained above, only the portion of the works containing necessary electronic service materials are at issue under the proposed exemption. Accordingly, granting Petitioner's proposed exemption does not require use of the entire copyrighted works.

OEM Commenters argue that granting Petitioner's exemption requires use of its entire copyrighted works, providing little evidence to support this assertion, but the OEM Commenters do not address the fact that use of its works are part and parcel of a lawful possessor's ownership of the medical equipment it services. The OEM Commenters also do not admit that in certain instances, access to proprietary information, additional documentation or enhanced software programs is required.[36] OEM Commenters also falsely state that the current access level provides

---

[35] Opponent Medical Imaging & Technology Alliance ("MITA") cites *Allen-Myland, Inc. v. IBM* as an exemplar where copying computer code was not found to be fair use despite the computer code's informational nature, however the facts and holding are distinguishable from the facts at hand. In *Allen-Myland, Inc. v. IBM,* the court declined to find a fair use of computer code because the plaintiff copied code to build a library of different versions of the microcode in order to discover how to support various configurations and learn how to use IBM's system to achieve its commercial purposes without paying IBM. In this instance, Petitioner's purpose is not to create an internal inventory, it is to repair, service, and diagnose the medical equipment it owns.

[36] *See., e.*g., January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.

LOC_AR_00004518

information necessary for basic repair and maintenance, but the OEM Commenters do not define, extrapolate, or provide evidence of their interpretation of "basic."[37]

The attempt to drag safety and cybersecurity cautions into their arguments also fail, given that the FDA has weighed in and concluded ISOs like Petitioner are "critical" to a safe and functioning medical care industry. Moreover, Petitioner and other ISOs like it already receive some degree of training directly from OEMs, and are skilled and trained in repair and diagnosis of medical equipment, so long as they are empowered with the appropriate level of access needed to do so. If the OEMs cared solely about safety, they would provide even more training, not less. The OEM Commenters arguments that granting the exemption requires use of its entire copyrighted works is misleading and misses the point. The third fair use factor supports an exemption.

### iv.    The Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work Is Minimal

The OEM Commenters argue that the fourth factor weighs against Petitioner because as a third-party ISO it is inherently commercial.[38]  Instead, of responding to the valid concerns provided from lawful possessors, and those acting at their behest, the OEM Commenters attempt to focus on the potential for safety and hacking harm by allowing **third parties** access to service medical devices.  This argument ignores the plight of in-house hospital employees attempting to service their own medical equipment.[39]

Medical equipment software is effectively useless outside of the equipment it inhabits, with no separate market for reselling or distributing the software apart from the devices.  The servicing materials required are only useful for the particular medical equipment in which they are embedded.  Moreover, OEM Commenters concede that they already license some of their copyrighted materials to some ISOs,[40] which causes no harm to the secondary market.  Petitioner is seeking access for lawful possessors, and those acting at their behest, to the necessary electronic servicing materials to ensure proper operation and servicing activities on medical systems and devices.  Access to the computer programs and data files comprising the necessary electronic servicing materials is needed to replace the unprotected electrical and mechanical parts on the medical device.  Again, the TPMs do not provide a means for maintaining the device's hardware without also accessing the software.  There is no other need to otherwise copy or access the computer programs and data files.

OEMs would still be free to sell medical devices and computer programs.  Accordingly, the necessary servicing materials used by lawful possessors, ISOs, and third-party assistants does not

---

[37] *See also* supra at pg. 5.
[38] Philips Period 2 comments at10; AdvaMed Period 2 comments at 7; and MITA Period 2 comments at 8.
[39] *See* declarations of Melvin (Ex. 5 at ¶ 4), Kahler (Ex. 6 at ¶ 5), and Grogan (Ex. 8 at ¶¶ 6-7).
[40] Dickson Decl. at para. 4.

LOC_AR_00004519

affect the market for or value of the computer programs and data files involved. Therefore, the fourth factor weighs in favor of a finding of fair use.

**B.    The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device At The Request Of An Owner Of The Device Is An Essential Step In The Use Of The Device**

OEM Commenters raise the issue that a copy of the computer program or data base is not necessary for the activation of the medical device, but it is necessary to service or diagnose the medical device.[41] The OEM Commenters also claim that the owners of the medical devices are not the owners of the copies of the electronic materials embedded in the devices stating the software is only licensed. However, this ignores that the issue of ownership is a fact-based inquiry.[42] The Copyright Act provides for two basic manners for distributing copies of works: (a) by sale or other transfer of ownership, or (b) by rental, lease, or lending.[43] Yet the OEM Commenters nowhere describe how they are distributing their works via the rental, lease, or lending, or that the machine sale documents include these words or concepts. Rather, they rely on "licensing" which is an intellectual property right concept, not a concept associated with the transfer of tangible property, and in this case, the copies of sofware and data files stored or embedded on a machine.

Indeed, even assuming that the software in the owned machines was only considered rented, leased, or lent, there is no sensical explanation as to how one returns the embedded copies of the works. Presumably they could, if they knew how, delete all of the software by somehow reimaging the drives of the machines, but then the machines would cease to function. They would no longer constitute the purchased machine. This surely is not contemplated by anyone in the purchase of the medical devices. Rather, the expectation is that the medical devices can be maintained and repaired thoughout their useful lives.

Philips even concedes that its "customers purchase a limited license to use Philips' CSIP materials **to service their own Philips imaging systems**."[44] Yet, Philips fails to address why these materials, which include "documentation and software to support planned maintenance activities and to execute common corrective maintenance activities," are not essential in the use

---

[41] AdvaMed Period 2 comments at 7-8; MITA Period 2 comments at 13; and Philips Period 2 comments at 12-13.
[42] *See* Raymond Nimmer, The Law of Computer Technology § 1.18[1] p. 1–103 (1992) ("Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.")
[43] 17 U.S.C. §106(3).
[44] Dickson Decl. at para. 4.

14

LOC_AR_00004520

of the medical device.[45]  Instead Philips misconstrues Petitioner's comments relating to use as an essential step by relying on the 2018 Recommendation regarding motor vehicle telematics and entertainment system to assert that software is licensed, not owned.[46]

Philips' arguments ignores the nature and context of the Register's concerns in its 2018 Recommendation.  First, the Recommendations noted that most of the concerns "primarily relate to accessing entertainment works through vehicle entertainment systems and related subscription services, not to repairing more functional software installed to facilitate vehicle operation."[47]  In its 2018 Recommendation, the Register also distinguished the 2015 rulemaking favoring exemption for vehicle repair "because the activities were personal, noncommercial, and would 'enhance the intended use' of the vehicle programs."[48]  Again, Philips does not address how the TPM protected necessary electronic servicing materials do not enhance the use of the medical devices.  Instead, Philips is attempting to categorize its software licenses with subscription services such as Sirius XM, which were of concern in the 2018 Recommendation.[49]  These arguments also ignore that a potential harm from medical devices that are not properly serviced and maintained is loss of human life.

To rebut Petitioner's evidence of servicing harm during the COVID-19 pandemic, Philips (the only OEM to address this issue) provides that its own records do not show a reduction in service capabilities.[50]  This over-simplification of the argument ignores the potential harm to life from medical equipment that is not properly maintained.[51]  It also avoids addressing the current effect to taxpayers and patients resulting from costs for maintaining medical devices from purchasing access keys and paying higher service charges by OEMs.[52]  By ignoring the current harms to both patient safety and medical costs, OEM Commenters are minimizing the current market harm from its broadly applied use of TPMs.

Petitioner is not seeking an exemption to access the same types of software that were of concern in the 2018 Recommendation.  Rather, Petitioner is seeking access to fairly use the necessary electronic servicing materials embedded in medical equipment as an essential step in the servicing and repair activities associated with the medical equipment.  This software cannot be separated from the medical equipment.  The medical device is rendered useless without the software.  This is distinguishable from motor vehicle telematics and entertainment system software where, as the Register notes, "diagnostic data is still available through the online

---

[45] Id.
[46] Philips Period 2 comments at 12.
[47] 2018 Recommendation, Ex. 29 at 215.
[48] Id. at 203.
[49] Id. at 216.
[50] Philips Period 2 comments at pg. 14.
[51] See FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 2018, Ex. 25; see also Peloso Decl., Ex. 15 at ¶¶ 11-13.
[52] Kahler Decl., Ex. 6 at ¶ 16; see also Lane-Savage Decl., Ex. 7 at ¶ 21.

LOC_AR_00004521

diagnostics port."[53]  Here, OEMs are using TPMs to prevent both ISOs and medical device owners from accessing diagnostic data.[54]

## C.    Hardware Maintenance And Repair 17 U.S.C. § 117(C) Is Applicable To Effect Maintenance Or Repair Of A Medical Device

The necessary electronic servicing materials are not "additional"—they are an included and necessary part of the medical equipment.

In relying on *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc*,[55] the OEM Commenters mischaracterize and cherry pick their supporting arguments. In this case, the court stated that "Congress's clearest indication of what it considered to be 'necessary for the machine to be activated,' is found not in section 117(c), but in section 117(d) which defines repair and maintenance in terms of allowing the system to work "in accordance with its original specifications and any changes to those specifications authorized for that machine." The court continued, stating that "the service provider must be able to cause the machine to boot up in order to determine if it 'works in accordance with its original specifications.'"  The court concluded that "in some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." Accordingly, it found that where the maintenance code was "so entangled with the functional code that the entire code must be loaded into RAM for the machine to function at all", loading the maintenance code was necessary for the Management or Control Unit "to be turned on."[56]

The OEM Commenters conflate the concepts and incorrectly emphasize the element of turning on the device with the underlying purpose of the statute: function. The necessary electronic servicing materials on medical equipment are so entangled with the devices, that they must be accessible in order to conduct diagnosis and repair in a safe manner. In order to determine if the medical equipment functions in accordance with its original and updated specifications, use of servicing computer programs and data files comprising the necessary electronic servicing materials is required.

Indeed, attached as **Exhibits 31 and 32**, are copies of the certified registrations for two versions of the Allura software embedded in Philips x-ray machines.  Each registration is for a complete software package that includes aspects of the code for both running and maintaining the machines.  The entire package is invoked when operating and maintaining the machines.

---

[53] *Id*. at 213.
[54] *See* declarations of Spencer (Ex. 3 at ¶ 6), Melvin (Ex. 5 at ¶ 5), Kahler (Ex. 6 at ¶ 6), Lane-Savage (Ex. 7 at ¶ 22), and Grogan (Ex. 8 at ¶ 6).
[55] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1314 (Fed. Cir. 2005).
[56] Notably, the court in *Storage Tech. Corp.* held that the Defendant-Appellant service company came within the safe harbor for software copying done solely for purposes of maintenance or repair and found the district court erred in finding that it was unlikely to prevail on its defense to copyright infringement. *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1317 (Fed. Cir. 2005).

LOC_AR_00004522

Transtate is not aware of any ISO or lawful possessor that modifies the necessary servicing computer programs and data. Instead, they simply seek to access and use them for repair and servicing activities. Transtate is not aware of anyone who makes copies of the necessary electronic materials, outside of fair use loading of them into random access memory for execution purposes. Accordingly, and because the necessary electronic servicing materials are necessary to conduct servicing activities, the proposed use is exempt from infringement under Section 117.

**CONCLUSION**

The OEM Commenters' argument that granting Petitioner's exemption will expose the public to serious dangers associated with the modification of medical devices has already been dispelled by the FDA. The OEM Commenters' further argument that the current access and use of documentation and software is sufficient to perform servicing activities is self-serving and not supported. As concluded by the many declarants supporting Petitioner's Period 1 comments and the proposed exemption, this is not the case. Finally, the OEM Commenters' argument that the Copyright Office granting the proposed exemption will threaten entire copyrighted works, proprietary information and trade secrets is not supported. The Petitioner seeks a tailored exemption, which would grant access only to the electronic service materials necessary for servicing (diagnosis, repair, and maintenance) of medical devices and systems. As a result, the OEM Commenters arguments fail.

For the aforementioned reasons, Petitioner's proposed exemption should be granted.

17

JA308

LOC_AR_00004523



August 13, 2021

Kevin R. Amer
Acting General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Sent via email: kamer@copyright.gov

Re:  Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Amer:

On May 4, 2021, Regan A. Smith, General Counsel and Associate Register of Copyrights for the United States Copyright Office, sent a letter to FDA's Acting Chief Counsel to inform FDA of a rulemaking proceeding pending before the Copyright Office that relates to, among other things, medical devices.  We understand that this proceeding pertains to 17 U.S.C. § 1201 and potential exemptions to the general prohibition on the circumvention of technological protection measures (TPMs) that control access to copyrighted works, including software.  Ms. Smith stated that participants in the rulemaking process had referenced FDA's regulatory authority in this area as relates to the safety and effectiveness of medical devices, and the Copyright Office therefore sought to make FDA aware of the rulemaking proceeding.

Ms. Smith drew FDA's attention to two proposed exemptions being considered in this proceeding.  The first of these proposed exemptions, designated the "Class 9" proposal, seeks to expand an existing exemption under 37 C.F.R. § 201.40(b)(4), pursuant to which the prohibition on circumventing TPMs does not apply to a patient who accesses compilations of data generated by the patient's own medical device or corresponding personal monitoring system, provided that the device is wholly or partially implanted in the patient's body; the circumvention is undertaken by the patient; the access is accomplished through the passive monitoring of wireless transmissions already being produced by the device or monitoring system; and the circumvention does not constitute a violation of applicable law.  The Class 9 proposal would remove these four limitations.

Under the second proposed exemption, designated the "Class 12" proposal, the prohibition on circumventing TPMs would not apply to circumvention that is conducted to access computer programs and data files that are contained in and control the functioning of medical devices (among other things) for the purpose of diagnosis, maintenance, or repair of such devices.  Ms. Smith stated that opponents of both proposals have expressed concerns regarding potential impacts to health and safety should the exemptions be granted.

FDA would like to thank the Copyright Office for informing FDA of this proceeding.  The following are

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

LOC_AR_00006160

our views with respect to both the Class 9 and Class 12 proposals, as they relate to devices within the meaning of section 201(h) of the Federal Food, Drug, and Cosmetic Act (referred to as "medical devices" herein). We offer no opinion at this time on any existing exemptions or proposed exemptions to the general prohibition on the circumvention of TPMs that control access to copyrighted works other than as specifically discussed below.

Class 9

It is FDA's understanding that the proposed expansion of the current exemption under 37 C.F.R. § 201.40(b)(4) would broaden opportunities for patients to access data generated by their own medical devices without potential liability under 17 U.S.C. § 1201, but would impose no requirements on, or in any way limit the actions of, the manufacturers of those devices. FDA does not believe that further exempting patients (or those acting on their behalf) from potential liability in this fashion is likely to significantly impact the safety or effectiveness of medical devices, or to impair the ability of medical device manufacturers to comply with applicable regulatory requirements enforced by FDA. We are aware that opponents of the proposed expansion have raised concerns that the expansion may jeopardize the cybersecurity of affected devices, and may require greater effort from manufacturers to ensure that their devices remain secure. FDA believes that an exemption from liability expressly limited to circumvention conducted for the sole purpose of lawfully accessing data generated by a patient's own device or associated monitoring system, whether or not such device is implanted and/or such access is accomplished through the passive monitoring of existing wireless transmissions, is unlikely to undermine the cybersecurity of affected devices, other than as intentionally undertaken by the patient and as may impact only such patient's own device. FDA further believes that the proposed expansion of the exemption under 37 C.F.R. § 201.40(b)(4) is broadly consistent with the existing exemption for good-faith security research under 37 C.F.R. § 201.40(b)(11). FDA therefore does not view the proposed expansion of the exemption at 37 C.F.R. § 201.40(b)(4) as likely to undermine or impede efforts to ensure an appropriate degree of cybersecurity for medical devices.

FDA notes that the Class 9 proposal includes modifications to 37 C.F.R. § 201.40(b)(4) that would remove the current regulatory language expressly limiting the exemption to circumvention that "does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration." To the extent this language is removed from the regulation, FDA recommends that the final rule clarify that nothing in the rule affects the application of other federal laws and regulations, and remind interested parties that the exemption continues to apply only where circumvention is undertaken "for the sole purpose of *lawfully* accessing the data generated by [the patient's] own device or monitoring system" (emphasis added).

Class 12

As a preliminary matter, FDA understands that the proposed exemption would apply to circumvention that is conducted solely to obtain data access for the purpose of diagnosis,

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

2

JA310

LOC_AR_00006161

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

maintenance, or repair of medical devices, and not for the purpose of device modification that may significantly change the performance or safety specifications of the device or its intended use.[1] FDA further understands that opponents of the Class 12 proposal have expressed concerns that the exemption may facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers.

In May 2018, FDA issued a report that evaluated the available evidence pertaining to the quality, safety, and effectiveness of medical device servicing in the United States.[2] Based on an assessment of complaints, peer-reviewed published literature, medical device reports describing suspected device-associated deaths, serious injuries, and malfunctions, and research and analysis provided by third parties, the report concluded that many entities that perform or participate in the servicing of medical devices – including both original equipment manufacturers (OEMs) and independent service organization (ISOs) – provide high quality, safe, and effective medical device servicing.[3] The report determined that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing, and therefore concluded that the evidence did not justify imposing additional regulatory requirements on ISOs.[4] The report further concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States.[5]

With respect to cybersecurity concerns in particular, FDA recently issued a discussion paper that is intended to guide future assessment of both the challenges and opportunities related to cybersecurity and the servicing of medical devices.[6] The discussion paper acknowledges the cybersecurity challenges related to ISO servicing of medical devices, but also notes that device servicing entities may be well positioned to help identify and address security vulnerabilities, and observes that ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices. FDA therefore does not share the view that an exemption from liability under 17 U.S.C. § 1201 for circumvention conducted solely for the purpose of diagnosis, maintenance, or repair of medical devices would necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity; however, FDA has sought stakeholder input on this topic and is evaluating FDA's approach to cybersecurity and medical device servicing.

---

[1] FDA notes that if the proposed exemption were to cover device modification that may significantly change the performance or safety specifications of the device or its intended use, such exemption could raise safety and effectiveness concerns not addressed in this letter, and may have implications with respect to the application of FDA regulatory requirements pertaining to device marketing authorization, registration/listing, quality system regulations, and medical device reporting, among other requirements.

[2] "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices," available at https://www.fda.gov/media/113431/download.

[3] See id. at 23.

[4] Id.

[5] Id.

[6] "Strengthening Cybersecurity Practices Associated with Servicing of Medical Devices: Challenges and Opportunities," available at https://www.fda.gov/media/150144/download.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

3

LOC_AR_00006162

**U.S. FOOD & DRUG**
ADMINISTRATION

Please let us know if you have any questions regarding these comments, or if FDA can be of any further assistance to the Copyright Office in connection with this rulemaking proceeding.

Sincerely,

Suzanne B. Schwartz -S

Digitally signed by Suzanne B. Schwartz -S
Date: 2021.08.13 11:12:55 -04'00'

Suzanne B. Schwartz, MD, MBA
Director, Office of Strategic Partnerships and Technology Innovation
Center for Devices and Radiological Health
U.S. Food and Drug Administration

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

4

JA312

LOC_AR_00006163



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

May 4, 2021

Mark Raza
Acting Chief Counsel
U.S. Food and Drug Administration
Mark.Raza@fda.hhs.gov

Re:    Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Raza:

I am writing to inform you of a regulatory proceeding pending before the U.S. Copyright Office that relates to medical devices.

Section 1201 of title 17, United States Code generally prohibits the circumvention of technological protection measures that control access to copyrighted works, including software. Section 1201, however, allows the Librarian of Congress, upon the recommendation of the Register of Copyrights, to exempt certain classes of works from the prohibition, based upon a rulemaking proceeding held every three years. The statute requires the Copyright Office to consult with the National Telecommunications and Information Administration of the Department of Commerce, which represents the Administration in the rulemaking. Because, however, certain participants in the current rulemaking have specifically noted the FDA's regulatory authority in this area, and because the FDA provided views to the Copyright Office in a prior section 1201 rulemaking, we wanted to reach out to you directly to make you aware of the pendency of this proceeding.

Under consideration in the current rulemaking are two proposed exemptions that involve medical devices. The first proposal seeks to expand an existing exemption under which a patient may, under certain circumstances, access compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems.[1] This exemption was first adopted in the 2015 rulemaking, during which the Copyright Office advised the FDA of the proposal and the FDA provided its views (see Attachments A and B). The current proposal seeks to remove certain restrictions in the current regulation,

---

[1] 37 C.F.R. § 201.40(b)(4).

1

LOC_AR_00006168

specifically (1) the limitation to wholly or partially implanted devices, (2) the prohibition against circumvention by persons other than the patient, (3) the requirement that access be accomplished solely through passive monitoring of wireless transmissions that are already being produced by the device or system, and (4) the requirement that circumvention not constitute a violation of other applicable laws.

The second proposed exemption would allow access to computer programs and data files that are contained in and control the functioning of medical devices for the purpose of diagnosis, maintenance, or repair of such devices. The parties seeking this exemption have indicated that covered devices would include, but not be limited to, ventilators, CT scanners, ultrasound devices, and x-ray systems.

The Office has received comments in opposition to both proposed exemptions. Opponents have noted the FDA's regulatory authority for ensuring that medical devices are safe and effective and have expressed concern over potential impacts on health and safety. Although any exemptions granted under section 1201 have no effect on the applicability of other laws or regulations, and the Copyright Office ordinarily limits its analysis to copyright-related concerns, we believe it is appropriate to make the FDA aware of this proceeding in light of opponents' specific reference to its regulatory authority and its past participation in the section 1201 rulemaking.

I have included as Attachment C the notice of proposed rulemaking, which describes the proposed exemptions in this proceeding. The two proposals at issue are identified as Class 9 and Class 12. The full record of the rulemaking to date, including public comments related to these proposed exemptions, are available at https://www.copyright.gov/1201/2021/.

Please do not hesitate to contact me if you have any questions. Please submit any responses to me at regans@copyright.gov, and to Nick Bartelt at niba@copyright.gov and Melinda Kern at mkern@copyright.gov.

Sincerely,

Regan A. Smith
General Counsel and Associate Register of Copyrights

cc:    Stacy M. Cheney, Senior Attorney Advisor, Office of the General Counsel, National Telecommunications and Information Administration

2

JA314

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2023, this joint appendix was served electronically via the Court's CM/ECF system upon all counsel of record.

Dated: June 2, 2023                    /s/ *Michael B. Kimberly*