No. 23-5067

# United States Court of Appeals
## for the District of Columbia Circuit

———————————————

Medical Imaging & Technology Alliance, et al.,
*Plaintiffs - Appellants,*

v.

Library of Congress, et al.,
*Defendants - Appellees.*

———————————————

On appeal from a final judgment of the
United States District Court for the District of Columbia
Case No. 22-cv-499 (BAH)

———————————————

**REPLY BRIEF**

———————————————

Peter Tolsdorf
  *National Electrical
    Manufacturers Association*
  *1300 17th Street North, No. 900
  Arlington, VA 22209
  (703) 841-3200*

*Counsel for Medical Imaging &
Technology Alliance*

Terry Chang
  *Advanced Medical
    Technology Association*
  *1301 Pennsylvania Ave. NW
  Suite 400
  Washington, DC 20004
  (202) 783-8700*

*Counsel for Advanced Medical
Technology Association*

Michael B. Kimberly
Emmett Witkovsky-Eldred
  *McDermott Will & Emery LLP
  500 N. Capitol Street NW
  Washington, DC 20001
  mkimberly@mwe.com
  (202) 756-8000*

*Counsel for appellants*

# TABLE OF CONTENTS

Table of Authorities ........................................................................ i

Introduction .................................................................................. 1

Argument ...................................................................................... 2

    A.   None of this Court's prior cases controls the outcome here ............... 2

    B.   The statutory language and canons of construction compel the conclusion that the Library is an "agency" when it is engaged in triennial rulemakings under the DMCA ............................................ 6

        1.   The words "the Congress" do not cover the Library when it is acting as a component of the executive branch ........... 6

        2.   The Library is plainly an "agency" under the Federal Register Act when engaged in triennial rulemakings under the DMCA and is thus also so under the APA ................. 12

        3.   The canon in favor of judicial review resolves any ambiguity in favor of appellants ............................................... 17

    C.   Alternatively, appellants are entitled to relief under *Larson* ............ 19

Conclusion.................................................................................... 24

i

# TABLE OF AUTHORITIES

## Cases

*Aid Association for Lutherans v. U.S. Postal Service*,
    321 F.3d 1166 (D.C. Cir. 2003) ............................................................ 24

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
    143 S. Ct. 1258 (2023) ............................................ 20, 22, 23

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991) ...................................................... 8

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ................................................................. 6

*Campbell v. Acuff-Rose Music*,
    510 U.S. 569 (1994) ............................................................... 20

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) .............................................................. 14

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984) ...................................... 1, 2, 3, 4, 5, 11, 19

*Cooper Industries v. Aviall Services*,
    543 U.S. 157 (2004) ................................................................. 4

*Doehla Greeting Cards v. Summerfield*,
    227 F.2d 44 (D.C. Cir. 1955) ..................................................... 22

*Ethnic Employees of Library of Congress v. Boorstin*,
    751 F.2d 1405 (D.C. Cir. 1985) .................................................... 5

*Federal Law Enforcement Officers Association v. Ahuja*,
    62 F.4th 551 (D.C. Cir. 2023) .................................................... 13

*Freytag v. Commissioner*,
    501 U.S. 868 (1991) ................................................................. 3

*Guerrero-Lasprilla v. Barr*,
    140 S. Ct. 1062 (2020) ........................................................... 18

*Intercollegiate Broadcasting System v. Copyright Royalty Board*,
    684 F.3d 1332 (D.C. Cir. 2012) ......................................... 1, 3, 6, 8, 10, 18

## Cases—continued

*Knapp Medical Center v. Hargan*,
  875 F.3d 1125 (D.C. Cir. 2017) .............................................................. 19

*Larson v. Domestic and Foreign Corp.*,
  337 U.S. 682 (1949) ................................................................ 19, 20, 24

*LaShawn A. v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996) ................................................................ 4

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ............................................................................ 24

*Live365 v. Copyright Royalty Board*,
  698 F. Supp. 2d 25 (D.D.C. 2010) ..................................................... 3, 13

*Make the Road New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .............................................................. 17

*McKinney v. White*,
  291 F.3d 851 (D.C. Cir. 2002) ........................................................ 10, 11

*Partington v. Houck*,
  723 F.3d 280 (D.C. Cir. 2013) ........................................................ 10, 11

*Pickus v. United States Board of Parole*,
  507 F.2d 1107 (D.C. Cir. 1974) ............................................................ 10

*Ryan v. Department of Justice*,
  617 F.2d 781 (D.C. Cir. 1980) .......................................................... 9, 10

*Soucie v. David*,
  448 F.2d 1067 (D.C. Cir. 1971) .............................................................. 9

*Triad Systems v. Southeastern Express*,
  64 F.3d 1330 (9th Cir. 1995) ................................................................ 21

*United States v. Eshetu*,
  898 F.3d 36 (D.C. Cir. 2018) .................................................................. 4

*Washington Legal Foundation v. U.S. Sentencing Commission*,
  17 F.3d 1446 (D.C. Cir. 1994) ................................................................ 5

**Constitutions, statutes and regulations**

U.S. Const.
    Art. I ....................................................................................... 6, 7
    Art. II, § 1, cl. 1 ...................................................................... 14
    Art. II, § 2, cl. 2 ........................................................................ 3

1 U.S.C. § 1.1 ............................................................................ 15

2 U.S.C. § 136 ........................................................................... 13

5 U.S.C.
    § 551(5) ................................................................................... 12
    § 553 ........................................................................... 12, 13, 14
    § 701(b)(1) ................................................. 1, 6, 7, 9, 10, 17

17 U.S.C.
    § 1201(a)(1)(B) ................................................................ 22, 23
    § 1201(a)(1)(C) ................................................................. 12, 13
    § 701(e) ............................................................... 11, 12, 13

39 U.S.C. § 410(a) ..................................................................... 8

44 U.S.C.
    § 1501 ....................................................... 5, 14, 15, 16
    § 1505 ..................................................................................... 14
    § 1505(a) ................................................................................. 16
    § 1505(b) ........................................................................... 14, 16
    § 1510(a) ........................................................................... 14, 16
    § 3613(b) ................................................................................. 16

1 C.F.R.
    § 5.2(c) ................................................................................... 16
    § 5.3 ................................................................................. 15, 16
    § 5.9 ....................................................................................... 14
    § 5.9(b) ................................................................................... 17
    § 5.9(c) ................................................................................... 17

## INTRODUCTION

The government does not dispute that the Library of Congress is "a freestanding [government] entity" with feet constitutionally in both the legislative and executive branches. *Intercollegiate Broadcasting System v. Copyright Royalty Board*, 684 F.3d 1332, 1341-1342 (D.C. Cir. 2012). Nor could it. As this Court recently held, the Library sometimes is a "congressional agency," such as when it collects and analyzes information through the Congressional Research Service; and other times is a "component of the Executive Branch," such as when it "promulgate[s] copyright regulations." *Id.*

The government takes the perplexing view that the Library is nonetheless categorically, in all circumstances, a part of "Congress" under 5 U.S.C. § 701(b)(1), even when it is exercising executive authority that may not constitutionally be *exercised* by Congress, using tools like the Federal Register that may not lawfully be *used* by Congress. It grounds that unusual position not on an analysis of any statutory text (how could it?), but instead almost entirely on fourteen unexplained words appearing in an almost 40-year-old decision, *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984).

*Clark* does not bear the weight the government puts upon it. That case implicated the Library's status as a congressional agency only; it did not even acknowledge the Library's sometimes status as a component of the executive, let alone purport to resolve whether the Library is a part of "Congress" within

1

the meaning of the APA even when engaged in executive rulemakings. And issues that are neither presented by the facts of a case nor expressly ruled on by the Court do not constitute binding precedents.

Rather than stretching a 14-word sentence fragment from a 40-year-old decision beyond its factual breaking point, the Court must turn instead to the statutory language and relevant canons of construction in the first instance. On that front, the text of the APA, DMCA, and Federal Register Act all point uniformly in the same direction: When the Library uses the APA's notice-and-comment rulemaking procedures to promulgate regulations that implement statutes, are codified in the C.F.R., and carry the force and effect of law, it is plainly functioning as an executive "agency" and not a part of "the Congress." Even if there were ambiguity on that score (there is none), it would be resolved for appellants by the canon favoring judicial review.

## ARGUMENT

### A.    None of this Court's prior cases controls the outcome here

**1.**  We begin with the crux of the government's argument (Br. 14-16), that *Clark* "already held" that the Library is a component of "Congress" *in all cases* and thus categorically exempt from judicial review under the APA.

The question whether the Library qualifies as "Congress" within the meaning of Section 701(b)(1) when it is engaged in the inherently executive role of promulgating a regulation using the APA's notice-and-comment procedures

2

was not posed in or resolved by *Clark*. As we noted in the opening brief (at 38-40), *Clark* involved a Title VII employment discrimination claim and implicated the Library's role as a congressional agency. *See Live365 v. Copyright Royalty Board*, 698 F. Supp. 2d 25, 43 (D.D.C. 2010) (the Library "operates independently from the Executive Branch in conducting its daily operations"). *Clark* was therefore presented with the question whether the Library's actions are subject to judicial review under the APA when it acts as a component of the legislative branch, and not the executive branch.

In the time since *Clark* was decided, moreover, the Court has expressly confirmed that the Library is a "freestanding entity" that acts in some capacities as a "congressional agency" and in others as a "component of the Executive Branch." *Intercollegiate*, 684 F.3d at 1341-1342. More than that, *Intercollegiate* held that the Librarian is a "Head of Department" within the meaning of the Appointments Clause. *Id.* at 1342. The Supreme Court "for more than a century has held that the term 'Department'" in the Appointments Clause "refers only to a part or division of the executive government," meaning a part or division of the "executive branch." *Freytag v. Commissioner*, 501 U.S. 868, 886 (1991) (cleaned up).

*Clark* thus does not answer the distinct question of whether the Library counts as an "agency" within the meaning of Section 701(b)(1) when it is engaged in executive rulemakings. That is especially so because *Clark*'s holding

3

on this score was wholly unreasoned; the Court did not offer any analysis even hinting at consideration of facts beyond the specific confines of that case. *See* 750 F.2d at 102. It is implausible to say that a single, conclusory sentence fragment addressing an analytically distinct factual context reflects a considered decision of the Court on the question posed in this appeal.

For its part, the government does not dispute the general proposition that *Clark* must be read with a careful eye to its context and not beyond the scope of its facts. Nor does it disagree that *Clark* addressed the reviewability of the Library's actions in its legislative role, not its executive role. That forecloses the government's reliance on *Clark*. Because the issue presented for resolution in this appeal was "neither brought to the attention of the court nor ruled upon" by it in *Clark*, the Court's opinion cannot "be considered as having been so decided as to constitute [a] precedent[]" on that point. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 n.7 (D.C. Cir. 1996) (en banc); *accord Cooper Industries v. Aviall Services*, 543 U.S. 157, 170 (2004) (same).[1]

---

[1]  For this reason, the Court need not entertain the question whether *Clark* should be overruled. But if the panel rejects that view and concludes that *Clark* controls, we reserve the right to ask the *en banc* Court to overrule *Clark* as applied. *Cf. United States v. Eshetu*, 898 F.3d 36, 37 (D.C. Cir. 2018) (recognizing that "one panel cannot overrule another" and that "'[t]hat power may be exercised only by the full court'" or the Supreme Court) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc)).

**2.**  The government finds no better support from *Washington Legal Foundation v. U.S. Sentencing Commission*, 17 F.3d 1446 (D.C. Cir. 1994), or *Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405 (D.C. Cir. 1985). *See* Br. 15-16.

For starters, *Washington Legal Foundation* concerned the status of the U.S. Sentencing Commission under the APA, not the Library, so anything it said about the Library was necessarily dictum. Setting that aside, *Washington Legal Foundation*'s reasoning suggests that the word "Congress" in the APA must be given the same meaning as the words "legislative . . . branch[]" in the Federal Register Act. *See* 17 F.3d at 1449. And that helps us, and not the government—as we showed in the opening brief (at 26-28) and defend further at pages 14-16, *infra*, when the Library uses the Federal Register and Code of Federal Regulations, it necessarily acts as an agency and not a component of the "legislative . . . branch[]" within the meaning of the Federal Register Act (44 U.S.C. § 1501)—and it acts in the same capacity within the meaning of the APA. *See Washington Legal Foundation*, 17 F.3d at 1449.

As for *Ethnic Employees*, that case (like *Clark*) concerned an employment discrimination claim and did not implicate the Library's executive rulemaking powers. *Ethnic Employees* thus appropriately relied on *Clark* by applying it to analytically similar facts. We made this point in the opening brief (at 39 n.2), but the government offers no response.

**B.**    **The statutory language and canons of construction compel the conclusion that the Library is an "agency" when it is engaged in triennial rulemakings under the DMCA**

Because the Court has not previously resolved the question posed in this appeal, it must look to the statutory text and canons of construction in the first instance. Together, they point inexorably toward reversal.

**1.    *The words "the Congress" do not cover the Library when it is acting as a component of the executive branch***

**a.**    The question here is whether the Library of Congress—a "freestanding entity" that is not situated wholly within either the executive or legislative branch (*Intercollegiate*, 684 F.3d at 1341)—is an "agency" or instead a component of "Congress" within the meaning of 5 U.S.C. § 701(b)(1) when it acts in its purely executive-branch capacity using notice-and-comment rule-making. The answer is a not close call—it is an "agency."

To conclude otherwise would mean that, when the drafters of the APA said "Congress" in Section 701(b)(1), they meant something other than the legislative branch established by Article I of the Constitution. That is the only way to read the word "Congress" to cover a government entity exercising the purely executive power to implement a statute, as the Library does when it engages in notice-and-comment rulemaking under the DMCA. After all, the Constitution's tripartite structure "does not permit Congress to execute the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986).

The government does not dispute that, under its proposed approach, the word "Congress" would refer anomalously to something other than the legislative branch established by Article I of the Constitution. It instead offers a red herring—it argues (Br. 25) that "[n]othing in the APA's definition of an agency has any bearing on the constitutional status of the described entities." It says also (Br. 26) that the Constitution does not "limit[] the exercise of executive power only to those entities defined as an agency by the APA."

That gets matters backwards in both respects. Our point is not that the APA's text dictates the constitutional status of a government entity, but that the constitutional status of a government entity dictates proper interpretation of the APA's text. In other words, when the drafters of the APA exempted element of "Congress" from the act's strictures, they clearly meant "Congress" in the constitutional sense. What other sense is there? The point is thus a simple one: If an entity is not a component of the Congress in the constitutional sense, it is not a component of the Congress in the APA sense, either.

None of this is to say that Congress could not have exempted the Library's executive rulemakings from APA review if it had wished to do so. We thus agree with the government (Br. 27) that "there is no constitutional difficulty with concluding that the APA exempts the Librarian's triennial rulemaking from judicial review." Among other options, the APA's drafters could have expressly included the Library among the list of exempted entities under Section 701(b)(1)

7

itself. Or it could have specified elsewhere in the U.S. Code that "the provisions of chapters 5 and 7 of title 5 shall not apply to the exercise of the powers of the Library of Congress," as it did with respect to the Postal Service. *See* 39 U.S.C. § 410(a). Our point is only that the drafters did not clearly exempt the Library's executive rulemakings from APA review by carving out "Congress" without more, because when the Library is engaged in executive rulemakings, it is not a part of that body.

**b.** The government asserts (Br. 20-24) that an entity must be an agency under the APA either *always* or *never*. In the government's view, an entity's status can never vary depending on context. That is wrong.

As a starting point, the government again is unable to cite any statutory text to support its position. Nor could it. As we demonstrated in the opening brief (at 22-23), nothing in the APA's language forecloses treating the Library as an agency when it is a component of the executive branch and not as an agency when it is a component of Congress. And unlike the government's all-or-nothing approach, doing so comports with the Library's chimerical character and this Court's instruction to "avoid a formalistic definition of 'agency' that might exclude authority within the executive branch that should appropriately be subject to the requirements of the APA." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). And as the Court held in *Intercollegiate*, the Library *is* undoubtedly within the executive branch when promulgating regulations.

8

In support of its contrary view, the government again relies exclusively on snippets of this Court's opinions taken from cases involving manifestly different facts. The government first cites (Br. 21) *Ryan v. Department of Justice*, 617 F.2d 781 (D.C. Cir. 1980). The question there concerned proper application of this Court's decision in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), which had implied that "staff to the President," whose function is exclusively to advise the President and not to promulgate regulations, cannot constitute an "agency" within the meaning of the APA or FOIA. *Id.* at 1073. The Court in *Ryan* held only that the Department of Justice does not, under *Soucie*, periodically become a "non-agency" when "performing [the] function of advising the President." 617 F.2d at 788.

That holding has no bearing here. The APA's text makes no distinction between executive-branch entities that give advice and those that promulgate regulations, so the Court's refusal to treat singular executive entities differently under the APA "on a case-by-case basis" based on that supposed distinction makes good sense. *Ryan*, 617 F.2d at 789.

In contrast, the APA *does* draw a distinction between entities within "the Congress" and entities within the other branches of government. 5 U.S.C. § 701(b)(1). And the Library is unique among such entities in that it acts as a component of one of two different branches, depending on context. It is thus entirely consistent with the text of the APA and the Library's special hybrid

9

nature to treat it as an executive "agency" in some circumstances (when it is engaged in its executive rulemaking role) but not others (when it is engaged in its congressional agency role). *Ryan* does not hold to the contrary.

As for *Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974)—discussed on page 22 of the government's brief—the Court there held that an entity (the Parole Board) that is categorically an "agenc[y] of the Executive Branch" is not exempted from the APA simply because it performs functions that resemble in some respects those performed by an entity (the Probation Service) that is "an auxiliary of the courts." *Id.* at 1112.

That, too, is irrelevant here. The Library is not categorically a component of the Congress that occasionally performs acts that resemble executive functions. Rather, it is a "freestanding entity" helmed by an executive Head of Department that "is undoubtedly a 'component of the Executive Branch'" when it implements statutes with notice-and-comment rulemaking. *Intercollegiate*, 684 F.3d at 1342. Certainly, nothing in *Pickus* suggests the Library must always be classed as "the Congress" under Section 701(b)(1), even when it is engaged in purely executive rulemaking. The out-of-circuit cases cited on page 23 of the government's brief each resolved the same basic question as *Pickus*. None sheds any light on how to treat a hybrid agency like the Library.

Finally, the government falsely asserts (Br. 23) that *Partington v. Houck*, 723 F.3d 280 (D.C. Cir. 2013), and *McKinney v. White*, 291 F.3d 851 (D.C. Cir.

10

2002), "expressly declined to hold that an entity might be an agency for purposes of the APA in some circumstances but not others." In fact, *Partington* held only that "Congress's decision to establish a separate judicial system for courts-martial . . . , together with the [express] exclusion of courts martial from the APA's definition of 'agency,' precluded APA review of the Judge Advocate General's decision." 723 F.3d at 290. The Court said substantively the same in *McKinney*. *See* 291 F.3d at 855-56. Neither opinion devoted a single word to the question whether a government entity "might be an agency for purposes of the APA in some circumstances but not others." U.S. Br. 23. The government errs to say otherwise.

**c.**  Finally, the government parrots the district court (JA52-53) when it asserts (Br. 18-19) that "[i]f the Library of Congress were already an agency," Congress's decision to make the Copyright Office subject to the APA under 17 U.S.C. § 701(e), "would be superfluous." But that simply is not so. After *Intercollegiate*, it is clear that the Library is an executive agency only sometimes. Under *Clark*, it is not subject to the APA when it acts as a component of Congress. Under Section 701(e), in contrast, the Copyright Office is always, in all circumstances, subject to the APA, including (for example) with respect to the kind of personnel decisions at issue in *Clark*. Section 701(e) thus has independent operation and is not superfluous. We made this basic point in the opening brief (at 29-30), but the government does not respond to our reasoning.

11

### 2. The Library is plainly an "agency" under the Federal Register Act when engaged in triennial rulemakings under the DMCA and is thus also so under the APA

All we have said so far is sufficient to hold that the Library is an "agency" subject to the APA when it promulgates DMCA exemptions using notice-and-comment rulemaking. That conclusion is supported beyond all reasonable debate by the Library's utilization of the Federal Register and C.F.R.

**a.** As a threshold matter, it is clear evidence of the APA's application that the DMCA directs the Library to undertake a "rulemaking" (17 U.S.C. § 1201(a)(1)(C)); that the APA defines what is a "rule making" (5 U.S.C. § 551(5)) and directs how rulemakings are to proceed (*id.* § 553); and that the Library in practice follows the APA's specifications for rulemaking when promulgating DMCA exemptions. Indeed, in each rulemaking since the DMCA was enacted in 1998, the Library has promulgated the Section 1201(a)(1)(C) exemptions in general conformity with Section 553's notice-and-comment requirements. The government is thus wrong to say (Br. 17) that the Library "does not behave as" "an agency for APA purposes." With respect to the promulgation of DMCA exemptions, that is exactly what it does.

It is no answer to say (Br. 19-20) that, under 17 U.S.C. § 701(e), "Section 553 applies to the Copyright Office's development of a recommendation" and not to the Library's adoption of the final exemptions. First, the APA's notice-and-comment rulemaking standards do not apply to non-binding statements like

the Register's recommendation, so Section 701(e) is beside the point in this context. *See, e.g.*, *Federal Law Enforcement Officers Association v. Ahuja*, 62 F.4th 551, 557 (D.C. Cir. 2023) ("the APA does not require agencies to promulgate [non-binding] rules by notice and comment"). Second, it is the Librarian, not the Register, who is tasked by Congress with "mak[ing] the determination in a rulemaking proceeding" whether an exemption should issue. 17 U.S.C. § 1201(a)(1)(C). It is therefore the Librarian who signs each document published in the Federal Register and complies with Section 553, both during and following finalization of the Register's recommendation.

The government notes (Br. 17) that "[t]he Library does not adhere to the procedural requirements of Section 553 of the APA" when it "make[s] rules and regulations for the government of the Library" under 2 U.S.C. § 136. But that proves *our* point, not the government's. The Library's adoption of Section 136 rules does not implicate its executive powers; such rules relate to its "daily operations," which are matters "independent[ of] the Executive Branch." *Live365*, 698 F. Supp. 2d at 43. When it comes to adopting rules for the government of the Library, therefore, the Library behaves as a congressional agency and thus does not utilize the APA's notice-and-comment procedures.

DMCA exemptions adopted under Section 1201(a)(1)(C), in contrast, interpret and implement an act of Congress, settling the rights of regulated parties with the force and effect of law. That is necessarily and purely an

13

"exercise of the 'executive Power'" within the meaning of Art. II, § 1, cl. 1. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (cleaned up). And that is why the Library complies with Section 553 in adopting DMCA exemptions—in that role, it is an executive-branch agency.

**b.** In following the APA's Section 553 procedures, the Library uses the Federal Register and publishes its DMCA exemptions in the C.F.R. That forecloses any contention that Library is not an "agency" when engaged in DMCA rulemaking.

As we explained (Opening Br. 26-27), only a "document" may be published in the Federal Register or C.F.R., and a "document" is something that may be issued only by the President or an executive "agency." 44 U.S.C. §§ 1501, 1505, 1510(a). There is no debating this point; the applicable regulations state that any instrument "suggest[ing] changes to regulations in the Code of Federal Regulations" or that has "general applicability and legal effect" and is "subject to codification" in the C.F.R., is by default an agency "document" that must be published. 1 C.F.R. § 5.9. Thus, with respect to DMCA rulemakings, the Library is plainly an "agency" under the Federal Register Act.

The government attempts to refute this conclusion for the first time on appeal. It asserts (Br. 18) that when the Library uses the Federal Register to promulgate regulations that implement statutes, it does so pursuant to 44 U.S.C. § 1505(b), which calls for publication of "documents authorized to be

14

published by regulations." The government in turn points to 1 C.F.R. § 5.3, which authorizes the publication of a "document" if the Director of the Federal Register determines it "would be in the public interest." And it emphasizes the qualifier at the top of Section 1501, which states that the act's express definitions apply "unless context otherwise requires."

That is irrelevant, incomplete, and incorrect.

It is *irrelevant* because Section 1505(b) and 1 C.F.R. § 5.3 still each permits the publication only of a "document," which (again) only the President or an agency may issue. *See* 44 U.S.C. § 1501; 1 U.S.C. § 1.1. So even if the government's position were correct, it would not indicate that the Library is anything other than an "agency" within the meaning of the act.

The phrase "unless context otherwise requires" appearing at the top of Section 1501 does not suggest differently. That qualifier means only that each word in Section 1501 bears its express definition throughout Title 44 of the U.S. Code unless context clearly indicates that the word bears a meaning other than the express definition. For example, if context suggests that the word "document" is being used as a verb, then it should not be given the express definition given by Section 1501, which treats the word as a noun. *E.g.*, 44 U.S.C. § 3613(b) ("the head of the agency shall document . . . the reasons for [its] determination"). But whenever the word "document" appears in a context suggesting reference to an order, rule, notice, or "similar instrument" (44

U.S.C. § 1501), it must be given its express definition. To credit the government's contrary view (Br. 18) would be to read the "context" qualifier as an invitation to ignore Section 1501's express definitions whenever they are inconvenient to the government's interests. That is not a credible interpretation of Congress's intent.

The government's argument is ***incomplete*** because Section 1505(b) and 1 C.F.R. § 5.3 concern only the Federal Register and have no bearing on the Library's use of the Code of Federal Regulations. Use of the C.F.R. is reserved strictly for "codifications of the documents of each agency of the Government having general applicability and legal effect, issued or promulgated by the agency by publication in the Federal Register." 44 U.S.C. § 1510(a). That makes the Library an "agency" in this context under the Federal Register Act by any understanding.

And the government's argument is, in any event, ***incorrect*** because the documents relating to the Library's triennial DMCA rulemaking are not published in the Federal Register pursuant to 44 U.S.C. § 1505(b) and 1 C.F.R. § 5.3, but instead explicitly pursuant to 44 U.S.C. § 1505(a) and 1 C.F.R. § 5.2(c). Those provisions mandate publication in the Federal Register of "document[s] having general applicability and legal effect." Such documents are specifically defined to include all of those relating to proposed and final rules and regulations that are to be codified in the Code of Federal Regulations.

16

*See* 1 C.F.R. § 5.9(b), (c). That describes DMCA exemptions.

At bottom, there is no escaping the conclusion that, pursuant to the relevant language of the Federal Register Act, only an executive "agency" may conduct a rulemaking using the Federal Register, and only an executive "agency" may codify a final rule in the Code of Federal Regulations. That makes the Library an "agency" when it is engaged in triennial rulemakings, because it uses both of those rulemaking tools. And the government now agrees (Br. 17) that if the Library is an agency for purposes of the Federal Register Act, it is an agency for purposes of the APA as well.

### 3. *The canon in favor of judicial review resolves any ambiguity in favor of appellants*

The government does not dispute that the word "Congress" in 5 U.S.C. § 701(b)(1) "expressly prohibits judicial review" and therefore "must be read narrowly," or conversely that the word "agency" must be read broadly. *Make the Road New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020). It accordingly does not dispute that, for it to prevail in this appeal, it must do more than show that its reading of the relevant language is permissible—it must show that its reading is the *only* plausible approach and that the relevant language "is not 'reasonably susceptible' to [the] different interpretation" that we put forward in the opening brief. U.S. Br. 29 (quoting *Make the Road*, 962 F.3d at 624). The government has failed to make the required showing.

17

Reduced to its essence, our position is that when the APA's drafters used the word "Congress," they meant to include the Library when, under the circumstances, it is a component of that body; but not when, under the circumstances, it is a component of the executive branch. That approach, grounded in the holding of *Intercollegiate*, it at least a plausible (indeed, the only plausible) reading of the text.

Our position is further that, when the APA's drafters used the word "agency" in the APA, they meant it to have the same meaning as the word "agency" under the Federal Register Act; and that the Library is an "agency" within the meaning of the Federal Register Act when it engages in its triennial DMCA rulemakings using the Federal Register and C.F.R. That, too, is not just a plausible approach to the text, but the only possible one.

The government thus misses the point when it asserts (Br. 27) that "Congress may" by statute "treat [the Library] as part of the Congress" if it wishes to. Again, we do not dispute that general proposition. But when the upshot of doing so is to foreclose judicial review, Congress must use clear and explicit language to accomplish that goal. *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020); *Knapp Medical Center v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). Such language is absent here. The Library is a freestanding and hybrid entity that is a part of Congress only in *some* circumstances. The word "Congress" thus does not clearly and explicitly encompass the Library in

*all* circumstances. It does not do so, in particular, when it is a component of the executive branch. A reversal is thus required for the Court to address the merits of appellants' APA claims.

### C. Alternatively, appellants are entitled to relief under *Larson*

If *Clark* is notable for any reason, it is that the Court in that case moved so quickly past the Library-as-agency question because it had no difficulty concluding in the very next sentence that the Library's actions were subject to review instead under the *Larson* doctrine, which provides for review of "actions of [government] officials [that] are alleged to be unconstitutional or beyond statutory authority." *See* 750 F.2d at 102 (citing *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682 (1949), among other cases). If the Court concludes that the APA does not provide judicial review of the Library's executive rulemakings despite all we have said, it should follow *Clark*'s lead and reverse with instructions to grant relief under *Larson* instead.

**1.** The government brushes (Br. 29) this argument aside as a "Hail Mary pass" that cannot succeed in light of the "extremely limited scope" of *Larson* review under contemporary cases decided after *Clark*. Its position (Br. 30-31) is that, because the fair-use analysis is "highly fact-specific," and because the Register "analyzed each of the [fair-use] factors based on the relevant case law and facts presented in the record," the *Larson* claim here is nothing more than a

19

case-specific disagreement concerning "the outcome of a fair use analysis," which is not sufficiently extreme to support relief under *Larson*.

That fundamentally mischaracterizes the claim. We do not disagree with the government (Br. 32) that some purely commercial uses of copyrighted code are fair use. But to justify a purely commercial use of copyrighted material, the copier *must* put the material to a *transformative* use—that is, a use that either serves a new and "distinct purpose" from the original or else "alters the first work with new expression, meaning, or message," either way imbuing the original with some "different character." *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 143 S. Ct. 1258, 1276, 1282 (2023) (cleaned up) (quoting *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994)).

The Librarian concluded (JA154) that the proposed uses here were "likely transformative" without a single word of reasoning, other than to say that "[t]he Register has previously concluded that diagnosis and repair are likely to be transformative uses."[2] But as we explained in the opening brief (at 46-48), the Library does not discharge its statutory duty by mindlessly referring to past decisions made under different circumstances. That is especially clear in this case, because the independent service operators seeking the Exemption *expressly disclaimed* making transformative uses of the copied code, in order

---

[2]    In the opening brief, at page 46, we mistakenly cited JA156 for this proposition. The correct citation is JA154.

that they may avoid federal regulation by the FDA.

The government does not dispute this point on appeal. It instead supplies its own post hoc reasoning in an effort to salvage the Librarian's decision. To that end, it asserts (Br. 32) that "the Register properly concluded that using the copyrighted materials . . . was likely transformative" because "[t]he purpose of the software itself is to operate advanced medical equipment, while the purpose of the uses permitted by the exemption is to restore such equipment's functionality." But that is flat wrong. The copyrighted code at issue here includes not just general operating code, but maintenance and diagnostic code and related written materials. *See, e.g.*, JA156. In other words, the use of the copyrighted material *is diagnosis, maintenance, and repair of the equipment*; and the commercial use proposed by the copiers *is diagnosis, maintenance, and repair of the equipment*—they are precisely the same.

As the Ninth Circuit held in a case identical to this one, the copiers of appellants' members' code thus "simply commandeer" the "software and us[e] it for the very purpose for which, and in precisely the manner in which, it was designed to be used." *Triad Systems v. Southeastern Express*, 64 F.3d 1330, 1337 (9th Cir. 1995) (holding that copying by ISOs to service computers is not fair use). "A use that shares the purpose of a copyrighted work" like this will merely "provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which

21

undermines the goal of copyright." *Andy Warhol Foundation*, 143 S. Ct. at 1276 (cleaned up). We made this point on page 46 of the opening brief, but the government, like the Librarian, talks past it.

Thus, this is no routine disagreement over the weighing of elements in a multi-factor balancing test; it is not a mere "claim of error in the exercise of [an official's statutory] power" (*Doehla Greeting Cards v. Summerfield*, 227 F.2d 44, 46 (D.C. Cir. 1955)). It is, instead, a claim of an official entirely abdicating her duty to weigh the facts actually before her.

**2.** The Librarian's departure from her delegated powers is made all the more evident by the reasoning that she *actually* supplied to support her decision: The Exemption was warranted, she explained (JA173), because "OEMs charge higher prices" than ISOs "to service their equipment," creating "competitive concerns recently highlighted by the Executive Branch."

The government defends this reasoning only by noting (Br. 33) that the Librarian's fair-use finding was "separate from and a precondition to" her consideration of these "competitive concerns," which bore only on whether the non-infringing uses would likely be "adversely affected" by the DMCA's anti-circumvention rule under 17 U.S.C. § 1201(a)(1)(B). But that misses the point, which is that, regardless of the statutory inquiry with respect to which the Librarian raised these "competitive concerns," they unambiguously give the lie to her fair-use analysis.

As the Supreme Court explained earlier this year, to "provide the public with a substantial substitute" for a copyright owner's work in order to lower market prices is rather obviously to "undermine[] the goal of copyright," which is to preserve "the incentive to create." *Andy Warhol Foundation*, 143 S. Ct. at 1276 (quotation marks omitted). Thus, "the claim to fairness in borrowing from another's work" vanishes when the only real justification is to encourage competition at lower prices. *Id.* And yet, this is precisely the rationale that the Librarian gave—in her view (really, the view of the President, whose directive she was following), OEMs charge too much, and cancelling their exclusive rights to the necessary code would "help to address the broader competitive concerns." *See* JA173.

This sort of anti-copyright reasoning is manifestly beyond that Librarian's statutory authority under the DMCA. Section 1201(a)(1) authorizes her to adopt exemptions for "*non*infringing uses" that may be "adversely affected by virtue of" the DMCA's ban on circumvention of technological protective measures. 17 U.S.C. § 1201(a)(1)(B). It does not authorize her to adopt exemptions for *infringing* uses when separate executive-branch policy objectives would be served by cancelling exclusive rights to original works. Here again, the Librarian did not merely misapply settled legal rules in debatable ways; she arrogated to herself policymaking authority "in excess of [her] delegated powers and contrary to" the DMCA's express limits. *Aid Association for*

23

*Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quoting

*Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). That is clearcut grounds for relief

under the *Larson* doctrine.

## CONCLUSION

The Court should reverse the district court's dismissal and remand with

instructions either to resolve MITA and AdvaMed's APA claims on their merits,

or otherwise to enter judgment for MITA and AdvaMed under *Larson*.

August 4, 2023

Respectfully submitted,

/s/ *Michael B. Kimberly*

Peter Tolsdorf
   *National Electrical*
     *Manufacturers Association*
   *1300 17th Street North, No. 900*
   *Arlington, VA 22209*
   *(703) 841-3200*

*Counsel for Medical Imaging &*
*Technology Alliance*

Terry Chang
   *Advanced Medical*
     *Technology Association*
   *1301 Pennsylvania Ave. NW*
   *Suite 400*
   *Washington, DC 20004*
   *(202) 783-8700*

*Counsel for Advanced Medical*
*Technology Association*

Michael B. Kimberly
Emmett Witkovsky-Eldred
   *McDermott Will & Emery LLP*
   *500 N. Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Counsel for all appellants*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel for appellants certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 5,800 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in Century Supra font in 14 points.

August 4, 2023                    /s/ *Michael B. Kimberly*


## CERTIFICATE OF SERVICE

Undersigned counsel for appellants certifies that that on August 4, 2023, the foregoing document was served electronically via the Court's CM/ECF system upon all counsel of record.

August 4, 2023                    /s/ *Michael B. Kimberly*